UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal Action No. 10-223 (RBW) |
| | ) | |
| | ) | |
| WILLIAM R. CLEMENS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

William R. Clemens, the defendant in this criminal case, has been indicted on various criminal charges related to testimony that he provided to the House Committee on Oversight and Government Reform in February of 2008. See Indictment ("Indict.") at 12-19.[1] On or about February 10, 2011, the defendant served DLA Piper US LLP ("DLA Piper") with a subpoena duces tecum pursuant to Federal Rule of Criminal Procedure 17(c), Memorandum in Support of Non-Party DLA Piper's Motion to Quash Subpoena ("DLA Piper's Mem.") at 1, seeking, inter alia, "all interview summaries, notes, and memoranda" pertaining to Jose Canseco, Brian McNamee, and Kirk Radomski that are "related to the 'Report to the Commissioner of Baseball of an Independent Investigation into the Illegal Use of Steroids and Other Performance Enhancing Substances by Players in Major League Baseball," id., Ex. 3 (Subpoena Duces Tecum to DLA Piper US LLP) at 3. DLA Piper then moved to quash the subpoena, arguing that "the handwritten or typed notes taken during interviews" conducted by DLA Piper of these three

---

[1] The defendant was originally indicted in this case on August 19, 2010. A superseding indictment, which like the original indictment is also titled "Indictment," was filed with the Court on May 10, 2011. Unless otherwise noted, the Court is referring to the superseding indictment in its use of the term "Indictment" or any short form thereof.

individuals, as well as the "memoranda prepared after [the] interviews summarizing the substance of the[se] interviews . . . . constitute classic attorney work product." DLA Piper's Mem. at 2. After careful consideration of DLA Piper's motion to quash, the defendant's memorandum in opposition to DLA Piper's motion, DLA Piper's brief in reply to the defendant's opposition memorandum, DLA Piper's work product, the defendant's ex parte submission regarding the DLA Piper documents, and the representations made to the Court during the ex parte hearing with the DLA Piper attorneys who participated in the interviews, the Court concludes for the following reasons that the motion to quash must be granted in part and denied in part, based on the finding that the defendant is entitled to excerpts from DLA Piper's interview notes and memoranda.

## I. Background

The defendant is a former Major League Baseball ("MLB") player who played for four different teams over a span of twenty-four years. See Indict. at 2. "In or about March 2005," the United States House of Representatives—specifically, the House Committee on Oversight and Government Reform (the "Committee")—conducted an investigation into "the use of [performance-enhancing drugs] in professional baseball." Id. at 7. "[T]he Commissioner of MLB, partially in response to concerns raised by the Committee during its 2005 [investigation], engaged former . . . United States Senator . . . George J. Mitchell . . . to conduct a comprehensive investigation of [performance-enhancing drug] use in MLB. Id. at 8. Senator Mitchell, who at the time of the engagement was a partner at DLA Piper, retained his law firm to represent him during the investigation. See June 8, 2011 Hearing Transcript ("6/8/11 Hr'g Tr.") at 5:20-21

("Senator Mitchell . . . retained [DLA Piper] to represent him.");[2] id. at 5:23-6:2 ("[T]he way the contracts were set up is that baseball retained him to do an investigation, [and] he then retained [DLA Piper] to act as his legal counsel . . . ."). "On or about December 13, 2007, Senator Mitchell issued a 409-page report," commonly referred to as the "Mitchell Report," which "contained multiple allegations of [performance-enhancing] drug use in MLB over the years preceding its release." Indict. at 8. Among the allegations contained in the Mitchell Report were claims that the defendant "used anabolic steroids on multiple occasions in 1998, 2000, and 2001," as well as human-growth hormone ("HGH") "on multiple occasions in 2000." Id. In response to the allegations made in the Mitchell Report, the defendant appeared before the Committee for a deposition "on or about February 5, 2008," and a hearing "on or about February 13, 2008," during which he denied using performance-enhancing drugs. Id. at 10-11. According to the government, the defendant made statements before the Committee that he "knew to be false and misleading," and it is these statements that are the subject of the criminal charges currently pending against him. See generally id. at 12-19.

As noted above, the defendant served DLA Piper with a subpoena duces tecum, in which it demanded production of, inter alia, various interview notes and memoranda pertaining to Jose Canseco, Kirk Radomski, and Brian McNamee. See DLA Piper's Mem., Ex. 3 (Subpoena Duces Tecum to DLA Piper US LLP) at 3. DLA Piper moved to quash the subpoena on March 18, 2011. See DLA Piper's Mem. at 1. On April 21, 2011, the Court conducted a hearing on the merits of DLA Piper's motion to quash the subpoena, and after considering the arguments raised by the parties at the hearing and in their written submissions, the Court concluded that the notes

---

[2] The Court relied on a draft version of the June 8, 2011 hearing transcript in drafting this memorandum opinion. After review of the draft transcript, the Court is confident that the transcription substantially reflects the representations made by DLA Piper at the June 8, 2011 hearing. The Court nonetheless will review the final version of the transcript upon its release and amend this memorandum opinion, if necessary.

and memoranda at issue were prepared in anticipation of litigation, and thus they were entitled to protection as attorney work product. April 21, 2011 Hearing Transcript ("4/21/11 Hr'g Tr.") at 83:8-11. Furthermore, the Court concluded that due to the government's involvement with the interviews of Mr. Radomski and Mr. McNamee (but not Mr. Canseco),[3] the defendant may be entitled to some portions of DLA Piper's work product.[4] See id. at 85:5-10 (noting that the work product with regard to Mr. Canseco is in a different posture from the materials regarding Mr. Radomski and Mr. McNamee); id. at 89:9-14 (ruling that "substantially verbatim" statements made by either Mr. Radomski or Mr. McNamee "should . . . be made available to" the defendant). The Court reserved its ruling on this issue, however, and instead directed DLA Piper to produce for its in camera inspection "all documents responsive to the subpoena duces tecum that involved an interview by DLA Piper of either [Mr.] McNamee or [Mr.] Radomski while in the presence of government attorneys or investigators." April 27, 2011 Order at 1-2, United States v. Clemens, Criminal Action No. 10-223 (RBW) (D.D.C.).[5] The Court later explained in its April 27, 2011 Order that

> [t]he first step in the Court's review will be to determine whether the documents at issue constitute "opinion work product" or "fact work product."[6] If the Court determines that the documents fall within the category of "opinion work product,"

---

[3] The nature of the government's involvement in these interviews is discussed later in this memorandum opinion. See infra p. 6-8.

[4] During the April 21, 2011 hearing, the Court stated that if DLA Piper's work product contained "substantially verbatim" statements by Mr. Radomski or Mr. McNamee, then the Court would find "that there was a waiver." Id. at 87:18-20. The Court, however, did not intend to use the term "waiver" in the legal sense, such as where a party loses protection over its work product by disclosing its materials in a manner that "is inconsistent with the maintenance of secrecy from the disclosing party's adversary." United States v. Thompson, 562 F.3d 387, 394 (D.C. Cir. 2009). Rather, the Court meant to convey its decision to provide the defendant with access to DLA Piper's work product if the statements contained in the work product could be reasonably attributed to the witnesses.

[5] The oral rulings issued by the Court at the conclusion of the April 21, 2011 motions hearing were memorialized in the Court's April 27, 2011 Order.

[6] The Court provides a further explanation of the "fact" and "opinion" work product distinction below. See infra p. 11-27.

4

then the Court will not order DLA Piper to produce these documents to the defendant. On the other hand, if the Court concludes that the documents, or portions thereof, constitute "fact work product" because they contain substantially verbatim statements of Mr. McNamee or Mr. Radomski, then the Court will assess whether (1) the statements are inconsistent with the statements made by these potential witnesses in interviews conducted by the government prior to their interviews with DLA Piper, or (2) Mr. McNamee's statements are consistent with the defendant's theory that Mr. McNamee has progressively embellished the facts that form the basis of the offenses charged in the Indictment. If the Court concludes that the documents do fall within either of these two categories, then the Court will order DLA Piper to produce those documents to the defendant immediately.

Id. at 2 n.2 (footnote added). In accordance with the Court's Order, DLA Piper then provided the Court with nine interview memoranda—five pertaining to Mr. Radomski, and the other four regarding Mr. McNamee. Where they existed, any notes related to the aforementioned interview memoranda were also provided to the Court by DLA Piper.

After conducting an in camera review of DLA Piper's work product, "the Court conclud[ed] that there [was] insufficient information in the record that [would] enable the Court to reach an informed decision as to whether these materials," or portions thereof, constitute "fact" or "opinion" work product. May 16, 2011 Order at 2-3, United States v. Clemens, Criminal Action No. 10-223 (RBW) (D.D.C.). And, because the Court could not determine the level of protection to which DLA Piper's work product was entitled, the Court found that it needed to "conduct a hearing to resolve the matter." Id. at 3 (quoting Saunders v. United States, 316 F.2d 346, 350 (D.C. Cir. 1963)). Consequently, the Court ordered "all current DLA Piper attorneys that were present during these interviews and who played some role in creating the documents at issue" to appear for an ex parte hearing on June 8, 2011, for the purpose of allowing the Court to make the necessary inquiries to resolve DLA Piper's motion to quash the subpoena. Id. at 2-3.

The Court held the hearing as scheduled, during which DLA Piper attorneys David Clarke, Charles Scheeler, John Clarke, and Ellen Ginsberg were present.[7] David Clarke first explained that the purpose underlying DLA Piper's investigation into the use of performance-enhancing drugs in Major League Baseball was "[t]o provide [baseball's C]ommissioner with an informed basis for taking any action that [he] needed to take with regard to [the] matter," 6/8/11 Hr'g Tr. at 6:10-12, including, inter alia, responding to "additional Congressional inquiries" and "taking punitive actions against players or teams," id. at 6:13-15. To provide the Commissioner with "a firm factual foundation . . . to respond to the various potential litigation" on the horizon, id. at 8:17-19, DLA Piper conducted "interviews of individuals who had information pertinent to the investigation," id. at 8:14-15. After the completion of an interview, DLA Piper attorneys memorialized the interview in a "memorandum[,] precisely so [that] there would be a record of . . . [the] factual foundation" for any response or action taken by the Commissioner. Id. at 8:21-23.

Mr. Scheeler then explained to the Court the interview protocols employed by DLA Piper with respect to Kirk Radomski and Brian McNamee. He advised the Court that in the spring of 2006, DLA Piper was contacted by Matt Parella, an Assistant United States Attorney in the Northern District of California, regarding an unidentified individual (who later turned out to be Mr. Radomski) who he wanted to make available to DLA Piper for its investigation. Id. at 11:10-13. Mr. Parella represented to DLA Piper that the unidentified individual was obligated to talk with the law firm under the terms of a cooperation agreement. Id. at 11:11-13. DLA Piper

---

[7] David Clarke was present at the hearing as counsel of record for DLA Piper on the motion to quash, and, to the Court's knowledge, he was not involved in the creation of the notes and memoranda that are at issue here. Additionally, Brett Ingerman, who did have a role in creating these notes and memoranda, was excused from the hearing due to his involvement in another matter.

represented to the Court that it had no knowledge of Mr. Radomski's identity until April 27, 2007, when a press release announced that Mr. Radomski had reached a plea agreement with the United States Attorney's Office for the Northern District of California in his criminal case. See id. at 26:24-27:6 (statement by Mr. Scheeler that a press release regarding Mr. Radomski was issued on April 27, 2007, and it was "[a]t that point [that he] knew who it was"); Criminal Pretrial Minutes at 1, United States v. Radomski, Criminal Action No. 07-222 (SI) (N.D. Cal.), ECF No. 12 (reflecting April 27, 2007, as the date the written plea agreement in Mr. Radomski's case was filed in open court). Similarly, the prosecutor arranged to have Mr. McNamee interviewed by DLA Piper without disclosing his identity, and DLA Piper only learned of Mr. McNamee's identity less than 24 hours prior to their first scheduled interview on July 13, 2007. See 6/8/11 Hr'g Tr. at 9:15-16 (statement by David Clarke that the interview with Mr. McNamee was "arranged before [he] was identified"); id. at 12:16-17 (statement by Mr. Scheeler that DLA Piper learned of Mr. McNamee's identity "less than 24 hours" prior to their first interview).

Due to the lack of notice provided to DLA Piper, the law firm conducted its initial interviews of Mr. Radomski and Mr. McNamee "with somewhat less preparation than there might have been if [it] had known who the witnesses were."[8] Id. at 9:25-10:1. According to DLA Piper, the lack of preparation was a break from its standard protocol, in which the law firm would generally prepare "a lengthy . . . list of questions" for an interview. Id. at 12:23-24. For "subsequent interviews," however, DLA Piper did revert to its standard practice of preparing interview outlines, and with regard to the interviews of Mr. Radomski and Mr. McNamee, the

---

[8] Although DLA Piper asserts that it did not have sufficient time to prepare for its initial interview with Mr. Radomski due to the government's secrecy regarding his identity prior to the interview, it acknowledged that it learned of Mr. Radomski's identity approximately six weeks prior to the start of the interview. 6/8/11 Hr'g Tr. at 27:1-2.

law firm composed a list of "follow[-]up questions" that were identified "based on the first interviews" and "things that were being disclosed in the public domain." Id. at 10:7-12. According to DLA Piper, the inquiries in these subsequent interviews were designed "to focus on what [it] believe[d] were the most important area[s]," id. at 15:25-16:1, and to "confirm[] information[ and] get[] clarifications . . . where [it was not] certain of exactly what [it] had gotten information wise in the earlier interviews," id. at 16:2-5.

During the interviews of Mr. Radomski and Mr. McNamee, Senator Mitchell "took the lead" in presenting questions to the witnesses, with Mr. Scheeler asking questions as well. Id. at 13:16-17. In addition, there were several government officials[9] present during each of these interviews, and at times they "ask[ed] some questions . . . . to try to help . . . the witness refresh their recollection if they had said something differently before or said they did[ not] remember now [what] they [had] said . . . earlier."[10] Id. at 18:21-19:4. In the latter interviews for both Mr. Radomski and Mr. McNamee, DLA Piper would "actually read [the witnesses a] draft of the report . . . to make sure[ whether] there was a single word that [the witness] believed was inaccurate." Id. at 16:8-10. DLA Piper's interview protocols were "consistent with" the goal of doing "everything . . . humanly possible [to] make sure everything in the report was accurate." Id. at 16:11-14. At no point during the process, however, did DLA Piper "show[ the witnesses] the interview memorand[a]" from prior interviews, id. at 18:8-9, nor did they "read[] portions of the[se] memorand[a] to the witnesses," id. at 31:18-19.

---

[9] At times, the Court will use the term "government officials" to describe both federal prosecutors and law enforcement agents.

[10] Although DLA Piper recorded in its notes and memoranda which government officials were present during these interviews, the law firm did not note which responses by the witnesses were in response to questions asked by the government officials. See id. at 32:17-20 (statement by David Clarke that one could not "conclude from silence in the memo[randum] that there were not other instances [of government involvement] because the memo[randa] are nowhere close to a verbatim [transcript]").

After the completion of each interview, a DLA Piper attorney would be designated to create the first draft of an interview memorandum. Id. at 22:13-15. After the attorney completed the first draft of the memorandum, the draft was then "circulated to other persons who participated in the interviews," with the exception of Senator Mitchell. Id. at 22:18-19. Those attorneys would review the memoranda, "refer to their notes, [and] sometimes would . . . take a look at . . . what else was going on in the investigation . . . . to make sure [the memorandum] was accurate." Id. at 22:22-23:2. The attorneys also wanted to ensure that only those matters that they "deemed to be material" were reflected in the memorandum. Id. at 23:3-4. After all of the attorneys reviewed the memorandum, they would then identify and address any "issues or . . . concerns" regarding the memorandum. Id. at 23:6-7. DLA Piper explained, for instance, that if one attorney heard the witness say one thing, but another attorney heard it differently, then the attorneys would participate in a telephone conference to discuss the matter. Id. at 23:6-9. Once the attorneys reached a consensus, they would then memorialize their agreement about the witness's statement in the final draft of the memorandum. Id. at 23:9-11. After the memorandum was completed, one of the attorneys would enter the memorandum into a database so that the other attorneys on the team could learn about an interview and assess whether what was obtained from that interview "ha[d] an impact on what [those attorneys] were asking other witnesses." Id. at 23:15-17.

In light of DLA Piper's protocols, the law firm now contends that its notes and memoranda constitute "opinion" work product. As support for this position, DLA Piper argues that the interviews "were very much directed by DLA Piper and what DLA Piper thought was important," id. at 29:17-18, and that "[e]ven the initial interviews" were directed by DLA Piper despite not learning of either Mr. Radomski's or Mr. McNamee's identities sufficiently prior to

9

their first interviews to prepare for them. Id. at 29:13-15. With regard to the notes, DLA Piper argues that "none of the attorneys . . . charged with taking notes is anything close to having the job skills of a court reporter," id. at 28:11-13, and that "the notes they took were very [summary]," in that they made no attempt to record the actual questions and the responses to them, id. at 28:13-15. As for the memoranda, DLA Piper argues that the preparation of these documents required "a further c[u]lling process where some things that were in [the] notes were not significant enough to be repeated in the memo[randum]." Id. at 28:18-20.

DLA Piper also argues that its efforts to ensure the accuracy of its memoranda have no impact on the work-product analysis. It asserts that in no instance was an interview memorandum given to the witnesses for their review, nor did any of the attorneys ever read portions of the memorandum to them. See id. at 31:18-20 (statement by David Clarke that the witnesses "never saw" the memoranda, and that the memoranda were "[n]ever . . . read to them"). At most, according to DLA Piper, the attorneys would go "through the memorandum summar[iz]ing the points and restating the facts as they understood them," and the witnesses either confirmed or corrected what was related to them. Id. at 31:15-18. Because DLA Piper never read its memoranda to any of the witnesses, it contends that these documents do not amount to "statement[s] adopted by the witness[es]." Id. at 30:24. In sum, DLA Piper argues that all of its notes and memoranda are entitled to "opinion" work-product protection. See id. at 29:22-24 (statement by David Clarke that "all" of the materials at issue "should be protected," although admitting that there are "some very specific snippets that . . . one might be able to conclude . . . are in any way factual").

## I. Legal Standard

"The work[-]product doctrine reflects the strong public policy against invading the privacy of an attorney's course of preparation." In re Sealed Case, 856 F.2d 268, 273 (D.C. Cir. 1988) ("Sealed Case I"). As the Supreme Court explained in the seminal case on the attorney work-product doctrine, Hickman v. Taylor, 329 U.S. 495 (1947):

> Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. . . . This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways . . . . Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten.

Id. at 511. The work-product doctrine, therefore, serves to protect "written materials that lawyers prepare in anticipation of litigation." United States v. Thompson, 562 F.3d 387, 393 (D.C. Cir. 2009) (internal quotation marks omitted).

While "the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation," the attorney work-product doctrine's applicability is not limited to the civil context. United States v. Nobles, 422 U.S. 225, 238 (1975). Indeed, the doctrine's "role in assuring the proper functioning of the criminal justice system is even more vital" because "[t]he interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case." Id.; see also id. at 238 n.12 ("A number of state and federal decisions have recognized the role of the work-product doctrine in the criminal law, and have applied its protections to the files of the prosecution and the accused alike."). Thus, the attorney work-product "doctrine applies to criminal litigation as well as civil." Id. at 236.

The attorney work-product doctrine also can bar a party from obtaining protected materials from a third party. For instance, in United States v. Paxson, the defendant appealed his conviction on the grounds that, inter alia, the district court erroneously quashed a subpoena issued under Federal Rule of Criminal Procedure 17(c) and denied the defendant access to notes of an interview of a third-party that were drafted by that third-party's attorney. 861 F.2d 730, 735 (D.C. Cir. 1988). The District of Columbia Circuit acknowledged that "[n]either party . . . cited any case applying the work-product privilege to facts paralleling those" before the Court in Paxson. Id. Nonetheless, the Circuit concluded "that the principles laid down in [Hickman] are perfectly applicable" to a situation where a defendant seeks attorney work-product from a third-party. Id. It is of no moment, therefore, that the individual or entity seeking cover under the attorney work-product doctrine is not a party to the underlying litigation.

Although the attorney work-product doctrine can protect an attorney's materials in a number of different circumstances, not "all written materials obtained or prepared by an adversary's counsel with an eye toward litigation are necessarily free from discovery in all cases." Hickman, 324 U.S. at 511. Rather, attorney work-product is discoverable "if the party seeking discovery can make a sufficient showing of necessity." 8 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 2025 (3d ed. 1998). However, the showing of need required to discover another party's work product depends on whether the materials at issue constitute "fact" work product or "opinion" work product. See In re Sealed Case, 676 F.2d 793, 811 (D.C. Cir. 1982) (noting that there is "qualified protection for 'fact' work product and more absolute protection for 'opinion' work product"). A party seeking discovery of "fact" work product—e.g., "[w]here relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case," Hickman, 329 U.S.

12

at 511—must demonstrate "a substantial need for the materials and an undue hardship in acquiring the information any other way," Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP, 124 F.3d 1304, 1307 (D.C. Cir. 1997). On the other hand, with regard to "opinion" work product—e.g., written materials prepared by counsel that reflect the attorney's "'mental impressions, conclusions, opinions, or legal theories,'" United States v. Deloitte LLP, 610 F.3d 129, 135 (D.C. Cir. 2010) (quoting Dir., Office of Thrift Supervision, 610 F.3d at 1307)—such materials are "virtually undiscoverable," Dir., Office of Thrift Supervision, 124 F.3d at 1307. Discovery of "opinion" work product is therefore permissible only where a party has made "a far stronger showing of necessity and unavailability by other means" than would otherwise be sufficient for discovery of "fact" work product. Upjohn Co. v. United States, 449 U.S. 383, 402 (1981).

The challenge for the Court here is determining what constitutes "fact" versus "opinion" work product. It is well understood in the law that "the task of drawing a line between what is fact and what is opinion can at times be frustrating and perplexing." Florida House of Representatives v. U.S. Dep't of Commerce, 961 F.2d 941, 947 (11th Cir. 1992). And, in the work-product analysis, the "fact" and "opinion" labels are even less useful because even if it can be agreed upon that a collection of materials or statements constitute "facts," the collection of those facts itself might nonetheless reveal an attorney's thought processes and mental impressions of the case, thereby converting the information into "opinion" work product. See Dir., Office of Thrift Supervision, 124 F.3d at 1308 ("At some point, . . . a lawyer's factual selection reflects his focus; in deciding what to include and what to omit, the lawyer reveals his view of the case."). Additionally, the facts elicited from an investigation may be, in some contexts, necessarily reflective of an attorney's focus in a case. See In re Sealed Case, 124 F.3d

230, 236 (1997) ("Sealed Case II") (observing that "the facts elicited" from a "litigation-related investigation . . . . necessarily reflected a focus chosen by the lawyer" (emphases added)); Better Gov. Bureau, Inc. v. McGraw, 106 F.3d 582, 608 (4th Cir. 1997), cited in Sealed Case II, 124 F.3d at 236 (concluding that information gained from a witness and memorialized in a typewritten summary "tend[ed] to indicate the focus of her investigation, and hence, her theories and opinions regarding this litigation"). The "difficult matter[]" of deciding what "degree of selection [is] necessary to transform facts into opinions" has yet to be resolved by the District of Columbia Circuit. Dir., Office of Thrift Supervision, 124 F.3d at 1308.

The Court is not without guidance on this issue, however. The natural starting point for determining the contours of "fact" and "opinion" work product is the Supreme Court's Hickman decision. Hickman involved the sinking of a tugboat that left five of nine crew members dead. Hickman, 329 U.S. at 498. The attorney for the tugboat company "privately interviewed the [four] survivors and took statements from them," which they "signed." Id. The attorney "also interviewed other persons believed to have some information relating to the accident[,] and in some cases he made memoranda of what they told him." Id. A representative for the decedents then sought production of the signed statements and interview memoranda. Id. at 499.

With regard to the signed witness statements, the Supreme Court concluded that such material "might, under certain circumstances, be admissible in evidence[,] give clues as to the existence or location of relevant facts[, o]r they might be useful for purposes of impeachment or corroboration." Id. at 511. For these signed statements, the Court concluded that "production might be justified where the witnesses are no longer available or can be reached only with difficulty." Id. However, "as to [the] oral statements made by [the] witnesses to [the attorney], whether presently in the form of his mental impressions or memoranda," the Court did "not

believe that any showing of necessity [could] be made under the circumstances of [that] case to justify production." Id. at 512. The Court reached this conclusion because

> [u]nder ordinary conditions, forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to his adversary gives rise to grave dangers of inaccuracy and untrustworthiness. No legitimate purpose is served by such production. The practice forces the attorney to testify as to what he remembers or what he saw fit to write down regarding the witnesses' remarks. Such testimony could not qualify as evidence, and to use it for impeachment or corroborative purposes would make the attorney much less an officer of the court and much more an ordinary witness. The standards of the profession would thereby suffer.

Hickman, 329 U.S. at 512-13. Justice Jackson, in concurring with the majority, elaborated on this point:

> I can conceive of no practice more demoralizing to the Bar than to require a lawyer to write out and deliver to his adversary an account of what witnesses have told him. Even if his recollection were perfect, the statement would be his language permeated with his inferences. Everyone who has tried it knows that it is almost impossible so fairly to record the expressions and emphasis of a witness that when he testifies in the environment of the court and under the influence of the leading question there will not be departures in some respects.

Id. at 516-17 (Jackson, J., concurring); see also Upjohn, 449 U.S. at 399 ("Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes."); Notes of Advisory Committee on 1970 Amendment to Rules, 28 U.S.C.A., p. 442, quoted in Upjohn, 449 U.S. at 400 (noting that Federal Rule of Civil Procedure 26(b)(3) "protect[s] against disclosure [of] the mental impressions, conclusions, opinions, or legal theories . . . of an attorney or other representative of a party. The Hickman opinion drew special attention to the need for protecting an attorney against discovery of memoranda prepared from recollection of oral interviews." (emphasis added)). The Hickman Court then concluded that "[i]f there should be a rare situation justifying production of these matters, [the] petitioner's case is not of that type." 329 U.S. at 513.

15

The Supreme Court further discussed the protection afforded to witness interview memoranda in Upjohn. That case involved an internal investigation conducted by corporate counsel into "'questionable payments'" by the corporation's subsidiary "to or for the benefit of foreign government officials in order to secure government business." 449 U.S. at 386. As part of its investigation, counsel dispatched a questionnaire to the corporation's employees, and he, along with outside counsel, also "interviewed the recipients of the questionnaire and some 33 other Upjohn officers or employees as part of the investigation." Id. at 387. Among the individuals interviewed were seven former employees of the company. See id. at 394 n.3 ("Seven of the . . . employees interviewed by counsel had terminated their employment with Upjohn at the time of the interview."). The corporation then notified both the Securities and Exchange Commission and the Internal Revenue Service ("IRS") about the questionable payments. Id. at 387.

The IRS "immediately began an investigation to determine the tax consequences of the payments," seeking both the "written questionnaires," along with "memorandums or notes of the interviews conducted in the United States and abroad with officers and employees of the" corporation. Id. at 387-88. "The company declined to produce the documents . . . on the grounds that they were protected from disclosure by the attorney-client privilege and constituted the work product of attorneys prepared in anticipation of litigation." Id. at 388.

As to the questionnaire responses and interview memoranda pertaining to the former employees, the Supreme Court declined to decide whether those communications were protected either under the attorney-client privilege or the attorney work-product doctrine because this issue had not been addressed by the trial court. Id. at 394 n.3. With regard to the current employees, however, the Supreme Court held that "the responses to the questionnaires and any notes

reflecting responses to interview questions" were "covered by the attorney-client privilege," id. at 397, and that any additional matters reflected in the interview notes and memoranda were entitled to protection under the "opinion" work product standard. See id. at 401 (holding that the work product at issue "cannot be disclosed simply on a showing of substantial need and . . . undue hardship" that is sufficient for the discovery of "fact" work product). In rejecting the argument that the notes and memoranda fell in the class of "relevant and nonprivileged facts" whose "production . . . is essential to the preparation of one's case," id. at 399 (quoting Hickman, 449 U.S. at 511) (alteration in the original), the Supreme Court noted that this basis for production recognized in Hickman did "not apply to 'oral statements made by witnesses . . . whether presently in the form of [the attorney's] mental impressions or memoranda,'" id. at 399 (quoting Hickman, 449 U.S. at 512). The Court concluded that requiring production of "notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes." Id. Thus, the Supreme Court concluded in Upjohn that to the extent the notes and memoranda "reveal communications, they are . . . protected by the attorney-client privilege," and "[t]o the extent they do not reveal communications, they reveal the attorney's mental processes in evaluating the communications." Id. at 401. Put differently, by remaining silent on the attorney work-product issue, Upjohn did not foreclose the possibility that the questionnaire and interview responses constituted "fact," rather than "opinion," work product.[11]

---

[11] The Supreme Court did note that if the trial court on remand determined that the questionnaire and interview responses by the former employees were not covered by the attorney-client privilege, the Court's discussion of "opinion" work product nonetheless would be "relevant." Id. at 394 n.3. The Supreme Court did not elaborate, however, on the extent to which its discussion would be relevant with regard to these communications by the former employees.

At least that was the District of Columbia Circuit's reading of Upjohn as explained in Sealed Case II. There, the Office of Independent Counsel sought production of "notes [from] a conversation between a now-deceased White House official and his private attorney." Sealed Case II, 124 F.3d at 231. The notes were drafted during a "preliminary" interview that was "initiated by the client." Id. at 236. The interview lasted two hours, and the attorney produced three pages of notes in which "he underlined certain words, placing both checkmarks and question marks next to certain sections." In re Sealed Case, 129 F.3d 637, 638 (D.C. Cir. 1997) ("Sealed Case III") (Tatel, J., dissenting from denial of en banc hearing). The district court found "that the notes were protected by the work-product privilege because they reflect[ed] the mental impressions of the attorney." Sealed Case II, 124 F.3d at 236 (internal quotation marks omitted).

The Circuit reversed and remanded the case to the district court for further examination. Id. at 237. The Circuit acknowledged the Supreme Court's pronouncement that "'[f]orcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes.'" Id. at 236 (quoting Upjohn, 449 U.S. at 401) (alteration in original). But the Circuit noted that the Supreme Court had "not decide[d]" in Upjohn "whether [the] factual elements embodied in such notes should be accorded the virtually absolute protection that the privilege gives to the attorney's mental impressions," given that the Upjohn Court's "reasoning seems to presuppose that such notes are analytically divisible; . . . that the notes in question represented either communications protected by the attorney-client privilege . . . or mental impressions protected by work-product privilege." Id.

The Circuit in Sealed Case II did acknowledge its previous decision in Sealed Case I, in which it held that where "the work product sought . . . is based on oral statements from

witnesses, a far stronger showing is required than the 'substantial need' and 'without undue hardship' standard applicable to discovery of ['fact'] work product." Sealed Case II, 124 F.3d at 236 (emphasis added). But the Circuit found Sealed Case I (along with two other cases, Better Government Bureau, Inc. and Cox v. Administrator, U.S. Steel, 17 F.3d 1386 (11th Cir. 1994)) distinguishable because those cases involved interviews that were conducted as "part of a litigation-related investigation," and that under those circumstances, "the facts elicited necessarily reflected a focus chosen by the lawyer." Sealed Case II, 124 F.3d at 236 (emphasis added). In Sealed Case II, however, the attorney notes at issue were produced in connection with a "preliminary" interview that "was . . . initiated by the client." Id. The Circuit suggested that in these circumstances, while the attorney "was surely no mere potted palm, one would expect him to have tried to encourage a fairly wide-ranging discourse from [his] client, so as to be sure that any nascent focus on the lawyer's part did not inhibit the client's disclosures." Id. The Circuit ultimately declined to rule on whether the notes constituted "fact" work product, see id. at 236-37 (noting that while the notes "contain[ed] factual material that could be classified as opinion only on a virtually omnivorous view of the term," remand to the district court was proper for "reexamin[ation] in light of [the Circuit's] opinion"), but it did hold that "[w]here the context suggests that the lawyer has not sharply focused or weeded the materials, the ordinary Rule 26(b)(3) standard (i.e., the "fact" work product standard) should apply." Id. Thus, Sealed Case II forecloses the proposition that all matters contained in attorney notes and memoranda are absolutely entitled to heightened protection as "opinion" work product. See Dir., Office of Thrift Supervision, 124 F.3d at 1308 ("We recently observed that under certain circumstances purely factual material embedded in attorney notes may not deserve the super-protection afforded to a lawyer's mental impressions." (citing Sealed Case II, 124 F.3d at 236-37)).

The Court also finds guidance on the "fact" versus "opinion" work product distinction in

cases construing 18 U.S.C. § 3500,[12] the statute commonly referred to as the Jencks Act, and

---

[12] The Jencks Act, 18 U.S.C. § 3500 (2006), states the following:

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

(d) If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means--

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

dealing with the issue of whether that statute requires production of "opinion" work product.[13]
Under the Jencks Act, the government in a criminal prosecution must, under certain
circumstances, "produce any statement . . . of the witness in [its] possession . . . which relates to
the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). In particular, the
types of "statements" producible under the Jencks Act include, inter alia, "a written statement
made by said witness and signed or otherwise adopted or approved by him," 18 U.S.C. §
3500(e)(1), as well as "a substantially verbatim recital of an oral statement made by said witness
and recorded contemporaneously with the making of such oral statement," 18 U.S.C. §
3500(e)(2). The intersection of the Jencks Act and the attorney work-product doctrine occurs
where a "statement" under the Jencks Act is found in a government attorney's (or an agent of the
attorney's) notes or memoranda.

The Supreme Court's decision in Palmero v. United States, 360 U.S. 343 (1959),
provides a useful introduction to the Jencks Act. Although the work-product doctrine was not at
issue in Palermo, the Supreme Court did address the issue of whether memoranda memorializing
a witness interview conducted by an Internal Revenue Service agent constituted a "statement" or
"substantially verbatim" statement under the Jencks Act. The Supreme Court analyzed the
Jencks Act and concluded that the Act "encompass[es] more than mere automatic reproductions
of oral statements." Id. at 352. At the same time, the Court concluded from the legislative
history of the Jencks Act that

> [i]t is clear . . . Congress was concerned that only those statements which could
> properly be called the witness'[s] own words should be made available to the

---

[13] To be clear, the Court does not suggest that the Jencks Act is applicable in this case, given that the Act applies to
only those statements in the government's possession, and it is DLA Piper in this instance that is in possession of the
attorney work product at issue in this case. Regardless, as the Court discusses below, the Supreme Court and
District of Columbia Circuit's analysis of the attorney work-product doctrine in the context of the Jencks Act
concerns the nature of the statement itself, and not who is in possession of it. The analysis in the Jencks Act context,
therefore, is helpful to illuminate the distinction between "fact" and "opinion" work product.

defense for purposes of impeachment. It was important that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent. Distortion can be a product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions. It is clear . . . that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital. Quoting out of context is one of the most frequent and powerful modes of misquotation.

Id. (emphasis added). For these reasons, the Supreme Court held that "summaries of an oral statement which evidence substantial selection of material, or which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent," fall outside the umbrella of "statements" or "substantially verbatim" statements that are required to be produced by the government under the Jencks Act. Id. at 352-53. But where the witness's recorded remarks fall within the several definitions of what is considered a "statement" under the Jencks Act, then the remarks can be fairly attributed to the witness and are, therefore, discoverable under the Jencks Act. Id. at 352.

The Supreme Court then issued its decision in Goldberg v. United States, 425 U.S. 94 (1976), which addressed the issue of whether a "statement . . . adopted or approved by" a witness under Section 3500(e)(1) could constitute "opinion" work product and, therefore, be exempt from discovery under the Jencks Act. In that case, a criminal defendant attempted to obtain from the government handwritten notes pertaining to a key government witness. Id. at 101. At trial, the witness was asked whether the government lawyers "sometimes questioned [him] about what [he] had just said to make sure that they got it down correctly," to which the witness responded that "[t]hey may have," although he was unsure whether such questions were "part of [a] pattern." Id. at 100; see also id. at 100-01 (citing trial transcript where witness was asked whether the attorneys' notes "[w]ere . . . read back to [him] to see whether or not they correctly understood what [he was] saying," to which the witness responded "[p]robably from time to

22

time"); id. at 101 (citing trial transcript where witness was asked whether he "either correct[ed] them or sa[id] 'Yes, that's right,' or 'No, that's not right,' . . . [or] words to that effect," to which the witness responded in the affirmative). The trial court denied the defendant access to these notes on the grounds that the materials constituted attorney work product. Id.

The Supreme Court concluded that the trial court's rulings were erroneous, id. at 108, and the matter was remanded to the trial court for further proceedings, id. at 112. The Supreme Court concluded that there is "nothing in the Jencks Act or its legislative history that excepts from production otherwise producible statements on the ground that they constitute 'work product' of [g]overnment lawyers." Id. at 101-02. In any event, the Supreme Court did not view the disclosure of statements under the Jencks Act as "undermin[ing] the policies that gave rise to the work-product doctrine," id. at 105, because "[p]roper application of the Act will not compel disclosure of a Government lawyer's recordation of mental impressions, personal beliefs, trial strategy, legal conclusions, or anything else that could not fairly be said to be the witness'[s] own statement," id. at 106 (internal quotation marks omitted); see also id. at 107 (observing that the production of statements under the Jencks Act does not require the lawyer to be "called upon to be a witness, since statements are produced only where they can fairly be said to be the witness'[s] own" statements (internal quotation marks omitted)). Although the Supreme Court acknowledged that "there is some risk that a witness'[s] words will be distorted in notes taken by a Government lawyer," it noted that "there is no such danger where a witness has adopted or approved the lawyer's notes." Id. at 107 (internal citation omitted). The Supreme Court then concluded that further proceedings by the trial court were "necessary to determine whether the prosecutors' notes were actually read back to [the witness] and whether he adopted or approved

them,"[14] id. at 110, i.e., whether the remarks contained in the attorney's memoranda or notes were either read back or shown to the witness, see id. at 111 n.19 (observing that an attorney's inquiries of a "general substance" to confirm "that he has correctly understood what the witness has said . . . . do not constitute adoption or approval of the lawyer's notes within [§] 3500(e)(1)" of the Jencks Act).

Although Goldberg addressed only those "statements" that were either "adopted or approved by the witness," the District of Columbia Circuit reached a similar decision in a case involving whether "substantially verbatim" notes drafted by a government attorney during a pre-trial witness interview were exempt from production under the Jencks Act as "opinion" work product. In Saunders,[15] the Circuit concluded that where a "government attorney took down what [a witness] said during the course of their interview[,] . . . . the trial judge was required to determine whether" the statement was producible under the Jencks Act. 316 F.2d at 349. In reaching its decision, the Circuit rejected the premise that such materials were protected from disclosure under the work-product doctrine because "if the attorney has made only a substantially verbatim record of his interview, then . . . his notes constitute a 'statement' and include no protected material flowing from the attorney's mental processes." Id. at 350. Thus, the District of Columbia Circuit concluded that "if notes are substantially a verbatim recitation of the witness'[s interview], there is no invasion of the attorney's work product." Id. And, where "the notes contain both verbatim remarks of the witness and personal observations of the

---

[14] Similarly, if an interview memoranda constitutes "an accurate copy of a written statement made th[at same] day . . . and adopted by [the witness] as his own," the memoranda is producible as a witness statement under the Jencks Act. Campbell v. United States, 373 U.S. 487, 497 (1963).

[15] Interestingly, Saunders was authored by retired Supreme Court Justice Stanley Forman Reed, who was an active Justice on the Supreme Court when the unanimous decision in Hickman was issued.

attorney, then [the Jencks Act] requires that the district judge inspect the statement and excise the protected material if this is possible." Id.

To summarize the case law discussed above, Goldberg and Saunders stand for the proposition that any attorney work-product materials containing either a "statement . . . approved or adopted by" the witness or a "substantially verbatim recital of an oral statement made by [the] witness and recorded contemporaneously with the making of such oral statement" do not constitute "opinion" work product. This is because "statements" under the Jencks Act do not "include . . . protected material flowing from the attorney's mental processes." Saunders, 316 F.2d at 350. At best, these statements would be analogous to the signed witness statements in Hickman and thus only entitled to protection as "fact" work product.

But the universe of "fact" work product is not limited to signed witness statements and "statements" under the Jencks Act. For instance, the District of Columbia Circuit insinuated that the attorney notes at issue in Sealed Case II, or at least portions thereof, constituted "fact" work product, even though there was no indication that the notes contained any "statement . . . adopted or approved by" the witness, 18 U.S.C. § 3500(e)(1), or a "substantially verbatim recital of an oral statement by [the] witness,"[16] 18 U.S.C. § 3500(e)(2). In fact, as Judge Tatel pointed out in his dissenting opinion from the Circuit's denial of a rehearing en banc, the attorney in that case only produced three pages of notes from a two-hour interview, which hardly suggests that the notes contained a verbatim transcription of the interview. Sealed Case III, 129 F.3d at 638 (Tatel, J., dissenting from denial of en banc hearing). Thus, even where the materials at issue do not contain "statements" under the Jencks Act, the Court must still look to the "context" of the

---

[16] Put differently, the Circuit's discussion in Sealed Case II of what constitutes "fact" work product did not depend at all on whether the attorney's notes contained any "statement" as the term is defined under the Jencks Act.

investigation and determine whether the attorney's work product resulting from the investigation appears to have been "sharply focused or weeded" by the attorney. Sealed Case II, 124 F.3d at 236. And although the District of Columbia Circuit has provided scant instruction thus far on how to apply the test, its analysis of the facts in Sealed Case I and Sealed Case II provides the following guidance: If the work product contains facts elicited in the course of a "litigation-related investigation" similar to the investigation discussed in Sealed Case I, then those facts "necessarily reflect[] a focus chosen by the lawyer." Sealed Case II, 124 F.3d at 236. However, if the facts were drawn from a more general inquiry where the attorney would have attempted to "encourage a fairly wide-ranging discourse from [his] client, so as to be sure that any nascent focus on the lawyer's part did not inhibit the client's disclosures," id., then those facts are entitled to less protection under the "fact" work-product standard.[17]

To be clear, however, simply because the record reflects a collection of facts that "necessarily reflect[] a focus chosen by the lawyer," id., does not mean that those facts are forever entitled to protection as "opinion" work product. As the cases above demonstrate, an attorney can take certain actions that will, in essence, transform "opinion" work product into "fact" work product. For instance, if an attorney authors a memorandum that includes a completely paraphrased account of a witness's interview, then the memorandum is entitled to protection as "opinion" work product. But if the attorney provides the memorandum to the witness, who then reviews the memorandum and signs it to indicate that he is adopting the

---

[17] It is not perfectly clear what the Circuit meant when it held that facts elicited in a "litigation-related investigation" are necessarily reflective of an attorney's focus, and that facts garnered from a more generalized inquiry are not entitled to "opinion" work-product protection. After all, to be entitled to protection as either "fact" or "opinion" work product, the materials must have been created with "an eye toward litigation." In re Sealed Case, 29 F.3d 715, 718 (D.C. Cir. 1994). In other words, even materials that constitute "fact" work product would appear to be created as a result of a "litigation-related investigation." Nonetheless, the Court must respect the precedent of this Circuit and attempt to apply to the best of its ability the standards articulated in the cases discussed above.

statements contained therein, then the attorney has now transformed that memorandum into a signed witness statement, which is only entitled to protection as "fact" work product. That much is clear; of course, as the Court discusses below, this is not such a clear-cut case.

The upshot of the Court's discussion up to this point is that the analysis of whether an attorney's work product constitutes "fact" or "opinion" work product is inherently and necessarily fact-specific. In other words, the Court must look at every facet of DLA Piper's investigation to determine whether the law firm's work product is entitled to the heightened protection accorded to "opinion" work product. And, the ultimate objective for the Court is to determine whether the work product at issue here contains either (1) "relevant and non-privileged facts" that are "essential to the preparation of one's case," Hickman, 329 U.S. at 511, which would include "statements [that] could properly be called the witness'[s] own words," Palmero, 360 U.S. at 352, or (2) the attorney's "'mental impressions, conclusions, opinions, or legal theories,'" Deloitte, 610 F.3d at 135 (quoting Fed. R. Civ. P. 26(b)(3)(B)), i.e., statements that are attributable to the attorney, rather than the witnesses, see Goldberg, 425 U.S. at 107 (noting that one of the policies behind protection of attorney work product is to prevent the "use of the attorney's words for impeachment," thereby making "the attorney a witness rather than an officer of the court"). With the aforementioned principles serving as the Court's touchstone, the Court turns to the factual aspects of DLA Piper's investigation that the Court believes are relevant to its analysis.

### III.    Legal Analysis

Applying the principles stated above to the facts of this case, the Court concludes that, for the most part,[18] DLA Piper's notes from its initial interviews of Mr. Radomski and Mr. McNamee, as well as all of its interview memoranda, constitute "fact" work product and are, therefore, entitled to a lower standard of protection under the principles set forth in Hickman and Upjohn.[19]    The Court reaches its conclusion for three reasons: (1) with regard to the initial interviews of both Mr. Radomski and Mr. McNamee, these interviews were of a general nature and not "sharply focused or weeded" by DLA Piper; (2) government officials actively participated in all of these interviews; and, most importantly, (3) DLA Piper made substantial efforts to confirm the accuracy of the various statements contained in the memoranda with the two interviewees.    Taken together, these factors persuade the Court that the recorded remarks of Mr. Radomski and Mr. McNamee contained in these notes and memoranda do not reflect the mental impressions, thought processes, legal strategy, or personal assessments of DLA Piper; in fact, they accurately depict the witnesses' own words.

First, the Court finds that the notes from the initial interviews of Mr. Radomski and Mr. McNamee fall squarely within the province of Sealed Case II.    As noted above, DLA Piper acknowledged to the Court that it was inhibited in preparing for the initial interviews of Mr. Radomski and Mr. McNamee because the law firm had not been made aware of the identity of the witnesses until shortly before they were conducted.    Given this limitation, the Court cannot

---

[18] DLA Piper, on some occasions, included a section in its interview memoranda that it explicitly identified as containing the attorney's assessments of the witnesses.    The Court's ruling does not encompass these portions of the memoranda.

[19] Accordingly, the only notes that constitute "opinion" work product are those that accompanied the interview memoranda of Mr. Radomski's second interview.    These notes were not affected by any of the three factors that the Court discusses below, and they were drafted during an interview that the Court finds was sufficiently focused and directed to qualify as "opinion" work product.

envision how DLA Piper could have developed a focused line of inquiry for either of these two witnesses. Rather, the Court finds that DLA Piper's objectives in these initial interviews of Mr. Radomski and Mr. McNamee necessarily would have been to gather as much information as possible concerning what they knew about the use of performance-enhancing drugs in Major League Baseball. And to accomplish that objective, it seems only logical that DLA Piper would have wanted to "encourage a fairly wide-ranging discourse from" these witnesses. Sealed Case II, 124 F.3d at 236. Thus, the initial interviews of these witnesses are analogous to the "preliminary" interview discussed in Sealed Case II. Moreover, even assuming that the Court agreed with DLA Piper that these notes were very "summary" in nature and did not constitute a verbatim transcript of the hearing, 6/8/11 Hr'g Tr. at 28:11-14, that factor alone is not sufficient to undermine the "fact" work-product nature of this document, see Sealed Case II, 124 F.3d at 236-37 (observing that at least portions of the notes "contain[ed] factual material that could be classified as opinion only on a virtually omnivorous view of the term"); Sealed Case III, 129 F.3d at 638 (Tatel, J., dissenting from denial of en banc hearing) (explaining that the attorney only produced three pages of notes from a two-hour interview, suggesting that the attorney "obviously wrote down what he thought was significant, omitting everything else"). For the same reasons discussed in Sealed Case II, the notes taken during the initial interviews of Mr. Radomski's and Mr. McNamee's initial interviews do not contain matters that were "sharply focused or weeded" by DLA Piper.

Second, with regard to the initial interview notes and all of the memoranda, the Court finds that DLA Piper failed to demonstrate to the Court that the government's participation at the interviews did not preclude it from exercising exclusive control over the focus and direction of these interviews. At least with regard to Mr. Radomski's initial interview, DLA Piper stated that

a government agent provided the law firm with "a stack of papers" that consisted of (1) "cancelled checks" from professional baseball players who had written the checks for "substances that Mr. Radomski sold to them," (2) "packing slips," and (3) "other corroboration of what Mr. Radomski was" stating during the interview. 6/8/11 Hr'g Tr. at 19:16-19. Given that "most of the[se] papers found their way into the [Mitchell R]eport," id. at 19:15, the Court can reasonably assume that a substantial portion of the initial interview (and possibly portions of the follow-up interviews) revolved around documentation that the government deemed to be relevant to DLA Piper's investigation. Thus, this factor certainly cuts against a finding that it was DLA Piper alone that "sharply focused or weeded" the materials it sought to elicit in Mr. Radomski's initial interview.

Furthermore, as to all of the interviews, DLA Piper acknowledges that the government officials who were present during these interviews would, at times, "ask some questions . . . . to try to help . . . the witness refresh their recollection if they had said something differently before or said they did[ not] remember now [what] they [had] said . . . earlier." Id. at 18:23-19:4. How much of an impact the government's participation in these interviews had on DLA Piper's ability to direct the interviews cannot be determined with any quantum of certainty, however, because the law firm was unable to say for certain which portions of the interview memoranda reflected statements by the witnesses made in response to questions asked by the government officials. See id. at 32:17-19 (statement by David Clarke that one could not "conclude from silence in the memo[randa] that there were not other instances [of government involvement] because the memo[randa] are nowhere close to a verbatim [transcript]"). DLA Piper could only surmise that the law firm's attorneys asked about "90 percent of the questions" in these interviews, but it was clear from the law firm's representation to the Court that the estimate was a rough one at best.

See id. at 19:9-12 (statement by Mr. Scheeler that he can "only" provide "an estimate[,] but if [he] had to say what was the portion of the questions asked by DLA Piper versus anyone in the government[, it] would be . . . DLA Piper asking over 90 percent of the questions"). Moreover, even assuming that DLA Piper asked the overwhelming majority of the questions during the interviews, it is not clear that "90 percent" of the responses recorded in the notes and memoranda resulted from questions asked solely by DLA Piper. As DLA Piper represented to the Court, the notes do not reflect a verbatim transcript from the interviews, id. at 28:10-15, and the memoranda were further culled from the notes, id. at 28:17-22. Thus, in filtering the information, it may have been the case that much, if not all, of the information omitted from the law firm's work product were responses to DLA Piper's questions, thereby resulting in a higher percentage of the government's efforts being recorded in the work product. And, because DLA Piper admits that "silence" in the notes and memoranda does not reflect whether the information resulted from the government's, rather than DLA Piper's, questioning, id. at 32:17-20, the Court cannot determine how much of the work product stems from DLA Piper's focus and direction. It is DLA Piper's burden to demonstrate that its work product is entitled to heightened protection, see In re PEPCO Emp't Lit., Civil Action No. 86-0603 (RCL), 1992 WL 310781, at *4 (D.D.C. Oct. 2, 1992) (noting that the party seeking work-product protection has the burden of "provid[ing] facts sufficient to support a judicial determination of the 'fact' or 'opinion' nature of the work product'"), and because the law firm is unable to represent with reasonable certainty the extent of the government's involvement in these interviews and which responses it recorded were the product of government questioning, the Court must conclude that the interview memoranda and initial interview notes constitute "fact," rather than "opinion," work product. See In re HealthSouth Corp. Sec. Litig., 250 F.R.D. 8, 12 (D.D.C. 2008) (Bates, J.)

(relying, in part, on the fact that the law firm "neither crafted nor asked the questions" in concluding that the firm's interview summaries were "fact" work product).

Third, and most importantly, the Court finds that the statements contained in the interview memoranda can be fairly attributed to the witnesses because of DLA Piper's efforts to ensure the accuracy of its memoranda. DLA Piper represented to the Court that one of the main objectives for the follow-up interviews was to clarify and confirm the information gathered in its previous interviews. See 6/8/11 Hr'g Tr. at 15:21-16:4 ("[W]e were trying to . . . make sure that every single sentence in [the Mitchell Report] were accurately and fairly written to the best of our ability. So those latter interviews were largely an exercise of DLA Piper . . . . confirming information, [and] getting clarifications of information where we weren't certain of exactly what we had gotten . . . in the earlier interviews."); id. at 24:3-8 (statement by Mr. Scheeler that DLA Piper conducted "follow[-]up interviews . . . to make sure the information we had was accurate . . . ."). These efforts resulted in at least one instance where DLA Piper revised an interview memorandum after reviewing the substance of the document with Mr. Radomski and discovering several erroneous statements.[20] Furthermore, in drafting the interview memoranda, DLA Piper emphasized that its attorneys would collaborate to ensure that the memoranda contained accurate statements from the witnesses. See id. at 17:16-18 (statement by Mr. Scheeler that in drafting the interview memoranda, the attorneys would review the memoranda for accuracy); id. at 17:18-19 (statement by Mr. Scheeler that an interview memorandum would be finalized "[w]hen everybody was confident it was accurate"); id. at 22:20-23:4 ("Those persons who participated in the interview but did not write the initial memoranda would look at the memoranda . . . . We wanted to make sure [the interview memoranda were] accurate . . . ."); id. at 24:15-21 (statement

---

[20] The Court cannot provide any further description of this example without divulging protected work product contained in the original and revised memoranda.

by Mr. Scheeler that DLA Piper would check the information in the memoranda "against other data [that] we had," for the purpose of "determin[ing] whether the information was accurate or not"). Of course, these efforts were reasonable because DLA Piper expected to rely heavily on these memoranda in drafting the Mitchell Report; in fact, a comparison of the Report to the interview memoranda reveals that many of the statements in the Report are taken verbatim or substantially verbatim from the memoranda. DLA Piper, therefore, needed "to do everything . . . humanly possible [to] make sure everything in the [R]eport was accurate," id. at 16:12-14, which included taking the necessary steps to ensure that the law firm "accurately captured [the witnesses'] statements," id. at 24:13-14; see also id. at 23:14-15 ("[O]ne of the reasons we needed to have accurate interview memo[randa was] because what we were learning from one witness ha[d] an impact on what we were asking other witnesses."). Based on the efforts employed by DLA Piper, the Court is confident that the statements contained in these memoranda can be fairly attributed to the witnesses, and thus it harbors no concern that the production of these statements would lead to DLA Piper attorneys having "to testify as to what [they] remember[] or what [they] saw fit to write down regarding the witnesses' remarks."[21] Hickman, 329 U.S. at 513; see also id. at 516-17 (Jackson, J., concurring) (expressing concern over the production of "statement[s]" written in the attorney's "language [and] permeated with his references").

---

[21] In the event that either Mr. Radomski or Mr. McNamee denies making the statements recorded in DLA Piper's interview memoranda or initial interview notes, it is possible that the defendant will need to call a DLA Piper attorney to testify in order to complete the impeachment of the witness. But such testimony need not include the attorney's recollection of the witness's statements, or the attorney's reasons for recording the particular statement in question. To properly impeach the witness with a statement contained in these attorney work-product materials, the defendant will be required to demonstrate only that (1) the DLA Piper attorney interviewed the witness, (2) the witness provided information to the attorney, (3) the attorney attempted to accurately capture in the work product information provided by the witness, (4) DLA Piper took steps to ensure the accuracy of the information contained in the work product, and (5) the purportedly inconsistent statement is reflected in the work product. Thus, because a successful impeachment can occur without requiring DLA Piper's attorneys to opine as to what the witnesses previously stated during these interviews, the Court is even more convinced that these materials constitute "fact," rather than "opinion," work product.

To be sure, the Court's conclusion is not affected by the fact that DLA Piper never reviewed its interview memoranda with Mr. Radomski and Mr. McNamee, or that it never read any specific portions of the memoranda to the witnesses to confirm their accuracy. 6/8/11 Hr'g Tr. at 31:18-20. While this factor would carry more weight in the context of the Jencks Act, see Goldberg, 425 U.S. at 110 n.19 (noting that a witness has not "adopted or approved" a lawyer's writings if "the lawyer does not read back, or the witness does not read, what the lawyer has written"), here the Court need not find that the memoranda contains "statements" as defined by the Jencks Act in order to conclude that the memoranda constitutes "fact" work product. The Court need only be satisfied that the remarks recorded in the interview memoranda can be fairly attributed to the witnesses. Cf. Palermo, 360 U.S. at 352 (noting that Congress was concerned that production under the Jencks Act be limited to "only those statements which could properly be called the witness'[s] own words," and "that the statement could fairly be deemed to reflect fully and without distortion what had been said to the government agent"). And for the reasons discussed above, the Court is indeed satisfied that the memoranda accurately reflect the witnesses' statements to DLA Piper.

DLA Piper must therefore produce portions of the interview memoranda and the initial interview notes to the defendant, provided that he has demonstrated a substantial need for the materials, and that it would be an undue burden to require that he attempt to obtain the materials from another source. And, based on defense counsel's representations, the Court concluded at the April 21, 2011 hearing and in its April 27, 2011 Order that the defendant established a substantial need for "(1) . . . statements [that] are inconsistent with the statements made by [Mr. Radomski or Mr. McNamee] in interviews conducted by the government prior to their interviews with DLA Piper," or (2) any statements by Mr. McNamee that "are consistent with the

defendant's theory that Mr. McNamee has progressively embellished the facts that form the basis of the offenses charged in the Indictment." April 27, 2011 Order at 2 n.1, United States v. Clemens, Criminal Action No. 10-223 (RBW) (D.D.C.). Moreover, the defendant could not possibly learn what was actually discussed during DLA Piper's interviews of Mr. Radomski and Mr. McNamee without obtaining the law firm's notes and interview memoranda;[22] thus, the defendant satisfied the "undue burden" prong as well.[23] As a result, the defendant has made a sufficient showing to pierce the cloak of protection that otherwise might be accorded to DLA Piper's "fact" work product.

To determine which statements should be made available to the defendant, the Court intended as part of its in camera review to excise for production the discoverable statements from DLA Piper's work product. As the Court soon discovered in reviewing these materials, the problem with this approach is that the Court lacks sufficient knowledge about the defendant's theory of the case to determine whether the statements contained in these materials are either inconsistent with other statements in the record, or an embellishment of other statements. Without this knowledge, the Court might inadvertently allow statements that would be beneficial to the defendant to remain undisclosed, thereby prejudicing his ability to put forth his best possible defense at trial. Furthermore, if the Court were to only provide the defendant with specific instances of what seem to be inconsistent or embellished statements, without providing other potentially germane portions of the initial interview notes and interview memoranda that could possibly give context to those statements, the Court risks prejudicing the government

---

[22] The government officials who attended the interviews did not take notes and no law enforcement reports were prepared by the law enforcement agents who were in attendance. See 6/8/11 Hr'g Tr. at 20:6-8 (statement by Mr. Scheeler that he could "not recall [the government officials] taking notes").

[23] Although the "undue burden" analysis is rather straight forward, the Court acknowledges that it did not communicate its findings regarding the "undue burden" prong either at the April 21, 2011 Hearing, or in the April 27, 2011 Order.

because it would not have the opportunity to review those contextual statements in order to adequately rebut the purported inconsistency.[24] See Palmero, 360 U.S. at 352 ("Quoting out of context is one of the most frequent and powerful modes of misquotation."). The Court's original approach, therefore, could possibly "distort the record, mislead the factfinder, and undermine the central truth-seeking function of the courts." Swidler & Berlin v. United States, 524 U.S. 399, 413 (1998) (O'Connor, J., dissenting).

At the same time, the Court is hesitant to give the defendant the entirety of DLA Piper's "fact" work product because much of the interview memoranda and initial interview notes, at least at this stage in the litigation, do not seemingly have any relevance to the matters that will be at issue in the upcoming trial. By allowing the defendant complete access to irrelevant materials, the Court would be giving short shrift to the protections otherwise accorded to DLA Piper's "fact" work product. Accordingly, after further consideration of the record and governing case law, the Court finds that the more sensible approach is to provide the defendant with every statement provided by Mr. Radomski or Mr. McNamee in DLA Piper's work product that directly pertains to the defendant, and to redact all other information contained in these materials. The Court concludes that this is the more prudent approach because, at this point in the litigation, the only information contained in the work product that the Court can be certain will be at issue at trial are those statements regarding the defendant that were provided by Mr. Radomski or Mr. McNamee. While information concerning the other matters discussed in DLA Piper's work product might also be brought out at trial, the likelihood of such production is unclear, and even

---

[24] The government, of course, would only be entitled to view DLA Piper's work product if the defendant makes evidentiary use of these materials at trial. See Fed. R. Evid. 612 (requiring a party that "uses a writing to refresh [a witness's] memory for the purpose of testifying" to produce that writing to the "adverse party . . . at the hearing"); Fed. R. Evid. 614 ("In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.")

assuming that these subjects are raised, it seems quite possible that these subjects will be "collateral" to the matters at issue and therefore are not subject to impeachment by DLA Piper's work product. See United States v. Pugh, 436 F.2d 222, 225 (D.C. Cir. 1970) ("[A] witness may not be impeached by extrinsic evidence (contradiction by another witness or evidence) on a collateral issue."). In any event, if necessary based on what occurs during the trial, the Court will revisit whether other portions of DLA Piper's work product must be produced to the defendant. Accordingly, at this time, the Court will require that DLA Piper produce only those portions of its interview memoranda and initial interview notes that directly pertain to the defendant. The Court believes that this approach properly balances the interests of DLA Piper in protecting its work product to the fullest extent possible, while also allowing the defendant access to the information that he needs to present his defense.

To further ensure that DLA Piper's work product is provided the protection it deserves under the circumstances, the Court will issue a protective order limiting the defendant's use of these materials. Specifically, the Court will limit the defendant's use to only those circumstances that are necessary to present his defense at trial. Any use of these materials in any unrelated litigation or in any other manner is strictly prohibited. The government, if it has been provided with any of the work product, will be subject to the same restrictions. Moreover, both parties will be required to immediately return to the Court at the conclusion of the trial any notes and memoranda they have received during the course of this litigation.

### IV. Conclusion

With the exception of one set of notes, see supra p. 28 n.19, as well as those portions of DLA Piper's interview memoranda that are explicitly labeled as the assessments of the attorneys, see supra p. 28 n.18, the Court concludes that the remainder of DLA Piper's notes and

memoranda constitute "fact" work product. As to the interview notes created during the initial interviews of Mr. Radomski and Mr. McNamee, those materials were created in an almost identical context to those created in Sealed Case II, which the District of Columbia Circuit strongly suggested constituted "fact" work product. With regard to the initial interview notes and all of the interview memoranda, these documents are not entitled to protection as "opinion" work product because DLA Piper has failed to meet its burden of demonstrating that the government's involvement did not otherwise impact its ability to "sharply focus or weed" the inquiries made of the witnesses. But more importantly, as to the interview memoranda, heightened protection for these documents is not warranted because the statements contained therein are an accurate reflection of the witnesses' statements, not the attorneys' mental impressions of what the witnesses had stated or what the attorneys thought was important to record. For these reasons, all of the materials just described are "fact" work product, and because the defendant has demonstrated a "substantial need" for those portions of the materials that he would be unable to obtain without undue hardship, Dir., Office of Thrift Supervision, 124 F.3d at 1307 (internal quotation marks omitted), the Court concludes that those portions must be produced to the defendant.

As noted above, DLA Piper is required to produce to the defendant those portions of its interview memoranda and initial interview notes that contain statements pertaining to the defendant and that were made by Mr. Radomski or Mr. McNamee. The remainder of the work product will be redacted, as the defendant has not established, at least at this point, a substantial need for this information. In the event that these other portions of DLA Piper's work product become relevant at trial, then the Court will determine at that time whether further production is necessary. In addition, the Court will issue a protective order to ensure that DLA Piper's work

product remains protected to the fullest extent possible. Finally, prior to requiring production of these materials to the defendant, the Court will advise DLA Piper of what information it will need to produce to the defendant, so as to afford it the opportunity to appeal the Court's decision to the District of Columbia Circuit.

     **SO ORDERED** this 21st day of June, 2011.[25]

REGGIE B. WALTON
United States District Judge

---

[25] An order is being issued contemporaneously with this memorandum opinion (1) granting in part and denying in part DLA Piper's motion to quash the subpoena duces tecum; and (2) directing DLA Piper to inform the Court in writing no later than June 25, 2011, as to whether it will appeal the Court's ruling to the District of Columbia Circuit. Should DLA Piper decide not to appeal the Court's ruling to the District of Columbia Circuit, then the Court will issue a protective order forthwith barring the defendant from disclosing any portion of DLA Piper's work product unless such disclosure is necessary to his defense at trial.