**IN THE UNITED STATES DISTRICT COURT**

FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA   :   Docket No.:
                           :
            Plaintiff,     :   1:10-CR-00223-RBW
                           :
      vs.                  :   Washington, D.C.
                           :
WILLIAM R. CLEMENS,        :   Wednesday, May 2, 2012
a/k/a "ROGER CLEMENS,"     :
                           :   TIME:  2:34 P.M.
            Defendant.     :
                           :
_____x   DAY 9
```

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE JUDGE REGGIE B. WALTON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:   STEVEN DURHAM, Esquire
                      DANIEL BUTLER, Esquire
                      COURTNEY SALESKI, Attorney-at-Law
                      GILBERTO GUERRERO Esquire
                      DAVID GOODHAND, Esquire
                      Assistant United States Attorneys
                      555 4th Street, N.W.
                      Washington, D.C.  20530

For the Defendant:    RUSSELL HARDIN, JR., Esquire
                      JEREMY MONTHY, Esquire
                      Rusty Hardin & Associates, P.C.
                      1401 McKinney, Suite 2250
                      Houston, Texas  77010
                      **(713) 652-9000**

                      MICHAEL ATTANASIO, Esquire
                      Cooley, Godward, Kronish, LLP
                      4401 Eastgate Mall
                      San Diego, California  92121

2

1    Appearances (Cont'd):

2    For the Movant:          DAVID CLARKE, JR., Esquire
                              JENNIFER SQUILLARIO, Attorney-at-Law
3                             DLA Piper US, LLP
                              6225 Smith Avenue
4                             Baltimore, Maryland  21209-3600

5

6    Court Reporter:          ANNIE R. SHAW, RPR
                              Official Court Reporter
7                             333 Constitution Avenue, N.W.
                              Room 6722
8                             Washington, D.C.  20001
                              (202) 354-3242

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by machine shorthand, transcript produced
     by computer-aided transcription.
25

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2                          (Afternoon session, 2:34 p.m.)

 3            THE COURT:  I apologize for the delay.  I tried to get

 4      out as soon as I could, but the doctor kept me waiting, so.

 5            Okay.  Anything before we bring the jury in?

 6            MR. HARDIN:  Very briefly, Your Honor.  Should we come

 7      up?

 8            THE COURT:  Oh, here at the bench?

 9            MR. HARDIN:  If you don't mind.

10            THE COURT:  That's fine.

11            (Bench conference.)

12            MR. HARDIN:  I'm not sure.  I have no reason to

13      believe these prosecutors are aware of it or not, but, in order

14      for the gag order to be consistent, I think it ought to be

15      observed by everybody.  And the Attorney General apparently at

16      lunch today in a public pronouncement told the world that the

17      Clemens prosecution was a legitimate use of government

18      resources.  I don't think the Attorney General --

19            THE COURT:  The Attorney General made the statement?

20            MR. HARDIN:  Yes, Attorney General Holder.  And I

21      don't think that's appropriate, but all I --

22            THE COURT:  I would agree.

23            MR. HARDIN:  Yeah, but I don't know what remedy there

24      is.  I don't know whether the jury, I think the jury is

25      supposed to be not looking at the media.  I realize that.  I
```

1    just wanted to express the concern.  I'm not asking for any

2    action on it because I don't know what action --

3            THE COURT:  I guess I can ask whether any of them have

4    heard anything if you want, that may highlight it.

5            MR. HARDIN:  I think that would highlight it.

6            THE COURT:  I don't know how you talk to your boss.

7            MR. DURHAM:  Judge, that's my boss' boss, and I call

8    him Mr. Attorney General.

9            THE COURT:  Oh, I know him.

10           MR. HARDIN:  I do too and I like him.

11           THE COURT:  I don't know why he would do that.

12           MR. HARDIN:  I don't know whether it's in response to

13   questions, you know, where he's at some other function and that

14   just happens.  I don't know the details.  The reason I came up

15   here is I don't see any reason to make a big public deal about

16   it.

17           THE COURT:  Just tell your boss and maybe he can pass

18   it on.

19           MR. HARDIN:  If we could just ask him to --

20           MR. DURHAM:  I'll ask him.  I'll pass it back to my

21   boss.

22           (Open court.)

23           THE COURT:  Okay, let's bring the jury in.

24           MR. PITTARD:  Your Honor, would you like the witness

25   back?

1    THE COURT:  Yes, please.

2    (Jury present at 2:39 p.m.)

3    THE COURT:  You may be seated.  Good afternoon.

4    THE JUROR:  Good afternoon.

5    THE COURT:  I apologize for the delay.  I had a

6    doctor's appointment.  It took a lot longer than I thought, so

7    I do apologize.

8    MR. DURHAM:  May I proceed, Your Honor?

9    THE COURT:  Yes.

10   BY MR. DURHAM:

11   Q.  Sir, good afternoon.

12   A.  Good afternoon.

13   Q.  I think it's been a day since you joined us.  Tell us again

14   what your name is, what you do?

15   A.  My name is Phil Barnett.  I'm a Congressional staff.  I'm

16   the Staff Director for the Energy and Commerce Committee, and I

17   was formerly the Staff Director for the -- I'm the Democratic

18   Staff Director for the Energy and Commerce Committee.  I was

19   formerly the Staff Director for the Oversight and Government

20   Reform Committee.

21   Q.  And that was in 2008 that you were the Staff Director for

22   Oversight and Government Reform?

23   A.  Yes.

24   Q.  Mr. Hardin asked you some questions during

25   cross-examination.  One of the items that he used was a

1    statement, a short statement, Mr. Clemens had made at the

2    public hearing.

3         MR. DURHAM:  May I have a moment, Your Honor?

4    BY MR. DURHAM:

5    Q.  I don't have the audio queued up, but let me read it.  It's

6    two sentences.  Mr. Clemens says under oath, "I'm not saying

7    Senator Mitchell's Report is entirely wrong.  I'm saying Brian

8    McNamee's statements about me are wrong."  Do you recall being

9    asked questions about that?

10   A.  Yes, I do.

11   Q.  The question I have for you, Mr. Barnett, is what was the

12   Committee's view of what Mr. Clemens was challenging in the

13   Report?

14        MR. HARDIN:  I know the Court's ruled just for the

15   record --

16        THE COURT:  No, I haven't ruled on that.  Approach.

17        (Bench conference.)

18        THE COURT:  No, I haven't ruled on that.  The

19   Committee's view of what Mr. Clemens --

20        MR. DURHAM:  No, no.  I'm sorry, it's a poorly framed

21   question.  What I'm getting at, Your Honor, is that there were

22   other public statements made that challenge the broader report,

23   not just the very narrow report related to McNamee.

24        THE COURT:  But again, even with that, I don't think

25   you can ask what their perception was of what he was

1   challenging, because that's a subjective assessment that you're

2   asking him to make about what the Committee was thinking.  I

3   have let him testify about what the Committee's concerns were

4   and why they were conducting a hearing, and I think that's

5   quite different.

6           But asking him to opine as to what the perception of

7   the Committee was about what Clemens was challenging, it seems

8   to me, if you have statements that he made --

9           MR. DURHAM:  Yes.

10          THE COURT:  -- then it's for the fact finder to assess

11  what he was challenging.

12          MR. DURHAM:  Well, just in terms, Your Honor, of

13  public statements that were made by Mr. Hardin about the

14  breadth of the challenge to Senator Mitchell's Report --

15          THE COURT:  But I don't know if those are coming from

16  you.  Lawyers speak on that for their clients all the time, and

17  that doesn't necessarily mean that they're mimicking what their

18  clients think.

19          MR. DURHAM:  Well they are public -- these are not

20  private statements he's referring to, Your Honor.  These are

21  statements that Mr. Hardin made with ESPN and New York Times.

22          THE COURT:  You mean you're going to convict

23  Mr. Clemens on what Mr. Hardin said?

24          MR. DURHAM:  Well, Mr. Hardin was acting as his

25  authorized agent, Your Honor, making statements.

1    THE COURT:  I don't know.  He was his lawyer, but I

2    don't know if you can attribute this because he made some

3    public statements about what he was challenging as counsel that

4    that meant Mr. Clemens was challenging it too.  Sustained.

5    (Open court.)

6    THE COURT:  I'll sustain the objection.

7    BY MR. DURHAM:

8    Q.  Let me ask you this, Mr. Barnett.  Was the Committee's

9    investigation focused exclusively on Mr. Clemens as an

10   individual who -- well, was the investigation of the Committee

11   focused exclusively on Mr. Clemens?

12   A.  The focus of the investigation was Senator Mitchell's

13   Report.  And in the -- in conducting that investigation,

14   Mr. Clemens was one of the players identified in the Report

15   whom the Committee talked with, but he was not the only player

16   identified in the Report that the Committee took a deposition

17   or an interview of.

18   Q.  Hang on just a second if we could.

19   MR. DURHAM:  Your Honor, may the witness identify by

20   name these --

21   THE COURT:  The names of other players he can, yes.

22   MR. DURHAM:  Very well.

23   BY MR. DURHAM:

24   Q.  You can continue, sir.

25   A.  One of the other players who was identified as using Human

1  Growth Hormone in Senator Mitchell's Report was Andy Pettitte,

2  and the Committee took a deposition of Mr. Pettitte.  Another

3  player was Chuck Knoblauch, and he was also identified in

4  Senator Mitchell's Report as using Human Growth Hormone.  And

5  the Committee, I think it was a transcribed interview, not a

6  deposition of Mr. Knoblauch.

7  Q.  Mr. Hardin had asked you some questions, I believe,

8  yesterday about he went, as I recall --

9           MR. DURHAM:  Could I use the Elmo, Madame Clerk?

10  Thank you.  This is Defendant's Exhibit 18.

11           THE DEPUTY CLERK:  Is it already in?

12           MR. DURHAM:  Yes.

13  BY MR. DURHAM:

14  Q.  Do you recall seeing this exhibit, Mr. Barnett?

15  A.  Yes, I do.

16           THE DEPUTY CLERK:  It's not admitted.

17           MR. DURHAM:  It's not admitted.  I understand that.

18  Am I correct on that, Your Honor?  This defense exhibit has not

19  been admitted; is that correct?

20           THE COURT:  It's not?

21           THE DEPUTY CLERK:  It's not.

22           THE COURT:  Very well.

23  BY MR. DURHAM:

24  Q.  All right.  Do you see it on the screen?

25           MR. HARDIN:  Pardon me, Your Honor.  If it is true and

1    the government objected to me displaying, I just want the

2    record to reflect now that they've chosen to, I have no

3    objection, but I ask that 17 and 18 by either side be allowed

4    to be displayed.  Eighteen up on the board, I have no problem.

5         MR. DURHAM:  Well it's displayed follow-up questions

6    that were asked on cross-examination.  It's not admitted at

7    this point.

8         MR. HARDIN:  I'm not quarreling with anything.  I'm

9    only asking that the record reflect they have now displayed one

10   that they objected to me displaying.  I have no objection to

11   them continuing to display it.  I would just like to be able to

12   do it at some time.

13        THE COURT:  It's not being displayed to the jury, is

14   it?

15        THE DEPUTY CLERK:  It was.

16        THE COURT:  It was?

17        THE DEPUTY CLERK:  That's why I asked was it in.

18        MR. HARDIN:  I tried to introduce it.  They objected

19   to it.  Now they see it on the screen.

20        THE COURT:  Did the jury read any of it?

21        THE JUROR:  Yes.

22        MR. DURHAM:  I'm going to ask some questions about it.

23        THE COURT:  Very well.  What's good for the goose is

24   good for the gander.

25        MR. DURHAM:  Candidly, and I don't mind, Your Honor,

 1   if this is admitted into evidence.  In fact --

 2             THE COURT:  Well, I don't know if he --

 3             MR. HARDIN:  We would renew our request then.

 4             THE COURT:  You want it in?

 5             MR. HARDIN:  Yes, sir.

 6             THE COURT:  Very well.  It will be admitted then.

 7             MR. DURHAM:  All right.

 8             (Defendant's Exhibit No. 18 was admitted into

 9             evidence.)

10   BY MR. DURHAM:

11   Q.  While we have this on the screen in front of us,

12   Mr. Barnett, explain to the ladies and gentlemen of the jury

13   what this is or what it purports to be.  Have you seen it

14   before?

15   A.  I did see it.  Mr. Hardin showed it to me yesterday.

16   Q.  Let me ask you this.  When was the first time that you saw

17   this particular item, Defendant's Exhibit Number 18?

18   A.  During Mr. Hardin's cross-examination of me.

19   Q.  Before Mr. Hardin cross-examined you, did you have the

20   opportunity to review this exhibit?

21   A.  No.

22   Q.  And Mr. Hardin showed you this exhibit during

23   cross-examination?

24   A.  Yes.

25   Q.  And do you recall that he asked you some questions in

1    connection with specific page numbers of the Congressional

2    deposition that you took of Mr. Clemens?  Do you recall that?

3    A.  Yes, I do.

4    Q.  And he asked you who was speaking on which particular page.

5    Do you remember that?

6    A.  Yes, I do.

7    Q.  And did you look at this exhibit and try to, an exhibit you

8    hadn't seen, and try to answer his questions to the best of

9    your ability?

10   A.  Yes, I did.

11   Q.  And after Mr. Hardin finished his cross-examination, did

12   you have an opportunity to go back and take a look at this

13   exhibit with an eye toward whether there were any inaccuracies

14   in this exhibit?

15   A.  Yes, I did.

16   Q.  And did you find any inaccuracies in this exhibit that

17   affected your ability to testify or answer the questions

18   Mr. Hardin had posed?

19   A.  I think it's related to act or count, Count 8 where there's

20   the quote and there was four or five B12 needless already lined

21   up to go.  My recollection had been that that occurred late in

22   the deposition.  And I was asked, I believe, whether I had

23   asked that question.  And my recollection was that it had been

24   a counsel for Mr. Clemens that had asked the question that led

25   to that.

1      I believe Mr. Hardin said this occurred on Page 36 when I

2   was asking the questions.  I went back.  It's actually over a

3   hundred pages later in the deposition, and the counsel are

4   asking those questions.  I was not asking those questions.

5   Q.  So your testimony was accurate to the best of your

6   recollection?

7   A.  Yes.

8   Q.  This exhibit was not; is that correct?

9   A.  Yes.

10          MR. DURHAM:  Take that down, thank you.

11   BY MR. DURHAM:

12   Q.  Mr. Barnett, part of those questions that Mr. Hardin asked

13   concerned the use of Vitamin B12.  Do you recall that?

14   A.  Yes.

15   Q.  And specifically and narrowly, Mr. Hardin asked you

16   questions about one specific or a few specific questions that

17   you or Miss Safavian or counsel asked Mr. Clemens about B12.

18   Do you recall that?

19   A.  Yes.

20   Q.  Now, the question that I have for you is that is this.

21   Were these individual questions that you asked Mr. Clemens,

22   were they part of a broader context, investigative context to

23   understand the issue of B12?

24   A.  Yes, they were.

25   Q.  And explain that to us if you would be so kind.

1    A.   This was not -- the Committee had had prior experience with

2    B12, and is it appropriate for me to talk about the Committee's

3    prior examination of B12?

4               MR. DURHAM:   I believe with the leave of Court.

5               THE COURT:   Was that a relevant consideration

6    regarding the questions that were asked regarding the hearings

7    that were being conducted?

8               THE WITNESS:   Yes.

9               THE COURT:   Very well.

10              THE WITNESS:   In 2005, when the Committee had other

11   players testify, one of the players was Rafael Palmeiro.   And

12   he had testified under oath before the Committee that he had

13   not used a, used any steroids.   Several, maybe two months

14   later, he tested positive for steroids.   And the Committee had

15   an investigation to determine had he testified truthfully,

16   because he had told us he hadn't used steroids and then he

17   tested positive.   His account was that he had not used steroids

18   intentionally, but it was in a, a injection of B12 that had

19   been, must have been contaminated so that was his account.

20              In the course of that investigation, we did talk -- he

21   played with the Baltimore Orioles and the Texas Rangers.   And

22   we talked to team physicians and trainers on those clubs about

23   the use of B12.   And particularly on the Rangers and also on

24   the Orioles, but probably to a lesser extent, B12 was regularly

25   injected.   So that was a concern of the, of the Committee,

1    because professional Baseball players are role models for kids.

2            We continued this exploration of B12 in the

3    investigation when we were looking at Senator Mitchell's

4    Reports after Mr. Clemens told us that he had been using B12

5    shots.  We had a hearing in fact the day before the hearing

6    with Mr. Clemens in which we had medical experts, who are

7    experts on Human Growth Hormone, and then a separate set of

8    experts, who are experts on B12, to talk about when is it

9    appropriate to take B12, what are the medical risks.  This was

10   part of the Committee's consideration, whether there would be a

11   need for any legislation in the area of B12.

12           THE COURT:  Now, ladies and gentlemen, let me explain

13   something to you.  You've heard this witness testify about what

14   people had said before the Committee on prior occasions.  That

15   is not before you for the truth of what was said at that time,

16   so you cannot conclude, for example, that, yes, Mr. Palmeiro

17   must have used these substances because it was said previously.

18   It's not being introduced for that purpose.

19           It's only being presented to you to show why,

20   allegedly, the Committee had the concerns that it had and

21   conducted the hearings regarding these various matters you've

22   been hearing about.  So please only consider it for that

23   purpose and not for the truth of what was said at that time.

24   BY MR. DURHAM:

25   Q.  Mr. Barnett, Mr. Hardin also asked you a number of

1   questions about individual acts again on Defendant's Exhibit

2   18.  And I ask you whether Mr., had Mr. Clemens had had a

3   discussion with Mr. -- whether you had done any research, I

4   believe, on growth hormone.  The individual question that you

5   asked Mr. Clemens or Miss Safavian, or counsel asked

6   Mr. Clemens during the deposition, was that part of a broader

7   investigative agenda or goal by the Committee?

8   A.  Yes, it was.  The Committee spent a considerable amount of

9   attention on Human Growth Hormone.  In Senator Mitchell's

10  Report he testified that or his Report found, because of the

11  Baseball's steroids policy and how it had gotten tougher in

12  recent years, steroid use appeared to be going down, but Human

13  Growth Hormone, which was not being tested, was going up.

14      So we had that testimony before us.  When we talked to the

15  other players I mentioned, Mr. Pettitte and Mr. Knoblauch, they

16  had both been identified in Mr. Mitchell's Report as using

17  Human Growth Hormone.  When we talked with them, they told us

18  about their use of Human Growth Hormone.  And in fact we

19  learned in our investigation that their use was greater than

20  had been reported by Senator Mitchell.  We had two different

21  accounts of use of Human Growth Hormone involving Mr. Clemens'

22  wife, Debbie Clemens, one account from Mr. Clemens, one from,

23  from Mr., from Mr. McNamee.

24      There was a hearing that we had.  I mentioned this the day

25  before, where we had the B12 experts and experts on adult and

1    child use of Human Growth Hormone.  And there was legislation

2    that a member of the Committee, Stephen Lynch, had introduced

3    that would have made Human Growth Hormone a controlled

4    substance.  We were --

5              MR. HARDIN:  Pardon me, Your Honor.  This was

6    identically testified to on direct, this entire subject about,

7    you remember Congressman Lynch.  He's testified to this

8    already.  I just simply object to it being repetitious and

9    narrative.  I would like the question and answer, so I can know

10   if I have an objection.

11             THE COURT:  If it's merely just repetitious, I agree,

12   but, you know, I'll give some leeway.

13             MR. HARDIN:  Thank you, Your Honor.

14             MR. DURHAM:  I'm sorry, Your Honor.

15   BY MR. DURHAM:

16   Q.  You said there was a Bill sponsored by Representative

17   Lynch; is that correct?

18   A.  Yes.

19   Q.  And was he a member of the House Oversight and Government

20   Reform?

21   A.  Yes.  He was a member, and there was testimony about the

22   Bill at both the January 15th and the February 12th hearings.

23   And the testimony in those hearings was generally favorable.

24   Pediatricians contacted us with concerns about his Bill after

25   his testimony.

1    Q.  Was that Bill --

2            THE COURT:  It should be obvious to you, but just to

3    make sure you understand, again, in reference to Senator

4    Mitchell's Report, the content of that Report and the

5    allegations made in that Report cannot be considered by you for

6    the truth of what is said in that Report.  The only reason the

7    information regarding the Report is relevant to this proceeding

8    is that you can use that in assessing whether the scope of the

9    hearing that was being conducted was consistent with what was

10   in that Report.  So you can only consider the Report in your

11   assessment as to whether or not Congress was in fact conducting

12   a hearing consistent with what was represented in that Report.

13   BY MR. DURHAM:

14   Q.  I'm sorry.  With respect to Human Growth Hormone, had you

15   completed your explanation?

16   A.  Let's see, so there was legislation that was before the

17   Committee.  There was information the Committee received pro

18   and con on that subject.  And there was members who had

19   concerns about the Committee, and some were expressed in, in

20   hearings about whether Senator Mitchell's Report was strong

21   enough on the issue of Human Growth Hormone, his

22   recommendations.

23   Q.  Mr. Hardin asked you, he went through each of these acts

24   that are charged individually.  And one of those was

25   Mr. Clemens' claim that he used the drug Lidocaine.  He was

1    injected with Lidocaine.  Did that particular area of inquiry,

2    that narrower question that Mr. Hardin focused on, did that tie

3    back in with any type of broad legislative authority that the

4    Committee had on that particular issue?

5    A.   The Committee, on the question of Lidocaine, we had

6    Mr. Clemens' assertions, Mr. Clemens' statement that

7    Mr. McNamee had given him Lidocaine injections.  In the course

8    of examining that claim, the Committee talked with medical

9    experts, who were experts in the administration of Lidocaine.

10   The Committee talked with team doctors and team trainers about

11   the administration of Lidocaine and whether it was plausible

12   that Mr. McNamee would have given Mr. Clemens a Lidocaine shot.

13   Q.   What was the investigative context of that particular

14   question, that is the question about whether or not Mr. Clemens

15   was injected by Mr. McNamee with Lidocaine?

16   A.   I'm not sure what you mean by investigative context.  What

17   was the purpose of the --

18   Q.   Yes.

19   A.   This was, the Committee was trying to assess the

20   reliability, credibility of Senator Mitchell's Reports.  And

21   Senator Mitchell had found Mr. McNamee had injected Mr. Clemens

22   with steroids and Human Growth Hormone.  And the account that

23   Mr. Clemens told the Committee was it was not those substances,

24   but it was Lidocaine and Vitamin B12.

25   Q.   Let me move on to one more topic area that is reflected in

1    Defendant's Exhibit Number 18, and that is corresponding to

2    Obstructive Act Number 14.  Do you recall, Mr. Barnett, taking

3    Mr. Clemens' deposition where he says that I had no idea that

4    Senator Mitchell wanted to talk to me?

5    A.  Yes.  Yes, I do recall that, that statement.

6    Q.  Now, with respect to that particular statement, how did

7    that serve the broad investigative authority of the Committee?

8    A.  Well, the Committee was trying to determine the credibility

9    of Senator Mitchell's Report.  A significant issue was the

10   approach that Senator Mitchell took to his investigation,

11   including whether he made appropriate efforts to talk to the

12   players he was identifying in his report, so that he would have

13   a opportunity to hear their side of the story.

14   Q.  Did that remain an open issue for the Committee at the time

15   of the public hearing on February 13th, 2008, that is whether

16   or not Senator Mitchell had reached out to Mr. Clemens?

17   A.  There was questioning on that subject during the public

18   hearing.

19   Q.  And do you recall was there a particular member of Congress

20   that asked Mr. Clemens additional questions about that issue,

21   that is whether Senator Mitchell did try to call him?

22   A.  Yes, I do.  Mr. Clemens had done an interview on "60

23   Minutes" and in that -- this was in early January.  And in that

24   interview, he had said, he was asked why didn't he speak with

25   Senator Mitchell.  And he had said his lawyers had advised him

1    not to speak to Senator Mitchell.

2         That was a different account than the account we received

3    in the deposition.  And a member, during the public hearing,

4    asked him about that, the two differing accounts and why there

5    was a difference in the accounts.

6    Q.  Who is the member, do you recall?

7    A.  It was Representative Carolyn Maloney from New York.

8    Q.  And have you had an opportunity to review the hearing

9    transcript and the audio portion, which is Government's

10   Exhibits 3a and 3b marked for identification?

11   A.  Yes.

12   Q.  And are you familiar with the audio/video portion of

13   certain questions that Congresswoman Maloney asked Mr. Clemens

14   on that very subject?

15   A.  Yes, I am.

16   Q.  And have you seen that recently as and are familiar with it

17   as Government's Exhibit 3b-10?

18   A.  Yes, I have.

19             MR. DURHAM:  Your Honor, may I have just a moment with

20   counsel?

21             THE COURT:  Yes.

22             MR. DURHAM:  Your Honor, may I have a moment to

23   consult with counsel?

24             THE COURT:  Yes.

25             MR. DURHAM:  Your Honor, thank you very much.

1    BY MR. DURHAM:

2    Q.  Sorry, Mr. Barnett.  You said that you had an opportunity

3    to look at an excerpt that's not been admitted into evidence,

4    Government's Exhibit 3b-10?

5    A.  Yes.

6    Q.  And is that, well, what is that?  Without going into

7    detail, what is that generally?

8    A.  That is the questioning that Representative Maloney --

9    those are the questions that Representative Maloney asked at

10   the hearing and the answers that Mr. Clemens gave.  And they

11   address the subject that we were just discussing, which is

12   whether Mr. Clemens was aware of Senator Mitchell's efforts to

13   speak with him and, I think in addition, addressed his two

14   differing statements about that.

15   Q.  Very well.

16          MR. DURHAM:  At this time, Your Honor, we're going to

17   reserve admission moving into evidence 3b-10 for a later time.

18          THE COURT:  Very well.

19   BY MR. DURHAM:

20   Q.  Mr. Barnett, I'm almost finished.  I think you had referred

21   to a Bill that Representative, was it, Lynch had drafted on

22   proposed legislation for Human Growth Hormone?

23   A.  Yes.

24   Q.  Was that ever passed?

25   A.  No, it was not.  We did not have the -- and this is an area

1    we did not have the oversight jurisdiction.  We had the

2    oversight investigative jurisdiction, but we did not have

3    legislative jurisdiction over that Bill.  There was a hearing

4    the following month in the Energy and Commerce Committee, which

5    did have the legislative jurisdiction about the issue of

6    steroids and Human Growth Hormone used in professional sports.

7    And Mr. Lynch's Bill was discussed at that hearing, but I'm not

8    aware that that Committee ever took any additional action

9    beyond that hearing.

10   Q.  Does legislation always come from hearings that the

11   Oversight Committee or other committees conduct?

12   A.  No.  It does come from hearings.  More often than not, a

13   legislation would not result from a hearing.

14   Q.  And does that happen from time to time where the Committee

15   will have a hearing and there will be no legislation directly

16   that results?

17   A.  Yes, that is not uncommon at all.

18   Q.  And is that part of what the Oversight Committee does?

19   A.  Yes, it is.

20   Q.  And how is that helpful to further the legislative

21   interests of the House of Representatives?

22   A.  Well, in some instances, the results can be achieved

23   without the need for legislation, and this instance I think is

24   a very good example of that.

25   Q.  Do you have information that the Committee's hearing had an

1    effect on the public health issues that you've described?

2    A.  Yes, in two ways, one, a baseball, after the 2005 hearing,

3    had significantly strengthened its policy voluntarily.  And it

4    did it again after the 2008 hearing on the fundamental issue of

5    steroid use by teenagers, which was the biggest motivation for

6    the Committee's interest in this.  Prior to the Committee

7    having these hearings, steroid use by teenagers had been

8    increasing, and it tripled in ten years.

9            MR. HARDIN:  Pardon me, Your Honor.  I'm going to

10   object to hearsay reports.  I don't mind if they've got more

11   exhibits to be introduced, but I certainly object to him giving

12   hearsay statistics without us having any support for what's in

13   question.

14           (Bench conference.)

15           THE COURT:  Because it's not being offered for its

16   truth, I guess it's being offered just as a, as information as

17   to why they would have a concern.  But has that information

18   been produced that he's now testifying about?

19           MISS SALESKI:  I believe that Mr. Hardin has received

20   a copy of the information that's related to this.  Not only has

21   he -- there was a discovery production in which there was both

22   an article and a study from the University of Michigan in which

23   the statistics show that, since the time of the hearings, the

24   steroid use by teens has dropped by half.  And so I think the

25   only thing that's going on here, Your Honor, is that Mr. Hardin

1   has suggested by way of cross-examination that nothing that the

2   Committee does or that Congress does came of these hearings,

3   and this is just offered to rebut that idea.

4          THE COURT:  By way off legislation?

5          MISS SALESKI:  By way of legislation, but what the

6   Committee does is broader than that, as Your Honor knows, and

7   we just want to be able to provide the full picture.

8          MR. HARDIN:  My objection is twofold.  Number one is

9   it is being offered for the truth of the matter.  He's

10  testifying that those statistics directly relate to what the

11  Committee hearing is.  Secondly, the studies that she's talking

12  about they provided us that I don't recall, I'll be glad to

13  look at it if we do.

14         But I would be willing to bet money did not say, make

15  any correlation between the Committee's hearings and those

16  statistical changes.  There are a lot of things going on in

17  society besides the Committee's looking at steroids and HGH,

18  and all I'm asking is is that he not be allowed to testify to

19  hearsay studies by others that draw no connection between his

20  Committee's work.

21         THE COURT:  Yeah, saying it's not being offered for

22  its truth, what relevance does it have?  I mean I understand

23  you're saying that maybe the 2005 hearings had some impact on

24  usage, but is that the proper role of Congress to have hearings

25  to try and influence behavior?  I didn't know that, within the

1    Constitution, that was their mandate.  I thought it was to make

2    laws.

3            MISS SALESKI:  So I think the case of *United States*

4    *versus Watkins*, which I pointed the Court to before, is very

5    informative that sometimes hearings are held that result in

6    legislation.  Sometimes hearings are held that can shed light

7    on things and then it turns out that there's not a need for

8    legislation.

9            THE COURT:  That's a different issue.  What you're

10   saying here is that the, you're trying to, I guess, or have the

11   jury say, well, the hearings were appropriate because they had

12   a impact on human behavior.  Is that appropriate?  Is that the

13   role of Congress to do that, or is it to investigate matters,

14   see whether legislation should be adopted?

15           And obviously there are going to be times when they

16   conclude that that's not the case.  But if there's a benefit or

17   some, you know, positive aspect that evolved from it, how is

18   that relevant as to whether the hearing was appropriately

19   conducted?  See what I'm saying?

20           MISS SALESKI:  I think I do, Your Honor, and I think I

21   understand the Court's concern.  And our position is, this is

22   directly related to the challenge, that this really may not

23   have been about public health, but this was just to go get

24   Roger Clemens, and that ultimately this didn't result in

25   legislation.

1      THE COURT:  Yeah, but being that, you know, the fact

2   that it had a salutary effect, it seems to me after the fact

3   doesn't show justification for holding the hearings.  I'm not

4   saying they weren't justified.  I'm just saying that the fact

5   that you had a positive impact on the rate of usage after the

6   fact is supportive of the fact that these hearings were

7   conducted within the purview of, that Congress has been given

8   under the Constitution.

9      MR. PITTARD:  If I could say two things, one, I think,

10  it seems to me, that it goes to why no legislation was passed.

11  It seems to be an implication that no legislation was passed,

12  so that suggests something bad or something untoward here.

13  Well, the reason that no legislation also was passed was

14  because the problem, policy problem, began to resolve itself in

15  light of what the Committee had done.

16      But whether it's in light of what the Committee had

17  done or not, when you have that causal link, it's really

18  irrelevant, because the point is it explains why no legislation

19  ultimately was needed because the problem began to dissipate

20  for whatever reason.

21      MR. HARDIN:  May I just briefly for the record, I know

22  the Court's ruled, but I object to counsel for the witness

23  interjecting why he should be allowed to be asked certain

24  questions, number one.  Number two, that's a standing issue.

25  But the second thing is the studies that he is being asked

1    about, which is all I objected to, draw no causal connection

2    between the work of the Committee and this result.  They want

3    to argue that, A, the studies are hearsay.  B, the studies do

4    not make any causal connection.  And as a result, between the

5    hearings and this, particularly the hearing of 2008, until they

6    can show that they're that, we don't even get to the studies.

7    I would respectfully state that it's just irrelevant.

8              MISS SALESKI:  I think that --

9              THE COURT:  I understand the objection.  I think he

10   does have standing to present what Congress' position is in

11   reference to the hearings, so I would not prohibit him from

12   interjecting his position.  But I think, if it's only coming in

13   for the purpose of showing why legislation was not adopted, if

14   that is in fact what the truth is, then I don't think it comes

15   in for the truth.

16             It only comes in to show why Congress, as a Committee,

17   why the Committee didn't take further action.  So it's not for

18   its truth.  It's just to explain their mental process as a

19   collective group in not moving forward with legislation.  I

20   think that's appropriate with obviously a cautionary

21   instruction to the jury regarding the limited use for which

22   they can consider the information.  But was it produced?

23   Because it should have been produced.  If it wasn't, it should

24   have been produced so that they were on notice as to what you

25   were relying upon.

1          MISS SALESKI:  It was produced and we can direct

2     counsel to it.

3          MR. HARDIN:  I have no idea.  I haven't seen it.  I'm

4     not suggesting they haven't produced it.  I'm simply saying I

5     haven't seen it.  I would again really urge that, if they're

6     not offering it to prove its truth, then there would be no

7     reason for Congress to act on it.  And so I would just ask the

8     Court to reconsider that, because these are hearsay

9     reports that draw no causal connection between what Congress

10    did or didn't do, and it's being offered to show, because it

11    was true, they decided not to do any further legislation.  I

12    think is what they're saying.

13         THE COURT:  Right.

14         MR. HARDIN:  I just think it's -- anyway, I object.

15         THE COURT:  I understand your position.  I do think

16    the intent of Congress has been challenged.  And to the extent

17    that they're saying that they had seen a decline in the use of

18    steroids among youth and subsequent to the 2005 hearing, and

19    then, because of that situation as it existed in 2008, they

20    decided that legislation wasn't needed, if in fact that's

21    accurate, I think that's some relevant consideration that

22    challenges your suggestion that these hearings were just, you

23    know, a wild goose hunt and not really for some legitimate

24    legislation.

25         MR. HARDIN:  Yes, sir.  I don't need to spend anymore

1   time on it.  Just, for the record, I want to make clear

2   remember we are only challenging December the 13th, 2008.  That

3   would be the only thing relevant to our challenge.  If they

4   have got studies that show, and we're not challenging the day

5   before with HGH.  We're not challenging the 2-5 hearings.

6   We're not challenging the January 15th hearings, only

7   February 13th of 2008.  And I don't think they're going to be

8   able to show any causal connection between the studies they

9   want to talk to and what happened on February the 13th, 2008.

10          THE COURT:  Well I understand that you want to

11   restrict it to that, but I do think the law says that you have

12   to consider all parts of the hearing as a collective whole,

13   that you just can't zero out a particular question or a

14   particular day's hearing and decide that, because maybe that

15   day's hearing, at least in a vacuum, would monetarily lead to

16   legislation.  I don't think you look at it that way.  I think

17   you have to look at the entire picture.

18          So I'll permit it with a limited instruction to the

19   jury if that's what he's saying.  If he's saying that this

20   decrease in youth usage was a reason that Congress decided that

21   legislation wasn't needed, if that's what you are saying --

22          MISS SALESKI:  I think we need to reframe our

23   question, because the actual studies were done later.  And

24   so --

25          THE COURT:  So that wasn't a factor?

1          MISS SALESKI:  So this University of Michigan study

2    that we're talking about would not have been out at least till

3    2008.

4          THE COURT:  I'll sustain the objection then.

5          (Open court.)

6          THE COURT:  I will sustain the objection.  Disregard

7    the statistics that were being given to you by the witness

8    about steroid usage among youth.  That's to be totally

9    disregarded by you in your deliberations in this case.

10   BY MR. DURHAM:

11   Q.  I just have a couple more questions, Mr. Barnett.  After

12   the February 13th, 2008, hearing, do you know whether Major

13   League Baseball took steps to fortify its own drug policy?

14   A.  Yes, it did.

15   Q.  Do you know what those steps were?

16   A.  Yes, the, in April of -- in April, they, the Commissioner

17   of Baseball and the Players Union reached an agreement to

18   increase the number of steroid tests, especially in the off

19   season.  They also reached an agreement to increase the

20   independence of the person who was responsible for

21   administering the tests so that he or she could not be

22   dismissed by the prior -- previous to that, either the

23   management or the Players Association could dismiss the

24   individual.  The individual had greater independence.

25        Both of those were key recommendations in Senator

1    Mitchell's Report.  There were other recommendations in Senator

2    Mitchell's Report, which Commissioner Selig, on January 15th --

3    Q.  Commissioner Selig, you're talking about the Commissioner

4    of Major League Baseball?

5    A.  The Commissioner of Major League Baseball said he had the

6    power to implement without negotiating with the Players Union,

7    and he implemented those or was in the process of implementing

8    those.  I think he told us on January 15th he committed to

9    implement them.  Those included establishing an investigative

10   unit within Major League Baseball that could investigate

11   allegations of use of steroids or Human Growth Hormone by

12   players.

13   Q.  You know, Mr. Barnett -- do you know, Mr. Barnett, whether

14   Major League Baseball -- in April of 2008 you were talking

15   about; is that correct?

16   A.  Yes.

17   Q.  Do you know whether Major League Baseball referenced the

18   Mitchell Report in April of 2008 in connection with Senator

19   Mitchell's work?

20   A.  That would certainly be my recollection.  The --

21   Q.  Let me, is there anything that might refresh your

22   recollection on that, sir?

23   A.  Certainly.

24   Q.  Press release?

25   A.  Sure, certainly.

1    Q.  Let me just mark this for identification purposes only,

2    Government's Exhibit Number 97.

3              MR. DURHAM:  May I approach the witness, Your Honor?

4              THE COURT:  Yes.

5    BY MR. DURHAM:

6    Q.  Mr. Barnett, let me hand you what's been marked as

7    Government's Exhibit 97, and I'll direct your attention to

8    Paragraph Six of Government's Exhibit 97.  Ask you to read it

9    silently and ask you whether that refreshes your

10   recollection of the statement issued by Major League Baseball

11   two months after the public hearing?

12   A.  Yes, there is a, there's a, there was a clear reference to

13   Senator Mitchell's Report in the release announcing the,

14   announcing the changes.  I have a very clear recollection that

15   the changes that were made to in the steroids policy were those

16   that were in Senator Mitchell's Report.

17         There were, as I said, there were two sets, some that

18   Baseball could do on its own and the Commissioner committed to

19   the Committee that he would implement those.  There were some

20   that needed negotiation between the Commissioner and the

21   Players Association.  And in this April announcement, the

22   Commissioner and the Players Association were announcing that

23   they were going to implement those additional recommendations.

24   Q.  Thank you, sir.

25             MR. DURHAM:  Thank you.

1          MR. HARDIN:  May I have five minutes, Your Honor?

2          THE COURT:  If it relates to new matters that were

3    only brought out on redirect.

4          MISS SALESKI:  Can we approach about that, Your Honor?

5          THE COURT:  Yes.

6          (Bench conference.)

7          MISS SALESKI:  Your Honor, our position would be that

8    there are no new matters that would justify going --

9          THE COURT:  Well, let me ask, what came out on

10   redirect that's new that you wouldn't have had a chance to

11   cross on?

12         MR. HARDIN:  This, number one, this report.

13         THE COURT:  Which?

14         MR. HARDIN:  This article that they just showed this

15   witness.  Did you move to introduce it?  You just asked him

16   about it.

17         MR. DURHAM:  Used to refresh.

18         THE COURT:  I didn't understand the context, because

19   he wasn't asked whether this had some bearing on Congress'

20   decision not to go forward with any type of legislation.  So

21   without that, I don't see how it's pertinent.  I mean did it

22   have an impact on, was that something that the Committee took

23   into account in deciding that it did not need to move forward

24   with any type of legislation?

25         MISS SALESKI:  That's a question for the government,

 1    Your Honor.

 2              THE COURT:  Right, that's what I'm asking.

 3              MISS SALESKI:  I think the answer is yes.  I mean the

 4    testimony has been again and again.

 5              THE COURT:  But I haven't heard him say that.  So all

 6    we have now is what at least would appear to be a hearsay

 7    statement, when it's not being offered to show what impact it

 8    had on Congress regarding his decision not to go forward with

 9    legislation.

10              MR. DURHAM:  Effect.

11              THE COURT:  Do we know if that's the case?

12              MR. DURHAM:  I think, Your Honor, the purpose of

13    showing him that to simply refresh his recollection was to

14    establish --

15              THE COURT:  I know, but it still has to have

16    relevance.  And I don't see how it has relevance unless it had

17    some bearing on what Congress decided or decided not to do.

18              MR. DURHAM:  No.  The point was to establish that the

19    hearing on February 13th had a positive effect, that it had an

20    effect.  This is chronological.  Major League Baseball took up

21    the challenge.  Congress laid it down, and Major League

22    Baseball took it up.

23              THE COURT:  I know, but again, did that have a bearing

24    on -- because his whole challenge is that what was taking place

25    had nothing to do with potential legislation being adopted by

1    Congress.  So I thought that you all were presenting evidence

2    to show either why Congress didn't go forward with legislation

3    or why the inquiries were in fact relevant to potential

4    legislation.

5            MR. DURHAM:  And think it's the former.  It's because

6    Baseball took up the challenge that there was no --

7            THE COURT:  Do we know that?  How does the jury know

8    that?  We haven't heard that.

9            MR. DURHAM:  I can close that loop.

10           THE COURT:  Because, otherwise, I don't see how it's

11   relevant, and it ends up appearing to be just a blatant hearsay

12   statement --

13           MR. DURHAM:  Understood.

14           THE COURT:  -- about how this situation has improved

15   but not put into proper context.

16           MR. DURHAM:  I understand, and I'm happy to clean that

17   up.

18           THE COURT:  And I guess that would be something new

19   because this is something being brought out that wasn't brought

20   out on direct examination, and he didn't have a chance to cross

21   on it.  So I'll permit that.  Are there any other areas you

22   want to go into?

23           MR. HARDIN:  Mr. Knoblauch, his name was mentioned.

24           THE COURT:  And it wasn't mentioned before, I agree.

25           MR. HARDIN:  Mr. Knoblauch, the facts are and this has

1    to do with earlier testimony that wasn't brought out.

2    Mr. Knoblauch ignored the Committee's invitation to testify,

3    and they issued a subpoena to him for this very hearing.  I

4    just want to elicit that information.  He was part of the

5    February 13th group originally.

6              In February, so the Court can put it in context, the

7    February 13th group originally was going to be Mr. Knoblauch,

8    Mr. Pettitte, Mr. Radomski, Mr. Pettitte and Mr. Clemens.  And

9    Mr. Knoblauch refused to respond to them, and so they issued a

10   subpoena for him.  That's all I'm going to ask.  Then

11   Mr. Palmeiro, I want to make sure it's clear --

12             THE COURT:  How is that, regarding Knoblauch, how is

13   that relevant?  Because the only reason I let them bring that

14   out was to show that the focus of the investigation was not

15   just solely on Mr. Clemens.

16             MR. HARDIN:  It goes back to the previous issue at

17   that time we weren't allowed to talk about, and that is what

18   would happen if we didn't acknowledge.  And here they have

19   brought into the mix a guy that was subpoenaed, the only person

20   refused to show up in was subpoenaed.

21             THE COURT:  But that still goes back to the same

22   question I raised before.  Was there knowledge on the part of

23   Mr. Clemens that that had occurred and therefore he knew that,

24   if he didn't show up voluntarily, he was going to get

25   subpoenaed?

1          MR. HARDIN:  I don't intend to argue the issue with

2    the Court.  I --

3          THE COURT:  Well, I'll sustain the objection on that.

4    I'll let you go into this.

5          MR. HARDIN:  All right.  And then the other thing is I

6    want to make sure that Mr. Palmeiro, everybody understands

7    Mr. Palmeiro was referred to the 2005 hearings.  It wasn't

8    clear.

9          THE COURT:  I'll let you ask that.

10         MR. DURHAM:  Judge, I'm sorry, do you want me to clean

11   this up?

12         THE COURT:  Yes.

13         MR. DURHAM:  Okay.  Very well.

14         THE COURT:  Do you have a copy of it?

15         MR. HARDIN:  That was mine.

16         (Open court.)

17   BY MR. DURHAM:

18   Q.  Mr. Barnett, just a couple more quick questions.  With

19   respect to the document that I showed you, that is the, to

20   refresh your recollection of what Major League Baseball may

21   have done, did that aid the Committee in determining whether or

22   not legislation was or was not necessary at that point in time?

23   A.  Yes, it did.

24   Q.  And how so?

25   A.  The Committee had a -- the Committee had a strong interest

1    in the implementation of the recommendations that Senator

2    Mitchell made when Baseball and the Players Association

3    voluntarily implemented those recommendations that eliminated

4    the need for legislation.

5    Q.  Very well.

6            MR. DURHAM:  Thank you, Your Honor.  That completes my

7    examination.

8            THE COURT:  Okay.  Further cross on the matters

9    that --

10           MR. HARDIN:  Very, very, very briefly.  Thank you,

11   Your Honor.

12                        RECROSS EXAMINATION

13   BY MR. HARDIN:

14   Q.  Mr. Barnett, you've mentioned Mr. Palmeiro.  So that there

15   is no misunderstanding, Mr. Palmeiro's situation arose out of

16   the 2005 hearings, didn't it?

17   A.  Yes.

18   Q.  It had nothing to do with the hearings Mr. Clemens was

19   later asked to testify to in February of 2008; is that correct?

20   A.  It was the -- the Committee had the interest in B12 that

21   originated from Mr. Palmeiro's investigation --

22   Q.  Excuse me.  Excuse me.  Mr. Barnett, please now.  I

23   promised the judge I'd be short.  Listen.

24           MR. DURHAM:  Objection.

25           MR. HARDIN:  Well, he's just volunteering stuff,

1    judge, and I object.

2            THE COURT:  Just ask the question.

3            MR. HARDIN:  Thank you.

4    BY MR. HARDIN:

5    Q.  I'm asking you a very simple question.  Mr. Palmeiro, the

6    individual, his situation arose out of the 2005 hearings, did

7    they not?

8    A.  Yes.

9    Q.  And his situation had nothing to do with Mr. Clemens, did

10   it?

11   A.  No, it had nothing to do with Mr. Clemens.

12   Q.  It had to do with Mr. Palmeiro's testimony, you testified

13   to Mr. Durham under oath, at the 2005 hearings, correct?

14   A.  Yes.

15   Q.  All right.  And the Committee did an investigation and

16   chose not to refer Mr. --

17           MR. DURHAM:  Objection, it's not relevant.

18   BY MR. HARDIN:

19   Q.  -- to Mr. Palmeiro, right?

20           (Bench conference.)

21           THE COURT:  How is their decision not to do anything

22   regarding Mr. Palmeiro, how is that relevant?

23           MR. HARDIN:  They are talking about whether they did

24   legislation and how fair the hearings were, and I'm simply

25   trying to point out.  They introduced Mr. Palmeiro.  We weren't

1    going to.  Here's what happens.  Mr. Palmeiro ultimately was

2    investigated by the Committee, and they decided not to refer

3    him.  That's the only question I'm going to ask.  And he was

4    never prosecuted.

5              THE COURT:  But how is that relevant?

6              MR. ATTANASIO:  This witness said to Mr. Durham, we've

7    looked into whether Palmeiro should be referred.  And we

8    determined, based on his statement, that there was a tainted

9    B12 shot.  We couldn't refer him.  I don't see how we can't ask

10   him --

11             THE COURT:  He said that during his testimony?

12             MR. HARDIN:  Yes, sir, in direct, I mean in the

13   redirect.

14             MR. DURHAM:  I'm sorry.  He said that -- I'm sorry.

15             THE COURT:  I didn't recall that.

16             MR. DURHAM:  I don't recall that either.

17             THE COURT:  I don't recall that.  I don't remember

18   that.

19             MR. DURHAM:  There was certainly no reference to a

20   referral by Mr. Palmeiro.

21             THE COURT:  But I didn't remember him saying.

22             MR. DURHAM:  No.

23             THE COURT:  I'd have to check the transcript, but I

24   don't think he did.

25             MR. DURHAM:  I'm 98 percent sure.

1          UNIDENTIFIED SPEAKER:  In reference to Mr. Palmeiro

2     defending himself by saying that there was a tainted B12 shot,

3     I understood it to be in that context.

4          THE COURT:  Yeah, he may have said that, but I didn't

5     understand him saying anything about there being a nonreferral.

6     Maybe he did.  I can check.  If you believe he did, I'll check

7     the record.

8          MR. ATTANASIO:  I may have inserted the word referral.

9     So I may be wrong about that, but the point is that the witness

10    talked about Palmeiro defending himself and Congress

11    investigating whether he had I guess perjured himself by saying

12    he had gotten a tainted B12 shot.  That's what the witness

13    talked about.  And whether he said referral or not, I'm not a

14    hundred percent positive, but the context was in a

15    Congressional investigation whether Palmeiro stated that he had

16    not used steroids was false or not.

17         THE COURT:  Well, but we're now talking about a

18    referral and whether it was not a referral that in his case and

19    I don't see how that would be relevant.

20         MR. HARDIN:  Okay.  Thank you, judge.

21         MISS SALESKI:  Before we go, Your Honor, that was a

22    bit of a surprise to us because we thought there was just going

23    to be a question about 2005.  Is there anything else that could

24    be potentially objectionable before we go back?

25         MR. HARDIN:  I object to a question by question.  I'm

1    not familiar with just what the Court wants me to do on the

2    recross.

3              THE COURT:  No.  I gave the scope of what I thought

4    was appropriate, and I assume counsel would operate within that

5    scope.

6              MR. HARDIN:  Thank you, judge.

7              (Open court.)

8    BY MR. HARDIN:

9    Q.  Lidocaine you mentioned to him, and in the case of

10   Lidocaine, do you recall medical records that showed that

11   Mr. Clemens had received a Lidocaine shot --

12             MR. DURHAM:  Objection, Your Honor, scope.

13             THE COURT:  Sustained.

14             MR. HARDIN:  I'm sorry, judge.  I thought they talked

15   about Lidocaine in this redirect.  In fact it's --

16             THE COURT:  They talked about it on direct.  Did they

17   only bring it out for the first time on redirect?  If they

18   brought it out for the first time on redirect, and you didn't

19   have a chance because of that to question him on cross, I'll

20   permit the scope of that examination, but anything beyond that

21   is inappropriate.

22             MR. HARDIN:  I'm certainly not arguing with the Court.

23             THE COURT:  If it's brand new, if it only came out on

24   redirect and therefore you didn't know about it, I'll permit

25   it.

1          MR. HARDIN:  Okay.  So if the Court is saying, if they

2     brought it out on direct and they brought it out again on

3     redirect, I can't do it on recross?

4          THE COURT:  Right, because you had a chance on cross

5     to ask about it.

6          MR. HARDIN:  I don't believe the question about

7     Lidocaine on recross -- well, never mind.  I understand the

8     Court.  Thank you, judge.

9     BY MR. HARDIN:

10    Q.  And then the last thing I want to ask you about is is you

11    testified that during, that there was consideration of

12    legislation at Mr. Lynch's hearing.  And I guess my only

13    question to you about that -- well, it's the next to last

14    thing.  My only question to you about that, Mr. Barnett, is at

15    any time, of all the exhibits that you sponsored through the

16    government throughout this trial that you played, was there any

17    mention by any of the people questioning Mr. Clemens about

18    possible legislation during that hearing of February the

19    13th of 2008?

20         MR. DURHAM:  Object, Your Honor, it's beyond the

21    scope.

22         THE COURT:  I'll permit it.

23    BY MR. HARDIN:

24    Q.  Was there?

25    A.  Are you asking me was there discussion about possible

1   legislation of the hearing, because there was --

2   Q.  Yes.  I'm asking you on the hearing on February the 13th?

3   A.  Yes.  There was, my recollection is there were members that

4   raised questions about whether Baseball could be relied upon to

5   deal with its steroid policy itself or whether there would be a

6   need for revisiting the legislation in 2005 if the Committee

7   had passed out of Committee.

8   Q.  Do you recall who did that?

9   A.  I think it was, I think it was Congressman Souder from

10  Indiana and potentially Danny Davis from Illinois.

11  Q.  And what legislation is it that you think that they

12  discussed the possibility of?

13  A.  They discussed -- there was legislation that the Committee

14  had reported out called the Clean Sports Acts in 2005 that had

15  a very strong federal role, set a lot of federal standards for,

16  that Baseball and Football and other leagues would have to meet

17  in their steroids policy.  And the discussion was whether the

18  Committee should report out similar legislation in 2008 because

19  Baseball could not be relied upon to, to police itself.

20  Q.  And is it your testimony that the questions and answers to

21  Mr. Clemens on February the 13th of 2008, somehow let the

22  Committee decide whether there needed to be legislation?

23          MR. DURHAM:  Objection, Your Honor.

24          MR. HARDIN:  It's, Your Honor, the last question.

25          THE COURT:  Very well.  You can answer it.

1    BY MR. HARDIN:

2    Q.  Is that your testimony?

3    A.  Yes, I think there --

4    Q.  Thank you.  That's all I --

5           MR. DURHAM:  Sorry, the witness --

6           THE COURT:  You can answer.

7           THE WITNESS:  Yes, I think there was a connection.

8           MR. HARDIN:  That's all I'm asking.

9           THE COURT:  Okay.

10           MR. HARDIN:  Thank you very much.

11           THE COURT:  Okay.  Any questions from the jury?

12           Approach counsel.

13           (Bench conference.)

14           THE COURT:  I don't know if he said this, but I think

15    it's an appropriate question.  Mr. Barnett said that oaths were

16    administered for some Committee hearings, but not others.  Why

17    not?  How was this decision made?  I don't recall, maybe he

18    said that.

19           MR. HARDIN:  He did say that.

20           THE COURT:  I'll ask.

21           MR. HARDIN:  And you have this one too.  I don't

22    remember what it says.  I just remember that you set it aside

23    for Mr. Barnett.

24           THE COURT:  It says, teenage athletes are from each

25    sport.  I guess they're saying participate in each sport.  Why

1   was only baseball targeted?  And did Senator Mitchell's Report

2   investigate and report out on each sport?

3           I'm sure the second one is no, because they were hired

4   by Major League Baseball to do a report.  And I don't know if

5   this, based upon what he just said a minute ago, I don't know

6   if they were just concerned with Baseball.  I guess the focus

7   of it was Baseball, but he also said that they were looking at

8   it regarding other sports.  So I don't know if you all want me

9   to ask that or not.

10          MR. DURHAM:  I would, on behalf of the Executive

11  Branch of the government, I would ask that the Court does ask

12  that question.  It's an insightful question from a juror.  I

13  agree he's testified to it, but I think he can answer it.

14          MR. ATTANASIO:  No, the question is did Senator

15  Mitchell look at other sports.  That's the question.

16          MR. DURHAM:  That one's inappropriate.

17          MR. ATTANASIO:  That's the question but then there's

18  no --

19          THE COURT:  Yeah, I won't ask that one.  Well, I mean

20  I can ask him who, who did Senator Mitchell produce his report

21  for?

22          MR. ATTANASIO:  I'm fine with that.

23          THE COURT:  I think that's already out.  Major League

24  Baseball.

25          MR. DURHAM:  Or who hired Senator Mitchell.

1          THE COURT:  Or who hired him?

2          MR. DURHAM:  Yes.

3          THE COURT:  And then the other one was teenage

4    athletes participated in each sport, why was only Baseball

5    targeted?  Any objection?

6          MR. DURHAM:  I don't.

7          THE COURT:  And then the next one is, did the Baseball

8    League, it says, give random drug tests in 2003 before the

9    hearings in 2005 and 2008?

10          MR. HARDIN:  And the answer to that, yes.  He can

11    answer that.

12          UNIDENTIFIED SPEAKER:  That's an excellent question.

13          THE COURT:  That they were doing random --

14          MR. DURHAM:  Well he can answer this question, but

15    there was no drug tests for growth hormone.  I think he can

16    answer that question.

17          THE COURT:  But I mean is he the appropriate person to

18    answer this?

19          MR. DURHAM:  He can.

20          THE COURT:  If there's no objection, I'll ask him.

21          MR. DURHAM:  He knows there's no test for growth

22    hormone.  I guess I don't object to the question being asked so

23    long as he's allowed to qualify it fully.

24          MR. HARDIN:  Okay.  And then the last one, judge.  We

25    don't have an objection to that.  What was the last one?

1            THE COURT:  Did you say the House was deciding to make

2    HGH a controlled substance?  If not, is it over-the-counter

3    substance?

4            MR. HARDIN:  I see what they mean.  He testified they

5    were considering whether to make it -- and that was the hearing

6    the day before.

7            THE COURT:  I guess I've seen it in a magazine.  I

8    have seen it in health food stores.  I don't know if that's --

9    but I've seen it.

10            MR. HARDIN:  We have no objection to those questions.

11            THE COURT:  Okay.

12            (Open court.)

13            THE COURT:  Sir, a couple of questions from the jury.

14    Did you say that the House decided to make HGH a controlled

15    substance?

16            THE WITNESS:  No.  There was no legislation passed on

17    that subject.

18            THE COURT:  Was there a consideration by the Committee

19    as to whether HGH should be made a controlled substance?

20            THE WITNESS:  Yes, the Committee heard testimony about

21    that subject.  There were, and the Committee received views

22    that were pro and con.  Would it be appropriate for me to

23    explain a little?

24            THE COURT:  Pro and con about?

25            THE WITNESS:  About making HGH a controlled substance.

1      Would it be appropriate for me to explain a little bit of that?

2               THE COURT:  No, there may be an objection.  No, I

3      don't think so.  Let me just ask.  Can you buy HGH over the

4      counter?

5               THE WITNESS:  No, it requires a prescription.

6               THE COURT:  Okay.  Did Major League Baseball give

7      random drug tests in 2003 prior to the 2005 and 2008 hearings?

8               THE WITNESS:  Yes, Baseball, for the first time in

9      2003, instituted a, did random, did drug tests I think of all

10     the players at a random point and time.  And the purpose of

11     that -- there was no enforcement action.  The purpose of that

12     was to inform the League and the Players Association of the

13     incidence of use of steroids by Baseball players.

14              THE COURT:  So the testing would be able to detect

15     steroid use?

16              THE WITNESS:  Yes, it would.  There were, my

17     understanding of this is steroids, different steroids stay in

18     the body for different amounts of time.  So, you know, you

19     could, depending on what that timeframe is, it would either

20     detect or not detect.

21              THE COURT:  And what about HGH?  Was there random

22     testing being done for HGH?

23              THE WITNESS:  There was no testing.  Baseball did not

24     do testing for HGH.  There's only, for the first time in the

25     pre-season this year, as testing methodologies have improved,

1    Baseball has started to do some testing for Human Growth

2    Hormone during the pre-season.

3             THE COURT:  And the questions I've just been asking

4    you about, random testing, was that a factor that came into

5    play in Congress' assessment about whether legislation would or

6    would not be needed?  Or was it -- was it a predicate for the

7    hearings being held?

8             THE WITNESS:  A very important question was whether

9    the, how Baseball did its tests, the frequency of the tests,

10   the number of times tests were done, the independence of the

11   test administrator, and the procedures used, whether those were

12   adequate.  For instance, when they had a testing policy going

13   into the 2005 hearing, we learned that they allowed players to

14   leave in the middle of the tests, which create opportunity to

15   falsify test results.  So those kinds of questions were all

16   concerns.

17            And in 2008 there was a question whether they were

18   doing enough testing, was the person administering the test

19   independent enough, should they be doing more on Human Growth

20   Hormone, were all questions that the Committee was considering.

21            THE COURT:  Now, you said that oaths are administered

22   in some Committee hearings but not in others; is that correct?

23            THE WITNESS:  Yes.

24            THE COURT:  And what is the basis for the decision as

25   to whether oaths are given or not given at hearings?

1        THE WITNESS:  It's, sometimes it's the practice of

2   the, it depends on the practice of the Committee.  Typically,

3   in a hearing where, where, in an oversight committee and in

4   committees that have oversight and investigation subcommittees,

5   where they're delving deeply into facts, trying to understand

6   the factual predicates to inform legislation also to be

7   administered, if there is a Bill that's there and there's

8   testimony from various experts pro and con about a Bill, people

9   would not be put under oath in that circumstance.

10       THE COURT:  And teenagers participate in all different

11  types of athletics, right?

12       THE WITNESS:  Yes.

13       THE COURT:  Was there any particular reason why the

14  Committee focused on Major League Baseball?

15       THE WITNESS:  The Committee's focus was not

16  exclusively on Major League Baseball.  We had hearings in 2005

17  with Football and with Basketball.  In 2006, I think we had

18  some additional interchange with Football about steroid

19  policies in Football.  In 2008, the -- in 2005, the Committee's

20  view that Baseball's policies were particularly deficient that

21  it led to the request for Senator Mitchell to do his

22  investigation.

23       When Senator Mitchell then released his reports in

24  December of 2007, that's what triggered the set of hearings

25  that were held in January and February about Senator Mitchell's

1    Report.  And that was focused on Baseball but looking at the

2    Committee's broader investigation was not limited to Baseball.

3           THE COURT:  And who hired Senator Mitchell to do the

4    Report?

5           THE WITNESS:  Major League Baseball.

6           THE COURT:  I do, as a practice, permit counsel to ask

7    any follow-up questions based upon the responses that were

8    given by the witness to the questions asked by the jury.  Any

9    other questions from either side?  Government counsel?

10          MR. DURHAM:  No, Your Honor.

11          MR. HARDIN:  No, Your Honor.

12          THE COURT:  Very well.  Thank you, sir.

13          THE WITNESS:  Thank you.

14          THE COURT:  Okay.  We'll take a ten-minute break.

15          (Recessed at 3:44 p.m.)

16          (Resumed at 3:57 p.m.)

17          (Jury present.)

18          THE COURT:  You can be seated.

19          Next witness.

20          MR. DURHAM:  Your Honor, at this time the United

21    States calls Jeff Novitzky.

22          THE WITNESS:  Good afternoon.

23            JEFF NOVITZKY, GOVERNMENT WITNESS, SWORN

24          MR. DURHAM:  May I proceed, Your Honor?

25          THE COURT:  Yes.

1                          DIRECT EXAMINATION

2     BY MR. DURHAM:

3     Q.  Sir, could you please take a moment and introduce yourself

4     to the ladies and gentlemen of our jury, and spell your name

5     for our court reporter, Miss Shaw?

6     A.  Sure.  My name is Jeff Novitzky.  Last name spelled

7     N-O-V-I-T-Z-K-Y.

8     Q.  What do you do for a living?

9     A.  I am a Special Agent with the Food and Drug Administration,

10    Office of Criminal Investigation.

11    Q.  And how long have you been with that particular job?

12    A.  I been with the FDA for approximately four years.

13    Q.  And right now, as you sit here today, what are your job

14    duties with the Food and Drug Administration?  You said

15    Inspector General Office?

16    A.  No, Office of Criminal Investigation.

17    Q.  Criminal Investigation.  Please?

18    A.  Our mission statement is to protect the public health.  So,

19    from a criminal perspective, we are the consumers' front-line

20    protection against issues with the food, drug supply, certain

21    medical devices.  We investigate counterfeit drugs coming into

22    the United States, certain faulty medical devices, even

23    cosmetics.  We are charged with investigating the distribution

24    of human growth hormone, so things like that.

25    Q.  Okay.  And you said you have been doing that for four

1    years?

2    A.   Approximately, yes.

3    Q.   Approximately when did you start as an agent with the Food

4    and Drug Administration in criminal enforcement?

5    A.   That would have been April of 2008.

6    Q.   Were you employed before then in federal law enforcement?

7    A.   Yes, I was.

8    Q.   And how were you employed, tell the ladies and gentlemen of

9    the jury?

10   A.   I was a Special Agent with the IRS, Criminal Investigation

11   Division.

12   Q.   And describe, if you could -- summarize the duties that you

13   had with the IRS Criminal Investigation Division?

14   A.   I investigated federal financial crimes such as large-scale

15   tax evasion, money laundering, currency reporting violations

16   and other related federal financial crimes.

17   Q.   How long did you do that, sir?

18   A.   I did that for 15 years.

19   Q.   Let me direct your attention back to the early 2000s, and

20   I'll ask you generally, did you participate in a financial

21   investigation related to the distribution of

22   performance-enhancing drugs?

23   A.   Yes, I did.

24   Q.   And just -- and again very generally, could you tell the

25   ladies and gentlemen of the jury how that particular

1    investigation began and where it began?

2    A.   It began in spring of 2002 in the San Francisco Bay Area

3    where I'm stationed.  We received information about a business

4    located in close proximity to San Francisco Airport by the name

5    of BALCO Laboratories.  And we had received information that

6    they were distributing performance-enhancing drugs.

7    Q.   And did you take law enforcement steps to investigate the

8    information that came to you?

9    A.   Yes, I did.

10   Q.   And did you conduct a financial investigation on the

11   financial side of which you have observed to be drug

12   distribution?

13   A.   Yes, I did.

14   Q.   And what did your particular investigation focus on, again,

15   generally?

16   A.   Again, it focused on the financial side of the distribution

17   of these drugs, and specifically on money laundering

18   violations.  So where money comes from an illicit source, an

19   illegal source and then it's transacted in some way, through a

20   bank account or with another individual.

21       Most typically and the reason for it being called money

22   laundering is to clean up the money, to make dirty money appear

23   as if it's clean, coming from a legitimate source.

24   Q.   Did that investigation, Agent Novitzky, lead you to

25   distributors, individual distributors of performance-enhancing

1    drugs?

2    A.  Yes.

3    Q.  Now, do you know an individual by the name of Kirk

4    Radomski?  Is that name familiar to you?

5    A.  Yes, it is.

6    Q.  And how did you first become familiar with Kirk Radomski by

7    way of background?

8    A.  In early 2005, I was contacted by an FBI agent in Baltimore

9    area who told me that he had a source, a cooperating source

10   that had information about a distributor of

11   performance-enhancing drugs.

12   Q.  And did there come a point in time when -- well, first of

13   all, just again by way of background, are you familiar with the

14   term "a search warrant"?

15   A.  Yes.

16   Q.  What is a search warrant, just to make sure our record is

17   clear here?

18   A.  Sure.  A search warrant is something, in my line of work,

19   that is authorized by a federal judge, like Judge Walton here,

20   and it authorizes us to go in and search a particular location

21   for particular items contained in the search warrant.

22   Q.  And let me direct your attention to December of 2005.  As

23   part of your federal law enforcement responsibilities, did you

24   execute a search warrant related to this Mr. Radomski you have

25   described?

1   A.   Yes, I did.

2   Q.   Do you recall the date of that search warrant, sir?

3   A.   It was December 14th, 2005.

4   Q.   Do you recall where that search warrant was executed?

5   A.   Took place on Kirk Radomski's residence, which is located

6   in Manorville, New York, Long Island in New York.

7   Q.   Was that duly authorized by a judge through the protocol

8   that you have described?

9   A.   Correct, it was.

10  Q.   And what were you looking for when you went to

11  Mr. Radomski's house on the morning of December the 14th, 2005?

12  A.   We were looking for evidence of the distribution -- of the

13  distribution of performance-enhancing drugs, including the

14  drugs themselves, including financial documents which tend to

15  show payment for those drugs, things of that sort.

16  Q.   And when you -- you entered Mr. Radomski's house; is that

17  correct?

18  A.   Correct.

19  Q.   Did he cooperate at that point or did he give you a hard

20  time?

21  A.   He did.  He cooperated just about immediately.

22  Q.   And were you able -- without going into great detail, but

23  did you find what you were looking for, what the judge

24  authorized, that is, evidence of the distribution of

25  performance-enhancing drugs?

1    A.  Yes, we did.

2    Q.  Did you find anabolic steroids?

3    A.  Yes, we did.

4    Q.  Did you find human growth hormone?

5    A.  Yes, we did.

6    Q.  Did you find needles?

7    A.  Yes.

8    Q.  Did you find other paraphernalia?

9    A.  Yes.

10   Q.  And did you also find other items that were within the

11   scope of the search warrant?

12   A.  Yes, we did.

13   Q.  And describe generally what other related items you found

14   there?

15   A.  We found numerous shipping receipts indicating shipments of

16   these performance-enhancing drugs to various individuals.

17   Q.  All right.  I'm going to show you a couple of items with an

18   eye toward telling us whether you have seen them before and can

19   identify them.  Under Government's Exhibits 50c-1 and 50c-2.

20         MR. DURHAM:  The record should reflect that I believe

21   counsel has copies.  I'm sorry.  50c-1 and 50c-2.

22         May I approach the witness, Your Honor?

23         THE COURT:  Yes.

24   BY MR. DURHAM:

25   Q.  Agent Novitzky, I'm going to show you what has been marked

1    as 50c-1 and 50c-2, marked for identification purposes.  Do you

2    recognize those items, sir?

3    A.  Yes.

4    Q.  What are they?

5    A.  These were a couple of the shipping receipts that we seized

6    from Kirk Radomski's house during the search warrant.

7    Q.  And are they -- bear with me for a moment.  Did there

8    appear to be some redactions or information taken out of those?

9    A.  Yeah.  The only difference from what they looked like when

10   we seized them is the -- the "To" section or who these were

11   sent to are redacted.  There is a gray box over each of them.

12   Q.  There's some names taken out?

13   A.  Correct.

14   Q.  And other than that, are these -- these items, are they in

15   substantially the same condition as when you first took them

16   from Mr. Radomski's house on December the 14th, 2005?

17   A.  Yes, they appear to be.

18           MR. DURHAM:  Your Honor, at this time I will move into

19   evidence Government's Exhibits 50c-1 and 50c-2.

20           MR. HARDIN:  If we can get the names of them, we have

21   no objection.  I'm not sure why there is a redaction of the

22   names.

23           (Bench conference.)

24           THE COURT:  Is there a reason for the redaction of the

25   names?

1          MR. DURHAM:  Your Honor, these are basically Radomski

2     sending performance-enhancing drugs to other players, which I

3     thought Mr. Hardin --

4          MR. HARDIN:  I don't know who the names are.

5          MR. DURHAM:  Yes.  These are other players, which we

6     have taken the liberty to redact.

7          THE COURT:  If you want them back in, I guess we can

8     put them back in.

9          MR. DURHAM:  I have the originals.  I mean, we can --

10         MR. HARDIN:  I just wonder what they are.

11         MR. DURHAM:  I'm sorry.

12         MR. HARDIN:  We have never seen the names.  That's all

13    we are saying.

14         THE COURT:  That should have been shared.

15         MR. DURHAM:  I thought that we had shared unredacted

16    copies during discovery, Your Honor.  I can look --

17         MR. HARDIN:  The copies we have are redacted.

18         MR. DURHAM:  No, I understand that.  But the discovery

19    goes back several years in this case.

20         THE COURT:  What do you want?

21         MR. HARDIN:  I don't need them now that I know who

22    they are, but I would like to look each time you do this to see

23    who they are.

24         THE COURT:  You talk to me, don't talk to him.

25         MR. HARDIN:  I'm sorry, Judge.

```
 1            MR. DURHAM:  Your Honor, can I inquire through
 2      counsel, we could put originals in if counsel prefers.
 3            MR. HARDIN:  I'm okay with copies.  I just want to
 4      know the names.
 5            THE COURT:  You have a right to.  Okay.
 6            (Open court.)
 7            MR. HARDIN:  No objection, Your Honor.
 8            THE COURT:  Very well.  They will be admitted.
 9            (Government's Exhibit Nos. 50c-1 and 50c-2 were
10      received in evidence.)
11            MR. DURHAM:  Can we use the ELMO?  Take these off,
12      publish these with the Court's permission?
13            MR. HARDIN:  May I approach counsel, Your Honor?
14            THE COURT:  Yes.
15      BY MR. DURHAM:
16      Q.  Let me publish this and then I'm going to ask you a
17      question about the redacted box at counsel's request.  This is
18      Government's Exhibit 50c-1, which has been admitted into
19      evidence.  Do you recognize this exhibit, sir?
20      A.  Yes.
21      Q.  Tell the ladies and gentlemen of the jury what it is and
22      where you found it?
23      A.  There was found in Kirk Radomski's residence, and it is a
24      torn off piece of a United States Postal Service Express Mail
25      service shipping receipt.
```

1    Q.   Just so we are clear, I'm pointing to what appears to be a

2    grayed out area.   What information generally is grayed out,

3    without naming names?

4    A.   Generally there that would have been where the package was

5    sent to, the name and address of the recipient of the package.

6    Q.   Just to be clear, the grayed out portion on Government's

7    Exhibit 50c-1, that is not Mr. Clemens, Mr. Roger Clemens in

8    this case; is that correct?

9    A.   That's correct.

10   Q.   And there's no address on this particular mailing label

11   that corresponds to any address that you have known Mr. Clemens

12   to live at; is that correct?

13   A.   Correct.

14   Q.   This is an item that you found in Mr. Radomski's house?

15   A.   Yes.

16   Q.   All right.   Let me put up Government's Exhibit 50c-2, if I

17   could.   It's been admitted into evidence and with the Court's

18   permission we will publish this to the jury.

19        Do you recognize Government's Exhibit 50c-2, Agent

20   Novitzky?

21   A.   Yes.

22   Q.   And what is that, sir?

23   A.   Another -- this one is a full non-torn shipping receipt

24   that we seized from Kirk Radomski's residence in December of

25   2005 during the search warrant.

1    Q.  And is there some grayed out information on this one as

2    well?

3    A.  Yes.

4    Q.  Is that the name of somebody and an address?

5    A.  Correct.

6    Q.  And to be clear, on 50c-2, the name and the address do not

7    correspond to the defendant in this case, Mr. Clemens; is that

8    correct?

9    A.  That's correct.

10   Q.  Okay.  Let me just go back to 50c-1.  I want to ask you a

11   question about it, if I could.  50c-1, is this the style of the

12   label that you found in Mr. Radomski's residence in December of

13   2005?

14   A.  This particular label, yes, this was how we found it.

15   Q.  All right.  And on 50c-2, is this also the style of the

16   mailing label that you found at that time and at that location?

17   A.  Yes, that's the style, how we found it in December of 2005.

18   Q.  I'm going to direct your attention to the upper right-hand

19   corner where it says "Customer Copy."  Do you see that?

20   A.  Yes.

21   Q.  All right.  I'm all thumbs when the comes to technology.  I

22   think this is going to work.  This has been admitted into

23   evidence.  Do you see what appears to be embossed, a form date

24   on the upper right-hand corner of this mailing label?

25   A.  Yes.

1    Q.  And what is that, sir?

2    A.  September 2002.

3    Q.  All right.  And does this reflect that is the customer

4    copy?

5    A.  That's what it says, yes.

6    Q.  That would be the person who did the shipping, to the best

7    of your knowledge?

8    A.  That's my understanding, yes.

9    Q.  I'm sorry.  I'm sorry.  Let me go back to 50c-2.  I have

10   one more question I want to ask you about this document.

11       I want to direct your attention, sir, to the upper

12   left-hand corner of this particular item, that is Government's

13   Exhibit 50c-2, and do you see a date that is handwritten on

14   this item?

15   A.  Yes.

16   Q.  And what does that date appear to be to you?

17   A.  June either 1st or 7th of 2004.

18   Q.  All right.  Thank you.

19       And on 50c-1, do you note that this is -- this label

20   appears to be ripped?

21   A.  Correct.

22   Q.  Is that the same condition in which you found it on

23   December 14, 2005?

24   A.  Yes.

25   Q.  All right.  I'm going to ask you to look at another

1     label -- excuse me -- another exhibit, Government's Exhibit 48.

2     This is marked for identification purposes at this time.

3              MR. HARDIN:   May I see it, counsel?

4              MR. DURHAM:   May I approach the witness, Your Honor?

5              THE COURT:   Yes.

6     BY MR. DURHAM:

7     Q.   Agent Novitzky, I'm going to hand you what's been marked as

8     Government's Exhibit 48 for identification purposes.   Do you

9     recognize that, sir?

10    A.   Yes.

11    Q.   What is it?

12    A.   There was -- this is a torn shipping label similar to the

13    last one that we looked at that was given to me by Kirk

14    Radomski in the summer of 2008.

15    Q.   And Mr. Radomski, you said he began cooperating with your

16    investigation at some point in time?

17    A.   Correct, on December 14, 2005.

18    Q.   And in December of -- excuse me.   At some point in time did

19    Mr. Radomski --

20             MR. DURHAM:   May we approach, Your Honor?   I just want

21    to clear one thing before I ask it.

22             (Bench conference.)

23             MR. DURHAM:   I'm sorry.   I just want to be very

24    cautious.   I don't think this is the subject of any Court

25    ruling, but I was just going to ask at some point did

1    Mr. Radomski enter a guilty plea to drug distribution and money

2    laundering in the Northern District of California.  I expect

3    Mr. Radomski to testify.  Obviously, that's an impeachable

4    conviction.  I was -- that's my point.

5            MR. HARDIN:  Is the question whether we object to him

6    bringing it out now?  We don't.

7            THE COURT:  Very well.

8            (Open court.)

9    BY MR. DURHAM:

10   Q.  Agent Novitzky, did there come a point in time when

11   Mr. Radomski, the person who had been cooperating with your

12   investigation, enter a guilty plea in federal court?

13   A.  Yes.

14   Q.  And do you know what he pled guilty to?

15   A.  To the distribution of anabolic steroids and to money

16   laundering.

17   Q.  Do you know approximately when he entered his guilty plea?

18   A.  That was the early part of 2007.

19   Q.  And in 2008 -- well, did that guilty plea -- was he

20   required to continue cooperating with your investigation, with

21   the United States government?

22   A.  I don't know if the guilty plea necessarily required him to

23   do that --

24   Q.  Well, let me ask you this --

25   A.   -- but he continued to do that.

1    Q.  -- as of June -- did you say July you got this mailing

2    label?

3    A.  June or July of 2008, correct.

4    Q.  As of July 2008, was Mr. Radomski still, at least in some

5    part, cooperating with your investigation?

6    A.  Yes, he was.

7              MR. DURHAM:  Your Honor, at this time --

8    BY MR. DURHAM:

9    Q.  That mailing label you have in front of you, is that in --

10   is that the identical item that you received from Mr. Radomski

11   in July of 2008?

12   A.  Yes.

13             MR. DURHAM:  At this time, Your Honor, the government

14   would move into evidence Government's Exhibit 48.

15             THE COURT:  Any objection?

16             MR. HARDIN:  No objection.

17             THE COURT:  Admitted.

18             (Government's Exhibit No. 48 was received in

19             evidence.)

20             MR. DURHAM:  Court's indulgence.  With the Court's

21   permission, we will publish this to the jury.

22             THE COURT:  Very well.

23   BY MR. DURHAM:

24   Q.  Agent Novitzky, this has been admitted now as Government's

25   Exhibit Number 48.  What is this, sir?

A.   This is that torn shipping receipt that Kirk Radomski gave to me in the summer of 2008.

Q.   Is this the identical item that Mr. Radomski gave to you in July of 2008?

A.   Yes.

Q.   And are you able to tell us, does this appear to be the top copy or a lower copy, do you know?

A.   Appeared to be a carbon copy, so it would be the customer lower copy.

Q.   And with respect to the information contained in this, can you please read for us what this says, the -- that is, the shipping information, the handwritten information, sir?

A.   Sure.  Hold for B. McNamee, a number which is obscured somewhat by a carbon blotch there.  I see the numbers 1135 Quail Hollow Drive, Houston, Texas, 77024.

Q.   All right.  And the zip code that's listed in the blocks, that's the same zip code, 77024?

A.   Yes.

Q.   Okay.

     Let me show you another exhibit, Government's Exhibit Number 49.

          MR. DURHAM:  May I have a moment with counsel, Your Honor?

          THE COURT:  Yes.

          MR. DURHAM:  May I approach the witness, Your Honor?

1                    THE COURT:  Yes.

2      BY MR. DURHAM:

3      Q.  Agent Novitzky, I'm going to hand you what's been marked as

4      Government's Exhibit 49 for identification.  Do you recognize

5      it?

6      A.  Yes.

7      Q.  What are these items?

8      A.  These were additional shipping receipts that Kirk Radomski

9      handed to me in the summer of 2008.

10     Q.  At the same time that he handed you Government's Exhibit 48

11     which we just looked at?

12     A.  Correct.

13     Q.  And are those items, are they redacted in any way?

14     A.  Yes, they are.

15     Q.  And apart from the redactions, the grayed out areas, are

16     those shipping labels, are they in substantially the same

17     condition as when you received them from Mr. Radomski?

18     A.  Yes.

19              MR. DURHAM:  Your Honor, at this time we will move

20     into evidence Government's Exhibit Number 49.

21              THE COURT:  Any objection?

22              MR. HARDIN:  No objection.

23              THE COURT:  Very well.  Admitted.

24              (Government's Exhibit No. 49 was received in

25     evidence.)

1           MR. DURHAM:  These are on the screen.  With the

2   Court's permission we will put them on the screen?

3           THE COURT:  Very well.

4   BY MR. DURHAM:

5   Q.  With Government's Exhibit Number 49 now on the screen, what

6   is this, sir?

7   A.  This is one of the shipping labels that was handed to me by

8   Kirk Radomski in the summer of 2008.

9   Q.  And to be clear, that's a copy for electronic distribution;

10  is that correct?

11  A.  Correct.

12  Q.  Let me direct your attention to the upper right-hand

13  portion that's says "Customer Copy."  Do you see that?

14  A.  Yes.

15  Q.  All right.  And is there a date embossed on the upper

16  right-hand corner of this particular exhibit?

17  A.  Yes, there is.

18  Q.  What is it?

19  A.  June 2002.

20  Q.  And if you would direct your attention over to the left

21  side, I'm going circle another date.  Do you see that date?

22  A.  Yes.

23  Q.  Does it appear to be a handwritten date?

24  A.  Yes.

25  Q.  What is the date?

1    A.  8-14-03.

2    Q.  All right.  Let's take a look at the second mailing label.

3    Is that the back?

4    A.  Correct, the back of the first one.

5    Q.  All right.  Keep going here.  Is this another mailing

6    label, a part of Exhibit Number 49?

7    A.  Yes.

8    Q.  And again, where did you come into contact with this?

9    A.  Kirk Radomski handed it to me in the summer of 2008.

10   Q.  And with respect to the information contained, let me

11   direct your attention to the upper right-hand corner, do you

12   see a form date on this particular label?

13   A.  Yes.

14   Q.  And what is it?

15   A.  June 2002.

16   Q.  And do you see on the left-hand side a handwritten date on

17   this particular label?

18   A.  Yes.

19   Q.  And what is it?

20   A.  6-11-03.

21   Q.  All right.  And to be clear, the sender here, is this

22   Mr. Radomski, the gentleman that you identified?

23   A.  Correct.

24   Q.  Now, again, let me be clear, on any of this redacted

25   material, the things that are whited out or grayed out, is that

1    Mr. Clemens?

2    A.   No.

3    Q.   And is that Mr. Clemens' address?

4    A.   No.

5    Q.   So is it fair to say -- read just a little bit here -- that

6    Government's Exhibit 48 that we looked at that, was the only

7    label that Mr. Radomski turned over that -- well, I'll rephrase

8    that.

9        Let me go on to the next one.

10       Do you see this mailing label which is part of Government's

11   Exhibit 49?

12   A.   Yes.

13   Q.   Where did you receive this?

14   A.   From Kirk Radomski, summer of 2008.

15   Q.   And is there, in the upper left-hand corner, what appears

16   to be a handwritten date?

17   A.   Yes.

18   Q.   What is it?

19   A.   6-6-03.

20   Q.   All right.  And is this in substantially the same condition

21   as when Mr. Radomski handed it over to you in July of 2008?

22   A.   Yes.

23   Q.   All right, sir.

24       Let's quickly look through two more that have been admitted

25   as part of Government's Exhibit 49.  We will go through the

1    same exercise.  Again, with respect to all of these that we are

2    going to see, are they items that Mr. Radomski turned over to

3    you in July of 2008?

4    A.  Yes.

5    Q.  And with respect to this particular label, do you see --

6    this is a -- is this a FedEx label?

7    A.  Correct.

8    Q.  Upper left-hand corner, do you see a handwritten date?

9    A.  Yes, I do.

10   Q.  What is it?

11   A.  12-3-02.

12   Q.  All right.

13       And the next one, please.  Again, is this a mailing label,

14   FedEx bill that Mr. Radomski turned over to you in July of

15   2008?

16   A.  Yes, it is.

17   Q.  And again, we will look at the upper left-hand corner.

18   What is the handwritten date there, sir?

19   A.  7-24-03.

20   Q.  And again, with respect to all the whited or grayed out

21   information that -- Mr. Clemens' name or known address to you

22   is not listed; is that correct?

23   A.  Correct.

24            MR. DURHAM:  Very well.  And do another one.  Are we

25   done?  I think that completes the set.

1    BY MR. DURHAM:

2    Q.   Okay.  Moving right along here.  Did there come a point in

3    time, Agent Novitzky, when you reached out to or encountered a

4    man by the name of Brian McNamee?

5    A.   Yes.

6    Q.   And just by way of background, how did that come about?

7    A.   He was identified through Mr. Radomski's bank records.

8    There were several multi-thousand dollar amount checks

9    deposited into Mr. Radomski's bank account.  And based

10   primarily on that, we decided to contact Mr. McNamee.  And I

11   did so in May of 2007.

12   Q.   And what was your suspicion at that point in time, again,

13   by way of background?

14   A.   Based upon the amount of checks -- the amount of the

15   checks, as well as what we knew about Mr. McNamee's involvement

16   with Major League Baseball, we felt there could be a potential

17   that he was distributing performance-enhancing drugs.

18   Q.   Did there come a point in time when you actually reached

19   out to Mr. McNamee, that you reached out personally to

20   Mr. McNamee?

21   A.   Yes.

22   Q.   And can you tell us about when that happened?

23   A.   That was in May of 2007.

24   Q.   And what were the circumstances of that contact with

25   Mr. McNamee in May of 2007?

1  A.  I asked and told him that we wanted to talk with him and

2  ask him some questions.

3  Q.  And do you know where Mr. McNamee was at that time, if you

4  know?

5  A.  At that time I didn't.  He told me later.

6  Q.  How did you know to contact him?  How did you know how to

7  get ahold of Mr. McNamee?

8  A.  I believe I had a phone number from a phone book that we

9  seized from Kirk Radomski's residence.

10  Q.  Just to be clear, did you reach out to Mr. McNamee or did

11  Mr. McNamee reach out to you?

12  A.  I called him.

13  Q.  What did you communicate to Mr. McNamee in May of 2007?

14  A.  Basically that we wanted to speak with him.  I think I told

15  him that his name had come up in the Kirk Radomski

16  investigation, kept it very general.  There wasn't much

17  information shared, other than that we wished to talk with him

18  and ask him some questions.

19  Q.  Did there come a point in time when you met personally with

20  Mr. McNamee?

21  A.  Yes.

22  Q.  And do you recall when the first time you met personally

23  with Mr. McNamee?

24  A.  That would have been June 6, 2007.

25  Q.  Where was that meeting?

1    A.  At his attorneys' office in New York City.

2    Q.  And at that point in time, June 6, 2007, was Mr. McNamee

3    represented by an attorney?

4    A.  Yes, he was.

5    Q.  Let me show you what's been marked as Government's Exhibit

6    Number 82a for identification.

7             MR. DURHAM:  May I approach, Your Honor?

8             THE COURT:  Yes.

9    BY MR. DURHAM:

10   Q.  Go ahead and take a look at that document, if you could,

11   sir.  Do you recognize it?

12   A.  Yes.

13   Q.  What is it?

14   A.  This is proffer agreement entered into between the United

15   States Attorney's Office for the Northern District of

16   California and Brian McNamee.

17   Q.  And is your signature on this document?

18   A.  My signature is on this document, yes.

19   Q.  And was there a United States attorney's office that

20   authorized this particular agreement with Mr. McNamee?

21   A.  Yes.

22   Q.  And to be clear, was it our office here in the District of

23   Columbia?

24   A.  No.  This was issued by the Northern District of

25   California, U.S. Attorney's Office.

1    Q.  And is that a true and accurate copy of that agreement that

2    you and the U.S. attorney in the Northern District of

3    California entered into with Mr. McNamee?

4    A.  Yes.

5         MR. DURHAM:  Your Honor, at this time we will move

6    into evidence Government's Exhibit 82a.

7         MR. HARDIN:  No objection.

8         THE COURT:  Admitted.

9         (Government's Exhibit No. 82a was received in

10   evidence.)

11        MR. DURHAM:  May we publish it, Your Honor?

12        THE COURT:  Yes.

13   BY MR. DURHAM:

14   Q.  Go ahead and take a look at Government's Exhibit 82a, which

15   I believe is on the screen in front of you, so we are all on

16   the same page here.  Tell us what this is?

17   A.  This is a copy of that proffer agreement.

18   Q.  Mr. McNamee sign this document?

19   A.  Yes, he did.

20   Q.  And does his signature appear on the lower left-hand

21   corner?

22   A.  Yes.

23   Q.  Was he represented by an attorney?

24   A.  Yes.

25   Q.  A Mr. Harvey?

1    A.   Correct.

2    Q.   All right.   And Mr. Parrella from the United States

3    Attorney's Office for the Northern District of California, does

4    he sign that document?

5    A.   Yes.

6    Q.   And do you sign that document?

7    A.   Yes, I did.

8    Q.   Blocked out your signature here, Agent Novitzky.   Is that

9    your signature?

10   A.   Yes.

11   Q.   Now, the document is in evidence and speaks for itself.

12   But what were Mr. McNamee's obligations under this particular

13   agreement that he entered into?

14   A.   His obligations?

15   Q.   Yes.

16   A.   Were to --

17   Q.   Summarize them.

18   A.   To tell us the truth, in exchange his statements made to us

19   that day could not be used against him in any potential

20   prosecution against him, unless, as it lists in paragraph 2

21   under circumstances, if he should testify or to rebut any

22   evidence offered.

23       So basically, it was just what's kind of referred to as

24   queen for the day, where we couldn't use his statements against

25   him that he made that day.   But it didn't promise that he could

1    never be prosecuted, only those statements could not be used

2    against him.

3    Q.  Have you ever, in your law enforcement career, ever had

4    someone that's been granted what we call immunity from

5    prosecution?

6    A.  Lots of time.  Oh, immunity from prosecution?

7    Q.  Yes.  Immunity from prosecution.

8    A.  Not that I can recall.

9    Q.  Is this particular agreement an immunity agreement from

10   prosecution?

11   A.  No.

12   Q.  And does this agreement authorize you to follow

13   investigative leads in order to develop evidence, if you

14   should -- if it should go in that direction?

15   A.  Yes.

16        MR. DURHAM:  We can take that down, thank you.

17   BY MR. DURHAM:

18   Q.  Sir, you said this meeting occurred at Mr. McNamee's

19   attorneys' office in New York?

20   A.  Correct.

21   Q.  Were you there?

22   A.  Yes.

23   Q.  And could you describe for us -- for the ladies and

24   gentlemen of the jury, what was Mr. McNamee's demeanor when you

25   first met with him on June 6, 2007?

1    A.   Extremely nervous, appeared that he did not want -- that

2    was the last place in the world he wanted to be.  I mean, the

3    best description is just extreme nervousness.

4    Q.   Did you ask him questions about his possible involvement

5    with performance-enhancing drugs?

6    A.   Yes.

7    Q.   And did he begin to answer some of those questions?

8    A.   Yes.

9    Q.   Now, and I don't want to get into a detailed description,

10   but I do want to ask you, was one of those areas you asked

11   about Mr. McNamee's relation with an individual by the name of

12   Roger Clemens?

13   A.   Yes.

14   Q.   And give us an idea, Agent Novitzky, how long did this

15   first meeting with Mr. McNamee last?

16              THE COURT:  Approach for a minute.  Approach for a

17   minute.

18              (Bench conference.)

19              THE COURT:  There have been objections.  I assume

20   there is a tactical reason for that, because obviously, the

21   fact that he is indicating that there was a statement made and

22   it's being offered by the proponent, I think there is case law,

23   at least in this jurisdiction, that says that the reasonable

24   inference to be drawn from is that a prior consistent statement

25   is being implicitly elicited.

```
 1              I don't know if you all have a position.  If you want
 2    it to come in, that's fine.
 3              MR. HARDIN:  Well, I didn't think he was going to try
 4    to get his statement in.
 5              THE COURT:  No, but I'm saying there is case law in
 6    this jurisdiction, at least, that says --
 7              MR. HARDIN:  The implication --
 8              THE COURT:   -- that there's an implication that's the
 9    only reason the proponent can bring it out is if it was
10    consistent.
11              MR. DURHAM:  Judge, I can limit it to just the meeting
12    itself and perhaps the demeanor.  I don't really need to get
13    into the nuts and bolts of any statements at this juncture.
14              MR. HARDIN:  Now, I think it's not going to be
15    consistent to what he says later, which is one reason we are
16    not objecting.
17              THE COURT:  Okay.
18              MR. HARDIN:  Thank you, Judge.
19              (Open court.)
20    BY MR. DURHAM:
21    Q.  Sorry.  You said approximately how long did the meeting
22    last?
23    A.  Approximately two hours.
24    Q.  And was -- again, without getting into the specifics, was a
25    portion of the meeting did you ask questions about
```

1    Mr. McNamee's relationship with Mr. Clemens?

2    A.  A portion, yes.

3    Q.  And did that cover the entire meeting?  Was that the only

4    person that you asked Mr. McNamee questions about?

5    A.  No.

6    Q.  Was that the only subject matter you covered with

7    Mr. McNamee?

8    A.  No.

9    Q.  Did you meet with Mr. McNamee a second time after this

10   first meeting you have described?

11   A.  Yes.

12   Q.  When was that, sir?

13   A.  It was two days later on June 8, 2007.

14   Q.  Where was this meeting?

15   A.  This was at another of his attorneys' offices in New York

16   City.

17   Q.  And did Mr. McNamee provide additional information, without

18   going into the details of what it might have been?

19   A.  Yes.

20   Q.  Let me move on a bit.  Did you -- in the summer of 2007,

21   were you aware that Senator Mitchell was doing some work or had

22   been retained by Major League Baseball?

23   A.  Yes.

24   Q.  And do you know why Senator Mitchell -- former Senator

25   Mitchell had been retained by Major League Baseball?

1    A.  Yes.

2    Q.  Why?  What's your understanding of why?

3    A.  To investigate the use of performance-enhancing drugs in

4    Major League Baseball.

5    Q.  And did you -- in connection with your investigation, did

6    you approach Mr. McNamee about cooperating with Senator

7    Mitchell's investigation?

8    A.  I didn't personally, but the U.S. Attorney's Office in the

9    Northern District of California did.

10   Q.  How did that come about, do you know?

11   A.  I do know.  I think about six months prior after Senator

12   Mitchell was brought on by Major League Baseball to conduct

13   this investigation, Senator Mitchell traveled out to San

14   Francisco and met with at the time the presidentially-appointed

15   United States Attorney Kevin Ryan, and basically expressed his

16   desire that if the government had any information that could be

17   shared with him to assist him in his investigation, he would be

18   very receptive to it and appreciative of it.

19   Q.  Did you approach Mr. McNamee about speaking with Senator

20   Mitchell?

21   A.  Again, I didn't personally, but I was aware that the U.S.

22   Attorney's Office in the Northern District of California did.

23   Q.  Let me fast forward, if I could, a little bit.  Did there

24   come a point in time when Mr. McNamee met with Senator

25   Mitchell?

1    A.   Yes.

2    Q.   And do you know when that meeting occurred?

3    A.   July of 2007.

4    Q.   Were you present for that meeting?

5    A.   Yes.

6    Q.   Where did that meeting occur?

7    A.   It occurred at Senator Mitchell's law offices in New York

8    City.

9    Q.   And who else was present for that particular meeting in

10   July of 2007?

11   A.   There were a lot of people present.  Assistant United

12   States Attorney Matt Parrella; I believe Assistant United

13   States Attorney Jeff Nedrow, also from the Northern District of

14   California; myself; IRS Special Agent Erwin Rogers, who worked

15   with me.  I believe FBI Special Agent Heather Young, who also

16   worked out in the San Francisco Bay Area.  Mr. McNamee was

17   there with at least one of his attorneys.  Senator Mitchell was

18   there with several other attorneys from his law office.

19   Q.   Why did you attend the Mitchell -- excuse me -- attend the

20   meeting in which Senator Mitchell and his staff were meeting

21   with Mr. McNamee?

22   A.   I did so at the request of the United States Attorney's

23   Office in the Northern District of California.  My

24   understanding for the reason being was that Brian McNamee was a

25   cooperator with us at that time, and we were sent there to

1    monitor and observe and make sure his cooperation went

2    smoothly.

3    Q.  And did this meeting that you described, did Senator

4    Mitchell personally -- let me back up for a moment.

5         Had you ever met former Senator Mitchell before this day?

6    A.  Yes.

7    Q.  And was that in connection with your job?

8    A.  Yes.

9    Q.  And with respect to that particular day, July of 2007, that

10   you have described, did Senator Mitchell participate in

11   questioning Mr. McNamee?

12   A.  Yes, he took a very active role in that participation.

13   Q.  And again, I don't want to ask you the nature of the

14   questions, but generally, by way of background, did it relate

15   to the topic areas that you had approached Mr. McNamee on

16   earlier?

17   A.  Yes.

18   Q.  Do you know whether Senator Mitchell was working at that

19   time, that is, in July of 2007?

20   A.  Do I know where he was working?

21   Q.  I'm sorry.  Do you know if he was working on a report for

22   Major League Baseball?

23   A.  I know he was working on an investigation.  I didn't know

24   the extent of -- if a report was going to be developed or what.

25   Q.  Did you know, as of July of 2007, whether Senator Mitchell

1    was going to put anybody's names in his report, if he was going

2    to publish one at all?

3    A.  No.

4    Q.  Were there additional meetings or phone calls, that you are

5    aware of, between Senator Mitchell and his staff and

6    Mr. McNamee?

7    A.  Yes.

8    Q.  Do you know how many?

9    A.  There was one in person meeting, and then I believe two

10   phone conversations with McNamee, Senator Mitchell.  And then

11   this was one additional one, I believe, which was McNamee and

12   one of Mitchell's aides.

13   Q.  And how many of these additional meetings or conversations

14   did you participate personally in?

15   A.  I was just at the in person meeting and then the two

16   subsequent phone conversations that Senator Mitchell

17   participated in.

18   Q.  All right.  Move to a different topic area here.  I think

19   it's a related topic area.

20       As part of your investigation in the summer of 2007, did

21   you ask Mr. McNamee for any assistance that you might not

22   otherwise been aware of in connection with some of the things

23   that he told you?  Did you get my question?

24   A.  Not exactly.

25   Q.  After you met with Mr. McNamee, do you -- well, did you

1    specifically ask Mr. McNamee to produce any physical evidence

2    that he may have, did you specifically make that request?

3    A.  No.

4    Q.  Did you -- do you typically make a more general request in

5    these circumstances?

6    A.  Yes.

7    Q.  Do you recall whether you made a more general request to

8    Mr. McNamee at the end of your meetings in 2007?

9    A.  Yes, I believe I did.

10   Q.  And paraphrase for us, if you can, what that request would

11   be?

12   A.  Generally when I conduct an interview of someone, at the

13   conclusion of the interview, I ask them --

14           MR. HARDIN:  Excuse me.  I object to "generally."

15   Just what happened in this case.

16           THE COURT:  Sustained.

17   BY MR. DURHAM:

18   Q.  I'm sorry.  Do you have an independent recollection of

19   whether you asked Mr. McNamee, in this particular instance?

20   A.  Yes.

21   Q.  And share that with us.

22   A.  It would have been to ask him is there anything else that

23   we haven't gone over that you think will be relative to what we

24   are looking for.  And I asked him that both in June 6th and

25   June 8, 2007, when we first made contact with him.

1    Q.   Did Mr. McNamee produce anything at that point in time?

2    A.   No.

3    Q.   Produce any physical evidence?

4    A.   No.

5    Q.   Did there come a point in time, as we move forward, that

6    Mr. McNamee or his attorneys reached out to you about physical

7    evidence?

8    A.   Yes.

9    Q.   How did that come about?

10   A.   I believe it was indirectly to me through the United States

11   Attorney's Office in the Northern District of California, but

12   it was approximately January 8th, 2008.  And Mr. McNamee's

13   attorney indicated that Mr. McNamee had some physical evidence

14   that he wished to turn over to us.

15   Q.   And what did you do in response to that information you

16   received about physical evidence?

17   A.   Myself, Special Agent Erwin Rogers of IRS and Assistant

18   United States Attorney Matt Parrella, from the Northern

19   District of California, flew back to New York and met with

20   Mr. McNamee at his attorneys' office in New York City.

21   Q.   And again, so we are clear, you talk about --

22            THE COURT:  One moment.

23            Okay.

24   BY MR. DURHAM:

25   Q.   I'm sorry.  I think you had indicated that January 8th,

1    2008, you learned of some possible physical evidence; is that

2    correct?

3    A.  Correct.

4    Q.  And -- and you described some individuals who went to New

5    York; is that right?

6    A.  Yes.

7    Q.  And just so we are clear, when you talk about the U.S.

8    attorney's office, again, you are not talking about the D.C.

9    U.S. Attorney's Office; is that correct?

10   A.  That's correct.  Northern District of California United

11   States Attorney's Office.

12   Q.  What day did you go to New York?

13   A.  We met with Mr. McNamee on January 10th, 2008.

14   Q.  Where did you meet with Mr. McNamee on that date?

15   A.  At his attorneys' office in New York City.

16   Q.  And who represented Mr. McNamee at that time?

17   A.  His name is escaping me right now.

18   Q.  I can refresh your memory, but let's move on.  We are close

19   to the end of the workday.

20       Mr. McNamee's attorney, you went to his office?

21   A.  Correct.

22   Q.  Where was his office located?

23   A.  Across from Rockefeller Center, midtown Manhattan.

24   Q.  What type of building was it?

25   A.  It was a large multilevel skyscraper building.

1    Q.   And security at the front gate?

2    A.   Yes.

3    Q.   Where was Mr. Emery's office, do you recall?  Did you have

4    to take an elevator up?

5    A.   I had to take an elevator several floors up.

6    Q.   Was there a reception area?

7    A.   It was reception area once we got up to the attorneys'

8    floor, correct.

9    Q.   And was access to Mr. McNamee's attorneys' office was it

10   controlled, that is, monitored?

11   A.   Yes.

12   Q.   Let me show you some photographs that have not yet been

13   admitted.   These are Government's Exhibits 96a through 96c for

14   identification.

15        Agent Novitzky, go ahead and take a look at those series of

16   photographs with an eye toward telling us whether you recognize

17   them.

18   A.   Okay.

19   Q.   Sorry.   Let me correct the record.   This is Government's

20   Exhibits 96a through 96e for identification.   Do you recognize

21   those photographs?

22   A.   Yes.

23   Q.   What are they?  What do they depict?

24   A.   These are photographs of Mr. McNamee's attorneys' office

25   where we met that day.

1   Q.  And is -- those photographs, do they fairly and accurately

2   depict Mr. McNamee's attorneys' office as you recall it from

3   January 10, 2008?

4   A.  Yes.

5           MR. DURHAM:  Your Honor, at this time we move into

6   evidence Government's Exhibit 96a through 96e.

7           MR. HARDIN:  No objection.

8           THE COURT:  Very well.  Admitted.

9           (Government's Exhibit Nos. 96a through 96e were

10  received in evidence.)

11          MR. DURHAM:  With the Court's permission, we will

12  publish, Your Honor.

13  BY MR. DURHAM:

14  Q.  On the screen in front of you is a photograph.  What is

15  this photograph, sir?

16  A.  Of the rear of the office as you enter the door.

17  Q.  And is that Mr. McNamee's attorneys' office?

18  A.  Yes.

19  Q.  All right.  And we will go to 96b, please.  And what does

20  this depict?

21  A.  These were series of cabinets in the back of the office.

22  Q.  All right.  96c, please.  Same?

23  A.  Also cabinets in the back of the office.

24  Q.  And 96d?

25  A.  That's a shot into the office from the door.

1    Q.   And 96e?

2    A.   That's the desk area where Mr. McNamee's attorneys sat.

3    Q.   All right.

4          MR. DURHAM:   We can take those down, thank you.

5    BY MR. DURHAM:

6    Q.   When you went to Mr. McNamee's attorneys' office in

7    January 10, 2008, did you take custody of any items of physical

8    evidence?

9    A.   Yes.

10   Q.   All right.   Describe generally what those items are, sir.

11   A.   There was three plastic bags, one of them contained various

12   ampules of what appeared to be anabolic steroids.

13        One of the bags contained -- a second bag contained a pill

14   jar, with an unknown amount of pills in it.

15        And then a third bag contained various pieces of gauze,

16   cotton balls, a needle, and a Miller Lite beer can.

17   Q.   What did you do with these items?

18   A.   I briefly examined them, and then I was given a FedEx box,

19   which I put all three bags inside the FedEx box and took away

20   with me that day.

21   Q.   You were given a FedEx box; is that correct?

22   A.   Correct.

23   Q.   What did you do with the items once you took them away?

24   A.   I brought them back to my hotel room in New York and

25   secured them in a locked suitcase.

1    I then traveled with them back to the San Francisco Bay

2  Area, put them in a secure area in my residence.  And then the

3  next time I went back to the office, I took them with me to the

4  office and locked them within a locked steel cage within our

5  secured office.

6  Q.  And you say your secured office.  At that time it was the

7  IRS Criminal Investigation Division?

8  A.  Correct.

9  Q.  Did you maintain custody and control of these items from

10  when you picked them up on January 10, 2008, in New York?  Did

11  you maintain custody and control of those items?

12  A.  Yes.

13  Q.  Now, by custody and control, let me ask you, did you have

14  your eye on them every minute of every day?

15  A.  No.

16  Q.  Did you know where they were?

17  A.  Yes.

18  Q.  And were they stored in a location where you knew where

19  they were?

20  A.  Yes.

21          MR. DURHAM:  May I approach the witness, Your Honor?

22          THE COURT:  Yes.

23          MR. DURHAM:  This is Government's Exhibit 52k for

24  identification.

25          THE COURT:  Very well.

BY MR. DURHAM:

Q.  Agent Novitzky, I'm going to show you a series of photographs marked Government's Exhibit 52k.

A.  Okay.

Q.  Do you recognize this photograph, sir?

A.  Yes.

Q.  What are they?

A.  These are photographs of some of the items that were turned over to us by Mr. McNamee on January 10, 2008.

Q.  Who took those photographs?

A.  Another agent in the IRS offices in San Jose, Quinn Nadrigal, N-A-D-R-I-G-A-L.

Q.  Were you present when those photographs were taken?

A.  Yes.

Q.  I'm sorry.  What date were they taken, do you recall?

A.  I think they were taken February 4th, 2008.

Q.  And did you write a report in connection with this?

A.  Yes, I did.

Q.  And would that report refresh your recollection of the exact date those photographs were --

A.  It absolutely would.

Q.  Because we are going to move to the last five minutes, I want to ask you, do those photographs fairly and accurately depict the items that you had or at least some of the items that you had picked up from Mr. McNamee's attorneys' office on

1    January 10th of 2008?

2    A.  Yes, they do.

3         MR. DURHAM:  Your Honor, at this time we will move

4    into evidence Government's Exhibit 52k.  It's a series of

5    photographs.

6         MR. HARDIN:  No objection.

7         THE COURT:  Admitted.

8         (Government's Exhibit No. 52k was received in

9    evidence.)

10        MR. DURHAM:  Putting the items on screen.  Let me go

11   through these quickly, so that the jury can see what they are.

12   BY MR. DURHAM:

13   Q.  The first photograph, could you please describe that for

14   the ladies and gentlemen of the jury?

15   A.  This was one of the bags, the bag that had the beer can,

16   the gauze pads, and the needle in.

17   Q.  Okay.  And to be clear, are these the items that you took

18   custody of on January 10, 2008?

19   A.  Yes.

20   Q.  And so we are -- conserve a little time, are all these

21   photographs that we are going to see, are all those photographs

22   of the same items that you received?

23   A.  The items that I received on January 10, 2008, correct.

24   Q.  This beer can you see, was that among the items that you

25   received on January 10, 2008?

1   A.  Yes.

2   Q.  And the beer can, as it's photographed here, is that the --

3   about the same condition that you -- when you picked up -- it

4   looks crushed, is that the same condition that you picked it up

5   in New York in January of '08?

6   A.  Yes, it was crushed just like that when I first saw it.

7           MR. DURHAM:  All right.  The next photograph, if we

8   could please.  Actually let me back up just one.  Sorry.  I

9   want to ask one more question.

10  BY MR. DURHAM:

11  Q.  Do see this, what appears to be a FedEx box?

12  A.  Yes.

13  Q.  Where did you come into custody of that?

14  A.  At Mr. McNamee's attorneys' office.  It was given to me to

15  put the plastic bags in, and it was expressed at that time

16  Mr. McNamee brought it to the office.

17          MR. DURHAM:  All right.  Next photograph, please.

18  BY MR. DURHAM:

19  Q.  What is this?

20  A.  This is a picture of that first bag, the items from the

21  first bag removed and laid out on the table.

22          MR. HARDIN:  That number, please?

23          MR. DURHAM:  I'm sorry.  It's Government's

24  Exhibit 52k.

25          MR. HARDIN:  Thank you.

1    BY MR. DURHAM:

2    Q.  And among these items do you see what appear to be needles

3    or at least one needle?  I'm sorry.

4    A.  Correct, amongst those items that was pictured on the

5    screen right now there was one needle within -- correct, within

6    the tissue paper or gauze there.

7    Q.  And what is this?

8    A.  That's a syringe that does not have a needle on the end of

9    it.

10   Q.  All right.  And what is this?

11   A.  That is a vial.

12   Q.  Do you know what was in that vial or how it was labeled?

13   A.  You know, if I looked at my report --

14   Q.  That's fine.

15   A.  -- I could be more accurate and refresh my memory.

16   Q.  That's fine.  That's fine.  Let's just move along, and we

17   can -- want to get through these photographs before we end, if

18   we could, today.

19          MR. DURHAM:  The next photograph, if we could, please.

20   BY MR. DURHAM:

21   Q.  What does this photograph depict?

22   A.  This depicts the contents of the inside of the beer can.  I

23   removed the bottom of the beer can, and all the items seen

24   within that -- on top of that plastic evidence bag there were

25   from within the beer can.

1   Q.  So, make sure I understand this.  Who cut the beer can

2   here?

3   A.  I did.

4   Q.  All right.  And why did you cut the bottom off the beer

5   can?

6   A.  To retrieve the items within.  They were visible from

7   within the top open portion of the beer can, and I wanted to

8   take them out, so I cut bottom half of it off.

9   Q.  And what were the contents you found inside the beer can

10  when you did that?

11  A.  Those that are depicted in that picture there.  There were

12  a couple of syringe wrappers, the bottom left there.

13  Q.  Here?

14  A.  Yes.

15  Q.  All right.

16  A.  There was a needle with a blue plastic attachment cap to

17  it.

18  Q.  That came from inside the beer can?

19  A.  Came from inside the beer can, correct.

20  Q.  Go ahead.

21  A.  Next to that there's a needleless syringe.

22  Q.  Here?

23  A.  Yes.

24  Q.  Next?

25  A.  Next to that there is an insulin syringe with an orange

1    cap.

2    Q.   When you say "insulin syringe," is that different than the

3    needle that you described here?

4    A.   Correct.

5    Q.   What's the difference?

6    A.   Insulin syringes are smaller and thinner and made for

7    subcutaneous injections just under the skin, while the bigger

8    circled one is a needle typically used for intermuscular

9    injections, to go deeper.

10   Q.   All right.   What else did you find in the beer can?

11   A.   To the bottom right, a couple of covers for needles.

12   Q.   Yes.

13   A.   Up above there are two vials, one with a blue top, one with

14   a gray top.   I believe one was human growth hormone and one was

15   an anabolic steroid.

16   Q.   All right.

17   A.   At least on the labeling.   To the right of that is a broken

18   ampule, which contains -- appeared to have contained an

19   anabolic steroid at one point.

20   Q.   All right.   Let me back up for a second.   You said a broken

21   ampule?

22   A.   Correct.

23   Q.   Is it made of glass?

24   A.   It's made of glass, yes.

25   Q.   And how is it broken?

1   A.   The top is broken off of it.

2   Q.   When you opened the beer can, was there any liquid left in

3   the beer can?

4   A.   No.

5   Q.   Okay.  Let's continue.  Go ahead, Agent Novitzky.

6   A.   And then, finally to the right, far right portion of that

7   plastic bag, three cotton balls with what appeared to be blood

8   stains on a few of them.

9   Q.   All right.  Sorry.  We left out a couple of items.  Do you

10  know what these are, these photographs?

11  A.   I believe they were also wrapping or packaging for

12  syringes.

13  Q.   All right.  Let's take a look at the next photograph, if we

14  could.  What are these?

15  A.   These are the three cotton balls that were found within the

16  beer can that were separated.

17  Q.   And the next photograph, please?

18  A.   This was a picture of an IRS evidence bag into which we

19  placed those three cotton balls and sealed it.

20  Q.   Let me back up just one moment and ask that question about

21  the preceding picture, if I could.  This cotton ball on the

22  left, does there appear to be stains on the cotton ball?

23  A.   Yes.

24          MR. DURHAM:  All right.  We can move forward.  And

25  then again, please.  Thank you.

1    BY MR. DURHAM:

2    Q.  What is this?

3    A.  This was the insulin syringe and the needle with the blue

4    plastic cap that were found within the beer can.  And they are

5    separated out here in this photo.

6              MR. DURHAM:  All right.  Next, please.

7    BY MR. DURHAM:

8    Q.  And this?

9    A.  This was the IRS evidence bag into which we placed those

10   two items, the insulin syringe and the needle with the blue

11   plastic cap.

12   Q.  And the next one.

13   A.  These were items from the bag with the beer can but they

14   were found outside the beer can.  A needle with a plastic cap

15   or a base, couple of pieces of Kleenex tissue, a piece of

16   gauze, and then two cotton balls up top.  Again, these were

17   found in the same bag with the beer can but outside of the beer

18   can.

19   Q.  These were turned over -- you took custody of them at

20   Mr. McNamee's attorneys' office January 10, 2008, and they were

21   found not inside but outside the beer can?

22   A.  Correct.

23   Q.  Let me back up to January 10, 2008.  I don't recall if I

24   asked you.  Was Mr. McNamee himself present at his attorneys'

25   office when you took custody of these items on that day?

1    A.   Yes.

2    Q.   And was his attorney present?

3    A.   Yes.

4    Q.   All right.  We will take a look at the next picture.

5    A.   Richard Emery is the name of his attorney.  It finally came

6    back to me.

7    Q.   Richard Emery?

8    A.   Yes.

9         MR. DURHAM:  All right.  Go ahead, next photograph,

10   please.

11   BY MR. DURHAM:

12   Q.   What is that?

13   A.   These were some of the items that were found outside of the

14   beer can but within that same plastic bag after they had been

15   placed in IRS evidence bag and sealed.

16        MR. DURHAM:  All right.  Next, please.  I think that's

17   it.

18        Your Honor, this may be an opportune place to stop, if

19   the Court so desires.

20        THE COURT:  Yes.  I was about to stop anyhow, since

21   it's past 5:00.

22        Okay.  We will recess at this time.  I can't start at

23   9:00, because I have a prior commitment that I have in the

24   morning.  So it will be probably be about 11 o'clock before I

25   can leave and get back here for that -- from that event.  So we

1    will ask that you come in at 11 o'clock.  Hopefully, I will be

2    here at that time, and we can get started.

3             Again, please comply with all of the instructions I

4    have given you.  Have a nice evening.  We will see you at

5    11 o'clock tomorrow.

6             (Jury excused at 5:03 p.m.)

7             THE COURT:  Yes, you wanted to raise something with

8    me?

9             MR. DURHAM:  I'm sorry, Your Honor.  There is an issue

10   that came up with respect to briefing of an issue, legal issue

11   of Mr. Pettitte.  But we would just ask for an opportunity

12   to -- perhaps 48 hours, if the Court wants to entertain any

13   type of legal briefing on that.  We would need to look at the

14   transcript and obviously make sure our research is in order.

15            THE COURT:  That's fine.

16            MR. DURHAM:  Very well.

17            THE COURT:  I know we are early in the process, but

18   how many anticipated witnesses does the government intend to

19   call?  I know you identified a number of people, but --

20            MR. DURHAM:  Yes.

21            THE COURT:  -- how many additional witnesses do you

22   intend to call, and how long are we talking about being in

23   trial?

24            MR. DURHAM:  We are trying to reach stipulations, Your

25   Honor.  And I understand that it doesn't mean that Mr. Clemens

1    has to stipulate to anything.  If we can stipulate down some of

2    the science, we can probably -- these are the lengthy

3    witnesses, so we are kind of front loading some of this.

4          Mr. McNamee, we do intend to call.  He will be

5    lengthy, probably, depending on how much Mr. Hardin wants to do

6    in cross-examination.  But many of these witnesses that are

7    going to come in are, you know, one- or two-hour witnesses.  My

8    best estimation is if we get the --

9          THE COURT:  You said how many?

10         MR. DURHAM:  Well, I think that if we can get

11   stipulations on some of this, we can probably call 20 or less

12   witnesses.  Now, again, some of these witnesses are going to be

13   routine and very short.  They certainly aren't going to be the

14   length of witnesses that we have called so far.

15         THE COURT:  So, you are anticipating lengthy witnesses

16   will be McNamee and who else?

17         MR. DURHAM:  Mr. Radomski will have, I believe,

18   some length.  The case agent, Agent Longmire, not real long,

19   but not 15 minutes either.  But we do have some people from the

20   teams, medical personnel, we have tried to pare the list down

21   considerably, and we are trying to try this case as efficiently

22   as we can.  And as I said, many of our witnesses are -- well,

23   lengthier witnesses are --

24         THE COURT:  Next week is basically wide open, so I

25   should be able to sit almost continuously between 9:00 and

1    5:00, except for breaks every day -- well, Monday through

2    Thursday, and I'm not sure about where we are on Friday.  Let

3    me see --

4              THE DEPUTY CLERK:  That's the 11th.  We are kind of

5    heavy, I think, on the 11th.

6              THE COURT:  We will find out.  I have got a Guantanamo

7    Bay case at 2:00, so check with Nick, I think it's Nick's case,

8    and see if maybe that can be moved.  I don't know how long

9    that's supposed to be, but I have an 11:45 matter, if we do

10   that in the morning, that would free up all Friday afternoon.

11             So assuming we have four full days and then part the

12   day on Friday, how long?  I mean, you obviously can't

13   anticipate cross-examination, but --

14             MR. DURHAM:  Two weeks.

15             THE COURT:  Very well.

16             (Court adjourned at 5:08 p.m.)

17                              - o -

18

19

20

21

22

23

24

25

1                        I-N-D-E-X

2                        **WITNESSES**

3    **On behalf of the Government**:

4                    **Direct**  **Cross**  **Redirect**  **Recross**

5    Phil Barnett
       (By Mr. Durham)                        5
6       (Mr. Hardin)                                        39

7    Jeff Novitsky

8       (By Mr. Durham)          53

9                        **EXHIBITS**

10   **Government Exhibits**:

11                                             **Page No.**:

12   No. 50c-1 and 50c-2 – Shipping receipts         62

13   No. 48 – Shipping label                         68

14   No. 49 – Shipping receipts                      70

15   No. 82a – Proffer agreement                     78

16   No. 96a through 96e –  Photographs              92

17   No. 52k – Photographs                           96

18

19   Defendant's Exhibits:

20   **No. 18 – Document**                           **11**

21

22

23

24

25

1                    **CERTIFICATE OF COURT REPORTER**

2

3          **I, ANNIE R. SHAW, certify that the foregoing is a**

4      **correct transcript from the record of proceedings in**

5      **the above matter.**

6

7   **Date:  May 3, 2012**

8                                    _____

9                                    **Signature of Court Reporter**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

'08 [1]   97/5

**0**

02 [1]   74/11
03 [4]   72/1 72/20 73/19 74/19

**1**

10 [12]   21/17 22/4 22/17 92/3
93/7 94/10 95/9 96/18 96/23
96/25 102/20 102/23
10th [1]   90/13
11 [1]   107/20
11 o'clock [3]   103/24 104/1
104/5
1135 [1]   69/14
11:45 [1]   106/9
11th [2]   106/4 106/5
12-3-02 [1]   74/11
12th [1]   17/22
13th [5]   20/15 30/2 30/9 31/12
45/2
13th of [2]   44/19 45/21
14 [3]   20/2 65/23 66/17
1401 [1]   1/19
14th [3]   58/3 58/11 60/16
15 [2]   55/18 105/19
15th [2]   17/22 32/2
17 [1]   10/3
18 [7]   9/10 10/3 11/8 11/17
16/2 20/1 107/20
1:10-CR-00223-RBW [1]   1/4
1st [1]   65/17

**2**

2-5 [1]   30/5
20 [1]   105/11
20001 [1]   2/8
2000s [1]   55/19
2002 [4]   56/2 65/2 71/19 72/15
2003 [3]   48/8 50/7 50/9
2004 [1]   65/17
2005 [26]   14/10 24/2 25/23
29/18 38/7 39/16 40/6 40/13
42/23 45/6 45/14 48/9 50/7
51/13 52/16 52/19 57/8 57/22
58/3 58/11 60/16 63/25 64/13
64/17 65/23 66/17
2006 [1]   52/17
2007 [19]   52/24 67/18 75/11
75/23 75/25 76/13 76/24 77/2
80/25 83/13 83/20 85/3 85/10
86/9 86/19 86/25 87/20 88/8
88/25
2008 [49]
2012 [2]   1/6 108/7
202 [1]   2/8
20530 [1]   1/17
21209-3600 [1]   2/4
2250 [1]   1/19
2:00 [1]   106/7
2:34 [1]   1/7
2:34 p.m [1]   3/2
2:39 p.m [1]   5/2

**3**

3242 [1]   2/8
333 [1]   2/7
354-3242 [1]   2/8
36 [1]   13/1
3600 [1]   2/4

**3**

3:44 p.m [1]   53/15
3:57 [1]   53/16
3a [1]   21/10
3b [1]   21/10
3b-10 [3]   21/17 22/4 22/17

**4**

4401 [1]   1/22
48 [9]   66/1 66/8 68/14 68/18
68/25 70/10 73/6 104/12 107/13
49 [9]   69/21 70/4 70/20 70/24
71/5 72/6 73/11 73/25 107/14
4th [2]   1/16 95/16

**5**

50c-1 [11]   59/19 59/21 60/1
60/19 62/9 62/18 63/7 64/10
64/11 65/19 107/12
50c-2 [12]   59/19 59/21 60/1
60/19 62/9 63/16 63/19 64/6
64/15 65/9 65/13 107/12
52k [6]   94/23 95/3 96/4 96/8
97/24 107/17
53 [1]   107/8
555 [1]   1/16
5:00 [2]   103/21 106/1
5:03 p.m [1]   104/6
5:08 [1]   106/16

**6**

6-11-03 [1]   72/20
6-6-03 [1]   73/19
60 [1]   20/22
62 [1]   107/12
6225 [1]   2/3
652-9000 [1]   1/20
6722 [1]   2/7
68 [1]   107/13
6th [1]   88/24

**7**

7-24-03 [1]   74/19
70 [1]   107/14
713 [1]   1/20
77010 [1]   1/20
77024 [2]   69/15 69/17
78 [1]   107/15
7th of [1]   65/17

**8**

8-14-03 [1]   72/1
82a [5]   77/6 78/6 78/9 78/14
107/15
8th [2]   89/12 89/25

**9**

9000 [1]   1/20
92 [1]   107/16
92121 [1]   1/23
96 [1]   107/17
96a [5]   91/13 91/20 92/6 92/9
107/16
96b [1]   92/19
96c [2]   91/13 92/22
96d [1]   92/24
96e [5]   91/20 92/6 92/9 93/1
107/16
97 [3]   33/2 33/7 33/8
98 [1]   41/25
9:00 [2]   103/23 105/25

**A**

a chance [1]   44/4
a salutary [1]   27/2
a/k/a [1]   1/7
ability [2]   12/9 12/17
able [7]   10/11 25/7 30/8 50/14
58/22 69/6 105/25
about [98]
above [2]   100/13 108/5
absolutely [1]   95/21
access [1]   91/9
account [9]   14/17 14/19 16/22
19/22 21/2 21/2 34/23 56/20
75/9
accounts [3]   16/21 21/4 21/5
accurate [4]   13/5 29/21 78/1
98/15
accurately [2]   92/1 95/23
achieved [1]   23/22
acknowledge [1]   37/18
Across [1]   90/23
act [3]   12/19 20/2 29/7
acting [1]   7/24
action [5]   4/2 4/2 23/8 28/17
50/11
active [1]   86/12
acts [3]   16/1 18/23 45/14
actual [1]   30/23
actually [3]   13/2 75/18 97/8
addition [1]   22/13
additional [10]   20/20 23/3
33/23 52/18 70/8 83/17 87/4
87/11 87/13 104/21
address [8]   22/11 63/5 63/10
63/11 64/4 64/6 73/3 74/21
addressed [1]   22/13
adequate [1]   51/12
adjourned [1]   106/16
administered [3]   46/16 51/21
52/7
administering [2]   31/21 51/18
administration [5]   19/9 19/11
54/9 54/14 55/4
administrator [1]   51/11
admission [1]   22/17
admitted [20]   9/16 9/17 9/19
10/6 11/1 11/6 11/8 22/3 62/8
62/18 63/17 64/22 68/17 68/24
70/23 73/24 78/8 91/13 92/8
96/7
adopted [3]   26/14 28/13 35/25
adult [1]   16/25
advised [1]   20/25
affected [1]   12/17
after [13]   12/11 15/4 17/24
24/2 24/4 27/2 27/5 31/11
33/11 83/9 84/11 87/25 103/14
afternoon [7]   3/2 5/3 5/4 5/11
5/12 53/22 106/10
again [30]
against [5]   54/20 79/19 79/20
79/24 80/2
agenda [1]   16/7
agent [24]   7/25 54/9 55/3
55/10 56/24 57/8 59/25 63/19
66/7 67/10 68/24 70/3 75/3
79/8 81/14 85/14 85/15 89/17
91/15 95/2 95/11 101/5 105/18
105/18
ago [1]   47/5
agree [4]   3/22 17/11 36/24

# A

agree... [1]  47/13
agreement [11]  31/17 31/19
 77/14 77/20 78/1 78/17 79/13
 80/9 80/9 80/12 107/15
ahead [6]  77/10 78/14 91/15
 99/20 101/5 103/9
ahold [1]  76/7
aid [1]  38/21
aided [1]  2/24
aides [1]  87/12
Airport [1]  56/4
all [71]
allegations [2]  18/5 32/11
allegedly [1]  15/20
allowed [6]  10/3 25/18 27/23
 37/17 48/23 51/13
almost [2]  22/20 105/25
along [2]  75/2 98/16
already [4]  9/11 12/20 17/8
 47/23
also [13]  9/3 14/23 15/25
 27/13 31/19 47/7 52/6 59/10
 64/15 85/13 85/15 92/23 101/11
always [1]  23/10
am [3]  9/18 21/15 54/9
AMERICA [1]  1/3
among [4]  29/18 31/8 96/24
 98/2
amongst [1]  98/4
amount [5]  16/8 75/8 75/14
 75/14 93/14
amounts [1]  50/18
ampule [2]  100/18 100/21
ampules [1]  93/12
anabolic [5]  59/2 67/15 93/12
 100/15 100/19
and maybe [1]  4/17
Andy [1]  9/1
ANNIE [2]  2/6 108/3
announcement [1]  33/21
announcing [3]  33/13 33/14
 33/22
another [11]  9/2 56/20 63/23
 65/25 66/1 69/20 71/21 72/5
 74/24 83/15 95/11
answer [13]  12/8 12/17 17/9
 35/3 45/25 46/6 47/13 48/10
 48/11 48/14 48/16 48/18 81/7
answers [2]  22/10 45/20
anticipate [1]  106/13
anticipated [1]  104/18
anticipating [1]  105/15
any [43]
anybody's [1]  87/1
anyhow [1]  103/20
anymore [1]  29/25
anything [11]  3/5 4/4 10/8
 32/21 40/21 42/5 42/23 43/20
 88/22 89/1 105/1
anyway [1]  29/14
apart [1]  70/15
apologize [3]  3/3 5/5 5/7
apparently [1]  3/15
appear [10]  35/6 56/22 60/8
 60/17 65/16 69/6 71/23 78/20
 98/2 101/22
APPEARANCES [2]  1/12 2/1
appeared [6]  16/12 69/8 81/1
 93/12 100/18 101/7
appearing [1]  36/11
appointed [1]  84/14
appointment [1]  5/6
appreciative [1]  84/18
approach [16]  6/16 20/10 33/3
 34/4 46/12 59/22 62/13 66/4
 66/20 69/25 77/7 81/16 81/16
 84/6 84/19 94/21
approached [1]  86/15
appropriate [12]  3/21 14/2
 15/9 20/11 26/11 26/12 28/20
 43/4 46/15 48/17 49/22 50/1
appropriately [1]  26/18
approximately [7]  54/12 55/2
 55/3 67/17 82/21 82/23 89/12
April [6]  31/16 31/16 32/14
 32/18 33/21 55/5
are [103]
area [15]  15/11 19/1 19/25
 22/25 56/2 57/9 63/2 85/16
 87/18 87/19 91/6 91/7 93/2
 94/2 94/2
areas [4]  36/21 70/15 81/10
 86/15
aren't [1]  105/13
argue [2]  28/3 38/1
arguing [1]  43/22
arose [2]  39/15 40/6
article [2]  24/22 34/14
as [61]
aside [1]  46/22
ask [53]
asked [37]
asking [14]  4/1 7/2 7/6 10/9
 13/2 13/4 13/4 25/18 35/2 40/5
 44/25 45/2 46/8 51/3
aspect [1]  26/17
assertions [1]  19/6
assess [2]  7/10 19/19
assessing [1]  18/8
assessment [3]  7/1 18/11 51/5
assist [1]  84/17
assistance [1]  87/21
Assistant [4]  1/16 85/11 85/12
 89/17
Associates [1]  1/19
Association [5]  31/23 33/21
 33/22 39/2 50/12
assume [2]  43/4 81/19
assuming [1]  106/11
athletes [2]  46/24 48/4
athletics [1]  52/11
attachment [1]  99/16
ATTANASIO [1]  1/21
attend [2]  85/19 85/19
attention [9]  16/9 33/7 55/19
 57/22 64/18 65/11 71/12 71/20
 72/11
attorney [18]  1/14 2/2 3/15
 3/18 3/19 3/20 4/8 77/3 78/2
 78/23 84/15 85/12 85/13 89/13
 89/18 90/20 103/23 105/5
attorney's [11]  77/15 77/19
 77/25 79/3 84/8 84/22 85/22
 89/11 90/8 90/9 90/11
Attorney-at-Law [2]  1/14 2/2
attorneys [5]  1/16 85/17 85/18
 89/6 93/2
attorneys' [15]  77/1 80/19
 83/15 89/20 90/15 91/7 91/9
 91/24 92/2 92/17 93/6 95/25
attribute [1]  8/2
audio [3]  6/5 21/9 21/12
audio/video [1]  21/12
authority [2]  19/3 20/7
authorize [1]  80/12
authorized [5]  7/25 57/19 58/7
 58/24 77/20
authorizes [1]  57/20
Avenue [2]  2/3 2/7
aware [7]  3/13 22/12 23/8
 83/21 84/21 87/5 87/22
away [2]  93/19 93/23

# B

B12 [20]  12/20 13/13 13/17
 13/23 14/2 14/3 14/18 14/23
 14/24 15/2 15/4 15/8 15/9
 15/11 16/25 19/24 39/20 41/9
 42/2 42/12
back [29]
background [5]  57/7 57/13 75/6
 75/13 86/14
bad [1]  27/12
bag [13]  93/13 93/15 96/15
 97/20 97/21 98/24 101/7 101/18
 102/9 102/13 102/17 103/14
 103/15
bags [5]  92/11 93/13 93/19
 96/15 97/15
BALCO [1]  56/5
ball [2]  101/21 101/22
balls [5]  93/16 101/7 101/15
 101/19 102/16
Baltimore [3]  2/4 14/21 57/8
bank [3]  56/20 75/7 75/9
Barnett [21]  5/15 6/11 8/8
 9/14 11/12 13/12 15/25 20/2
 22/2 22/20 31/11 32/13 32/13
 33/6 38/18 39/14 39/22 44/14
 46/15 46/23 107/5
base [1]  102/15
baseball [43]
Baseball's [2]  16/11 52/20
based [5]  41/8 47/5 53/7 75/9
 75/14
basically [5]  61/1 76/14 79/23
 84/15 105/24
basis [1]  51/24
Basketball [1]  52/17
Bay [4]  56/2 85/16 94/1 106/7
be [110]
be consistent [1]  3/14
bear [1]  60/7
bearing [3]  34/19 35/17 35/23
because [33]
become [1]  57/6
been [48]
beer [24]  93/16 96/15 96/24
 97/2 98/22 98/23 98/25 99/1
 99/4 99/7 99/9 99/18 99/19
 100/10 101/2 101/3 101/16
 102/4 102/13 102/14 102/17
 102/17 102/21 103/14
before [25]  1/11 3/5 11/14
 11/19 14/12 15/5 15/14 15/15
 16/14 16/25 18/16 26/4 30/5
 36/24 37/22 42/21 42/24 48/8
 49/6 55/6 59/18 66/21 86/5
 98/17 103/24
began [6]  27/14 27/19 56/1
 56/1 56/2 66/15

**B**

begin [1]  81/7
behalf [2]  47/10 107/3
behavior [2]  25/25 26/12
being [28]
believe [21]  3/13 9/7 12/22
 13/1 14/4 16/4 24/19 42/6 44/6
 59/20 76/8 78/15 85/12 85/15
 87/9 87/11 88/9 89/10 100/14
 101/17 105/17
bench [10]  3/8 3/11 6/17 24/14
 34/6 40/20 46/13 60/23 66/22
 81/18
benefit [1]  26/16
besides [1]  25/17
best [5]  12/8 13/5 65/6 81/3
 105/8
bet [1]  25/14
between [10]  25/15 25/19 28/2
 28/4 29/9 30/8 33/20 77/14
 87/5 105/25
beyond [3]  23/9 43/20 44/20
big [1]  4/15
bigger [1]  100/7
biggest [1]  24/5
bill [10]  17/16 17/22 17/24
 18/1 22/21 23/3 23/7 52/7 52/8
 74/14
bit [5]  42/22 50/1 73/5 83/20
 84/23
blatant [1]  36/11
Blocked [1]  79/8
blocks [1]  69/16
blood [1]  101/7
blotch [1]  69/14
blue [4]  99/16 100/13 102/3
 102/10
board [1]  10/4
body [1]  50/18
bolts [1]  82/13
book [1]  76/8
boss [4]  4/6 4/7 4/17 4/21
boss' [1]  4/7
both [5]  16/16 17/22 24/21
 31/25 88/24
bottom [5]  98/23 99/4 99/8
 99/12 100/11
box [6]  60/11 62/17 93/18
 93/19 93/21 97/11
Branch [1]  47/11
brand [1]  43/23
breadth [1]  7/14
break [1]  53/14
breaks [1]  106/1
Brian [4]  6/7 75/4 77/16 85/24
briefing [2]  104/10 104/13
briefly [4]  3/6 27/21 39/10
 93/18
bring [5]  3/5 4/23 37/13 43/17
 82/9
bringing [1]  67/6
broad [2]  19/3 20/7
broader [5]  6/22 13/22 16/6
 25/6 53/2
broken [4]  100/17 100/20
 100/25 101/1
brought [11]  34/3 36/19 36/19
 37/1 37/19 43/18 44/2 44/2
 84/12 93/24 97/16
building [2]  90/24 90/25
business [1]  56/3

**BUT [1]**  1/24
buy [1]  50/3

**C**

cabinets [2]  92/21 92/23
cage [1]  94/4
California [1]  1/23 67/2
 77/16 77/25 78/3 79/3 84/9
 84/22 85/14 85/23 89/11 89/19
 90/10
call [7]  4/7 20/21 80/4 104/19
 104/22 105/4 105/11
called [4]  45/14 56/21 76/12
 105/14
calls [2]  53/21 87/4
came [10]  4/14 25/2 34/9 43/23
 51/4 56/8 99/18 99/19 103/5
 104/10
can [79]
can't [5]  30/13 41/9 44/3
 103/22 106/12
Candidly [1]  10/25
cannot [2]  15/16 18/5
cap [5]  99/16 100/1 102/4
 102/11 102/14
carbon [2]  69/8 69/14
career [1]  80/3
Carolyn [1]  21/7
case [16]  26/3 26/16 31/9
 35/11 42/18 43/9 61/19 63/8
 64/7 81/22 82/5 88/15 105/18
 105/21 106/7 106/7
case and [1]  42/18
causal [5]  27/17 28/1 28/4
 29/9 30/8
cautionary [1]  28/20
cautious [1]  66/24
Center [1]  90/23
certain [4]  21/13 27/23 54/20
 54/22
certainly [7]  24/11 32/20
 32/23 32/25 41/19 43/22 105/13
CERTIFICATE [1]  108/1
certify [1]  108/3
challenge [7]  6/22 7/14 26/22
 30/3 35/21 35/24 36/6
challenge that [1]  36/6
challenge to [1]  7/14
challenged [1]  29/16
challenges [1]  29/22
challenging [10]  6/12 7/1 7/7
 7/11 8/3 8/4 30/2 30/4 30/5
 30/6
chance [4]  34/10 36/20 43/19
 44/4
changes [3]  25/16 33/14 33/15
charged [2]  18/24 54/23
check [4]  41/23 42/6 42/6
 106/7
checks [3]  75/8 75/14 75/15
child [1]  17/1
chose [1]  40/16
chosen [1]  10/2
chronological [1]  35/20
Chuck [1]  9/3
circle [1]  71/21
circled [1]  100/8
circumstance [1]  52/9
circumstances [3]  75/24 79/21
 88/5
City [5]  77/1 83/16 85/8 89/20
 90/15

clean [5]  36/16 38/10 45/14
 56/22 56/23
clear [18]  30/1 33/12 33/14
 37/11 38/8 57/17 63/1 63/6
 64/6 66/21 71/9 72/21 72/24
 76/10 77/22 89/21 90/7 96/17
CLEMENS [52]
Clemens' [7]  16/21 18/25 19/6
 19/6 20/3 73/3 74/21
Clerk [1]  9/9
clients [2]  7/16 7/18
close [3]  36/9 56/4 90/18
clubs [1]  14/22
code [2]  69/16 69/17
collective [2]  28/19 30/12
COLUMBIA [2]  1/2 77/23
come [19]  3/6 23/10 23/12
 57/12 67/10 72/8 75/2 75/6
 75/18 76/15 76/19 82/2 84/10
 84/24 89/5 89/9 97/13 104/1
 105/7
comes [4]  28/14 28/16 56/18
 64/21
coming [4]  7/15 28/12 54/21
 56/23
Commerce [3]  5/16 5/18 23/4
Commissioner [8]  31/16 32/2
 32/3 32/3 32/5 33/18 33/20
 33/22
Commissioner committed [1]
 33/18
commitment [1]  103/23
committed [2]  32/8 33/18
committee [68]
Committee's [15]  6/12 6/19 7/3
 8/8 14/2 15/10 23/25 24/6
 25/15 25/17 25/20 37/2 52/15
 52/19 53/2
committees [2]  23/11 54/4
communicate [1]  76/13
completed [1]  18/15
completes [2]  39/6 74/25
comply [1]  104/3
computer [1]  2/24
computer-aided [1]  2/24
con [4]  18/18 49/22 49/24 52/8
concern [4]  4/1 14/25 24/17
 26/21
concerned [2]  13/13 47/6
concerns [5]  7/3 15/20 17/24
 18/19 51/16
conclude [2]  15/16 26/16
conclusion [1]  88/13
condition [6]  60/15 65/22
 70/17 73/20 97/3 97/4
conduct [4]  23/11 56/10 84/12
 88/12
conducted [5]  14/7 15/21 18/9
 26/19 27/7
conducting [3]  7/4 8/13 18/11
conference [9]  3/11 6/17 24/14
 34/6 40/20 46/13 60/23 66/22
 81/18
Congress [17]  18/11 20/19 25/2
 25/24 26/13 27/7 28/16 29/7
 29/9 29/16 30/20 35/8 35/17
 35/21 36/1 36/2 42/10
Congress' [3]  28/10 34/19 51/5
Congressional [3]  5/15 12/1
 42/15

Case 1:10-cr-00223-RBW   Document 209   Filed 04/08/14   Page 112 of 123

**C**

Congressman [2]   17/7 45/9
Congresswoman [1]   21/13
connection [12]   12/1 25/19
  28/1 28/4 29/9 30/8 32/18 46/7
  84/5 86/7 87/22 95/17
conserve [1]   96/20
consider [4]   15/22 18/10 28/22
  30/12
considerable [1]   16/8
considerably [1]   105/21
consideration [5]   14/5 15/10
  29/21 44/11 49/18
considered [1]   18/5
considering [2]   49/5 51/20
consistent [6]   3/14 18/9 18/12
  81/24 82/10 82/15
Constitution [3]   2/7 26/1 27/8
consult [1]   21/23
consumers' [1]   54/19
Cont'd [1]   2/1
contact [5]   72/8 75/10 75/24
  76/6 88/25
contacted [2]   17/24 57/8
contained [8]   57/21 69/10
  72/10 93/11 93/13 93/13 93/15
  100/18
contains [1]   100/18
contaminated [1]   14/19
content [1]   18/4
contents [2]   98/22 99/9
context [9]   13/22 13/22 19/13
  19/16 34/18 36/15 37/6 42/3
  42/14
continue [3]   8/24 67/20 101/5
continued [2]   15/2 67/25
continuing [1]   10/11
continuously [1]   105/25
control [3]   94/9 94/11 94/13
controlled [6]   17/3 49/2 49/14
  49/19 49/25 91/10
conversations [3]   87/10 87/13
  87/16
convict [1]   7/22
conviction [1]   67/4
Cooley [1]   1/22
cooperate [1]   58/19
cooperated [1]   58/21
cooperating [6]   57/9 66/15
  67/11 67/20 68/5 84/6
cooperation [1]   86/1
cooperator [1]   85/25
copies [4]   59/21 61/16 61/17
  62/3
copy [12]   24/20 38/14 64/19
  65/4 69/7 69/7 69/8 69/9 71/9
  71/13 78/1 78/17
corner [9]   64/19 64/24 65/12
  71/16 72/11 73/15 74/8 74/17
  78/21
correct [50]
correlation [1]   25/15
correspond [1]   64/7
corresponding [1]   20/1
corresponds [1]   63/11
cosmetics [1]   54/23
cotton [7]   93/16 101/7 101/15
  101/19 101/21 101/22 102/16
could [34]
couldn't [2]   41/9 79/24
counsel [19]   8/3 12/24 13/3
  29/2 43/4 46/12 53/6 53/9
  59/21 62/2 62/2 62/13 66/3
  69/22
counsel's [1]   62/17
count [2]   12/19 12/19
counter [2]   49/2 50/4
counterfeit [1]   54/21
couple [9]   31/11 38/18 49/13
  59/17 60/5 99/12 100/11 101/9
  102/15
course [2]   14/20 19/7
court [30]
Court's [9]   6/14 26/21 27/22
  62/12 63/17 68/20 68/20 71/2
  92/11
COURTNEY [1]   1/14
cover [1]   83/3
covered [1]   83/6
covers [1]   100/11
CR [1]   1/4
create [1]   51/14
credibility [2]   19/20 20/8
crimes [1]   55/14 55/16
criminal [8]   54/10 54/16 54/17
  54/19 55/4 55/10 55/13 94/7
cross [15]   5/25 10/6 11/18
  11/19 11/23 12/10 11/25 12/1 34/11
  36/20 39/8 43/19 44/4 105/6
  106/13 107/4
cross-examination [8]   5/25
  10/6 11/18 11/23 12/11 25/1
  105/6 106/13
cross-examined [1]   11/19
crushed [2]   97/4 97/6
currency [1]   55/15
custody [8]   93/7 94/9 94/11
  94/13 96/18 97/13 102/19
  102/25
customer [4]   64/19 65/3 69/8
  71/13
cut [3]   99/1 99/4 99/8

**D**

D.C [4]   1/5 1/17 2/8 90/8
DANIEL [1]   1/14
Danny [1]   45/10
date [18]   58/2 64/23 65/13
  65/16 71/15 71/21 71/21 71/23
  71/25 72/12 72/16 73/16 74/8
  74/18 90/14 95/15 95/20 108/7
DAVID [2]   1/15 2/2
Davis [1]   45/10
day [18]   1/9 5/13 15/5 16/24
  30/4 49/6 79/19 79/24 79/25
  86/5 86/9 90/12 91/25 93/20
  94/14 102/25 106/1 106/12
day's [2]   30/14 30/15
days [2]   83/13 106/11
deal [2]   4/15 45/5
Debbie [1]   16/22
December [12]   30/2 52/24 57/22
  58/3 58/11 60/16 63/24 64/12
  64/17 65/23 66/17 66/18
December 14 [2]   65/23 66/17
December 14th [1]   58/3
Decemeber of [2]   63/24 64/17
decide [2]   30/14 45/22
decided [8]   29/11 29/20 30/20
  35/17 35/17 41/2 49/14 75/10
deciding [2]   34/23 49/1
decision [5]   34/20 35/8 40/21
decline [1]   29/17
decrease [1]   30/20
deeper [1]   100/9
deeply [1]   52/5
defendant [3]   1/8 1/18 64/7
Defendant's [6]   9/10 11/8
  11/17 16/1 20/1 107/19
defending [2]   42/2 42/10
defense [1]   9/18
deficient [1]   52/20
delay [2]   3/3 5/5
deliberations [1]   31/9
delving [1]   52/5
demeanor [2]   80/24 82/12
Democratic [1]   5/17
depending [2]   50/19 105/5
depends [1]   52/2
depict [5]   91/23 92/2 92/20
  95/24 98/21
depicted [1]   99/11
depicts [1]   98/22
deposited [1]   75/9
deposition [9]   8/16 9/2 9/6
  12/2 12/22 13/3 16/6 20/3 21/3
describe [5]   55/12 59/13 80/23
  93/10 96/13
described [8]   24/1 57/25 58/8
  83/10 86/3 86/10 90/4 100/3
description [2]   81/3 81/9
desire [1]   84/16
desires [1]   103/19
desk [1]   93/2
detail [2]   22/7 58/22
detailed [1]   81/9
details [2]   4/14 83/18
detect [3]   50/14 50/20 50/20
determine [2]   14/15 20/8
determined [1]   41/8
determining [1]   38/21
develop [1]   80/13
developed [1]   86/24
devices [2]   54/21 54/22
did [151]
didn't [22]   20/24 25/25 26/24
  28/17 29/10 34/18 36/2 36/20
  37/18 37/24 39/16 41/15 41/21
  42/4 43/18 43/24 76/5 79/25
  82/3 84/8 84/21 86/23
Diego [1]   1/23
difference [3]   21/5 60/9 100/5
different [9]   7/5 16/20 21/2
  26/9 50/17 50/18 52/10 87/18
  100/2
differing [2]   21/4 22/14
direct [16]   17/6 29/1 33/7
  36/20 41/12 43/16 44/2 54/1
  55/19 57/22 64/18 65/11 71/12
  71/20 72/11 107/4
direction [1]   80/14
directly [3]   23/15 25/10 26/22
Director [5]   5/16 5/17 5/18
  5/19 5/21
dirty [1]   56/22
discovery [3]   24/21 61/16
  61/18
discussed [3]   23/7 45/12 45/13
discussing [1]   22/11
discussion [3]   16/3 44/25
  45/17
dismiss [1]   31/23
dismissed [1]   31/22

**D**

display [1]  10/11
displayed [4]  10/4 10/5 10/9
 10/13
displaying [2]  10/1 10/10
Disregard [1]  31/6
disregarded [1]  31/9
dissipate [1]  27/19
distributing [2]  56/6 75/11
distribution [10]  54/23 55/21
 56/12 56/16 58/12 58/13 58/24
 67/1 67/15 71/9
distributor [1]  57/10
distributors [2]  56/25 56/25
DISTRICT [16]  1/1 1/2 1/11
 67/2 77/15 77/22 77/24 78/2
 79/3 84/9 84/22 85/13 85/23
 89/11 89/19 90/10
Division [3]  55/11 55/13 94/7
DLA [1]  2/3
do [127]
Docket [1]  1/3
doctor [1]  3/4
doctor's [1]  5/6
doctors [1]  19/10
document [10]  38/19 65/10
 77/10 77/17 77/18 78/18 79/4
 79/6 79/11 107/20
documents [1]  58/14
does [23]  23/10 23/12 23/14
 23/18 25/2 25/2 25/6 25/22
 28/10 36/7 47/11 65/3 65/16
 69/6 71/23 78/20 79/3 80/12
 92/19 98/8 98/21 101/22 104/18
doesn't [3]  7/17 27/3 104/25
doing [5]  48/13 51/18 51/19
 54/25 83/21
dollar [1]  75/8
don't [59]
done [9]  16/3 20/22 27/15
 27/17 30/23 38/21 50/22 51/10
 74/25
door [2]  92/16 92/25
down [7]  13/10 16/12 35/21
 80/16 93/4 105/1 105/20
drafted [1]  22/21
draw [3]  25/19 28/1 29/9
drawn [1]  81/24
Drive [1]  69/15
dropped [1]  24/24
drug [2]  18/25 31/13 48/8
 48/15 50/7 50/9 54/9 54/14
 54/20 55/4 56/11 67/1
drugs [15]  54/21 55/22 56/6
 56/17 57/1 57/11 58/13 58/14
 58/15 58/25 59/16 61/2 75/11
 81/5 84/3
duly [1]  58/7
DURHAM [5]  1/13 40/13 41/6
 107/5 107/8
during [13]  5/24 11/18 11/22
 16/6 20/17 21/3 41/11 44/11
 44/18 51/2 60/6 61/16 63/25
duties [2]  54/14 55/12

**E**

each [7]  18/23 46/24 46/25
 47/2 48/4 60/11 61/22
earlier [2]  37/1 86/16
early [5]  20/23 55/19 57/8
 67/18 104/17

effect [5]  24/1 27/2 35/10
 35/19 35/20
efficiently [1]  105/21
efforts [2]  20/11 22/12
Eighteen [1]  10/4
either [8]  10/3 31/22 36/2
 41/16 50/19 53/9 65/17 105/19
electronic [1]  71/9
elevator [2]  91/4 91/5
elicit [1]  37/4
elicited [1]  81/25
eliminated [1]  39/3
Elmo [2]  9/9 62/11
else [5]  42/23 85/9 88/22
 100/10 105/16
embossed [2]  64/23 71/15
Emery [2]  103/5 103/7
Emery's [1]  91/3
employed [2]  55/6 55/8
encountered [1]  75/3
end [4]  88/8 90/19 98/8 98/17
ends [1]  36/11
Energy [3]  5/16 5/18 23/4
enforcement [6]  50/11 55/4
 55/6 56/7 57/23 80/3
enhancing [11]  55/22 56/6
 56/25 57/11 58/13 58/25 59/16
 61/2 75/17 81/5 84/3
enough [3]  18/21 51/18 51/19
enter [3]  67/1 67/12 92/16
entered [5]  58/16 67/17 77/14
 78/3 79/13
entertain [1]  104/12
entire [3]  17/6 30/17 83/3
entirely [1]  6/7
Erwin [2]  85/14 89/17
escaping [1]  90/17
especially [1]  31/18
ESPN [1]  7/21
Esquire [8]  1/13 1/14 1/15
 1/15 1/18 1/18 1/21 2/2
establish [2]  35/14 35/18
establishing [1]  32/9
estimation [1]  105/8
evasion [1]  55/15
even [3]  6/24 28/6 54/22
evening [1]  104/4
event [1]  103/25
ever [5]  22/24 23/8 80/3 80/3
 86/5
every [3]  94/14 94/14 106/1
everybody [2]  3/15 38/6
evidence [36]
evolved [1]  26/17
exact [1]  95/20
exactly [1]  87/24
examination [14]  5/25 10/6
 11/18 11/23 12/11 14/3 25/1
 36/20 39/7 39/12 43/20 54/1
 105/6 106/13
examined [2]  11/19 93/18
examining [1]  19/8
example [2]  15/16 23/24
excellent [1]  48/12
except [1]  106/1
excerpt [1]  22/3
exchange [1]  79/18
exclusively [3]  8/9 8/11 52/16
excuse [6]  39/22 39/22 66/1
 66/18 85/19 88/14
excused [1]  104/6

executed [1]  58/4
Executive [1]  47/10
exercise [1]  74/1
exhibit [56]
Exhibit 52k [1]  97/24
exhibits [10]  21/10 24/11
 44/15 59/19 60/19 91/13 91/20
 107/9 107/10 107/19
existed [1]  29/19
expect [1]  67/2
experience [1]  14/1
experts [9]  15/6 15/7 15/8
 15/8 16/25 16/25 19/9 19/9
 52/8
explain [6]  11/12 13/25 15/12
 28/18 49/23 50/1
explain a [1]  49/23
explains [1]  27/18
explanation [1]  18/15
exploration [1]  15/2
express [2]  4/1 62/24
expressed [3]  18/19 84/15
 97/15
extent [3]  14/24 29/16 86/24
extreme [1]  81/3
Extremely [1]  81/1
eye [4]  12/13 59/18 91/16
 94/14

**F**

fact [15]  7/10 11/1 15/5 16/18
 18/11 27/1 27/2 27/4 27/6 27/6
 28/14 29/20 36/3 43/15 81/21
factor [2]  30/25 51/4
facts [2]  36/25 52/5
factual [1]  52/6
fair [2]  40/24 73/5
fairly [2]  92/1 95/23
false [1]  42/16
falsify [1]  51/15
familiar [6]  21/12 21/16 43/1
 57/4 57/6 57/13
far [2]  101/6 105/14
fast [1]  84/23
faulty [1]  54/22
favorable [1]  17/23
FBI [2]  57/8 85/15
FDA [1]  54/12
February [15]  17/22 20/15 30/7
 30/9 31/12 35/19 37/5 37/6
 37/7 37/19 44/18 45/2 45/21
 52/25 95/16
February 12th [1]  17/22
February 13th [1]  20/15
February 13th group [1]  37/5
February 13th group originally [1]
 37/7
February 13th had [1]  35/19
February 13th of [1]  30/7
February 4th [1]  95/16
February the [4]  30/9 44/18
 45/2 45/21
federal [8]  45/15 45/15 55/6
 55/14 55/16 57/19 57/23 67/12
FedEx [6]  74/6 74/14 93/18
 93/19 93/21 97/11
felt [1]  75/16
few [2]  13/16 101/8
finally [2]  101/6 103/5
financial [7]  55/14 55/16
 55/20 56/10 56/11 56/16 58/14

Case 1:10-cr-00223-RBW   Document 679   Filed 04/08/14   Page 2/14 of 123   74/8 74/18

**F**

find [9]   12/16 58/23 59/2 59/4
  59/6 59/8 59/10 100/10 106/6
finder [1]   7/10
fine [7]   3/10 47/22 82/2 98/14
  98/16 98/16 104/15
finished [2]   12/11 22/20
first [18]   11/16 43/17 43/18
  50/8 50/24 57/6 57/12 60/15
  72/4 76/22 80/25 81/15 83/10
  88/25 96/13 97/6 97/20 97/21
five [3]   12/20 34/1 95/22
flew [1]   89/19
floor [1]   91/8
floors [1]   91/5
focus [5]   8/12 37/14 47/6
  52/15 56/14
focused [6]   8/9 8/11 19/2
  52/14 53/1 56/16
follow [3]   10/5 53/7 80/12
follow-up [2]   10/5 53/7
following [1]   23/4
food [5]   49/8 54/9 54/14 54/20
  55/3
Football [4]   45/16 52/17 52/18
  52/19
foregoing [1]   108/3
form [2]   64/23 72/12
former [3]   36/5 83/24 86/5
formerly [2]   5/17 5/19
fortify [1]   31/13
forward [8]   28/19 34/20 34/23
  35/8 36/2 84/23 89/5 101/24
found [19]   16/10 19/21 59/13
  59/15 62/22 62/23 63/14 64/12
  64/14 64/16 64/17 65/22 99/9
  101/15 102/4 102/14 102/17
  102/21 103/13
four [4]   12/20 54/12 54/25
  106/11
framed [1]   6/20
Francisco [5]   56/2 56/4 84/14
  85/16 94/1
free [1]   106/10
frequency [1]   51/9
Friday [3]   106/2 106/10 106/12
from each [1]   46/24
front [7]   11/11 54/19 68/9
  78/15 91/1 92/14 105/3
front-line [1]   54/19
full [3]   25/7 63/23 106/11
fully [1]   48/23
function [1]   4/13
fundamental [1]   24/4
further [4]   23/20 28/17 29/11
  39/8

**G**

gag [1]   3/14
gander [1]   10/24
gate [1]   91/1
gauze [4]   93/15 96/16 98/6
  102/16
gave [4]   22/10 43/3 69/1 69/3
general [9]   3/15 3/18 3/19
  3/20 4/8 54/15 76/16 88/4 88/7
generally [12]   17/23 22/7
  55/20 55/24 56/15 59/13 63/2
  63/4 86/14 88/12 88/14 93/10
gentleman [1]   72/22
gentlemen [8]   11/12 15/12 54/4

get [15]   3/3 26/23 28/6 37/24
  60/20 76/7 81/9 82/4 82/12
  87/23 98/17 103/25 104/2 105/8
  105/10
getting [2]   6/21 82/24
GILBERTO [1]   1/15
give [5]   17/12 48/8 50/6 58/19
  81/14
given [12]   19/7 19/12 27/7
  31/7 51/25 51/25 53/8 66/13
  93/18 93/21 97/14 104/4
giving [1]   24/11
glad [1]   25/12
glass [2]   100/23 100/24
go [26]   12/12 12/21 26/23
  34/20 35/8 36/2 36/22 38/4
  42/21 42/24 57/20 64/10 65/9
  73/9 73/25 77/10 78/14 80/14
  90/12 91/15 92/19 96/10 99/20
  100/9 101/5 103/9
goal [1]   16/7
Godward [1]   1/22
goes [4]   27/10 37/16 37/21
  61/19
going [45]
gone [1]   88/23
good [8]   5/3 5/4 5/11 5/12
  10/23 10/24 23/24 53/22
GOODHAND [1]   1/15
goose [2]   10/23 29/23
got [5]   24/10 30/4 68/1 91/7
  106/6
gotten [2]   16/11 42/12
government [17]   1/13 3/17 5/19
  5/22 10/1 17/19 34/25 44/16
  47/11 53/9 53/23 67/21 68/13
  84/16 104/18 107/3 107/10
Government's [41]
granted [1]   80/4
gray [2]   60/11 100/14
grayed [7]   63/2 63/2 63/6 64/1
  70/15 72/25 74/20
great [1]   58/22
greater [2]   16/19 31/24
group [3]   28/19 37/5 37/7
growth [24]   9/1 9/4 15/7 16/4
  16/9 16/13 16/17 16/18 16/21
  17/1 17/3 18/14 18/21 19/22
  22/22 23/6 32/11 48/15 48/21
  51/1 51/19 54/24 59/4 100/14
Guantanamo [1]   106/6
GUERRERO [1]   1/15
guess [11]   4/3 24/16 26/10
  36/18 42/11 44/12 46/25 47/6
  48/22 49/7 61/7
guilty [6]   67/1 67/12 67/14
  67/17 67/19 67/22
guy [1]   37/19

**H**

had [113]
had and [1]   15/20
hadn't [2]   12/8 14/16
half [2]   24/24 99/8
hand [14]   33/6 64/18 64/24
  65/12 66/7 70/3 71/12 71/16
  72/11 72/16 73/15 74/8 74/17
  78/20
handed [6]   70/9 70/10 71/7
  72/9 73/21
handwritten [7]   65/13 69/12

Hang [1]   8/18
happen [2]   23/14 37/18
happened [3]   30/9 75/22 88/15
happens [2]   4/14 41/1
happy [1]   36/16
hard [1]   58/19
HARDIN [24]   1/18 1/19 5/24
  7/13 7/21 7/23 7/24 9/7 11/15
  11/19 11/22 12/11 12/18 13/1
  13/12 13/15 15/25 18/23 19/2
  24/19 24/25 61/3 105/5 107/6
Hardin's [1]   11/18
Harvey [1]   78/25
has [20]   9/18 24/17 24/19
  24/20 24/24 25/1 27/7 29/16
  35/4 35/15 35/16 36/14 36/25
  51/1 59/21 59/25 62/18 64/22
  68/24 105/1
have [116]
have improved [1]   50/25
haven't [8]   6/16 6/18 29/3
  29/4 29/5 35/5 36/8 88/23
having [2]   24/7 24/12
he [120]
he's [10]   4/13 7/20 17/7 24/18
  25/9 30/19 30/19 39/25 47/13
  48/23
health [4]   24/1 26/23 49/8
  54/18
hear [1]   20/13
heard [5]   4/4 15/13 35/5 36/8
  49/20
hearing [39]
hearings [37]
hearsay [7]   24/10 24/12 25/19
  28/3 29/8 35/6 36/11
Heather [1]   85/15
heavy [1]   106/5
held [4]   26/5 26/6 51/7 52/25
helpful [1]   23/20
here [25]   3/8 4/15 24/25 26/10
  27/12 37/18 54/13 57/17 57/19
  72/5 72/21 73/5 75/2 77/22
  78/16 79/8 87/18 97/2 99/2
  99/13 99/22 100/3 102/5 103/25
  104/2
Here's [1]   41/1
HGH [10]   25/17 30/5 49/2 49/14
  49/19 49/25 50/3 50/21 50/22
  50/24
highlight [2]   4/4 4/5
him [53]
himself [4]   42/2 42/10 42/11
  102/24
hired [4]   47/3 47/25 48/1 53/3
his [55]
Hold [1]   69/13
Holder [1]   3/20
holding [1]   27/3
Hollow [1]   69/15
Honor [64]
HONORABLE [1]   1/11
Hopefully [1]   104/1
hormone [24]   9/1 9/4 15/7 16/4
  16/9 16/13 16/17 16/18 16/21
  17/1 17/3 18/14 18/21 19/22
  22/22 23/6 32/11 48/15 48/22
  51/2 51/20 54/24 59/4 100/14
hotel [1]   93/24
hour [1]   105/7
hours [2]   82/23 104/12

## H

house [9]   17/19 23/21 49/1
49/14 58/11 58/16 60/6 60/16
63/14
Houston [2]   1/20 69/15
how [47]
human [22]   8/25 9/4 15/7 16/9
16/12 16/17 16/18 16/21 17/1
17/3 18/14 18/21 19/22 22/22
23/6 26/12 32/11 51/1 51/19
54/24 59/4 100/14
hundred [2]   13/3 42/14
hunt [1]   29/23

## I

I'd [2]   39/23 41/23
I'll [20]   4/20 4/20 8/6 17/12
25/12 30/18 31/4 33/7 36/21
38/3 38/4 38/9 42/6 43/19
43/24 44/22 46/20 48/20 55/20
73/7
I'm [71]
I've [3]   49/7 49/9 51/3
I-N-D-E-X [1]   107/1
idea [4]   20/3 25/3 29/3 81/14
identical [2]   68/10 69/3
identically [1]   17/6
identification [10]   21/10 33/11
60/1 66/2 66/8 70/4 77/6 91/14
91/20 94/24
identified [8]   8/14 8/16 8/25
9/3 16/16 72/22 75/7 104/19
identify [2]   8/19 59/19
identifying [1]   20/12
if we [1]   37/18
ignored [1]   37/2
ignored the [1]   37/2
illegal [1]   56/19
illicit [1]   56/18
Illinois [1]   45/10
immediately [1]   58/21
immunity [4]   80/4 80/6 80/7
80/9
impact [5]   25/23 26/12 27/5
34/22 35/7
impeachable [1]   67/3
implement [4]   32/6 32/9 33/19
33/23
implementation [1]   39/1
implemented [2]   32/7 39/3
implementing [1]   32/7
implication [3]   27/11 82/7
82/8
implicitly [1]   81/25
important [1]   51/8
improved [2]   36/14 50/25
inaccuracies [2]   12/13 12/16
inappropriate [2]   43/21 47/16
incidence [1]   50/13
included [1]   32/9
including [3]   20/11 58/13
58/14
increase [2]   31/18 31/19
increasing [1]   24/8
independence [3]   31/20 31/24
51/10
independent [2]   51/19 88/18
Indiana [1]   45/10
indicated [2]   89/13 89/25
indicating [2]   59/15 81/21
indirectly [1]   89/10

16/1 16/4 31/24 31/24 40/6
56/20 56/25 57/3 81/11
individually [1]   18/24
individuals [2]   59/16 90/4
indulgence [1]   68/20
inference [1]   81/24
influence [1]   25/25
inform [2]   50/12 52/6
information [24]   18/7 18/17
23/25 24/16 24/17 24/20 28/22
37/4 56/3 56/5 56/8 57/10 60/8
63/2 64/1 69/10 69/12 69/12
72/10 74/21 76/17 83/17 84/16
89/15
informative [1]   26/5
injected [4]   14/25 19/1 19/15
19/21
injection [1]   14/18
injections [3]   19/7 100/7
100/9
inquire [1]   62/1
inquiries [1]   36/3
inquiry [1]   19/1
inserted [1]   42/8
inside [6]   93/19 98/22 99/9
99/18 99/19 102/21
insightful [1]   47/12
Inspector [1]   54/15
instance [3]   23/23 51/12 88/19
instances [1]   23/22
instituted [1]   50/9
instruction [2]   28/21 30/18
instructions [1]   104/3
insulin [5]   99/25 100/2 100/6
102/3 102/10
intend [4]   38/1 104/18 104/22
105/4
intent [1]   29/16
intentionally [1]   14/18
interchange [1]   52/18
interest [3]   24/6 38/25 39/20
interests [1]   23/21
interjecting [2]   27/23 28/12
intermuscular [1]   100/8
interview [6]   8/17 9/5 20/22
20/24 88/12 88/13
introduce [3]   10/18 34/15 54/3
introduced [4]   15/18 17/2
24/11 40/25
investigate [6]   26/13 32/10
47/2 54/21 56/7 84/3
investigated [2]   41/2 55/14
investigating [2]   42/11 54/23
investigation [38]
investigative [8]   13/22 16/7
19/13 19/16 20/7 23/2 32/9
80/13
invitation [1]   37/2
involvement [2]   75/15 81/4
involving [1]   16/21
irrelevant [2]   27/18 28/7
IRS [9]   55/10 55/13 85/14
89/17 94/7 95/11 101/18 102/9
103/15
IRS Special [1]   85/14
is [243]
Island [1]   58/6
issue [15]   13/23 18/21 19/4
20/9 20/14 20/20 23/5 24/4
26/9 27/24 37/16 38/1 104/9
104/10 104/10

issues [2]   24/1 54/20
it [239]
it's [56]
item [6]   11/17 63/14 65/12
65/14 68/10 69/3
items [34]
its [9]   24/3 24/15 25/22 28/18
29/6 31/13 33/18 45/5 51/9
itself [5]   27/14 45/5 45/19
79/11 82/12

## J

January [20]   17/22 20/23 30/6
32/2 32/8 52/25 89/12 89/25
90/13 92/3 93/7 94/10 95/9
96/1 96/18 96/23 96/25 97/5
102/20 102/23
January 10 [8]   92/3 93/7 95/9
96/18 96/23 96/25 102/20
102/23
January 10th [1]   90/13
January 10th of [1]   96/1
January 15th [1]   17/22
January 15th he [1]   32/8
January 15th hearings [1]   30/6
January 8th [2]   89/12 89/25
January of [1]   97/5
jar [1]   93/14
Jeff [5]   53/21 53/23 54/6
85/13 107/7
JENNIFER [1]   2/2
JEREMY [1]   1/18
job [3]   54/11 54/13 86/7
joined [1]   5/13
Jose [1]   95/11
JR [2]   1/18 2/2
judge [18]   1/11 1/11 4/7 38/10
39/23 40/1 42/20 43/6 43/14
44/8 48/24 57/19 57/19 58/7
58/23 61/25 82/11 82/18
July [13]   68/1 68/3 68/4 68/11
69/4 73/21 74/3 74/14 85/3
85/10 86/9 86/19 86/25
July 2008 [1]   68/4
juncture [1]   82/13
June [11]   65/17 68/1 68/3
71/19 72/15 76/24 77/2 80/25
83/13 88/24 88/25
June 2002 [1]   71/19
June 6 [3]   76/24 77/2 80/25
June 6th [1]   88/24
June 8 [2]   83/13 88/25
jurisdiction [6]   23/1 23/2
23/3 23/5 81/23 82/6
juror [1]   47/12
jury [26]   3/5 3/24 3/24 4/23
5/2 10/13 10/20 11/12 26/11
28/21 30/19 36/7 46/11 49/13
53/8 53/17 54/4 55/9 55/25
62/21 63/18 68/21 80/24 96/11
96/14 104/6
just [73]
justification [1]   27/3
justified [1]   27/4
justify [1]   34/8
justify going [1]   34/8

## K

Keep [1]   72/5
kept [2]   3/4 76/16

**K**

Kevin [1] 84/15
key [1] 31/25
kids [1] 15/1
kind [4] 13/25 79/23 105/3
106/4
kinds [1] 51/15
Kirk [14] 57/3 57/6 58/5 60/6
62/23 63/24 66/13 69/1 70/8
71/8 72/9 73/14 76/9 76/15
Kleenex [1] 102/15
knew [3] 37/23 75/15 94/18
Knoblauch [9] 9/3 9/6 16/15
36/23 36/25 37/2 37/7 37/9
37/12
know [70]
knowledge [2] 37/22 65/7
known [2] 63/11 74/21
knows [2] 25/6 48/21
Kronish [1] 1/22

**L**

label [20] 63/10 64/12 64/14
64/16 64/24 65/19 66/1 66/12
68/2 68/9 72/2 72/6 72/12
72/17 73/7 73/10 74/5 74/6
74/13 107/13
labeled [1] 98/12
labeling [1] 100/17
labels [2] 70/16 71/7
Laboratories [1] 56/5
ladies [8] 11/12 15/12 54/4
55/8 55/25 62/21 80/23 96/14
laid [2] 35/21 97/21
large [2] 55/14 90/25
large-scale [1] 55/14
last [11] 44/10 44/13 45/24
48/24 48/25 54/6 66/13 81/2
81/15 82/22 95/22
late [1] 12/21
later [8] 13/3 14/14 22/17
30/23 39/19 76/5 82/15 83/13
laundering [5] 55/15 56/17
56/22 67/2 67/16
law [11] 1/14 2/2 30/11 55/6
56/7 57/23 80/3 81/22 82/5
85/7 85/18
laws [1] 26/2
lawyer [1] 8/1
lawyers [2] 7/16 20/25
lead [2] 30/15 56/24
leads [1] 80/13
League [24] 31/13 32/4 32/5
32/10 32/14 32/17 33/10 35/20
35/21 38/20 47/4 47/23 48/8
50/6 50/12 52/14 52/16 53/5
75/16 83/22 83/25 84/4 84/12
86/22
leagues [1] 45/16
learned [3] 16/19 51/13 90/1
least [10] 30/15 31/2 35/6
68/4 81/23 82/6 85/17 95/24
98/3 100/17
leave [3] 14/4 51/14 103/25
led [2] 12/24 52/21
leeway [1] 17/12
left [11] 65/12 71/20 72/16
73/15 74/8 74/17 78/20 99/12
101/2 101/9 101/22
left-hand [6] 65/12 72/16
73/15 74/8 74/17 78/20

**M**

machine [1] 2/24
Madame [1] 1/25
made [22] 3/19 6/1 6/22 7/8
7/13 7/21 8/2 17/3 18/5 20/11

legislation [45]
legislative [4] 19/3 23/3 23/5
23/20
legitimate [3] 3/17 29/23
56/23
length [2] 105/14 105/18
lengthier [1] 105/23
lengthy [3] 102/5 105/5 105/15
less [1] 105/11
lesser [1] 14/24
let [40]
let's [8] 4/23 18/16 72/2
73/24 90/18 98/16 101/5 101/13
liberty [1] 61/6
Lidocaine [14] 18/25 19/1 19/5
19/7 19/9 19/11 19/12 19/15
19/24 43/9 43/10 43/11 43/15
44/7
light [3] 26/6 27/15 27/16
like [9] 4/10 4/24 10/11 17/9
54/24 57/19 60/9 61/22 97/6
limit [1] 82/11
limited [3] 28/21 30/18 53/2
line [2] 54/19 57/18
lined [1] 12/20
link [1] 27/17
liquid [1] 101/2
list [1] 105/20
listed [2] 69/16 74/22
Listen [1] 39/23
lists [1] 79/20
Lite [1] 93/16
little [5] 49/23 50/1 73/5
84/23 96/20
live [1] 63/12
living [1] 54/8
LLP [2] 1/22 2/3
loading [1] 105/3
located [3] 56/4 58/5 90/22
location [3] 57/20 64/16 94/18
locked [3] 93/25 94/4 94/4
long [10] 48/23 54/11 55/17
58/6 81/14 82/21 104/22 105/18
106/8 106/12
longer [1] 5/6
Longmire [1] 105/18
look [19] 12/7 12/12 22/3
25/13 30/16 30/17 47/15 61/16
61/22 65/25 72/2 73/24 74/17
77/10 78/14 91/15 101/13 103/4
104/13
looked [6] 41/7 60/9 66/13
70/11 73/6 98/13
looking [9] 3/25 15/3 25/17
47/7 53/1 58/10 58/12 58/23
88/24
looks [1] 97/4
loop [1] 36/9
lot [4] 5/6 25/16 45/15 85/11
Lots [1] 80/6
lower [3] 69/7 69/9 78/20
lunch [1] 3/16
Lynch [4] 17/2 17/7 17/17
22/21
Lynch's [2] 23/7 44/12

legislation

39/19 79/18
79/25 81/21 88/7 88/25 100/6
100/23 100/24
magazine [1] 49/7
Mail [1] 62/24
mailing [9] 63/10 64/16 64/24
68/1 68/9 72/2 72/5 73/10
74/13
maintain [2] 94/9 94/11
Major [22] 31/12 32/4 32/5
32/10 32/14 32/17 33/10 35/20
35/21 38/20 47/4 47/23 50/6
52/14 52/16 53/5 75/16 83/22
83/25 84/4 84/12 86/22
make [19] 4/15 7/2 18/3 25/14
26/1 28/4 30/1 37/11 38/6 49/1
49/5 49/14 56/22 57/16 86/1
88/2 88/4 99/1 104/14
making [2] 7/25 49/25
Mall [1] 1/22
Maloney [4] 21/7 21/13 22/8
22/9
man [1] 75/4
management [1] 31/23
mandate [1] 26/1
Manhattan [1] 90/23
Manorville [1] 58/6
many [7] 87/8 87/13 104/18
104/21 105/6 105/9 105/22
mark [1] 33/1
marked [9] 21/10 33/6 59/25
60/1 66/2 66/7 70/3 77/5 95/3
Maryland [2] 2/4
material [1] 72/25
Matt [2] 85/12 89/18
matter [4] 25/9 83/6 106/9
108/5
matters [5] 15/21 26/13 34/2
34/8 39/8
may [35]
maybe [7] 4/17 14/13 25/23
30/14 42/6 46/17 106/8
McKinney [1] 1/19
McNamee [57]
McNamee's [18] 6/8 75/15 79/12
80/18 80/24 81/11 83/1 89/12
90/20 91/9 91/24 92/2 92/17
93/2 93/6 95/25 97/14 102/20
me [78]
mean [14] 7/17 7/22 19/16
25/22 34/21 35/3 41/12 47/19
48/17 49/4 61/9 81/2 104/25
106/12
meant [1] 8/4
media [1] 3/25
medical [7] 15/6 15/9 19/8
43/10 54/21 54/22 105/20
meet [3] 45/16 83/9 90/14
meeting [18] 76/25 80/18 81/15
82/11 82/21 82/25 83/3 83/10
83/14 85/2 85/4 85/6 85/9
85/20 85/20 86/3 87/9 87/15
meetings [3] 87/4 87/13 88/8
member [6] 17/2 17/19 17/21
20/19 21/3 21/6
members [2] 18/18 45/3
memory [2] 90/18 98/15
mental [1] 28/18
mention [1] 44/17
mentioned [6] 16/15 16/24
36/23 36/24 39/14 43/9
merely [1] 17/11

**M**

met [10]   76/19 76/22 80/25
84/14 84/24 86/5 87/25 89/19
90/13 91/25
methodologies [1]   50/25
MICHAEL [1]   1/21
Michigan [2]   24/22 31/1
middle [1]   51/14
midtown [1]   90/23
might [3]   32/21 83/18 87/21
Miller [1]   93/16
mimicking [1]   7/17
mind [4]   3/9 10/25 24/10 44/7
mine [1]   38/15
minute [5]   47/5 53/14 81/16
81/17 94/14
minutes [4]   20/23 34/1 95/22
105/19
Miss [3]   13/17 16/5 54/5
mission [1]   54/18
misunderstanding [1]   39/15
Mitchell [34]
Mitchell's [23]   6/7 7/14 8/12
9/1 9/4 15/3 16/9 16/16 18/4
18/20 19/20 20/9 22/12 32/1
32/2 32/19 33/13 33/16 47/1
52/25 84/7 85/7 87/12
mix [1]   37/19
models [1]   15/1
moment [9]   6/3 21/19 21/22
54/3 60/7 69/22 86/4 89/22
101/20
Monday [1]   106/1
monetarily [1]   30/15
money [7]   25/14 55/15 56/17
56/18 56/21 56/22 56/22 67/1
67/15
monitor [1]   86/1
monitored [1]   91/10
month [1]   23/4
months [3]   14/13 33/11 84/11
MONTHY [1]   1/18
more [12]   19/25 23/12 24/10
31/11 38/18 51/19 65/10 73/24
88/4 88/7 97/9 98/15
morning [3]   58/11 103/24
106/10
Most [1]   56/21
motivation [1]   24/5
Movant [1]   2/2
move [16]   19/25 34/15 34/23
60/18 68/14 70/19 78/5 83/20
87/18 89/5 90/18 92/5 95/22
96/3 98/16 101/24
moved [1]   106/8
moving [3]   22/17 28/19 75/2
Mr [18]   9/2 16/2 16/3 16/16
16/23 31/11 33/6 36/25 38/18
40/16 41/6 41/20 42/1 46/23
92/2 107/5 107/6 107/8
Mr. [208]
Mr. Attorney [1]   4/8
Mr. Barnett [15]   6/11 8/8 9/14
11/12 13/12 15/25 20/2 22/2
22/20 32/13 32/13 39/14 39/22
44/14 46/15
Mr. Clemens [44]
Mr. Clemens' [7]   16/21 18/25
19/6 19/6 20/3 73/3 74/21
Mr. Durham [1]   40/13
Mr. Emery's [1]   91/3

Mr. Hardin [1]   51/1
7/23 7/24 9/7 11/15 11/19
11/22 12/11 12/18 13/1 13/12
13/15 15/25 18/23 19/2 24/19
24/25 61/3 105/5
Mr. Hardin's [1]   11/18
Mr. Harvey [1]   78/25
Mr. Knoblauch [6]   9/6 16/15
36/23 37/2 37/7 37/9
Mr. Lynch's [2]   23/7 44/12
Mr. McNamee [49]
Mr. McNamee's [16]   75/15 79/12
80/18 80/24 81/11 83/1 89/12
90/20 91/9 91/24 92/17 93/2
93/6 95/25 97/14 102/20
Mr. Palmeiro [10]   15/16 37/11
38/6 38/7 39/14 40/5 40/19
40/22 40/25 41/1
Mr. Palmeiro's [3]   39/15 39/21
40/12
Mr. Parrella [1]   79/2
Mr. Pettitte [4]   16/15 37/8
37/8 104/11
Mr. Radomski [17]   37/8 57/24
66/15 66/19 67/1 67/13 67/11
68/4 68/10 69/3 70/17 72/22
73/7 73/21 74/2 74/14 105/17
Mr. Radomski's [7]   58/11 58/16
60/16 63/14 64/12 75/7 75/9
Mr. Roger [1]   63/7
much [4]   21/25 46/10 76/16
105/5
multi [1]   75/8
multi-thousand [1]   75/8
multilevel [1]   90/25
must [2]   14/19 15/17
my [24]   4/7 4/20 5/15 12/21
12/23 25/8 32/20 39/6 44/12
44/14 45/3 50/16 54/6 57/18
65/8 67/4 77/18 85/23 87/23
93/24 94/2 98/13 98/15 105/7
myself [2]   85/14 89/17

**N**

N-A-D-R-I-G-A-L [1]   95/12
N-O-V-I-T-Z-K-Y [1]   54/7
N.W [2]   1/16 2/7
Nadrigal [1]   95/12
name [19]   5/14 5/15 8/20 36/23
54/4 54/6 54/6 56/4 57/3 57/4
63/5 64/4 64/6 74/21 75/4
76/15 81/11 90/17 103/5
names [10]   8/21 60/12 60/20
60/22 60/25 61/4 61/12 62/4
63/3 87/1
naming [1]   63/3
narrative [1]   17/9
narrow [1]   6/23
narrower [1]   19/2
narrowly [1]   13/15
nature [1]   86/13
necessarily [2]   7/17 67/22
necessary [1]   38/22
Nedrow [1]   85/13
need [11]   15/11 23/23 26/7
29/25 30/22 34/23 39/4 45/6
61/21 82/12 104/13
needed [6]   27/19 29/20 30/21
33/20 45/22 51/6
needle [11]   93/16 96/16 98/3
98/5 98/8 99/16 100/3 100/8
102/3 102/10 102/14

needles [3]   59/6 98/2 100/11
needless [1]   12/20
negotiating [1]   32/6
negotiation [1]   33/20
nervous [1]   81/1
nervousness [1]   81/3
never [4]   41/4 44/7 61/12 80/1
new [21]   7/21 21/7 34/2 34/8
34/10 36/18 43/23 58/6 58/6
77/1 80/19 83/15 85/7 89/19
89/20 90/4 90/12 90/15 93/24
94/10 97/5
next [20]   44/13 48/7 53/19
73/9 74/13 94/3 97/7 97/17
98/19 99/21 99/24 99/25 101/13
101/17 102/6 102/12 103/4
103/9 103/16 105/24
nice [1]   104/4
Nick [1]   106/7
Nick's [1]   106/7
no [83]
non [1]   63/23
non-torn [1]   63/23
nonreferral [1]   42/5
Northern [12]   67/2 77/15 77/24
78/2 79/3 84/9 84/22 85/13
85/23 89/11 89/18 90/10
Nos [2]   62/9 92/9
not [118]
note [1]   65/19
nothing [5]   25/1 35/25 39/18
40/9 40/11
notice [1]   28/24
Novitsky [1]   107/7
Novitzky [16]   53/21 53/23 54/6
56/24 59/25 63/20 66/7 67/10
68/24 70/3 75/3 79/8 81/14
91/15 95/2 101/5
now [25]   10/2 10/9 10/19 13/20
15/12 20/6 24/18 35/6 39/22
42/17 51/21 54/13 57/3 61/21
67/6 68/24 71/5 72/24 79/11
81/9 82/14 90/17 94/13 98/5
105/12
number [21]   11/17 15/25 20/1
20/2 25/8 27/24 27/24 31/18
33/2 34/12 51/10 68/25 69/13
69/21 70/20 71/5 72/6 76/8
77/6 97/22 104/19
numbers [2]   12/1 69/14
numerous [1]   59/15
nuts [1]   82/13

**O**

o'clock [3]   103/24 104/1 104/5
oath [4]   6/6 14/12 40/13 52/9
oaths [3]   46/15 51/21 51/25
object [11]   17/8 24/10 24/11
27/22 29/14 40/1 42/25 44/20
48/22 67/5 88/14
objected [4]   10/1 10/10 10/18
28/1
objecting [1]   82/16
objection [27]   8/6 10/3 10/10
17/10 25/8 28/9 31/4 31/6 38/3
39/24 40/17 43/12 45/23 48/5
48/20 48/25 49/10 50/2 60/21
62/7 68/15 68/16 70/21 70/22
78/7 92/7 96/6
objectionable [1]   42/24
objections [1]   81/19

**O**

obligations [2]  79/12 79/14
obscured [1]  69/13
observe [1]  86/1
observed [2]  3/15 56/11
Obstructive [1]  20/2
obvious [1]  18/2
obviously [6]  26/15 28/20 67/3
81/20 104/14 106/12
occasions [1]  15/14
occur [1]  85/6
occurred [6]  12/21 13/1 37/23
80/18 85/2 85/7
off [7]  25/4 31/18 62/11 62/24
99/4 99/8 101/1
offered [9]  24/15 24/16 25/3
25/9 25/21 29/10 35/7 79/22
81/22
offering [1]  29/6
office [41]
offices [3]  83/15 85/7 95/11
Official [1]  2/6
often [1]  23/12
Oh [3]  3/8 4/9 80/6
okay [25]  3/5 4/23 38/13 39/8
42/20 44/1 46/9 46/11 48/24
49/11 50/6 53/14 54/25 62/3
62/5 64/10 69/19 75/2 82/17
89/23 91/18 95/4 96/17 101/5
103/22
once [2]  91/7 93/23
one [57]
one's [1]  47/16
only [31]
open [12]  4/22 8/5 20/14 31/5
38/16 43/7 49/12 62/6 67/8
82/19 99/7 105/24
opened [1]  101/2
operate [1]  43/4
opine [1]  7/6
opportune [1]  103/18
opportunity [7]  11/20 12/12
20/13 21/8 22/2 51/14 104/11
orange [1]  99/25
order [4]  3/13 3/14 80/13
104/14
originally [2]  37/5 37/7
originals [2]  61/9 62/2
originated [1]  39/21
Orioles [2]  14/21 14/24
other [24]  4/13 6/22 8/21 8/25
14/10 16/15 23/11 32/1 36/21
38/5 45/16 47/8 47/15 48/3
53/9 55/16 59/8 59/10 59/13
60/14 61/2 61/5 76/17 85/18
other areas [1]  36/21
others [3]  25/19 46/16 51/22
otherwise [2]  36/10 87/22
ought [1]  3/14
our [14]  11/3 16/19 26/21 30/3
30/22 34/7 54/4 54/5 54/18
57/16 77/22 94/4 104/14 105/22
out [50]
outside [4]  102/14 102/17
102/21 103/13
over [14]  13/2 23/3 49/2 50/3
60/11 71/20 73/7 73/21 74/2
74/14 88/23 89/14 95/9 102/19
over-the-counter [1]  49/2
oversight [9]  5/19 5/22 17/19
23/1 23/2 23/11 23/18 52/3

own [2]  31/13 33/18

**P**

P-R-O-C-E-E-D-I-N-G-S [1]  3/1
P.C [1]  1/19
p.m [1]  1/7 3/2 5/2 53/15
53/16 104/6 106/16
package [2]  63/4 63/5
packaging [1]  101/11
page [5]  12/1 12/4 13/1 78/16
107/11
pages [1]  13/3
Palmeiro [16]  14/11 15/16
37/11 38/6 38/7 39/14 40/5
40/19 40/22 40/25 41/1 41/7
41/20 42/1 42/10 42/15
Palmeiro's [3]  39/15 39/21
40/12
paper [1]  98/6
paragraph [2]  33/8 79/20
paraphernalia [1]  59/8
paraphrase [1]  88/10
Pardon [3]  9/25 17/5 24/9
pare [1]  105/20
Parrella [3]  79/2 85/12 89/18
part [15]  13/12 13/22 15/10
16/6 23/18 37/4 37/22 57/23
67/18 68/5 72/6 73/10 73/25
87/20 106/11
participate [5]  46/25 52/10
55/20 86/10 87/14
participated [2]  48/4 87/17
participation [1]  86/12
particular [28]
particularly [3]  14/23 28/5
52/20
parts [1]  30/12
pass [2]  4/17 4/20
passed [6]  22/24 27/10 27/11
27/13 45/7 49/16
past [1]  103/21
payment [1]  58/15
Pediatricians [1]  17/24
people [6]  15/14 44/17 52/8
85/11 104/19 105/19
percent [2]  41/25 42/14
perception [2]  6/25 7/6
performance [11]  55/22 56/6
56/25 57/11 58/13 58/25 59/16
61/2 75/17 81/5 84/3
performance-enhancing [11]
55/22 56/6 56/25 57/11 58/13
58/25 59/16 61/2 75/17 81/5
84/3
perhaps [2]  82/12 104/12
perjured [1]  42/11
permission [5]  62/12 63/18
68/21 71/2 92/11
permit [6]  30/18 36/21 43/20
43/24 44/22 53/6
person [9]  31/20 37/19 48/17
51/18 65/6 67/11 83/4 87/9
87/15
personally [7]  75/19 76/19
76/22 84/8 84/21 86/4 87/14
personnel [1]  105/20
perspective [1]  54/19
pertinent [1]  34/21
Pettitte [6]  9/1 9/2 16/15
37/8 37/8 104/11

phone [5]  76/8 76/8 87/4 87/10
87/16
photo [1]  102/5
photograph [11]  92/14 92/15
95/5 96/13 97/7 97/17 98/19
98/21 101/13 101/17 103/9
photographed [1]  97/2
photographs [18]  91/12 91/16
91/21 91/24 92/1 95/3 95/8
95/10 95/13 95/20 95/23 96/5
96/21 96/21 98/17 101/10
107/16 107/17
physical [7]  88/1 89/3 89/6
89/13 89/16 90/1 93/7
physicians [1]  14/22
picked [4]  94/10 95/25 97/3
97/4
picture [7]  25/7 30/17 97/20
99/11 101/18 101/21 103/4
pictured [1]  98/4
piece [2]  62/24 102/15
pieces [2]  93/15 102/15
pill [1]  93/13
pills [1]  93/14
Piper [1]  2/3
place [4]  35/24 58/5 81/2
103/18
placed [3]  101/19 102/9 103/15
Plaintiff [1]  1/4
plastic [9]  93/11 97/15 98/24
99/16 101/7 102/4 102/11
102/14 103/14
plausible [1]  19/11
play [1]  51/5
played [2]  14/21 44/16
player [2]  8/15 9/3
players [21]  8/14 8/21 8/25
14/11 14/11 15/1 16/15 20/12
31/17 31/23 32/6 32/12 33/21
33/22 39/2 50/10 50/12 50/13
51/13 61/2 61/5
plea [5]  67/1 67/12 67/17
67/19 67/22
please [20]  5/1 15/22 39/22
54/3 54/17 69/11 74/13 92/19
92/22 96/13 97/8 97/17 97/22
98/19 101/17 101/25 102/6
103/10 103/16 104/3
pled [1]  67/14
point [23]  10/7 27/18 35/18
38/22 40/25 42/9 50/10 57/12
58/19 66/16 66/18 66/25 67/4
67/10 75/2 75/12 75/18 76/19
77/2 84/24 89/1 89/5 100/19
pointed [1]  26/4
pointing [1]  63/1
police [1]  45/19
policies [2]  52/19 52/20
policy [8]  16/11 24/3 27/12
31/13 33/15 45/5 45/17 51/12
poorly [1]  6/20
portion [8]  21/9 21/12 63/6
71/13 82/25 83/2 99/7 101/6
posed [1]  12/18
position [6]  26/21 28/10 28/12
29/15 34/7 82/1
positive [6]  14/14 14/17 26/17
27/5 35/19 42/14
possibility [1]  45/12
possible [4]  44/18 44/25 81/4
90/1

**P**

Postal [1]   62/24
potential [4]   35/25 36/3 75/16
79/19
potentially [2]   42/24 45/10
power [1]   32/6
practice [3]   52/1 52/2 53/6
pre [2]   50/25 51/2
pre-season [2]   50/25 51/2
preceding [1]   101/21
predicate [1]   51/6
predicates [1]   52/6
prefers [1]   62/2
prescription [1]   50/5
present [9]   5/2 28/10 53/17
85/4 85/9 85/11 95/13 102/24
103/2
presented [1]   15/19
presenting [1]   36/1
presidentially [1]   84/14
presidentially-appointed [1]
84/14
Press [1]   32/24
previous [2]   31/22 37/16
previously [1]   15/17
primarily [1]   75/10
prior [9]   14/1 14/3 15/14 24/6
31/22 50/7 81/24 84/11 103/23
private [1]   7/20
pro [4]   18/17 49/22 49/24 52/8
probably [5]   14/24 103/24
105/2 105/5 105/11
problem [4]   10/4 27/14 27/14
27/19
procedures [1]   51/11
proceed [2]   5/8 53/24
proceeding [1]   18/7
proceedings [3]   1/10 2/24
108/4
process [3]   28/18 32/7 104/17
produce [4]   47/20 88/1 89/1
89/3
produced [7]   2/24 24/18 28/22
28/23 28/24 29/1 29/4
production [1]   24/21
professional [2]   15/1 23/6
proffer [3]   77/14 78/17 107/15
prohibit [1]   28/11
promise [1]   79/25
promised [1]   39/23
pronouncement [1]   3/16
proper [2]   25/24 36/15
proponent [2]   81/22 82/9
proposed [1]   22/22
prosecuted [2]   41/4 80/1
prosecution [6]   3/17 79/20
80/5 80/6 80/7 80/10
prosecutors [1]   3/13
protect [1]   54/18
protection [1]   54/20
protocol [1]   58/7
prove [1]   29/6
provide [2]   25/7 83/17
provided [1]   25/12
proximity [1]   56/4
public [14]   3/16 4/15 6/2 6/22
7/13 7/19 8/3 20/15 20/17 21/3
24/1 26/23 33/11 54/18
publish [7]   62/12 62/16 63/18
68/21 78/18 87/2 92/12
purports [1]   11/13

purposes [4]   33/1 60/1 66/2
66/8
purview [1]   27/7
put [11]   36/15 37/6 52/9 61/8
62/2 63/16 71/2 87/1 93/19
94/2 97/15
Putting [1]   96/10

**Q**

Quail [1]   69/15
qualify [1]   48/23
quarreling [1]   10/8
queen [1]   79/24
question [46]
questioning [4]   20/17 22/8
44/17 86/11
questions [42]
queued [1]   6/5
quick [1]   38/18
quickly [2]   73/24 96/11
Quinn [1]   95/11
quite [1]   7/5
quote [1]   12/20

**R**

Radomski [27]   37/8 57/4 57/6
57/24 61/1 66/14 66/15 66/19
67/1 67/3 67/11 68/4 68/10
69/1 69/3 70/8 70/17 71/8 72/9
72/22 73/7 73/14 73/21 74/2
74/14 76/15 105/17
Radomski's [12]   58/5 58/11
58/16 60/6 60/16 62/23 63/14
63/24 64/12 75/7 75/9 76/9
Rafael [1]   14/11
raise [1]   104/7
raised [2]   37/22 45/4
random [7]   48/8 48/13 50/7
50/9 50/10 50/21 51/7
Rangers [2]   14/21 14/23
rate [1]   27/5
RBW [1]   1/4
reach [3]   76/10 76/11 104/24
reached [7]   20/16 31/17 31/19
75/3 75/18 75/19 89/6
read [5]   6/5 10/20 33/8 69/11
73/5
real [1]   105/18
realize [1]   3/25
really [5]   26/22 27/17 29/5
29/23 82/12
rear [1]   92/16
reason [16]   3/12 4/14 4/15
18/6 27/13 27/20 29/7 30/20
37/13 52/13 56/21 60/24 81/20
82/9 82/15 85/24
reasonable [1]   81/23
rebut [2]   25/3 79/21
recall [27]   6/8 9/8 9/14 11/25
12/2 13/13 13/18 20/2 20/5
20/19 21/6 25/12 41/15 41/16
41/17 43/10 45/8 46/17 58/2
58/4 76/22 80/8 88/7 91/3 92/2
95/15 102/23
receipt [2]   62/25 63/23 69/1
receipts [5]   59/15 60/5 70/8
107/12 107/14
receive [1]   73/13
received [19]   18/17 21/2 24/19
43/11 49/21 56/3 56/5 62/10

70/24 78/9
89/16 92/10 96/8 96/22 96/23
96/25
recent [1]   16/12
recently [1]   21/16
reception [2]   91/6 91/7
receptive [1]   84/18
recess [1]   103/22
Recessed [1]   53/15
recipient [1]   63/5
recognize [9]   60/2 62/19 63/19
66/9 70/4 77/11 91/16 91/20
95/5
recollection [12]   12/21 12/23
13/6 32/20 32/22 33/10 33/14
35/13 38/20 45/3 88/18 95/19
recollection of [1]   33/10
recommendations [6]   18/22
31/25 32/1 33/23 39/1 39/3
reconsider [1]   29/8
record [10]   6/15 10/2 10/9
27/21 30/1 42/7 57/16 59/20
91/19 108/4
recorded [1]   2/24
records [2]   43/10 75/7
recross [5]   39/12 43/2 44/3
44/7 107/4
redact [1]   61/6
redacted [5]   60/11 61/17 62/17
70/13 72/24
redaction [2]   60/21 60/24
redactions [2]   60/8 70/15
redirect [9]   34/3 34/10 41/13
43/15 43/17 43/18 43/24 44/3
107/4
refer [3]   40/16 41/2 41/9
reference [5]   18/3 28/11 33/12
41/19 42/1
reference to [1]   41/19
referenced [1]   32/17
referral [5]   41/20 42/8 42/13
42/18 42/18
referred [4]   22/20 38/7 41/7
79/23
referring [1]   7/20
reflect [4]   10/2 10/9 59/20
65/3
reflected [1]   19/25
Reform [3]   5/20 5/22 17/20
reframe [1]   30/22
refresh [7]   32/21 34/17 35/13
38/20 90/18 95/19 98/15
refreshes [1]   33/9
refused [2]   37/9 37/20
regarding [9]   14/6 14/6 15/21
18/7 28/21 35/8 37/12 40/22
47/8
REGGIE [1]   1/11
regularly [1]   14/24
relate [2]   25/10 86/14
related [9]   6/23 12/19 24/20
26/22 55/16 55/21 57/24 59/13
87/19
relates [1]   34/2
relation [1]   81/11
relationship [1]   83/1
relative [1]   88/23
release [2]   32/24 33/13
released [1]   52/23
relevance [3]   25/22 35/16
35/16
relevant [12]   14/5 18/7 26/18

**R**

relevant... [9]   29/21 30/3
36/3 36/11 37/13 40/17 40/22
41/5 42/19
reliability [1]   19/20
relied [2]   45/4 45/19
relying [1]   28/25
remain [1]   20/14
remedy [1]   3/23
remember [7]   12/5 17/7 30/2
41/17 41/21 46/22 46/22
removed [2]   97/21 98/23
renew [1]   11/3
repetitious [2]   17/8 17/11
rephrase [1]   73/7
report [43]
reported [2]   16/20 45/14
reporter [5]   2/6 2/6 54/5
108/1 108/9
reporting [1]   55/15
reports [5]   15/4 19/20 24/10
29/9 52/23
reports that [1]   29/9
Representative [5]   17/16 21/7
22/8 22/9 22/21
Representatives [1]   23/21
represented [4]   18/12 77/3
78/23 90/16
request [8]   11/3 52/21 62/17
85/22 88/2 88/4 88/7 88/10
required [2]   67/20 67/22
requires [1]   50/5
research [2]   16/3 104/14
reserve [1]   22/17
residence [6]   58/5 62/23 63/24
64/12 76/9 94/2
resolve [1]   27/14
resources [1]   3/18
respect [10]   18/14 20/6 38/19
69/10 72/10 74/1 74/5 74/20
86/9 104/10
respectfully [1]   28/7
respond [1]   37/9
response [2]   4/12 89/15
responses [1]   53/7
responsibilities [1]   57/23
responsible [1]   31/20
restrict [1]   30/11
result [5]   23/16 26/5 26/24
28/2 28/4
results [3]   23/16 23/22 51/15
Resumed [1]   53/16
retained [2]   83/22 83/25
retrieve [1]   99/6
review [2]   11/20 21/8
revisiting [1]   45/6
Richard [2]   103/5 103/7
right [60]
right-hand [5]   64/18 64/24
71/12 71/16 72/11
ripped [1]   65/20
risks [1]   15/9
Rockefeller [1]   90/23
ROGER [4]   1/7 26/24 63/7 81/12
Rogers [2]   85/14 89/17
role [5]   15/1 25/24 26/13
45/15 86/12
room [2]   2/7 93/24
routine [1]   105/13
RPR [1]   2/6
ruled [4]   6/14 6/16 6/18 27/22

rulings [1]   8/19
RUSSELL [1]   1/18
Rusty [1]   1/19
Ryan [1]   84/15

**S**

Safavian [2]   13/17 16/5
said [32]
said to [1]   41/6
SALESKI [1]   1/14
salutary [1]   27/2
same [15]   37/21 60/15 65/22
69/17 70/10 70/16 73/20 74/1
78/16 92/22 96/22 97/3 97/4
102/17 103/14
San [7]   1/23 56/2 56/4 84/13
85/16 94/1 95/11
sat [1]   93/2
saw [2]   11/16 97/6
say [11]   25/14 26/11 27/9 35/5
46/19 49/1 49/14 68/1 73/5
94/6 100/2
saying [2]   6/6 6/7 25/21
25/23 26/10 26/19 27/4 27/4
29/4 29/12 29/17 30/19 30/19
30/21 41/21 42/2 42/5 42/11
44/1 46/25 61/13 82/5
says [13]   6/6 20/3 30/11 46/22
46/24 48/8 64/19 65/5 69/11
71/13 81/23 82/6 82/15
says that [1]   81/23
scale [1]   55/14
science [1]   105/2
scope [7]   18/8 43/3 43/5 43/12
43/20 44/21 59/11
screen [10]   9/24 10/19 11/11
71/1 71/2 71/5 78/15 92/14
96/10 98/5
sealed [2]   101/19 103/15
search [11]   57/14 57/16 57/18
57/20 57/21 57/24 58/2 58/4
59/11 60/6 63/25
season [3]   31/19 50/25 51/2
seated [2]   5/3 53/18
second [7]   8/18 27/25 47/3
72/2 83/9 93/13 100/20
Secondly [1]   25/11
section [1]   60/10
secure [1]   94/2
secured [3]   93/25 94/5 94/6
security [1]   91/1
see [35]
seeing [1]   9/14
seems [4]   7/7 27/2 27/10 27/11
seen [12]   11/13 12/8 21/16
29/3 29/5 29/17 49/7 49/8 49/9
59/18 61/12 98/23
seized [4]   60/5 60/10 63/24
76/9
Selig [2]   32/2 32/3
Senator [53]
sender [1]   72/21
sending [1]   61/2
sent [3]   60/11 63/5 85/25
sentences [1]   6/6
separate [1]   15/7
separated [2]   101/16 102/5
September [1]   65/2
series [4]   91/15 92/21 95/2
96/4
serve [1]   20/7
service [2]   62/24 62/25

set [5]   15/7 45/15 46/22 52/24
74/25
sets [1]   33/17
several [5]   14/13 61/19 75/8
85/18 91/5
share [1]   88/21
shared [4]   61/14 61/15 76/17
84/17
SHAW [3]   2/6 54/5 108/3
she [1]   31/21
she's [1]   25/11
shed [1]   26/6
shipments [1]   59/15
shipping [14]   59/15 60/5 62/25
63/23 65/6 66/12 69/1 69/12
70/8 70/16 71/7 107/12 107/13
107/14
short [3]   6/1 39/23 105/13
shorthand [1]   2/24
shot [6]   19/12 41/9 42/2 42/12
43/11 92/25
shots [1]   15/5
should [16]   3/6 18/2 26/14
27/23 28/23 28/23 41/7 45/18
49/19 51/19 59/20 61/14 79/21
80/14 80/14 105/25
show [20]   15/19 24/23 27/3
28/6 28/16 29/10 30/4 30/8
35/7 36/2 37/14 37/20 37/24
58/15 59/17 59/25 69/20 77/5
91/12 95/2
showed [5]   11/15 11/22 34/14
38/19 43/10
showing [2]   28/13 35/13
side [7]   10/3 20/13 53/9 56/11
56/16 71/21 72/16
sign [3]   78/18 79/4 79/6
signature [6]   77/17 77/18
78/20 79/8 79/9 108/9
significant [1]   20/9
significantly [1]   24/3
silently [1]   33/9
similar [2]   45/18 66/12
simple [1]   40/5
simply [4]   17/8 29/4 35/13
40/24
since [3]   5/13 24/23 103/20
sir [29]
sit [2]   54/13 105/25
situation [5]   29/19 36/14
39/15 40/6 40/9
six [2]   33/8 84/11
skin [1]   100/7
skyscraper [1]   90/25
smaller [1]   100/6
Smith [1]   2/3
smoothly [1]   86/2
so [66]
society [1]   25/17
solely [1]   37/15
some [48]
some length [1]   105/18
somebody [1]   64/4
somehow [1]   45/21
someone [2]   80/4 88/12
something [8]   15/13 27/12
27/12 34/22 36/18 36/19 57/18
104/7
sometimes [3]   26/5 26/6 52/1
somewhat [1]   69/14
soon [1]   3/4

**S**

sorry [26]   6/20 17/14 18/14
 22/2 38/10 41/14 41/14 43/14
 46/5 59/21 61/11 61/25 65/9
 65/9 66/23 82/21 86/21 88/18
 89/25 91/19 95/15 97/8 97/23
 98/3 101/9 104/9
sort [1]   58/15
Souder [1]   45/9
source [5]   56/18 56/19 56/23
 57/9 57/9
speak [5]   7/16 20/24 21/1
 22/13 76/14
speaking [2]   12/4 84/19
speaks [1]   79/11
Special [5]   54/9 55/10 85/14
 85/15 89/17
specific [3]   12/1 13/16 13/16
specifically [4]   13/15 56/17
 88/1 88/2
specifics [1]   82/24
spell [1]   54/4
spelled [1]   54/6
spend [1]   29/25
spent [1]   16/8
sponsored [2]   17/16 44/15
sport [4]   46/25 46/25 47/2
 48/4
sports [4]   23/6 45/14 47/8
 47/15
spring [1]   56/2
SQUILLARIO [1]   2/2
staff [8]   5/15 5/16 5/17 5/18
 5/19 5/21 85/20 87/5
stains [2]   101/8 101/22
standards [1]   45/15
standing [2]   27/24 28/10
start [2]   55/3 103/22
started [2]   51/1 104/2
state [1]   28/7
stated [1]   42/15
statement [14]   3/19 6/1 6/1
 19/6 20/5 20/6 33/10 35/7
 36/12 41/8 54/18 81/21 81/24
 82/4
statements [6]   6/8 6/22 7/8
 7/13 7/20 7/21 7/25 8/3 22/14
 79/18 79/24 80/1 82/13
STATES [19]   1/1 1/3 1/11 1/16
 26/3 53/21 54/22 62/24 67/21
 77/15 77/19 79/2 84/15 85/12
 85/13 85/22 89/10 89/18 90/11
stationed [1]   56/3
statistical [1]   25/16
statistics [4]   24/12 24/23
 25/10 31/7
stay [1]   50/17
steel [1]   94/4
Stephen [1]   17/2
steps [3]   31/13 31/15 56/7
steroid [17]   16/12 24/5 24/7
 24/24 31/8 31/18 45/5 50/15
 52/18 100/15 100/19
steroids [19]   14/13 14/14
 14/16 14/17 16/11 19/22 23/6
 25/17 29/18 32/11 33/15 42/16
 45/17 50/15 50/17 50/17 59/2
 67/15 93/12
STEVEN [1]   1/13
still [3]   35/15 37/21 68/4
stipulate [2]   105/1 105/1

stop [2]   103/18 103/20
stored [1]   94/18
stores [1]   49/8
story [1]   20/13
Street [1]   1/16
strengthened [1]   24/3
strong [3]   18/20 38/25 45/15
studies [9]   25/11 25/19 27/25
 28/3 28/3 28/6 30/4 30/8 30/23
study [2]   24/22 31/1
stuff [1]   39/25
style [3]   64/11 64/15 64/17
subcommittees [1]   52/4
subcommittees [1]   52/4
subcutaneous [1]   100/7
subject [9]   17/16 18/18 20/17
 21/14 22/11 49/17 49/21 66/24
 83/6
subjective [1]   7/1
subpoena [2]   37/3 37/10
subpoenaed [3]   37/19 37/20
 37/25
subsequent [2]   29/18 87/16
substance [6]   17/4 49/2 49/3
 49/15 49/19 49/25
substances [2]   15/17 19/23
substantially [3]   60/15 70/16
 73/20
such [1]   55/14
suggested [1]   25/1
suggesting [1]   29/4
suggestion [1]   29/22
suggests [1]   27/12
suitcase [1]   93/25
Suite [1]   1/19
summarize [2]   55/12 79/17
summer [8]   66/14 69/2 70/9
 71/8 72/9 73/14 83/20 87/20
supply [1]   54/20
support [1]   24/12
supportive [1]   27/6
supposed [2]   3/25 106/9
sure [17]   3/12 18/3 19/16
 32/25 37/11 38/6 41/25 47/3
 54/6 57/16 57/18 60/21 69/13
 86/1 99/1 104/14 106/2
surprise [1]   42/22
suspicion [1]   75/12
sustain [4]   8/6 31/4 31/6 38/3
Sustained [3]   8/4 43/13 88/16
SWORN [1]   53/23
syringe [5]   98/8 99/12 99/21
 99/25 100/2 102/3 102/10
syringes [2]   100/6 101/12

**T**

table [1]   97/21
tactical [1]   81/20
tainted [3]   41/8 42/2 42/12
take [20]   12/12 13/10 15/9
 28/17 53/14 54/3 56/7 62/11
 72/2 77/10 78/14 80/16 91/4
 91/5 91/15 93/4 93/7 99/8
 101/13 103/4
taken [6]   60/8 60/12 61/6
 95/13 95/15 95/16
taking [2]   20/2 35/24
talk [14]   4/6 14/2 14/20 15/8
 20/4 20/11 30/9 37/17 61/24
 61/24 76/1 76/17 89/21 90/7
talked [10]   8/15 14/22 16/14
 16/17 19/8 19/10 42/10 42/13

talking [8]   25/11 31/2 32/3
 32/14 40/23 42/17 90/8 104/22
targeted [2]   47/1 48/5
tax [1]   55/15
team [3]   14/22 19/10 19/10
teams [1]   105/20
technology [1]   64/21
teenage [2]   46/24 48/3
teenagers [3]   24/5 24/7 52/10
teens [1]   24/24
tell [9]   4/17 5/13 55/8 55/24
 62/21 69/6 75/22 78/16 79/18
telling [2]   59/18 91/16
ten [2]   24/8 53/14
ten-minute [1]   53/14
tend [1]   58/14
term [1]   57/14
terms [1]   7/12
test [4]   48/21 51/11 51/15
 51/18
tested [3]   14/14 14/17 16/13
testified [9]   14/12 14/15
 16/10 17/6 17/7 40/12 44/11
 47/13 49/4
testify [9]   7/3 12/17 14/11
 15/13 25/18 37/2 39/19 67/3
 79/21
testifying [2]   24/18 25/10
testimony [13]   13/5 16/14
 17/21 17/23 17/25 35/4 37/1
 40/12 41/11 45/20 46/2 49/20
 52/8
testing [9]   50/14 50/22 50/23
 50/24 50/25 51/1 51/4 51/12
 51/18
tests [10]   31/18 31/21 48/8
 48/15 50/7 50/9 51/9 51/9
 51/10 51/14
Texas [3]   1/20 14/21 69/15
than [22]   5/6 16/19 21/2 23/12
 25/6 60/14 76/17 100/2
thank [22]   9/10 13/10 17/13
 21/25 33/24 33/25 39/6 39/10
 40/3 42/20 43/6 44/8 46/4
 46/10 53/12 53/13 65/18 80/16
 82/18 93/4 97/25 101/25
that [635]
that show [1]   30/4
that's [60]
that's the [1]   82/8
the 2005 [1]   55/23
the Staff [1]   5/17
their [10]   6/25 7/16 7/17
 16/18 16/19 20/13 26/1 28/18
 40/21 45/17
them [34]
themselves [1]   58/14
then [32]
there [117]
there's [13]   12/19 26/7 26/16
 33/13 47/17 48/20 48/21 50/24
 52/7 60/12 63/10 82/8 99/21
therefore [2]   37/23 43/24
these [52]
they [88]
they're [8]   7/17 28/6 29/5
 29/12 29/17 30/7 46/25 52/5
they've [2]   10/2 24/10
thing [7]   24/25 27/25 30/3
 38/5 44/10 44/14 66/21
things [7]   25/16 26/7 27/9

**T**

things... [4]   54/24 58/15
72/25 87/22
things and [1]   26/7
think [66]
think there [2]   46/3 81/22
thinking [1]   7/2
thinner [1]   100/6
third [1]   93/15
this [188]
those [46]
thought [8]   5/6 26/1 36/1
42/22 43/3 43/14 61/3 61/15
thousand [1]   75/8
three [5]   93/11 93/19 101/7
101/15 101/19
through [17]   18/23 44/15 56/19
58/7 62/1 73/24 73/25 75/7
89/10 91/13 91/20 92/6 92/9
96/11 98/17 106/1 107/16
throughout [1]   44/16
thumbs [1]   64/21
Thursday [1]   106/2
tie [1]   19/2
till [1]   31/2
time [62]
timeframe [1]   50/19
times [3]   7/21 26/15 51/10
tissue [2]   98/6 102/15
today [3]   3/16 54/13 98/18
told [11]   14/14 16/15 4
16/17 19/23 32/8 57/9 76/1
76/5 76/14 87/23
tomorrow [1]   104/5
too [3]   4/10 8/4 46/21
took [21]   5/6 8/16 9/2 12/2
20/10 23/8 31/13 34/22 35/20
35/22 36/6 58/5 60/15 86/12
93/19 93/23 94/3 95/10 96/17
102/19 102/25
top [7]   69/6 98/24 99/7 100/13
100/14 101/1 102/16
topic [4]   19/25 86/15 87/18
87/19
torn [4]   62/24 63/23 66/12
69/1
totally [1]   31/8
tougher [1]   16/11
toward [3]   12/13 59/18 91/16
trainers [2]   14/22 19/10
transacted [1]   56/19
transcribed [1]   9/5
transcript [6]   1/10 2/24 21/9
41/23 104/14 108/4
transcription [1]   2/24
traveled [2]   84/13 94/1
trial [3]   1/10 44/16 104/23
tried [3]   3/3 10/18 105/20
triggered [1]   52/24
tripled [1]   24/8
true [3]   9/25 29/11 78/1
truth [11]   15/15 15/23 18/6
24/16 25/9 25/22 28/14 28/15
28/18 29/6 79/18
truthfully [1]   14/15
try [6]   12/7 12/8 20/21 25/25
82/3 105/21
trying [7]   19/19 20/8 26/10
40/25 52/5 104/24 105/21
turn [1]   89/14
turned [5]   73/7 74/2 74/14

turns [1]   26/7
two [20]   6/6 14/13 16/20 21/4
22/13 24/2 27/9 27/24 33/11
33/17 73/24 82/23 83/13 87/9
87/15 100/13 102/10 102/16
105/7 106/14
two-hour [1]   105/7
twofold [1]   25/8
type [5]   19/3 34/20 34/24
90/24 104/13
types [1]   52/11
typically [4]   52/2 56/21 88/4
100/8

**U**

U.S [6]   77/25 78/2 84/8 84/21
90/7 90/9
ultimately [3]   26/24 27/19
41/1
uncommon [1]   23/17
under [9]   6/6 14/12 27/8 40/13
52/9 59/19 79/12 79/21 100/7
understand [16]   9/17 13/23
18/3 25/22 26/21 28/9 29/15
30/10 34/18 36/16 42/5 44/7
52/5 61/18 99/1 104/25
understanding [4]   50/17 65/8
84/2 85/24
understands [1]   38/6
understood [2]   36/13 42/3
Union [2]   31/17 32/6
unit [1]   32/10
UNITED [19]   1/1 1/3 1/11 1/16
26/3 53/20 54/22 62/24 67/21
77/14 77/19 79/2 84/15 85/11
85/12 85/22 89/10 89/18 90/10
University [2]   24/22 31/1
unknown [1]   93/14
unless [2]   35/16 79/20
unredacted [1]   61/15
until [1]   28/5
untoward [1]   27/12
up [35]
upon [6]   28/25 45/4 45/19 47/5
53/7 75/14
upper [6]   64/18 64/24 65/11
71/12 71/15 72/11 73/15 74/8
74/17
urge [1]   29/5
us [30]
usage [4]   25/24 27/5 30/20
31/8
use [21]   3/17 9/9 13/13 14/23
16/12 16/18 16/19 16/21 17/1
18/8 24/5 24/7 24/24 28/21
29/17 32/11 50/13 50/15 62/11
79/24 84/3
used [14]   5/25 14/13 14/13
14/16 14/17 15/17 18/25 23/6
34/17 42/16 51/11 79/19 80/1
100/8
using [4]   8/25 9/4 15/4 16/16

**V**

vacuum [1]   30/15
various [5]   15/21 52/8 59/16
93/11 93/15
versus [1]   26/4
very [42]
vial [2]   98/11 98/12
vials [1]   100/13

video [1]   104/23
view [3]   6/12 6/19 52/20
views [1]   49/21
violations [2]   55/15 56/18
visible [1]   99/6
Vitamin [2]   13/13 19/24
voluntarily [3]   24/3 37/24
39/3
volunteering [1]   39/25

**W**

waiting [1]   3/4
WALTON [2]   1/11 57/19
want [31]
wanted [7]   4/1 20/4 76/1 76/14
81/2 99/7 104/7
wants [3]   43/1 104/12 105/5
warrant [10]   57/14 57/16 57/18
57/21 57/24 58/2 58/4 59/11
60/6 63/25
was [294]
Washington [3]   1/5 1/17 2/8
wasn't [10]   28/23 29/20 30/21
30/25 34/19 36/19 36/24 37/1
38/7 76/16
Watkins [1]   26/4
way [11]   25/1 25/4 25/5 30/16
56/19 57/7 57/13 70/13 75/6
75/13 86/14
ways [1]   24/2
we [164]
We'll [1]   53/14
we're [6]   22/16 30/4 30/5 30/6
31/2 42/17
we've [1]   41/6
Wednesday [1]   1/6
week [1]   105/24
weeks [1]   106/14
well [52]
went [9]   9/8 13/2 18/23 58/10
86/1 90/4 90/20 93/6 94/3
were [108]
weren't [3]   27/4 37/17 40/25
what [148]
what's [9]   10/23 24/12 33/6
66/7 70/3 77/5 79/23 84/2
100/5
whatever [1]   27/20
when [45]
where [33]
whether [50]
which [33]
while [2]   11/11 100/7
whited [2]   72/25 74/20
who [30]
whole [2]   30/12 35/24
whom [1]   8/15
why [25]   4/11 7/4 10/17 15/19
20/24 21/4 24/17 27/10 27/18
27/23 28/13 28/16 28/17 36/2
36/3 46/16 46/25 48/4 52/13
60/21 83/24 84/2 84/2 85/19
99/4
wide [1]   105/24
wife [1]   16/22
wild [1]   29/23
will [27]   11/6 23/15 23/15
31/6 60/18 62/8 63/18 68/21
70/19 71/2 73/25 74/17 78/5
88/23 92/11 92/19 96/3 103/4
103/22 103/24 104/1 104/1
104/4 105/4 105/16 105/17

**W**

will... [1]   106/6
WILLIAM [1]   1/6
willing [1]   25/14
wished [2]   76/17 89/14
with investigating [1]   54/23
within [16]   25/25 27/7 32/10
 43/4 59/10 94/4 94/4 98/5 98/5
 98/24 98/25 99/6 99/7 101/15
 102/4 103/14
without [9]   22/6 23/23 24/12
 32/6 34/21 58/22 63/3 82/24
 83/17
witness [18]   4/24 8/19 15/13
 27/22 31/7 33/3 34/15 41/6
 42/9 42/12 46/5 53/8 53/19
 53/23 59/22 66/4 69/25 94/21
witnesses [12]   104/18 104/21
 105/3 105/6 105/7 105/12
 105/12 105/14 105/15 105/22
 105/23 107/2
won't [1]   47/19
wonder [1]   61/10
word [1]   42/8
work [6]   25/20 28/2 32/19
 57/18 64/22 83/21
workday [1]   90/19
worked [2]   85/14 85/16
working [4]   86/18 86/20 86/21
 86/23
world [2]   3/16 81/2
would [60]
wouldn't [1]   34/10
wrappers [1]   99/12
wrapping [1]   101/11
write [1]   95/17
wrong [3]   6/7 6/8 42/9

**Y**

Yeah [6]   3/23 25/21 27/1 42/4
 47/19 60/9
year [1]   50/25
years [6]   16/12 24/8 54/12
 55/1 55/18 61/19
yes [192]
yesterday [2]   9/8 11/15
yet [1]   91/12
York [16]   7/21 21/7 58/6 58/6
 77/1 80/19 83/15 85/7 89/19
 89/20 90/5 90/12 90/15 93/24
 94/10 97/5
you [418]
you're [6]   7/1 7/22 25/23 26/9
 26/10 32/3
you've [4]   15/13 15/21 24/1
 39/14
Young [1]   85/15
your [112]
yourself [1]   54/3
youth [3]   29/18 30/20 31/8

**Z**

zero [1]   30/13
zip [2]   69/16 69/17