# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA    :   Docket No.:
                            :
           Plaintiff,       :   1:10-CR-00223-RBW
                            :
      vs.                   :   Washington, D.C.
                            :
WILLIAM R. CLEMENS,         :   Thursday, May 3, 2012
a/k/a "ROGER CLEMENS,"      :
                            :   TIME:  1:50 P.M.
           Defendant.       :
                            :
_____x   DAY 10
```

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE JUDGE REGGIE B. WALTON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:    STEVEN DURHAM, Esquire
                       DANIEL BUTLER, Esquire
                       COURTNEY SALESKI, Attorney-at-Law
                       GILBERTO GUERRERO Esquire
                       DAVID GOODHAND, Esquire
                       Assistant United States Attorneys
                       555 4th Street, N.W.
                       Washington, D.C.  20530

For the Defendant:     RUSSELL HARDIN, JR., Esquire
                       JEREMY MONTHY, Esquire
                       Rusty Hardin & Associates, P.C.
                       1401 McKinney, Suite 2250
                       Houston, Texas  77010
                       **(713) 652-9000**

                       MICHAEL ATTANASIO, Esquire
                       Cooley, Godward, Kronish, LLP
                       4401 Eastgate Mall
                       San Diego, California  92121

1    Appearances (Cont'd):

2    For the Movant:          DAVID CLARKE, JR., Esquire
                              JENNIFER SQUILLARIO, Attorney-at-Law
3                             DLA Piper US, LLP
                              6225 Smith Avenue
4                             Baltimore, Maryland   21209-3600

5

6    Court Reporter:          ANNIE R. SHAW, RPR
                              Official Court Reporter
7                             333 Constitution Avenue, N.W.
                              Room 6722
8                             Washington, D.C.   20001
                              (202) 354-3242
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by machine shorthand, transcript produced
     by computer-aided transcription.
25

<pre>
 1                      P-R-O-C-E-E-D-N-I-G-S

 2                            (Afternoon session, 1:50 p.m.)

 3                            (Jury present.)

 4          THE COURT:  You may be seated.

 5                      CROSS-EXAMINATION

 6   BY MR. HARDIN:

 7   Q.  Good afternoon.

 8   A.  Good afternoon.

 9   Q.  By the way, you and Mr. Clemens at least have one thing in

10   common, didn't you, except it's a different sport.  Do I

11   remember reading correctly that you started out as a athletic

12   secondary career, I guess, as a basketball player at a junior

13   college?

14   A.  Well, it wasn't a career.

15   Q.  Well, but it might have been if it hadn't been cut short by

16   an injury?

17   A.  No, I don't think so.

18   Q.  You don't think you were that good?

19       Did you play basketball?  Did you start out in college at a

20   junior college in San Jose?

21   A.  Yes.

22              MR. DURHAM:  Your Honor, I object.

23              THE COURT:  Did you?

24              THE WITNESS:  Yes.

25   BY MR. HARDIN:
</pre>

1    Q.  All right.  Was your education in the San Jose area

2    totally?

3    A.  No.

4    Q.  All right.  Where did you go to college?

5    A.  I started off at the University of Arizona, I went there

6    for a year.  I spent two years at Skyline Junior College, and

7    then transferred to San Jose State University, where I played

8    basketball and graduated.

9    Q.  Okay.  Skyline Junior College, is that in San Jose?

10   A.  No.

11   Q.  Okay.  Where is that?

12   A.  That's in San Bruno, California.

13   Q.  Okay.

14   A.  San Francisco Bay area.

15   Q.  And then did you enter the IRS after that?  I don't think

16   we really know where you went professionally.

17       So you finished college.  What year?

18   A.  In 1993 in San Jose.

19   Q.  And then what did you do?

20   A.  And I became a Special Agent with the IRS in November of

21   1993.

22   Q.  Okay.  So shortly after college you went with IRS?

23   A.  Correct.

24   Q.  Okay.  And it has always been in the criminal enforcement

25   area.  Would that be a fair statement?

1    A.   What's always been?

2    Q.   Your time there with the IRS?

3    A.   With the IRS?

4    Q.   Yes?

5    A.   It was in the Criminal Investigation Division of the IRS,

6    the full 15 years.

7    Q.   All right.  I'm going to move this board back.

8    A.   Sure.

9    Q.   Going to try to get it to where the jury can see and --

10   thank you -- and you can too.

11       Now, do you still have with you the exhibit I gave you that

12   showed the, the execution of a search warrant?

13   A.   Yes, I do.

14   Q.   All right.  Now, again, to refresh everybody, we are

15   talking about December 14, 2005.  It's a search warrant, is it

16   not, of the residence of a man that you considered a target

17   since February, January, really January of '05; is that right?

18   A.   Correct.

19   Q.   And one of the things I had asked you was, is, how many

20   people participated in this search.  And you count that off for

21   me and tell me?

22   A.   Sure.  Participated in the search, one, two --

23   Q.   Yeah, go ahead, yeah, please?

24   A.   Nine people participated in the search.

25   Q.   All right.  Now, you say agents and officers present.  How

1  many are those, total, counting the nine you just --

2  A.  Seventeen.

3  Q.  So you had 17 law enforcement connected people on this

4  search; is that right?

5  A.  On the search?

6  Q.  Or this activity, whatever we are going to call it?

7  A.  That were associated with the enforcement activity that

8  day, correct, not all --

9  Q.  Excuse me, I didn't mean to talk over you.

10  A.  Okay.

11  Q.  But I'm really apologizing as much to her, because she

12  can't get us own top of each other.  So I will try to be

13  careful and you do the same thing.

14  A.  Understood.

15  Q.  How long did this search, execution of a search warrant

16  last?

17  A.  It started at 7:20 a.m. and ended at approximately

18  12:50 p.m.

19  Q.  Now, I think Mr. Radomski and his wife were getting -- they

20  had a six year old daughter, they were getting her ready for

21  school; right?

22  A.  In the initial stages of the search warrant, correct.

23  Q.  Okay.  Now, was everybody -- was anybody dressed in riot

24  gear or anything?

25  A.  No.

1    Q.   How about like SWAT officers?

2    A.   Excuse me --

3    Q.   I'm looking at this just to see, it list three case agents,

4    you, people that the government elicited names from you before,

5    you, Mr. Rogers, and Heather Young, an FBI agent, all three of

6    you are listed as case agents; is that correct?

7    A.   Correct.

8    Q.   And then it has Special Agent, IRS, Tracy Wong was the team

9    leader?

10   A.   Yes.

11   Q.   And then you have entry inventory, entry photographer,

12   entry searcher, those three positions.  What does that mean?

13   What do they do?

14            MR. DURHAM:  Objection, relevance.

15            THE COURT:  Approach for a minute, please.

16            (Bench conference.)

17            THE COURT:  I mean, if we are going somewhere with

18   this, fine.  But my God, if we are going to take forever just

19   to examine this witness we will be here until eternity.

20            MR. HARDIN:  I hope not.  But my point being, and I

21   think it will become very apparent very quickly.  This is the

22   home that was searched so thoroughly by this number of people,

23   that magically two and-a-half years later Mr. Radomski finds

24   something that would have had to have been there at the home at

25   the time of the search, and it wasn't even found out.

1          We are always going to be questioning them finding it

2    and the circumstances of him having it.

3          THE COURT:  I'll give some leeway then.

4          (Open court.)

5    BY MR. HARDIN:

6    Q.  Let me -- let me ask you this.  Would you have considered

7    this a thorough search of the premises?

8    A.  Yes.

9    Q.  All right.  And again how many law enforcement connected

10   people searched Mr. Radomski's house on December 14th, 2005 for

11   five hours?

12   A.  Well, that's the five hour statement the search was done

13   for is not accurate.

14   Q.  Well, I -- maybe not.  Does your own records reflect that

15   it started at 7:20:00 a.m.?

16   A.  Correct, that's the time we made entry into the residence.

17   Q.  And does your -- do your own records reflect that it

18   concluded at 12:50 p.m.?

19   A.  That is the time that we exited the residence.

20   Q.  Okay.

21        And during that time -- can we move over, let's do if we

22   can, to page four.

23        Now, will you tell the jury what all in the way of drugs

24   were seized from Mr. Radomski's house during this search?

25        By the way, how big a house was this?

A.   Approximately 2,000 square feet.   Two story, three bedroom,
two baths -- actually, three stories, there was a lower story.
I would approximate about 2,000 square feet.

Q.   All right.   And so for -- did you seize any computers?

A.   I think we seized an image of a computer, not the computer
themselves.

Q.   All right.   And would you tell the jury, if it helps you
can confer, just read down, just read down for them the amount
of drugs you found in his house?

A.   Sure.   I mean, would you like me to do it in summary or
break it down?

Q.   Let's just go right down it real quickly, if you can?

A.   The entire list?

Q.   Yes.

A.   Okay.   Ten milliliter vial of Mexican Veterinary Steroids,
we found 23 of them.

     Ten milliliter vials of British Dragon steroids, 5.

     Anavar steroid pills in 100 pill quantities, we found 2 of
those.

     Durateston, 1 milliliter vial, we found 1 of those.

     Testoviron Depot, 1 milliliter, we found 11 of those.

Q.   Can I stop you there.

     Do I recall correctly that the things turned over in the
office later, in January of '08 to you by Mr. McNamee's
attorney and Mr. McNamee, was there a vial of Durateston in

1    that group?

2    A.   Yes.

3    Q.   Okay.

4    A.   An ampule.

5    Q.   An ampule.  Would you, again, tell us what an ampule is, as

6    opposed to a vial?

7            THE COURT:  One moment.  Let me just ask the Reporter,

8    do you need the spellings of these various things, or do you

9    have them?

10           THE COURT REPORTER:  I don't have all of them, but I

11   was thinking that they can give me the list.

12           THE COURT:  Okay.  Provide her with the list so she

13   will have the correct spellings.

14           MR. HARDIN:  Okay.  I was going to say I will provide

15   you with this whole list he is reading from.

16   BY MR. HARDIN:

17   Q.   So Durateston in a vial, what's the difference in a vial

18   and a ampule?

19   A.   And I actually think on that list it's misrepresented as a

20   vial, because one milliliter is typically an ampule.

21   Q.   Okay.

22   A.   But the difference would be an ampule is all glass, and you

23   get into it by breaking the top part of the glass off.  It's

24   got a very skinny thin neck.  That would be an ampule.

25       A vial is a little bit bigger and has a cap on the top with

1     a small rubber, piece of rubber where you would inject the

2     needle into and through the rubber to draw up the liquid

3     within.

4     Q.  Let me see if I understand.  If it's an ampule you break it

5     off to put the needle in to pull it out?

6     A.  Yes.

7     Q.  All right.  And with the vial you can simply stick a needle

8     down through the rubber at the top or whatever it is --

9     A.  Correct.

10    Q.  -- and extract?  All right.

11        Now, go ahead with what you found, Testoviron.  Go ahead.

12    A.  Okay.  So the Testoviron Depot, 1 milliliter, 11 of those.

13    Q.  What is that?

14    A.  It's an anabolic steroid.

15    Q.  Everything is a steroid that we he are going through?

16    A.  Let's see.

17    Q.  Well, just tell me when something isn't, that would be the

18    easiest thing.

19    A.  Sure.  The top part of the list is all steroids.

20    Q.  All right.  What's the next one?

21    A.  Deca, 1 milliliter, 2 of those.

22    Q.  Okay.

23    A.  Textex Elmu, 2 milliliters, 1 of those.

24    Q.  And those are steroid?

25    A.  Correct.

1          Deposteron, 2 milliliter, there was 2 of those.

2          Durateston one milliliter, ten of those.

3     Q.   Must have been in another type container?

4     A.   Correct.

5     Q.   All right.  Go ahead.

6     A.   Depostesteron, 2 milliliter, 5 of those.

7          Agovirin Depot, 2 milliliters, 6 of those.

8          Primobolan Depot, 1 milliliter, 50 of those.

9          Agovirin Depot, 2 milliliters, 50 of those.

10         Depotesteron, 2 milliliters, 50 of those.

11         Durateston, 1 milliliter, 50 of those.

12         The next one was Sustanon, 1 milliliter, 49.

13         Deca Durabolin, 1 milliliter, 1 of those.

14         Winstrol, W-I-N-S-T-R-O-L, 1 milliliter, 24 of those.

15         Trenbolona, 10 milliliter, 1 of those.

16         Another Winstrol, 1 milliliter, five of those.

17         Durateston, 1 milliliter, 20 of those.

18         And then D-bol pills, 1,000 of those.

19    Q.   All right.  Now, let me ask you this.  You total up down at

20    the bottom, do you not, the total number of pills and the total

21    number of vials that you received?

22    A.   Correct.

23    Q.   That you recovered.  And would you tell the jury what those

24    were?

25    A.   3,312 pills, and total amount of vials and ampules, some of

1   these may have been mislabeled as vials and they are actually
2   ampules, 438.
3   Q.  All right.  So does that 438, does that represent the
4   number of individual containers of steroids?
5   A.  No, not just steroids.
6   Q.  What else?  Was there any HGH?
7   A.  Down at the bottom there was Serostim, which is a form of
8   human growth hormone.
9   Q.  Oh, okay.
10  A.  There were 70 vials of that that were found and seized.
11  Q.  Okay.
12  A.  And then all the way at the bottom, Sigma IGF-1, that's
13  insulin growth factor one, which is similar to a human growth
14  hormone.  There were two vials of that.
15  Q.  But would you agree with me that what you recovered from
16  Mr. Radomski satisfied you that you were dealing with a major
17  drug dealer of prohibited substances without a prescription?
18  A.  Major drug dealer?
19  Q.  Yes.
20  A.  I don't know if I would necessarily use the term major.
21  Q.  Okay.  Substantial?
22  A.  I mean he was -- this is to me indication of possession of
23  drugs with intent to distribute based upon the quantity.
24  Q.  In fact, so the jury understands, when one is classifying
25  whether somebody is a drug dealer or a user sometimes the way

1    one does that in law enforcement circles, is it not, is the

2    amount they are in possession would indicate whether they were

3    possessing for personal use or to distribute to others.  Would

4    that be a fair statement?

5    A.  Correct.

6    Q.  And this clearly is an amount that qualified him as a drug

7    distributor, didn't it?

8    A.  Clearly, I don't know if I would quite use that word.  It

9    leaned toward that, and then other information led us to

10   believe that that was the case.

11   Q.  All right.  So the qualification you are saying is this

12   alone might not make him a substantial distributor, but that

13   plus other information you gathered did?

14   A.  Correct.

15   Q.  Okay.

16       Now, when you -- tell the jury during the time that y'all

17   are there, how many boxes of things that you took that you

18   considered possible evidence, that you took out of his house

19   that day?

20   A.  Boxes.  Okay.  We had --

21   Q.  Actually, I'm going to go over them with you, and if you

22   want to keep a count.  You start out in the basement, there was

23   a bathroom was there not?

24   A.  Yes.

25   Q.  So you searched that, obviously, very carefully and you

1    took --

2    A.  No, that's not accurate.

3    Q.  Pardon me?

4    A.  That's not an accurate statement.

5    Q.  What's not accurate about it?

6    A.  I didn't search that.

7    Q.  Well, your group did, didn't you?  I'm not asking about you

8    personally.

9    A.  Oh, sorry, I thought you were asking if I did.

10   Q.  No.

11   A.  No, I didn't search it.

12   Q.  But you prepared a report saying it was, correct, it was

13   searched in your group?

14   A.  I didn't prepare this report.

15   Q.  I thought when we were talking earlier today you said you

16   did?

17   A.  You started asking that question I believe right before

18   lunch, and I didn't answer it.  But, no, I didn't prepare this

19   report.

20   Q.  Did you participate in the creation of this report?

21   A.  No.

22   Q.  Are you saying you never reviewed Defendant's Exhibit 1,

23   61?

24   A.  No, I'm not saying that.

25   Q.  Oh, have you reviewed it?

1    A.  Yes.

2    Q.  Did you review it at the time?

3    A.  At the time of what?

4    Q.  At the time of the search or after the search, when it was

5    prepared?

6    A.  That was a multiple question there.  Which time are you

7    asking me if I reviewed it, at the search?

8    Q.  I thought I was, yes.

9    A.  No, this report wasn't prepared at the search.  It was

10   prepared after, when we got back to the office.

11   Q.  After it was prepared, did you participate with whomever

12   drafted it in its preparation?

13   A.  No.

14   Q.  Did you read it after it was prepared?

15   A.  Yes.

16   Q.  Did you satisfy yourself that it was accurate?

17   A.  To the extent I could.  I didn't have firsthand knowledge

18   to all these events that happened in the report.

19   Q.  Does your report indicate that the bathroom was searched

20   and certain information, certain things were taken out of

21   there?

22   A.  Again, it's not my report.  I didn't prepare it, but it

23   does indicate as such.

24   Q.  Okay.  Does it indicate that the garage was searched

25   thoroughly?

1   A.   It indicates that a, something was taken from the garage.

2   Q.   Syringes, actually a box of syringes was it?

3   A.   Correct.

4   Q.   And does it indicate the playroom was searched?

5   A.   It indicates that something was taken from the playroom.

6   Q.   Well, now, please, Mr. Novitzky, when you are executing a

7   search warrant, isn't it your practice in anyone that you have

8   ever been on to try to as fully and completely search the

9   premises you are authorized to search as is humanly possible?

10  A.   To the extent that you would be allowed to search a certain

11  area.  So how search warrants work is the judge will authorize

12  certain evidence for you to go in and seize.  So, for instance,

13  if the judge authorizes you to seize a table, I wouldn't be

14  searching under the chair there, because there couldn't be a

15  table there.  So to the extent that, you know, what you are

16  searching for could be possibly found there, you would want to,

17  you know, search as thoroughly as possible in those areas.

18          THE COURT:  What did the search authorize in this

19  case?

20          THE WITNESS:  The search authorized us to take drugs

21  and records relating to the distribution of such drugs, phone

22  records indicating contacts, business contacts, that

23  Mr. Radomski had.  So, you know, the evidence that the judge

24  authorized us to take was pretty thorough.

25          THE COURT:  And you had how many agents conducting the

1    search?

2              THE WITNESS:  Conducting the search, we had 1, 2, 3,

3    4, 5, 6, 7, 8, 9.

4              THE COURT:  And was it your view that the search of

5    that house did seize all of the evidence that was authorized by

6    the search warrant?

7              THE WITNESS:  No, that is not my --

8              THE COURT:  All right.  Go ahead.

9              MR. HARDIN:  All right.  Thank you, Your Honor.

10   BY MR. HARDIN:

11   Q.  Well let's talk about some things you did seize real

12   quickly.  I'll try to go with you as quickly as I can on this,

13   but in an upper cabinet, if you'll look on that Page One of the

14   third page, you have an inventory sheet, do you not, listing

15   all items searched at the search warrant site, correct?

16   A.  No.

17   Q.  You don't like the word you?

18   A.  No, I'm sorry.  You said, "all items searched at the search

19   warrant site."  This is all items seized at the search warrant

20   site.

21   Q.  Okay.  You have an inventory here that is three pages, do

22   you not, listing all items seized at the search warrant site?

23   A.  Correct.

24   Q.  And, for instance, you seized, did you not, USPS mail

25   slips, didn't you?

1    A.   What number are you referring to?

2    Q.   I'm on Page One of the inventory?

3    A.   What item?

4    Q.   Number five.

5    A.   Correct.

6    Q.   And it indicates that, in the upper cabinet left of the

7    refrigerator, seized per the warrant, does it not, Lexus

8    purchase order, USPS mail slips, medical invoices, ten boxes of

9    14 vials, 7 labeled Serostim and 7 labeled sterile dilutants.

10   Now, all of those were items that you seized, correct, that

11   were seized in this search?

12   A.   Correct.

13   Q.   All right.  Well, so you seized all -- would it be fair to

14   say that, in this search, all type of papers and documents were

15   seized?

16   A.   There were papers and documents seized during the search,

17   correct.

18   Q.   Well, you know, if we look over on the second page, would

19   you go with me?  On a garage shelf some syringes, a box of

20   syringes were seized, right?

21   A.   Correct.

22   Q.   And then in the garage, on another garage shelf you seized

23   a bunch of loose pills having different types of steroids,

24   correct, or seized per the warrant?

25   A.   No, those pills aren't steroids.

1   Q.   Pardon me?

2   A.   Those pills that you're referring to there that you said

3   were steroids --

4   Q.   They are not?

5   A.   -- that's Clenbuterol, which is not an anabolic steroid.

6   Q.   Why did you seize them?

7   A.   Because it is a performance-enhancing drug, which was

8   authorized under the search warrant from the judge for us to

9   seize.

10  Q.   I see.  You were actually authorized under the search

11  warrant to seize any records that you thought were relevant,

12  weren't you?

13  A.   No, not that I thought, that were the judge authorized.  So

14  you have to be somewhat or pretty specific on a search warrant.

15  You need to tell the judge we want these types of records.  You

16  can't be vague and say any records that I deem to be associated

17  with this.  You need to tell the judge ahead of time what

18  specific records that you want to seize, and that's what we did

19  in this case.

20  Q.   Mr. Novitzky, did you draft the search warrant?

21  A.   Yes, I did.

22  Q.   All right.  And you asked the judge for authority to seize

23  all type of records, didn't you?

24  A.   To seize certain quantified records.

25  Q.   Well, did you ask to seek financial records?

1    A.   Yes.

2    Q.   Did you seize -- in the master bedroom, look at Control

3    Number 11 in an evidence box, in the master bedroom, closet two

4    in file box, seized per warrant, cash receipts for purchases,

5    credit card statements, investment account statements, you took

6    all of that, didn't you?

7    A.   The team took that.  I didn't take that.

8    Q.   And then in the master bedroom, the dresser bottom door,

9    seized per warrant, duplicate checks, *Anabolic Reference Guide*,

10   *World Anabolic Review Book*, you seized that, didn't you?

11   A.   Again, the search warrant team or the searchers seized it,

12   yes.

13   Q.   Okay.  And then there were syringes, some more syringes

14   found in the garage, in the master bedroom seized by people

15   executing the search warrant that you drafted?

16   A.   Yes.

17   Q.   The search that you were in charge of, weren't you?

18   A.   No, I wasn't the team leader on the search.  As referred to

19   on the first page, I was the case agent, and I participated in

20   the interview of Kirk Radomski.  There was a separate agent who

21   was the team leader and, technically, he was in charge of the

22   search.

23   Q.   Seized per warrant, bank statement -- Number 14, seized per

24   warrant were bank statements, mortgage loan statements, car

25   statements, Verizon statement, money ordered, USPS receipt.

1    And it was in the master bedroom, does the document indicate

2    does it, closet, on floor and expandable folder.  That's what

3    the document, your document indicates, doesn't it?

4         MR. DURHAM:  I object unless the witness has firsthand

5    knowledge.

6    BY MR. HARDIN:

7    Q.  Well, I'm almost through with this, but let me ask you

8    this.  Let's move if we may to -- this is the same house, is it

9    not, that two and-a-half years later, Mr. Radomski contends he

10   found some slips that the government has now put up there or a

11   slip that the government put up and you sponsored in evidence,

12   didn't you, several of them?

13   A.  Correct.

14   Q.  Okay.  And that's really all I'm trying to find out from

15   you as to how thorough those nine agents and other seven or so

16   people associated with you were there for a five-hour search of

17   a residence that two and-a-half years later Mr. Radomski says

18   there's a piece of evidence that he just found.  Are you with

19   me?

20   A.  Yes.

21   Q.  Okay.  So let's go on that last page there, Page Three.  I

22   want to go with you real quickly as to the kinds of pieces of

23   paper that the people on your search team found and seized.

24   Are you with me?

25   A.  Yes.

1    Q.  So, in the kitchen, does it show -- well, let's look at

2    this.  Did you guys or your search team or the search team that

3    you just happened to be a case agent with, did you go through

4    drawers?

5    A.  Yes, they did.

6    Q.  All right.  And did they go through anything in sight in

7    closets?

8    A.  Yes, they did.

9    Q.  Did they go through cabinets?

10   A.  Yes, they did.

11   Q.  Did they look under beds?

12   A.  Yes, they did.

13   Q.  Would you look under furniture?

14   A.  I'm not aware they looked under any furniture.

15   Q.  Actually, you don't know, do you, because if you don't know

16   what they were doing when these items I asked you about, you

17   wouldn't know how, whether they looked under a cabinet, would

18   you?

19   A.  No.  I do know, because actually one of the searchers on

20   the front page, Special Agent Mike Baxter, is now my supervisor

21   in my office, so I work with him.  And so, when Mr. Radomski

22   gave me these items and he told me that he found them in an

23   envelope under a large television in his bedroom, I asked Mike

24   Baxter, my supervisor, who was one of the searchers listed on

25   this, whether or not the search team, which he was a part of,

1   was lifting up furniture, lifting up appliances, lifting up

2   large televisions, and he told me that they hadn't.

3   Q.  I see.  All right.  And so two and-a-half years later,

4   Mr. Radomski just magically finds it; right?

5          MR. DURHAM:  Object to the form of the question.

6          MR. HARDIN:  All right.  Strike magic.

7          THE COURT:  Sustained.

8   BY MR. HARDIN:

9   Q.  Let me, real quickly here, seized in the kitchen from the

10  upper right cabinet to the right of the sink, receipts paid by

11  cash, Apple Savings About receipts, North Fork bank statements,

12  two checkbooks, a pool invoice, Countrywide mortgage documents,

13  Chase statements, address book, Lexus repair bill, Merrill

14  Lynch statements, account number, postage receipts,

15  miscellaneous notes, two syringes, correct?

16  A.  Item 16, is that what you're on?

17  Q.  Yes.

18  A.  Correct.

19  Q.  Seventeen, drawer to the right of the dishwasher, business

20  card, notepad with details, personal bills, et cetera, right?

21  A.  Yes.

22  Q.  Going down to 18 in the kitchen, in a small closet next to

23  the black phone in the kitchen, Allstate bill, Lexus, Direct TV

24  statement, Lexis financial statement, Pool Mart permit fee for

25  the pool, Mike Lansing Marrision address, social security

1    statement for his wife, Verizon Wireless statement, Suffolk

2    County water bill, electric bill, Verizon bill, Keyspan bill,

3    Chase bank accounts, Quest Diagnostics invoice, EZ Pass

4    statement and Countrywide loan statement.

5        And then it talks about it took computer images of personal

6    computers.  So you actually seized in that, or your search

7    group that you just happened to be the case agent with,

8    actually seized mail slips, the very kind of mail slips that

9    you showed up on the board yesterday, right?

10   A.  Yes, we did.

11   Q.  And they were found in different locations in the house,

12   right?

13   A.  Correct.

14   Q.  But somehow y'all did not find this one that two and-a-half

15   years later Mr. Radomski produced, correct?

16   A.  Correct.

17   Q.  All right.  Now, if we can, when it's all over, tell the

18   jury how many boxes this search group that you just happened to

19   be the case agent with carted out of that house?

20   A.  There were ten boxes of items.

21   Q.  Okay.  Now, during this time, you interviewed Mr. Radomski

22   at the scene; is that correct?

23   A.  That's correct.

24   Q.  And then, after you interviewed Mr. Radomski at the scene,

25   did he become a cooperating person for you in your continued

1    investigation?

2    A.  Yes.

3    Q.  So can we say that, from December of 2000 -- by the way, in

4    that search, was there anything at all recovered to connect

5    Roger Clemens with Kirk Radomski?

6    A.  Yes.

7    Q.  What?

8    A.  There was evidence that his personal trainer, Brian

9    McNamee, was associated with Kirk Radomski on a close level,

10   and evidence obtained, via statements, that Mr. Radomski was

11   giving large amounts of drugs to Brian McNamee, who was

12   Mr. Clemens' personal trainer, so there was a connection.

13   Q.  Bingo.  Let me ask you.  Isn't it true that you always

14   referred, have always referred, before you had a single bit of

15   evidence from Mr. McNamee about Mr. Clemens or Mr. Pettitte,

16   that in every, just about every official document that you ever

17   executed and used the name Brian McNamee, you would also always

18   say, personal trainer for Roger Clemens and Andy Pettitte;

19   correct?

20   A.  When I first --

21   Q.  Correct?

22   A.  That's correct.

23   Q.  All right.  So, in your mind, as you sit there today, the

24   fact that Mr. Clemens had a trainer that was buying drugs, you

25   are telling this jury under oath, that is evidence against

1   Mr. Clemens that he was?

2           MR. DURHAM:  Objection.

3           MR. HARDIN:  That's what he volunteered.

4           THE COURT:  It's argumentative.  Approach.  Approach.

5           (Bench conference.)

6           THE COURT:  It is argumentative.

7           MR. HARDIN:  He volunteered it.

8           THE COURT:  It's a bad question.

9           MR. HARDIN:  I don't think it's a bad question to ask

10  somebody if they have any evidence.

11          THE COURT:  I would have been inclined to ask, did you

12  find anything that had my client's name on it because he is

13  suppositioned --

14          MR. HARDIN:  That was the next thing I was going to

15  do.  One of the things I want to do is to show his bias.

16  That's the way he's been from the beginning.

17          THE COURT:  I guess you could argue with him, but I

18  think his position is going to be that his belief was that he

19  was --

20          MR. HARDIN:  I'm perfectly -- have him finish.

21          THE COURT:  All right.

22          (Open court.)

23  BY MR. HARDIN:

24  Q.  Would it be a fair statement, Mr. Novitzky, that, from that

25  point on or really even from the back the time that Brian

1    McNamee's name surfaced and you discovered that he was a

2    trainer to Roger Clemens and Andy Pettitte and that he, Brian

3    McNamee, had written checks to Kirk Radomski, would it be a

4    fair statement from that moment you always considered that

5    evidence that Roger Clemens was using?

6    A.  No.

7    Q.  All right.  Now, when you got to, to the interview with

8    Mr. Radomski, isn't it true that at that time you decided,

9    because of what he told you about Brian McNamee, that Roger

10   Clemens was using steroids?

11   A.  No.

12   Q.  All right.  Then did you tell us a moment ago that you

13   considered the fact that Brian McNamee was buying steroids and

14   HGH from Kirk Radomski, evidence against Mr. Clemens?

15   A.  No, I did not say that a moment ago.

16   Q.  So if it sounded like that, you didn't mean to say that?

17          MR. DURHAM:  Objection.

18   BY MR. HARDIN:

19   Q.  I'm just asking.  Are you saying you did not mean to say

20   that?

21   A.  Not only I did not say that.  That was not what I said.  I

22   said, you asked me if there was anything from the search

23   warrant that showed a connection to Mr. Clemens.  You didn't

24   ask if it was evidence.

25   Q.  Yes, sir.  I asked you --

1    A.  And my answer was, there was a connection, and the

2    connection was his personal trainer, who, when I researched the

3    name, Brian McNamee, in the Summer of 2005 on publicly

4    available internet, every reference to him was this guy is the

5    personal trainer for Mr. Clemens and Mr. Pettitte.  So there

6    was just a connection.  I wouldn't say there was evidence of --

7    Q.  I see.  So you're not considering it evidence?  You're not

8    claiming it's evidence?  You're just saying that somebody that

9    trained Roger Clemens and Andy Pettitte was found to have been

10   buying steroids from Kirk Radomski?

11   A.  What I was doing was answering your question of whether or

12   not there was a connection found during the search warrant to

13   Mr. Clemens.  That's all I was doing.

14   Q.  All right.  Now, after that, Kirk Radomski becomes a

15   cooperator for you, correct?

16   A.  On December 14, 2005, correct.

17   Q.  And do you in fact ask Kirk Radomski to try to get evidence

18   against Roger Clemens?

19   A.  Not that I'm aware of.

20   Q.  Think carefully.  Think carefully, sir.  Do you recall any

21   e-mails of yours and phone conversations you might have had

22   with Roger, with -- I'm not asking the content.  I'm asking you

23   to think forward now in January of 2006, after Mr. Radomski has

24   become a cooperator, do you ask in any form or way Mr. Radomski

25   to try to get evidence against Roger Clemens?

1    A.   Well --

2    Q.   You can answer that yes or no.

3    A.   The answer is no.

4    Q.   All right.  You did not?

5    A.   No.

6    Q.   Did you have conversations with Mr. Radomski about that

7    subject?

8    A.   Yes.

9    Q.   Okay.  You're just saying that you weren't asking him to do

10   it.  Is that what I understand?

11   A.   Wasn't asking him to do what?  I'm sorry.

12   Q.   To try to get evidence against Mr. Clemens from Brian

13   McNamee.  Did you ask him to do that ever?

14   A.   Ask Mr. Radomski to get evidence against Mr. Clemens?

15   Q.   From Brian McNamee.

16   A.   The whole way --

17   Q.   You can answer yes or no.  Did you ever do that?

18   A.   No.

19   Q.   Okay.  Now, at the end of the search warrant and when he

20   becomes a cooperator with you, I believe there was a question

21   to you yesterday by the government about Mr. Jason Grimsley.

22   Do you recall that, that being a subject, not the necessary

23   question?

24   A.   The government asked me a question about Jason Grimsley?  I

25   don't know.

1    Q.  Do you know who Jason Grimsley is?

2              MR. DURHAM:  Sorry, Your Honor.  I don't believe I

3    asked about Jason Grimsley.

4              MR. HARDIN:  If he didn't, then it's my mistake.

5              THE COURT:  I didn't think you would ask --

6              MR. DURHAM:  The government didn't ask any questions

7    about Jason Grimsley.

8              MR. HARDIN:  All right.  Another matter that I

9    mis-remembered.  I apologize to you.

10   BY MR. HARDIN:

11   Q.  What I'm curious though is is that did you not do a search

12   warrant of Jason Grimsley in April of 2006?

13             MR. DURHAM:  I'm sorry, Your Honor, I have to object.

14             THE COURT:  Sustained.  I don't recall any questions

15   about Mr. Grimsley during your direct.  I'll sustain the

16   objection.

17             MR. HARDIN:  As not having been gone into, Your Honor?

18             THE COURT:  Yeah, I think it's outside of the scope.

19   I don't believe he was asked about it.

20             MR. HARDIN:  I may be able to establish the scope this

21   way.

22   BY MR. HARDIN:

23   Q.  Is it true that ultimately an article appeared in the "LA

24   Times" on October the 1st of 2006 saying that Mr. Clemens and

25   Mr. Pettitte were listed in your affidavit for a search warrant

1   of Mr. Grimsley's house as users of steroids and HGH?

2           MR. DURHAM:  The same objection.

3           MR. HARDIN:  It's been a subject throughout the trial,

4   Your Honor.

5           THE COURT:  I know, but it has to be within the scope

6   of his direct.  And I don't recall this having been a subject

7   of his direct.  I'll sustain the objection.

8           MR. HARDIN:  Okay.

9   BY MR. HARDIN:

10  Q.  You would be willing to remain available to us as a witness

11  when we go to put on our case, would you not?

12  A.  Absolutely.

13  Q.  Okay.  Now, do you become aware in 2001, I mean, excuse me,

14  of 2006, October 1st, 2006, of a "LA Times" article concerning

15  Mr. Clemens and Mr. Pettitte?

16          MR. DURHAM:  Your Honor, I think this "LA Times"

17  article is again outside of the scope of direct.

18          THE COURT:  Approach.

19          (Bench conference.)

20          THE COURT:  Where is this taking us?

21          MR. HARDIN:  My problem is is that that article runs

22  is later referred to in the Mitchell Report.  Nobody ever

23  corrects it even after the magistrate had sealed it.  What

24  happened is, just for the Court to understand, he gets a

25  sealed.  He gets a search warrant in April of '06 for Mr.

1   Grimsley's house.  He was a teammate of Mr. Clemens.  And

2   then -- at the Yankees.

3        And then Grimsley says he's going to cooperate, so

4   they don't execute the search warrant.  Then in May, when

5   Mr. Grimsley changes his mind, decides he's not going to

6   cooperate, they then go execute a full search warrant.  The

7   "L.A. Times" article is October the 1st, 2006.

8        If the Court remembers, there's testimony before, I

9   believe the jury, Mr. Durham can correct me from the

10  government, during the hearings in which Mr. Clemens talks

11  about he thought, when Mr. Mitchell wanted to talk to him, it

12  was about the "LA Times" story, okay.  I mean that's that and

13  then "60 Minutes".  He mentions that.  Where the sequence

14  becomes is, later in '07, in July of '07, at a hearing this man

15  attends, the Associated Press tries to get the magistrate to

16  unseal the warrant.

17       We've now fast-forwarded to almost a year later,

18  because Roger and Andy had always denied that they did, and so

19  they wanted to -- the magistrate and Mr. Novitzky, they

20  testified.  It was still an ongoing criminal investigation.  It

21  couldn't be unsealed.  He knew, during this whole time he was

22  doing that, that Mr. Clemens and Mr. Pettitte had been falsely

23  accused in that article of being in the affidavit.  They were

24  not in the affidavit.  What happened is, when he drafted the

25  affidavit, he named Brian McNamee.

1          THE COURT:  Who does?

2          MR. HARDIN:  Mr. Novitzky for the search warrant.  And

3    that affidavit said, Brian McNamee, personal trainer for Roger

4    Clemens and Andy Pettitte.  He's referred to him always that

5    way.  Somebody, he's always denied it's him, let a reporter for

6    the "LA Times" see the affidavit sealed, but the reporter got

7    it wrong and looked at the names Roger and Andy as users of

8    steroids and HGH.

9          The way this all fits into the whole scheme of the

10   case is that that happens in '07.  The Mitchell Report comes

11   out.  The Mitchell Report, on the section about Roger Clemens,

12   mentions that Roger Clemens and Andy Pettitte, in October of

13   2006, were listed as using steroids and HGH by the "LA Times."

14   The magistrate gets so upset about it that, ten days later,

15   eight days later in LA, or in Arizona rather, he unseals the

16   affidavit and excoriates the "LA Times" for having written a

17   false story.

18         I want it only to lay a predicate for this search

19   warrant.  I can do as little as the Court wants with this

20   witness.  I can bring him back if I don't get the information

21   from other people, so it's really up to the Court.

22         THE COURT:  It really is beyond the scope.  I mean it

23   isn't really relevant to his testimony in some way.  I mean

24   obviously, if it had something to do with putting false

25   information in an affidavit or revealing the information --

1          MR. HARDIN:  He didn't --

2          THE COURT:  -- to an order of the Court, that would be

3     a problem.  But if there's --

4          MR. HARDIN:  It's really offered to show bias and the

5     fact that he -- as you can tell now, he always believed and,

6     therefore, everything that happened from there was based on

7     that bias, and I'm really just trying, as nicely as I can, to

8     show the bias.  If the Court doesn't want me to go any further

9     with him, I'll be glad to --

10         THE COURT:  I think it's beyond the scope, but I'll

11    keep him available if you need to call him back.

12         MR. ATTANASIO:  Just quickly, when Mr. Hardin started

13    down this line and initially stated that he thought this had

14    been raised in direct, it was pointed out it was not raised in

15    direct.  Mr. Hardin said, I'm sorry.  It was a mistake, and I

16    mis-remembered.  Mr. Durham's father, audibly to me -- he's in

17    the gallery.  He's been here every day.  Audibly to me said,

18    audibly to my ear said, sure.

19         He's much closer to the jurors than he is to me, but I

20    certainly heard him.  So, through the Court, I would ask

21    government counsel to make sure that its people on its --

22    that's obviously inappropriate.  It shouldn't happen again.

23         THE COURT:  Okay.  Well, I didn't hear him, but

24    obviously that shouldn't occur.  But on the same end, the

25    statement shouldn't have been made, because I know why it was

1    made.

2              MR. HARDIN:  Thank you, judge.

3              (Open court.)

4              MR. HARDIN:  All right.  I believe this objection was

5    sustained, Your Honor?

6              THE COURT:  Yes, it was.

7              MR. HARDIN:  All right.

8    BY MR. HARDIN:

9    Q.   Now, if we can, I want to move with you -- so let me back

10   up.  I want to just put a couple of dates up here, so I can

11   kind of put it in context.  When is Mr. Radomski ultimately

12   charged with a crime and what is he charged with?

13   A.   April of 2007, I believe, and I think it was on the same

14   day and information was filed April, I'm not sure of the date.

15   Q.   That's okay.

16   A.   2007, there was an information filed, which is a criminal

17   charging document, and he entered into a guilty plea that day

18   or the very next day.

19   Q.   All right, sir.  Explain to the jury, you know, some people

20   might be charged correctly and then their case be pending, and

21   they either have a trial or they plead guilty and it may take

22   months or a year, right?

23   A.   Correct.

24   Q.   Or longer?  On some cases, with a cooperating witness, the

25   government may reach an agreement with the defendant as to what

1   they are going to charge him with, and they agree the same day

2   of the charge to plead guilty to it.  Is that a fair statement?

3   A.  Correct, the same day or shortly thereafter I think is was

4   the case here.

5   Q.  And your memory is that, in April of '07, Mr. Radomski was

6   both charged -- and you believe the same day, but I'm not going

7   to hold you to it if it's the next day or so.  You believe he

8   was charged and pled guilty the same day to what charge?  If

9   you hold on a second, I'm going to put KR PG, pleads guilty, to

10  what?

11  A.  Distribution of a controlled substance.

12  Q.  And?

13  A.  Money laundering.

14  Q.  All right.  Now, when that happens, sentencing is deferred,

15  is it not, not unlike a lot of situations, while he continues

16  to cooperate.  Is that a fair statement?

17  A.  Yes.

18  Q.  And so Mr. Radomski was allowed to plead guilty to

19  distribution of a controlled substance and money laundering,

20  but there was no sentencing date set, was there, or was there a

21  date set that continued to be reset?

22  A.  Correct, it was a date set far in the future, so that he

23  could continue his cooperation.

24  Q.  All right.  So by April of '07, Kirk Radomski has pled

25  guilty and is awaiting sentencing, and the U.S. Attorney's

1   Office and all of those working on the case would go in and

2   periodically ask the Court to reset the sentencing date until

3   that particular defendant's period of cooperation was

4   completed.  Is that a fair statement?

5   A.  Yes.

6   Q.  And so, after that, tell the jury when the first time you

7   ever contacted Brian McNamee personally?

8   A.  That would have been the next month, May of 2007.

9   Q.  Do you happen to remember a date?

10  A.  I don't offhand.  I think it may have been toward the end

11  of May.

12  Q.  Might it have been earlier than that?

13  A.  Possibly.

14  Q.  Is there any document that, if you reviewed it, would help

15  you know?

16  A.  There may be.

17  Q.  What would it be?

18  A.  Maybe an e-mail communication that I had with Mr. McNamee.

19  Q.  All right.  I'll get that.  So that the jury knows, let's

20  just say right now May, and we'll leave open the date, of '07,

21  JN first contacts Brian McNamee.  Is that a fair statement?

22  A.  Yes.

23  Q.  You hesitate to make sure I didn't sneak something in

24  there?

25  A.  No.  I just wanted you to be able to finish it.

1    Q.  All right.  So, at any rate, that date, and I'll get you

2    the e-mail in a little bit, so you can look at it and see if

3    that helps you.  So, am I to understand that the way you first

4    reach out to Brian McNamee is through an e-mail?

5    A.  No.  It's through a phone call.

6    Q.  All right.  Tell me about that.

7    A.  Placed a phone call to a phone number that we found during

8    the search warrant of Kirk Radomski's residence indicating it

9    was for Brian McNamee.  I left a message, because Mr. McNamee

10   did not answer, and he called me back shortly thereafter.

11   Q.  All right.  Now, that would be a year and-a-half after you

12   first knew that he was illegally buying drugs; correct?

13   A.  Correct.

14   Q.  Because it was like, I think we said, December 14th of '05

15   that you interviewed Mr. Radomski, and he told you whatever he

16   told you about Mr. McNamee, right?

17   A.  Correct.

18   Q.  So you waited for May of a year and-a-half later, in other

19   words, before you reached out in any way to Mr. McNamee?

20   A.  Correct.

21   Q.  If Mr. McNamee was ever to say that he had talked to you in

22   January of '07, would that be right or wrong?

23   A.  I don't think that's correct.

24   Q.  Okay.  How certain are you?

25   A.  Fairly certain.

1  Q.  Okay.  Did you have any contact with Mr. McNamee after the
2  "LA Times" story ran in October of '06?
3  A.  I'm not aware of that.
4  Q.  Okay.  I'm not saying you did.  I'm asking.  So do you
5  recall Mr. McNamee, in anyway that you're aware of, trying to
6  contact you after the "LA Times" story ran in October of '01 --
7  '06.
8         MR. DURHAM:  Your Honor.
9         MR. HARDIN:  I'm only asking about Mr. McNamee?
10        MR. DURHAM:  Objection --
11        THE COURT:  I'll permit it.
12  BY MR. HARDIN:
13  Q.  Are you aware of it?
14  A.  No.
15  Q.  Okay.  Now, so when you first call him, you leave a voice
16  mail for him?
17  A.  Yes.
18  Q.  And how long after you left the voice mail for him does he
19  contact you back?
20  A.  I believe it was that day.
21  Q.  Now, I believe, did the government introduce through you
22  Mr. Radomski's plea or just his charges?  Do you recall?
23        MR. DURHAM:  We haven't introduced that as a document.
24        MR. HARDIN:  All right.
25  BY MR. HARDIN:

1   Q.  All right.  Well, never mind.

2        So then, when he reached out to you, without going into

3   what Mr. McNamee said to you, did you make any arrangements to

4   try to get together with him?

5   A.  Yes.

6   Q.  What did you tell him you wanted to do?

7   A.  To talk to him and ask him some questions.

8   Q.  And what tone of voice did you use?

9   A.  Fairly pleasant tone of voice I hope.

10  Q.  All right.  Very nice guy.  Yes, because you wanted him to

11  volunteer and voluntarily meet with you, right?

12  A.  Yes.

13  Q.  Okay.  And so did you arrange to meet with him?

14  A.  Yes.

15  Q.  Who proposed the meeting?

16  A.  I did.

17  Q.  And did he ask you to get in touch with his lawyer?

18  A.  Yes.

19  Q.  And did you get in touch with his lawyer?

20  A.  Either myself or the Assistant United States Attorney, Matt

21  Parrella, we did, correct.

22  Q.  And who was the lawyer?

23  A.  The lawyer was Tom Harvey.

24  Q.  And where was Tom Harvey located?

25  A.  In Manhattan, New York City.

1  Q.  Okay.  Now, when you reached out to him, do you recall the

2  date that you met with Mr. McNamee?

3  A.  Yes, I do.

4  Q.  And in that, what was that date?

5  A.  June 6th, 2007.

6  Q.  Is that correct, June 6th is your first interview?

7  A.  Yes, that's correct.

8  Q.  And what location did you interview him here?

9  A.  His attorney, Tom Harvey's, law office in New York City.

10  Q.  How long did the interview take?

11  A.  Approximately two hours.

12  Q.  Two hours?  And then, at the conclusion of that meeting,

13  did you meet with him again?

14  A.  Yes, we did.

15  Q.  And what was that date?

16  A.  That was two days later, June 8th, 2007.

17  Q.  And all right.  Would you look at that for me please and

18  make sure that what I've written is correct?  Pardon me?

19  A.  Yes, it's correct.

20  Q.  All right.  So there are two different interviews.  And, in

21  addition to yourself, these interviews -- and each of them were

22  in the offices of a lawyer for Mr. McNamee; is that correct?

23  A.  Correct.

24  Q.  The June 8th meeting, was that a different office and a

25  different lawyer representing him?

1    A.   Yes, it was.

2    Q.   And who was representing him at the meeting on June 8th of

3    '07?

4    A.   Earl Ward.

5    Q.   And was there any other lawyer there with him?

6    A.   I don't recall.

7    Q.   Okay.  Now, Earl Ward was a different firm, different

8    office, from Mr. Harvey the two days before; is that correct?

9    A.   Yes.

10   Q.   All right.  Oh, I forgot to put that down.  How many hours

11   was this interview?

12   A.   My recollection is approximately the same amount,

13   approximately two.

14   Q.   All right.  Now, I don't want to go into what he told you

15   or anything like that right now.  But did, in the first

16   interview, was Mr. McNamee informed that he was not a target of

17   your investigation?

18   A.   Yes.

19   Q.   And was he told that, if he cooperated with you and told

20   what y'all call the truth, then he wouldn't be charged with

21   anything?

22   A.   No, I don't know if it went that far, that he wouldn't be

23   charged with anything.

24   Q.   You gave him an agreement.  I believe you called it up on

25   the stand, the colloquial phrase of "queen for a day," right?

1    That's what you called it.  Do I recall correctly?

2    A.  I'm sorry.  Yes.

3    Q.  All right.  Queen for a day means, does it not, whatever

4    the witness tells you can never be used against them in any

5    future proceeding unless you determine that he lied to you?

6    A.  No.

7    Q.  No?  Tell me what it says then.

8    A.  There were a couple of other circumstances, if he were to

9    testify, I believe it was one of the items in there, then it

10   could be used to rebut his testimony.  If I had it in front of

11   me, I could tell you exactly all of the circumstances where it

12   could be used.  There were a few other ones.

13   Q.  Well, we can point it out to the jury later.  It's in

14   evidence.  The government, I believe, introduced that.  It's

15   called a proffer letter, isn't it?

16   A.  Yes.

17   Q.  And that proffer letter would have Mr. McNamee on June 6th

18   of '07 with the understanding that he was not a target,

19   correct, and that, as long as he was, told the truth, he

20   wouldn't get in any trouble?

21   A.  Well, the proffer letter did not indicate that he was not a

22   target.  It doesn't say that in the proffer letter.

23   Q.  I know, but he was told that by the Assistant U.S.

24   Attorney, wasn't he?

25   A.  He was told he was being considered as a witness at that

1    time.

2    Q.  He was told specifically he was not a target, wasn't he?

3    A.  I think he was, correct.

4    Q.  You think he was told that?  Yes.  Explain to the jury why

5    a man that, for a year and-a-half, you believed was buying and

6    distributing drugs, was not a target of your investigation?

7    A.  Well, in terms of distributing drugs, the information that

8    we had at this point in time from the bank records and from the

9    interview with Kirk Radomski, was that Mr. McNamee was paying

10   Mr. Radomski thousand dollar amounts of checks.  And what

11   Mr. Radomski told us is that --

12   Q.  I didn't ask you.  Now, wait a minute, you're going to say

13   that -- all right.  Never mind.  Let's let it all hang out.

14   Tell them what Mr. Radomski told you in that respect, whatever

15   you were going to say.

16           THE COURT:  Let me just ask you this question before

17   you answer that.  Did you make a decision yourself that he was

18   not a target or was that a decision made by the prosecutor?

19           THE WITNESS:  It was made by the United States

20   Attorney's Office, not me.

21   BY MR. HARDIN:

22   Q.  Well, but you had also told him that yourself, hadn't you?

23   Take a moment to think if you would like.

24   A.  Yeah, I think we told him that during my first contact with

25   him on the telephone, but I was relaying information from the

1  United States Attorney's Office, who made that decision.

2  Q.  Yes, sir.  But Mr. Jeff Novitzky had personally told this

3  man, before he ever talked to you, that he was not a target of

4  the investigation, hadn't he?

5  A.  Correct.

6  Q.  All right.  Now, so and then in the meeting the Assistant

7  U.S. Attorney vouched for that at the first meeting and told

8  him he was not a target, correct?

9  A.  Yes.

10  Q.  And the man that you said was not a target is the man that

11  you had evidence had been buying steroids and HGH from a drug

12  dealer, correct?

13  A.  Correct.

14  Q.  And you didn't believe he was buying drugs and steroids

15  from Mr. Radomski for personal use, did you?

16  A.  We weren't sure at that period of time.

17  Q.  Okay.  Did you really think he might have been buying it

18  just for personal use?

19  A.  I wasn't sure to the point where, you know, at that point

20  he wasn't considered a target, because we didn't know whether

21  or not he was buying it for personal use or not.

22  Q.  Well, Mr. Novitzky, you actually personally thought he was

23  buying it for Roger Clemens, didn't you, and Andy Pettitte and

24  others?  You thought that, didn't you?

25  A.  It was definitely something that we were considering, sure.

1  Q.  And I'm asking you why wasn't he a target?  That's all.

2  A.  Because, at that period of time, we didn't have the

3  evidence against him.  It's one thing to have an inkling or a

4  suspicion as an investigator, which I did.  But something that

5  needs to be considered is, if you don't have that information

6  or that evidence in order to gather evidence and other things

7  from somebody, if we were to go in and tell him that he was a

8  target of the investigation, more than likely --

9  Q.  He'd get a lawyer.

10  A.  -- he would not cooperate and talk to us.  And so it was,

11  you know, a balancing act at that period of time to try to

12  obtain information from him that we didn't have at that point.

13  Q.  And the information you were trying to obtain was who was

14  he giving the steroids to, correct?

15  A.  That was a portion of the information.

16  Q.  All right.  And so would you agree with me that you folks

17  were reaching an accommodation with the guy who was providing

18  drugs to see who the user was?

19  A.  No.

20  Q.  Isn't that kind of reverse than the normal thing?  Is it

21  your usual deal to make a deal with the user to get to the

22  dealer?

23       MR. DURHAM:  Objection, Your Honor.

24       THE COURT:  Well, the question assumes a fact not in

25  evidence because he says something contrary to what you are now

1   suggesting.  I'll sustain the objection.

2   BY MR. HARDIN:

3   Q.  Well, is it true that what you told at the end of these two

4   meetings you still told him he wouldn't be charged with

5   anything; right?

6   A.  We told him he was still considered a witness in the

7   investigation, yes.

8   Q.  And he wouldn't be charged with anything as long as he

9   continued to tell the truth?

10  A.  I don't know if we went that far or we said he was still

11  considered in the witness category.

12  Q.  Mr. Novitzky, the people deciding what the truth was were

13  y'all, wasn't it, for you all or you, wasn't it?

14           MR. DURHAM:  Objection, form of the question, Your

15  Honor.

16           THE COURT:  Because he's using the plural?

17           MR. DURHAM:  Because he doesn't make the charging

18  decisions.

19           THE COURT:  Well, that's true.  For investigative

20  purposes, had you ruled him out as a target and only as a

21  witness, you personally?

22           THE WITNESS:  No.

23  BY MR. HARDIN:

24  Q.  Mr. Novitzky.

25  A.  Yes.

1    Q.  Has Brian McNamee ever been charged with anything?

2    A.  Not from my investigation, no.

3    Q.  And not that you know of?

4    A.  Not that I know of, correct.

5    Q.  Concerning -- that's an inartfully crafted question.  I

6    appreciate your correcting me.  In connection with your

7    investigation or any of this matter that we are here about, has

8    Brian McNamee ever been charged with anything?

9    A.  No.

10   Q.  And, after their two interviews, was there any doubt in

11   your mind that Brian McNamee was dealing drugs based on what

12   you believed after you talked to him?

13   A.  I believed he was distributing drugs, correct.

14   Q.  And would you agree with me that you never changed his

15   status as a target and, after you knew for sure he was a drug

16   dealer, you still never sought to have him charged with

17   anything, correct?

18           MR. DURHAM:  Your Honor, again these charging

19   decisions are made by --

20           MR. HARDIN:  I said sought.

21           THE COURT:  Overruled.

22   BY MR. HARDIN:

23   Q.  Excuse me, sought.  You never sought to have him charged

24   with anything, did you?

25   A.  Correct.

1  Q.  And nobody, in situations similar to these lawyers at this

2  table as Assistant U.S. Attorneys, to your knowledge, has ever

3  sought to have charges filed against him for these matters,

4  have they?

5  A.  That's correct.

6  Q.  Now, did you give -- let me ask you this.  Why in the world

7  on this -- well let me change that about.  Let me take that

8  back.

9       Could you have prosecuted anybody that Brian -- at the time

10  you got your information in '07, anybody that Brian McNamee

11  claimed he had given steroids or HGH?

12            MR. DURHAM:  Objection.

13  BY MR. HARDIN:

14  Q.  Could you legally have?  That's all I'm asking.

15            THE COURT:  That's a legal determination, and that's a

16  determination made by a prosecutor not an investigator, could

17  somebody charged.  I'll sustain the objection.

18  BY MR. HARDIN:

19  Q.  Was anybody?

20  A.  Was anybody what?  Could you --

21  Q.  Was anybody charged that Brian McNamee contended he had

22  given HGH or steroids to?

23  A.  Mr. Clemens was charged.

24  Q.  Anybody other than Mr. Clemens?

25  A.  No.

1  Q.  All right.  And Mr. Clemens was not charged with receiving

2  steroids or HGH from Mr. McNamee, was he?

3  A.  That was -- your question to me was --

4  Q.  I'm not arguing that you answered it wrongly.  I'm asking

5  you a new question.  Isn't that true?

6  A.  Correct.

7  Q.  All right.  Is it a true statement that nobody has ever

8  been charged with any criminal offense that involved them

9  receiving steroids or HGH from Brian McNamee?

10  A.  I'm just I'm trying to understand your question.  Could you

11  rephrase it?

12  Q.  Let me put it another way.

13  A.  Yeah, because I think it was kind of vague.  They could

14  have been charged with something else unrelated to this the way

15  you asked it.

16  Q.  And you know I'm not talking about that, Mr. Novitzky.

17  What I'm asking you is this.  Isn't it true that whatever the

18  believability or reliability one attaches to what Mr. McNamee

19  said to you about people he was giving things to, no one has

20  been charged based on that information?

21        MR. DURHAM:  Objection.

22  BY MR. HARDIN:

23  Q.  That you know of?

24        MR. DURHAM:  Objection.

25        THE COURT:  If he knows.

1          THE WITNESS:  Based on the information that Brian

2    McNamee has provided, no, I'm not aware of anybody being

3    charged other than Mr. Clemens.

4    BY MR. HARDIN:

5    Q.  Yes.  And then when -- and Mr. Clemens hasn't been charged

6    with that, has he?  He's been charged with lying about saying

7    he didn't do it, right?  You know that.

8    A.  I thought the question you asked was anybody charged.

9    Q.  No.  I'm not asking you about past questions, sir.  Just go

10   with me.

11   A.  I'm trying to answer the question.

12   Q.  Mr. Clemens has never been charged with receiving steroids

13   or HGH from Brian McNamee, has he?

14   A.  That's correct.

15   Q.  He has been charged and is here because he said he didn't

16   do it under oath, right?

17   A.  My understanding he has been charged with perjury before

18   Congress, correct?

19   Q.  All right.  Now, did you tell Mr. McNamee that he would

20   remain a non target, not somebody that y'all intended to

21   charge, if he went and talked to George Mitchell, yes or no?

22   A.  No, I didn't.

23   Q.  Were you present when he was told that?

24   A.  Not in the exact words that you phrased it right there.

25   Q.  Did you say to the prosecutor earlier that you wanted to,

1    you accompanied Mr. McNamee to a meeting with Senator Mitchell

2    and his people in order to, what, ensure cooperation or?  I

3    could look at my notes.  Do you recall what you said?

4    A.  I recall saying in order to monitor his cooperation --

5    Q.  Yes.

6    A.  -- at the request of the U.S. Attorneys Office in the

7    Northern District of California.

8    Q.  Well now, tell me what you mean by monitoring his

9    cooperation?

10   A.  To make sure that, when he sat down with Senator Mitchell

11   and Senator Mitchell began asking him questions, that he didn't

12   say, I don't want to do this anymore and walk out the door.

13   Q.  And why were you making that a condition of his

14   cooperation?

15   A.  I wasn't.

16   Q.  Why was the federal government doing that?

17           MR. DURHAM:  Objection.

18           THE COURT:  I'll sustain the objection.  You're asking

19   about somebody else, what their state of mind was.  I'll

20   sustain the objection.

21   BY MR. HARDIN:

22   Q.  Well, what I'm trying to ask and perhaps inartfully,

23   Mr. Novitzky, what is the explanation for making, as a

24   condition of somebody not becoming a target and subject to

25   prosecution themselves, that they go talk to a private

1    organization doing a private investigation?  Have you ever done

2    that before?

3            MR. DURHAM:  Objection.

4            THE COURT:  Unless that was his decision, was that

5    your decision?

6            THE WITNESS:  No.

7            THE COURT:  Sustained.

8    BY MR. HARDIN:

9    Q.  That's what happened, isn't it?

10   A.  Yes.

11   Q.  All right.  Let me see if I can ask it that way.  Isn't it

12   true that a condition of the cooperation being considered a

13   cooperator of Mr. McNamee is that he would have to go and tell

14   the Mitchell Commission the same things he had told you?

15   A.  Yes.

16   Q.  So your only quarrel is with whether you did that or not;

17   is that right?  You agree it happened.  You're just saying

18   you're not the one who did it?

19   A.  Correct.

20   Q.  All right.  Now, would you agree that it is incredibly

21   unusual for law enforcement to make the deal with a drug dealer

22   that he won't be charged if he goes to a private

23   organization --

24           MR. DURHAM:  Objection.

25   BY MR. HARDIN:

1   Q.  -- and helps them in their investigation?

2          THE COURT:  Sustained.

3   BY MR. HARDIN:

4   Q.  Have you ever done that before?

5          MR. DURHAM:  Same objection, Your Honor.

6          THE COURT:  The problem is he doesn't have the

7   authority to make charging decisions.  That's not the authority

8   of --

9          MR. HARDIN:  I appreciate it.  And so that I don't run

10  afoul of the Court's ruling, what I am seeking to elicit is, in

11  his experience as a law enforcement officer, whether that is

12  the normal course or way of doing things?

13         MR. DURHAM:  Also irrelevant, Your Honor.  It's also

14  beyond the scope.

15         THE COURT:  I'll sustain the objection.

16         EUFPLT:  All right.  Thank you, judge.

17  BY MR. HARDIN:

18  Q.  Now, after your meetings, let's go back to your two

19  meetings with Mr. McNamee, okay, your first two meetings.  Did

20  you feel he lied to you in the first meeting about anything?

21         MR. DURHAM:  Object, Your Honor, to the form of the

22  question.

23         THE COURT:  Okay.  We'll take a ten-minute break.

24         (Recessed at 3:02 p.m.)

25         (Resumed at 3:12 p.m.)

1      THE COURT:  In reference to the last objection, I

2  would sustain it.  I would sustain that objection because I

3  don't think a witness is qualified to opine on the credibility

4  of someone who they spoke to.  Now, if he has other information

5  that he investigated that caused him to believe that there were

6  falsehoods, then I think that's fine.  But I don't think he can

7  give an opinion as to whether the person was being truthful or

8  not to him at that time.

9      MR. HARDIN:  That's fine, judge.  I think I'll be able

10  to take care of it, because, if you'll recall, he was asked on

11  direct about whether Mr. McNamee was ever asked if he had any

12  physical evidence.  He touched on that evidence.  I'll try to

13  stick around that.  Thank you.

14      THE COURT:  Okay.

15      (Jury present.)

16      THE COURT:  Thank you.  You can be seated.

17  BY MR. HARDIN:

18  Q.  Now, I believe the question I asked you and the objection

19  was sustained by the Court.  So I'm not asking you now if he

20  lied to you in that first interview.  I am going to ask you,

21  however, in the second interview, was he told that he had and

22  he'd better not do it again?

23      MR. DURHAM:  Objection.

24      THE COURT:  If he was present when anything like that

25  happened?

1    BY MR. HARDIN:

2    Q.  Yes, were you present when Mr. Parrella warned him that he

3    could be charged with a 2001 violation if he lied, and that

4    y'all did not believe he was being forthcoming?

5    A.  No.

6    Q.  Okay.  And was he told anything at the beginning of the

7    second interview to indicate to them or did y'all indicate to

8    him in any way, you or Mr. Parrella, that you believed he was

9    not tell you everything?

10   A.  Yes.

11   Q.  And when somebody is not telling you anything, can that

12   ever be a 2001 violation or 1001 rather violation?

13            MR. DURHAM:  Objection.

14            THE COURT:  If he knows, do you know?

15   BY MR. HARDIN:

16   Q.  If you know.

17   A.  Well, that's why I answered no earlier.  It's actually

18   1001, which is a crime of lying to a federal agent.

19   Q.  Yes.  And, in fact, if a federal agent is asking somebody

20   something, it is potentially a 1001 violation for the person to

21   lie to them, isn't it?

22   A.  That's correct.

23   Q.  And depending on whether, I'm not asking to be a lawyer --

24   depending on whether all of the elements of the charge are met,

25   a person can be charged with a felony of lying to a federal law

1    enforcement officer if they do not tell them the truth in

2    response to questions; is that right?

3    A.  As you answered, there are some other --

4    Q.  The elements?

5    A.  So it has to be a material question, but generally that's

6    correct.

7    Q.  That's right.  If a federal agent asks what time it is and

8    the person doesn't tell you the right time, but it's not

9    material to what y'all are talking about, that's not a crime,

10    right?

11    A.  Exactly.

12    Q.  But, if the federal agent asks somebody, and the evidence

13    satisfies people that the witness has intentionally lied to the

14    agent about a matter that was material to the investigation or

15    the conversation, they could potentially be charged with a 1001

16    violation, right?

17    A.  That's correct.

18    Q.  All right.  And of course you've done that in the past in

19    your career, haven't you, sought, not charged, sought charges

20    for that?

21         MR. DURHAM:  It's a charging decision, Your Honor.

22         THE COURT:  Have you ever sought from a prosecutor

23    yourself charges based upon that?

24         THE WITNESS:  Yes, I have recommended charges to a

25    prosecutor for 1001 lying.

1    BY MR. HARDIN:

2    Q.  All right.  So if I ask you in the future always if whether

3    you've recommended it, you would prefer that word to sought.

4    But if I ask you if you ever recommended something, then we'd

5    be on the same page?

6    A.  As sought, yeah, either one.

7    Q.  All right.  Well, my question to you is, Mr. Novitzky,

8    isn't it true that, in the second interview, the second

9    interview started out with Mr. Parrella telling Mr. McNamee

10   that you, as a group, did not believe he was telling you the

11   whole truth?

12   A.  Generally, yes.

13   Q.  All right.  Thank you.

14   A.  That's not specifically what he said, but generally that

15   was told to Mr. McNamee at the start of the second interview,

16   yes.

17   Q.  And did you remind him that it was a potential 1001

18   violation to do that to a federal officer?

19   A.  I recall that we did, correct.

20   Q.  And did you indicate to him that, if he did not tell the

21   truth and the whole truth, he was potentially subjecting

22   himself to prosecution?

23   A.  Yes.

24   Q.  Now, my question to you earlier was who determines what the

25   truth is, and I don't believe we went any further.  And what I

1    mean by that -- I'm asking it a little bit different way this

2    time.  At the end of an interview with a witness, and if you're

3    trying to decide whether they've been truthful or not, it is

4    you or the Assistant U.S. Attorney or whoever is in charge of

5    it, that decides what the truth is in terms of whether it's

6    been violated?  Isn't it true?

7    A.  Decides what the truth is?

8    Q.  Yes.

9    A.  I think just that a jury decides what the truth is.

10   Q.  That's at a trial.  I'm speaking as a charge.  In this

11   particular interview, isn't it true, for instance, that

12   Mr. McNamee wasn't telling you enough about Mr. Clemens that

13   you believed was the truth, and what you were telling him was,

14   if you don't tell us more, you're going to be in trouble?

15   A.  No, that's not accurate.

16   Q.  I see.  Okay.

17        At the end of the day, you then made as a condition -- or

18   not you, I think you said.  The U.S. Attorney's Office made as

19   a condition that he would continue in his non target status if

20   he then went and told the Mitchell Commission what he had told

21   you, correct?

22   A.  Not exactly.  That was a condition of his non target

23   status.  It didn't guarantee that he would continue that.

24   Q.  Okay.  All right.  So what you're saying is is that, if he

25   wanted to continue as a non target, then he had to go talk to

1    the Mitchell Commission and tell the Mitchell Commission what

2    he had told you; is that correct?

3    A.  Well not exactly correct, generally.

4    Q.  Generally, will you give me generally?

5    A.  Generally, yeah.

6    Q.  All right.  And I'm speaking, as I ask you these questions

7    right now, about Roger Clemens, not really anyone else.

8    A.  Okay.

9    Q.  When he was to go to the Mitchell Commission and the

10   interview that you had on June 6th and June 8th, was that

11   before or after George Mitchell flew out to San Francisco to

12   meet with the Assistant U.S. Attorneys to ask that they help

13   him in his investigation?

14   A.  After.

15   Q.  The interviews were after?

16   A.  The interviews with Mr. McNamee were after.

17   Q.  All right.  So let me see if I can put in -- roughly, you

18   don't have in front of you a date, but approximately when would

19   you say it was that Mr. Mitchell met -- what, were y'all a task

20   force?  What were you called at that time?

21   A.  Nothing.

22   Q.  So how shall I refer to your group?  It was you, was it

23   not, Miss Heather Young, from the FBI, and Mr. Rogers.  Were

24   y'all basically all working together?

25   A.  Yes.

1   Q.   Okay.   Plus Mr. Nedrow and Mr. Parrella, Assistant U.S.

2   Attorneys, right?

3   A.   Correct.

4   Q.   Now, I don't mean gang in a bad word, but can I call it the

5   gang of five?

6   A.   You can call it whatever you want.

7   Q.   Thank you.   But I want to be, what's the most accurate way

8   to put it in terms of who your group was?

9   A.   I have no idea.

10   Q.   All right.   What did you refer to yourself as?

11   A.   Myself?

12   Q.   Or the group?   If you don't --

13   A.   Yeah, I don't.   I didn't.

14   Q.   All right.   All right.   So, in that meeting with George

15   Mitchell, were you present?

16   A.   No.   The meeting with the U.S. Attorney?

17   Q.   Yes.

18   A.   No, I was not.

19   Q.   Were you present with him at any time Mr. Mitchell was out

20   there on the West Coast asking for help?

21   A.   No.

22   Q.   Okay.   Give me, if you can, the month, as close to the date

23   if you can, of when Mr. Mitchell came out and asked for help.

24   A.   It's got to be a real approximate because I wasn't there.

25   Q.   Right.

1    A.  I just heard about it.  I can equate it to a time period.

2    It was shortly thereafter, Commissioner Selig, the Commissioner

3    of Major League Baseball, hired on Senator Mitchell and his law

4    firm to investigate it, so it was some time in the close

5    proximity thereafter.

6    Q.  Okay.  All right.  Well, could we, would it be April, would

7    that be a broad enough period for you, May?

8    A.  Yeah, I couldn't, I couldn't put it within three or four

9    months.  I'm not sure when that happened.

10   Q.  If I put four through five of '07, would it have been some

11   time, just best you can help me.  I just want it for this

12   chart.

13   A.  The only thing I can say with certainty was it was before

14   the meetings with Brian McNamee.

15   Q.  Somewhere between, was it -- actually I'm putting it here,

16   but maybe I'm wrong.  Was it before or after your first contact

17   with Mr. McNamee?

18   A.  I would estimate it was before.

19   Q.  So was it going to be in '07?

20   A.  It could have been the end of '06.

21   Q.  All right.  End of '06 or beginning or first four months of

22   '07?  How about that?

23   A.  Yeah, that's fair.

24   Q.  Or first four months of '07.  Now, this is going to look

25   kind of like a rubric.  I'm going to now draw an arrow up to

1  say, at the end of '06 or first four months of '07, Mitchell

2  asked, how about law enforcement?  Would that be -- or San Jose

3  office for help?

4  A.  He actually went to the United States Attorney of the

5  Northern District of California that sits in San Francisco.

6  The San Jose office is under the Northern District of

7  California, but they're located in San Jose.  My understanding

8  was Senator Mitchell met with Kevin Ryan, who is

9  the Presidentially-appointed U.S. Attorney that sits in San

10  Francisco and oversees the Northern Judicial District of

11  California, or oversaw it.

12  Q.  All right.  I don't know who's going to be able to read

13  this, but Mitchell asked San Francisco U.S. Attorney for help.

14  Is that accurate?  And he asked for that help at the end of '06

15  or first four months of '07?

16  A.  The date, I could be way off on the date.

17  Q.  I think everybody's clear.  I'm never going to hold you to

18  that unless I give you some actual something that you're

19  comfortable with.  I'm really only after before or after.  Can

20  we agree on this, that Senator Mitchell asked for help from the

21  U.S. Attorney in San Francisco, for whom you had been working

22  under as an agent?

23  A.  Correct.

24  Q.  For help in his investigation of Major League Baseball, and

25  he does that before you ever approached Brian McNamee for the

1    first time?

2    A.   That's correct.

3    Q.   Okay.  There we go.

4        Now, I'm going to give you a couple of exhibits to look at,

5    and see if that will help you and I plug in a date for when you

6    first contacted Brian McNamee.

7    A.   Okay.

8    Q.   I'm going to show you, I've given them to the government,

9    Defense 64 and 65.

10   A.   Thank you.

11   Q.   And see if -- can you first identify what those are?  Can

12   you just identify them?

13   A.   Yes.  They are e-mails from my e-mail account with IRS to

14   Brian McNamee's e-mail account.

15   Q.   All right.  Each of the exhibits?

16   A.   Correct.

17           MR. HARDIN:  Your Honor, we'd move to introduce 64 and

18   65?

19           MR. DURHAM:  No objection.

20           THE COURT:  Very well.  Admitted.

21           MR. HARDIN:  Great.

22           (Defendant's Exhibit Nos. 64 and 65 were admitted into

23           evidence.)

24   BY MR. HARDIN:

25   Q.   Can we start, tell me which exhibit number would be the

1    first one?

2    A.   Sure, Exhibit Five would be the first one.

3    Q.   Five or 65?

4    A.   I'm sorry, 65.

5    Q.   All right.  Stacey, do you have Exhibit 65?  If you can't

6    put it up right now, that's okay.  No problem.

7         All right.  Tell the jury what that helps you know as to

8    when your first contact was?

9    A.   This would have been the date that I first contacted Brian

10   McNamee via e-mail here, and I believe on that same day a phone

11   message.

12   Q.   All right.  When you said earlier you first called him and

13   then you sent him an e-mail, your memory is you did them the

14   same day?

15   A.   Yes.

16   Q.   Okay, and what's that date?

17   A.   That date is May 9th, 2007.

18   Q.   Okay.  So we know several things from that then, do we not?

19   That, by May 9th of 2007, the U.S. Attorneys Office had been

20   asked to help in the George Mitchell investigation, correct?

21   A.   Correct.

22   Q.   And we know that you then reached out to Mr. McNamee, who

23   you had known, had you not, for a year and-a-half you believed

24   that he was basically trafficking in steroids?

25   A.   I believed that he was receiving steroids.  I wasn't sure

1    whether or not he was trafficking at that point.

2    Q.   Okay.  Well --

3    A.   And growth hormone as well.

4    Q.   Right, but without going into what anybody told you, you

5    had interviewed Mr. Radomski, had you not?

6    A.   Correct.

7    Q.   And you actually, by that time, had sought a search warrant

8    naming Mr. McNamee, had you not?

9    A.   Can you refresh my memory?

10   Q.   Yeah.  I don't want to run afoul of the Court's ruling.  Do

11   you remember Mr. Grimsley we talked about?

12   A.   Yes.

13   Q.   And if I -- do you recall two different search warrants you

14   sought against Mr. Grimsley?

15   A.   Correct.

16   Q.   And those were both in '06, right?

17   A.   They were, correct.

18   Q.   And my memory right, one was in April of '06, one was in

19   late May of '06?

20   A.   That's correct.

21   Q.   And the reason you had two was the first one you didn't

22   execute after you got there because he agreed to cooperate,

23   right?

24   A.   That's correct.

25   Q.   And then he changed his mind, so in May you went back and

1    did a full search warrant execution?

2    A.  Correct.

3    Q.  And when you did that, my only point to you is, you named

4    Brian McNamee in there as a user and buyer from Radomski and,

5    as somebody trafficking -- not traffic is a bad word.  How did

6    you put it about Mr. McNamee?

7    A.  I'd have to take a look at that affidavit.

8    Q.  But you had, you named him in that affidavit?

9    A.  I believe he was named in that affidavit, correct.

10   Q.  As someone engaging in illegal activity?

11   A.  As someone associated with Kirk Radomski that was receiving

12   performance-enhancing drugs is my recollection.

13   Q.  Which was illegal, right?

14   A.  Correct.

15   Q.  Okay.  Now, so if we're doing this timeline, that's by

16   April, May of '06 that you are listing Brian McNamee in an

17   affidavit, correct?

18   A.  Yes.

19   Q.  So you and I can -- you and I can agree, can you not, that

20   by May 9th, '07, you believed and knew that Brian McNamee was

21   engaged in illegal conduct and, in fact, had said so in an

22   affidavit?

23   A.  Well, I think what I said in the affidavit was it was

24   probable cause to believe.

25   Q.  Yes.

1    A.   Which is, you know, a standard more likely than not.

2    Q.   Yes.  It's usually the standard used also for filing

3    charges, isn't it?

4              MR. DURHAM:   I object, Your Honor.

5              THE COURT:   Sustained about filing charges.  That's

6    not his business.

7    BY MR. HARDIN:

8    Q.   But you do seek charges, don't you?  Let me ask you this.

9    You frequently go to whoever the appropriate charging authority

10   lawyer is to seek to have them charge somebody with the crime,

11   don't you?

12   A.   Correct.

13   Q.   And as part of that process, you will regularly tell them

14   why you think you have probable cause to believe this person

15   committed a crime; right?

16   A.   Usually the standard, even though it may be a legal

17   standard, that I use or that we use as agents, is a higher

18   standard than probable cause.

19   Q.   Yeah, because you're judging there whether you're going to

20   succeed at trial, not just whether you believe the person did

21   it, right?  So you may raise the standard that you meet

22   yourself in asking for charges?

23   A.   Correct.

24   Q.   All right.  But all I'm asking you here is, would you agree

25   with me that, by at least April of 2006, you felt you had

1  enough probable cause to believe Brian McNamee was engaged in
2  criminal activity that you were putting it in an affidavit to a
3  magistrate?
4  A.  That is correct.
5  Q.  Okay.  And yet, a year later, the first time you approach
6  him you tell him he is not a target of your investigation,
7  correct?
8  A.  That is correct.
9  Q.  Okay.  Now, after those two meetings with Mr. McNamee, what
10 is it that you wanted him to do that, in your opinion, would
11 keep you from seeking criminal charges?
12 A.  Again, I wasn't the one --
13 Q.  Now I know, only asking in your mind, what did you want?
14 A.  What did I want?
15 Q.  Yes.
16 A.  Well, I thought it was a good idea for him to cooperate
17 with Senator Mitchell.  Senator Mitchell had been tasked by
18 Major League Baseball --
19 Q.  That's okay.  They know.  I only ask you why you thought,
20 and you said you thought because it was a good idea for him to
21 cooperate with Senator Mitchell.
22 A.  I was telling why.
23 Q.  I know I wasn't asking you why you thought it was a good
24 idea to cooperate with Senator Mitchell.  I only ask you what.
25 I'm just asking you this, Mr. Novitzky.  Is it a fair statement

1    then that you thought that what he ought to do to continue his

2    status of not being a target and not potentially being charged

3    with a crime that you already knew he had been committing, what

4    you wanted him to do was to cooperate with Senator Mitchell?

5    A.   And that was somewhat of a complex question.   Could you

6    repeat it one more time?

7    Q.   I'll shorten it.

8    A.   Perfect.

9    Q.   Didn't you just tell me that what you thought he ought to

10   do and what you wanted him to do to continue his non target

11   status was to cooperate and talk to Senator Mitchell?

12   A.   Yes.

13   Q.   All right.   And that, in turn, is, was the position also of

14   the Assistant U.S. Attorneys with you working on the case,

15   correct?

16   A.   Correct.

17   Q.   Now, so that everybody's clear, this is long before this

18   office here in the courtroom was involved, can we agree?

19   A.   Yes, we can.

20   Q.   When we talk about the Assistant U.S. Attorneys at the

21   stage we're at right now, we're talking about generally

22   Mr. Parrella and Mr. Nedrow; is that correct?

23   A.   Correct.

24   Q.   Who were officing out of San Jose, California, and not in

25   Washington, D.C., or New York or so, right?

1    A.   That's correct.

2    Q.   Okay.  Now, when you went to Senator Mitchell, how many law

3    enforcement people went with you?  And I assume Mr. McNamee's

4    lawyer went with him?

5    A.   Correct.

6    Q.   Which one of the lawyers or was there two of them, do you

7    recall?

8    A.   I recall Earl Ward being there.  I'm not sure if any others

9    were there.

10   Q.   Do you recall whether Mr. Richard Emery was there?

11   A.   I believe he was there as well, not positive on him.

12   Q.   All right.  So, when Mr. McNamee goes to speak with Senator

13   Mitchell --

14   A.   Yes.

15   Q.   -- and he goes with two lawyers with him, you, who else?

16   A.   Agent Rogers from the IRS.

17   Q.   Okay.

18   A.   Agent Young from the FBI.

19   Q.   All right.  So three law enforcement officers, the three

20   we've mentioned previously?

21   A.   Correct.

22   Q.   And Mr. Mitchell, how many lawyers in his were there?

23   A.   I'd say at least four.

24   Q.   Okay.  And were you there to aid in his investigation?

25   A.   No.

1    Q.  What were you there for?

2    A.  To monitor the cooperation of Brian McNamee.

3    Q.  And so why would you need to monitor it?

4    A.  Because that was part of his agreement with the government

5    to do that to continue his non target witness status.

6    Q.  So, if Brian McNamee wanted to continue in the status of

7    not being charged with a crime and not be a target, he needed

8    to tell Senator Mitchell what you believed was the truth?

9           MR. DURHAM:  Your Honor, I'm sorry, I think this has

10   been covered.

11          THE COURT:  Probably have gone over it, but go ahead.

12   You can answer it.  I thought we had gone over this before, but

13   go ahead.

14   BY MR. HARDIN:

15   Q.  Is that right?

16   A.  Yeah, that's what Assistant United States Parrella informed

17   Mr. McNamee and his attorneys.

18   Q.  Now, what is the occasion in which you will attend an

19   interview, Mr. Novitzky, in which you don't take any notes?

20          MR. DURHAM:  Your Honor, I object on relevance

21   grounds.

22          THE COURT:  Overruled.

23          THE WITNESS:  That I would attend an interview that

24   I'm conducting?

25   BY MR. HARDIN:

1   Q.  Do you always take notes if you're conducting it?

2   A.  Sure, if it's an interview in the course of an

3   investigation.

4   Q.  All right.  And do you ever take notes when you're

5   monitoring another interview?

6   A.  Not if the interview is not related to a federal criminal

7   investigation.

8   Q.  Well, let me see if I understand.  Did you have paper with

9   you that day?

10  A.  I don't recall.

11  Q.  Did you have a pen with you that day?

12  A.  Probably.

13  Q.  All right.  Isn't it true that during, neither during this

14  interview nor any of the other interviews that were conducted

15  by Mr. Mitchell's group with Mr. McNamee, isn't it true that

16  not a single law enforcement officer took a single note that

17  could ever be looked at by anybody else again?

18          MR. DURHAM:  Object to the argument and form of the

19  question.

20          THE COURT:  Sustained to the form of the question.

21  BY MR. HARDIN:

22  Q.  Is there -- did any of you, did any -- let me back up.  How

23  many interviews with Mr. McNamee, either in person or by phone,

24  by Mr. Mitchell's group did you attend or participate in as a

25  listener?

1    A.   Three.

2    Q.   Was the first one in person?

3    A.   Yes.

4    Q.   And where was it held?

5    A.   It was held in Mr. Mitchell's law firm in Manhattan, New

6    York City.

7    Q.   How long did it last?

8    A.   I'm not sure, a couple of hours approximately.

9    Q.   Did you ask any questions?

10   A.   I didn't ask any questions, no.

11   Q.   Was there an exchange at one time where Mr. McNamee told

12   them something that you disagreed with?

13   A.   Yeah, I may have interjected not in the form of a question,

14   however.

15   Q.   Yes.  But actually, during the interview, you interjected a

16   disagreement with what Mr. McNamee was telling them about

17   something, didn't you?

18   A.   I don't recall if it was a disagreement, possibly a

19   clarification.

20   Q.   Do you not recall, sir, that Mr. McNamee said --

21            MR. HARDIN:  I'm not going to say what he said.  I

22   promise.

23            THE COURT:  Sustained.

24   BY MR. HARDIN:

25   Q.   He said one thing, and you interjected to say that's not

1    right, and then you said what was right in your mind as to what

2    he had said before, correct?

3           MR. DURHAM:  The same objection, Your Honor.

4    BY MR. HARDIN:

5    Q.  Is that correct?

6           THE COURT:  Well, did that ever happen that he said

7    something and you corrected him and told him that what he was

8    saying wasn't correct?

9           THE WITNESS:  Well, not that it wasn't correct, but

10   possibly that it wasn't what he said last time.  I do recall

11   that occurring, yes.

12   BY MR. HARDIN:

13   Q.  All right.  But you didn't make any notes of that, did you?

14   A.  No.

15   Q.  And then, after that, and neither did Mr. Rogers, right?

16   A.  I'm not aware that he did, no.

17   Q.  And neither did the woman agent, did she?

18   A.  Agent Young?

19   Q.  Yes.

20   A.  I'm not aware that she did, no.

21   Q.  Well, then what about the phone interview?  When was the

22   occasion of the next interview that you listened in on?  How

23   were these interviews by phone arranged?  Where were you?

24   A.  I was out in San Jose, California, at my offices.

25   Q.  And then where was everybody else when the Mitchell

1     Commission wanted to talk some more to Mr. McNamee?

2              THE COURT:  Approach for a minute.

3              (Bench conference.)

4              THE COURT:  I mean I know the stakes are significant,

5     so I try to give a lot of leeway but, my God, we're going to be

6     here forever.  It seems that you're beating on something that's

7     not making a point.  Plus I think this is beyond the scope of

8     direct, because, as I recall, the government did not raise any

9     questions about the McNamee interviews.

10             So I mean obviously, if McNamee says something that is

11    a predicate for him being impeached or contradicted, based upon

12    something that this agent did, you can obviously call him in

13    your case.  But, as far as I understand, at this point his

14    credibility has not been placed at issue by the government.

15    There's nothing that they presented during their direct about

16    his interviews and what he said during those interviews, and

17    this is what this is going to.

18             MR. HARDIN:  Whatever the Court says.

19             THE COURT:  I'll sustain.  Let's move on.

20             (Open court.)

21    BY MR. HARDIN:

22    Q.  Let me go back.  In the meetings you personally attended,

23    in addition to none of the law enforcement personnel taking

24    notes, would you agree that neither one of the two Assistant

25    U.S. Attorneys took notes?

1   A.   I'm not sure about that.

2   Q.   Do you know of any notes they took?

3   A.   As I sit here, I don't know of any, but I'm not sure there

4   wasn't any.

5   Q.   All right.   And then, did you make any notes from then on

6   in the phone conversations that you also listened?

7   A.   No.

8   Q.   And was your purpose in doing this monitoring his

9   cooperation?

10   A.   Yes.

11   Q.   Now, after these interviews and the Mitchell Report came

12   out, the Mitchell Report, did it not, referenced that

13   October the 1st, 2000 Los Angeles Times article back in --

14             MR. DURHAM:   Your Honor, I object.   Agent Novitzky did

15   not author the Mitchell Report.

16             THE COURT:   Sustained.

17   BY MR. HARDIN:

18   Q.   All right.   Now, after the Mitchell Report came out, how

19   many more times did you participate in interviews of

20   Mr. McNamee?   If we put the jury -- let's put their time

21   here as to try to put a timeframe in.   We can agree, can we

22   not, that 12-13-07, is the Mitchell Report?

23   A.   Sounds right.

24   Q.   Do you recall the next time you interviewed Mr. McNamee?

25   A.   Yes, I do.

1    Q.   When was that?

2    A.   What I referred to a lot this morning, January 10th, 2008.

3    Q.   Did you on this occasion also interview Mr. Emery?

4    A.   Correct.

5    Q.   Did you -- and was that at Mr. Emery's office?

6    A.   Yes.

7    Q.   Is that the occasion in which you received the evidence you

8    were talking to the government about?

9    A.   Yes, it is.

10   Q.   Okay.  Now, I have written -- tell me if this is

11   accurate -- January the 10th of '08, J.N., you, interviews

12   McNamee and his lawyer at Mr. Emery's office, received stuff

13   from Emery and McNamee?

14   A.   Correct.

15   Q.   All right.  And the stuff that you received is what has --

16   was gone over in your visit, was it not, with Mr. Durham that

17   we went through all the physical evidence; is that correct?

18   A.   Correct.

19   Q.   All right.  Now, do you know where Mr. McNamee was, by the

20   way, at the time you reached out to him for that first

21   interview in June of '08?

22   A.   Yes.

23   Q.   Where was he -- June of '07.  Excuse me, I was wrong.

24   A.   May of '07?

25   Q.   Yes.  If you had the -- yeah.  I'm referring to the

1     interview for June of '07, when you reached out in May of '07,

2     do you know where he was?

3     A.   In May of '07, when I reached out --

4     Q.   Yes.

5     A.   Yes.

6     Q.   Where?

7     A.   He told me he was actually with Mr. Clemens at a sporting

8     goods store.  I believe it was in Tennessee.

9     Q.   Okay.  Could it have been Kentucky?

10    A.   Could have been Kentucky.

11    Q.   Okay.  And did you later learn that at the time that you

12    had Mr. McNamee come up to New York for your interviews, that

13    he was in the process of helping Mr. Clemens get in shape to

14    return to play his last year with the Yankees in '07?

15    A.   Yes.

16    Q.   Okay.  So, did you become aware that he actually leaves

17    working out with Mr. Clemens to go to New York to be

18    interviewed by you and the others we have talked about?

19    A.   I knew he was in the process of training Mr. Clemens at

20    that time.  I'm not sure if I knew he physically left at that

21    point to come up.  He may been in New York, anyway, on a hiatus

22    from training, in for a day or two.

23    Q.   Okay, fair enough.

24         Now, what I want to do is go over some of this stuff that

25    the government went over with you on as far as the evidence is

1  concerned.

2  A.  Okay.

3  Q.  First of all, would it help you to have up there for

4  reference what I have marked as Defendant's Exhibit 63?

5       MR. HARDIN:  Will tender to counsel.

6  BY MR. HARDIN:

7  Q.  And ask, first of all, can you identify it for me?

8  A.  Thank you.

9  Q.  Sure.

10  A.  So the question was, can I identify this?

11  Q.  Yes.

12  A.  Yes.

13  Q.  What is it, please?

14  A.  This was a summary report that I gave to FSA, the DNA and

15  fingerprint lab, along with items that I turned over to them on

16  February 7th, 2008.

17  Q.  All right.  So that everybody understands, this is sort of

18  descriptions you provided, along with photographs, to the first

19  lab, I believe it is, that you sent things to be looked at; is

20  that correct?

21  A.  It was the only lab I sent anything to be looked at.

22  Q.  The other things from the lab were sent by the FBI or the

23  group here?

24  A.  Or IRS Agent Rogers, yes.

25  Q.  Okay, I got you.  All right.  So -- but is this document

1   prepared by you?

2   A.  Yes.

3   Q.  And are the photographs, photographs you attached, because

4   some of these photographs are exactly the same that we have in

5   evidence individually; is that right?

6   A.  That's correct.

7           MR. HARDIN:  All right.  I'm going to move to

8   introduce Defendant's Exhibit 63 as a way of ease of talking to

9   the witness about some of them.

10          MR. DURHAM:  Your Honor, may I just have a moment?

11          MR. HARDIN:  Your Honor, I could tender a hard copy to

12  the Court, if that would help?

13          MR. DURHAM:  Going to object, Your Honor, this is,

14  obviously, a hearsay document, we have no objection.

15          THE COURT:  No objection?

16          MR. DURHAM:  No objection.

17          MR. HARDIN:  All right.  Now -- can you put up 63,

18  please.  Thank you.  Yeah.

19  BY MR. HARDIN:

20  Q.  Now, tell the jury what it is -- I want to publish it to

21  the jury -- just tell the jury -- first of all, you received it

22  on January the 10th; is that correct?

23  A.  That's correct.

24  Q.  And you forwarded it to FSA, I think you said, a month

25  later?

1    A.  Little less than a month.

2    Q.  A little less than a month later?

3    A.  February 7, 2008.

4    Q.  And once you took -- I'm sorry.  Excuse me.

5    A.  It was February 7, 2008.

6    Q.  And once you took possession of it and left Mr. Emery's

7    office, what did you do with it until you sent what we are

8    about to discuss to FSA?

9    A.  I brought it back to my hotel room in New York, put it in a

10   suitcase which had a lock on it.

11       I then transported it back to the San Francisco Bay Area,

12   stored in a secure area in my residence, and then brought it to

13   IRS, CID secured offices in San Jose, California, where I

14   placed it into a locked metal cage that had a padlock on it

15   that only I had the combination to.

16   Q.  All right.  Now, tell me, please, Mr. Novitzky, would you

17   agree with me that until you -- from the time backward, from

18   the time you arrived at Mr. Emery's office on January 10th of

19   2008, can you and I agree that you have no personal knowledge

20   or idea at all how any of this stuff was created or what was

21   done with it?

22   A.  No.

23   Q.  You have personal knowledge of -- personal knowledge that

24   you participated in of what happened with it before

25   January 10th?

1    A.  No, not that I participated in.

2    Q.  Okay.  Do you know anything about any of this stuff in

3    terms of how it was collected or anything, other than what

4    Mr. McNamee told you?

5    A.  Yes.

6    Q.  Whom else do you know about it from?

7    A.  Mr. Emery as well.

8    Q.  Well, all right.  His lawyer.  All right.

9    A.  Correct.

10   Q.  Other than what Mr. McNamee or his lawyer told you, do you

11   have any idea of the background or creation or preservation or

12   storage of any of the stuff that is reflected in

13   Defendant's 63?

14   A.  No, I do not.

15   Q.  So, can you and I agree that whether or not this stuff was

16   legitimately gathered, legitimately stored and legitimately

17   preserved all depends upon the believability of Mr. McNamee?

18          MR. DURHAM:  Objection, Your Honor.

19          THE COURT:  Calls for, I think, a conclusion that the

20   jury has got to make.  I'll sustain the objection.

21   BY MR. HARDIN:

22   Q.  Well, would you agree with me that you have no personal way

23   of knowing at all how this evidence was created, stored or

24   preserved, any personal knowledge yourself?

25   A.  No, I wouldn't agree with you.

1   Q.  From the time before you got there, when you -- at the time

2   you walked into his office on January 10th, what were your

3   personal sources of information about that evidence and how it

4   was created and stored that you had in that room other than

5   what Mr. McNamee and Mr. Emery told you?

6   A.  Some knowledge of the results of the DNA testing on the

7   items came back as --

8   Q.  Wait a minute.  Sir --

9           THE COURT:  I think the question is, at the time he

10  gave you the evidence, prior to that, do you have any personal

11  knowledge of how that material was stored?

12          THE WITNESS:  I'm sorry.  I thought he meant as I sat

13  here now.

14  BY MR. HARDIN:

15  Q.  No, I'm asking you -- you have a lot of knowledge about it,

16  I would assume correctly, from January 10, 2008, forward;

17  right?

18  A.  Correct.

19  Q.  Okay.  I'm not asking you that.  I'm asking you if you have

20  any personal knowledge at all as before January the 10th of

21  2008, as to how any of this stuff was created, preserved or

22  collected?

23  A.  Yeah.  I mean, the only way -- the only reason I answered

24  that is now, yes, based upon --

25  Q.  No, I'm asking you -- whether you sit there now -- you are

1    sitting there now; right?  We can agree on that?

2    A.  Yeah.

3    Q.  But I'm talking to you about what you personally know

4    happened before January 10th, 2008, when you took custody of

5    it?

6    A.  Is the question what did I know on January 10th, 2008,

7    before -- about the evidence?  Because now I do know things

8    about what was done with that evidence before January 2008.  At

9    the time I didn't.

10   Q.  Stop a minute.  You know about tests that had been run on

11   that evidence; right?

12   A.  Correct.

13   Q.  You don't have any personal knowledge about what happened

14   with that evidence and how it was created, do you?

15   A.  Well, I think I do.

16   Q.  What is your personal knowledge as to what happened with it

17   before January 10th?  I'm not talking about what subsequent

18   test results have showed.

19   A.  That's how I have that knowledge.

20   Q.  Well, that's not the knowledge I'm talking about,

21   Mr. Novitzky.

22       Let's talk about it this way.  I am asking you what

23   knowledge do you have as to what happened before January 10th,

24   2008, with this evidence?  The fact that sometimes -- that

25   somebody ran a test later doesn't tell how it got there, does

1    it?

2    A.  Well, it would reflect -- the result of that test would

3    reflect something that happened to that evidence before

4    January 10, 2008.

5    Q.  It won't tell you how, will it?  Let's take an example.

6    A.  Your question was, did you know anything about what

7    happened to that evidence, it wasn't just how, it was anything

8    about that evidence before January 10, 2008.  The results of

9    the subsequent tests would tell me something that happened to

10   that evidence before I received it.

11   Q.  Well, let's talk about that a minute, then, as long as you

12   insist on it.  If you test an item that has --

13          THE COURT:  I think the question is whether you have

14   personal knowledge, not based upon some test results, but

15   personal knowledge based upon your own abilities of perception

16   or knowledge to know what the circumstances were regarding that

17   evidence before you got it?

18          THE WITNESS:  January 10th, when I --

19          THE COURT:  Based upon your faculties, not what

20   somebody else did, but your own faculties, to hear, see,

21   perceived or whatever?

22          THE WITNESS:  Okay, not including any test results

23   that I --

24          THE COURT:  No.  Just based upon your own personal

25   knowledge, that's what he's asking you.

1          THE WITNESS:  Okay.  No.

2   BY MR. HARDIN:

3   Q.  For instance, let's look at the second page of Defense

4   Exhibit 63.  Tell us what that shows.

5   A.  That's a picture of a Ziploc baggie that contained the beer

6   can, the Miller Lite beer can, as well as some other items.

7   Q.  Yes.  And that -- is that the condition the evidence was in

8   when it was first shown to you on January the 10th?

9   A.  Yes.

10  Q.  Do you have any personal knowledge at all of how any of

11  that evidence got there that way, personal knowledge?

12  A.  Other than what was told to me?

13  Q.  Right.  Personal knowledge is not -- Mr. Novitzky, all the

14  years you have been a law enforcement officer, can't you agree

15  with me that what somebody tells you is not personal knowledge

16  of yours?

17          MR. DURHAM:  I object, Your Honor.

18          THE COURT:  Overruled.

19  BY MR. HARDIN:

20  Q.  You know that, don't you?  When I say "personal knowledge,"

21  I'm excluding what somebody may have told you.  And you know

22  that from all these years, don't you, sir?

23  A.  Okay.

24  Q.  All right.  You do, don't you?

25  A.  I guess so.

1    Q.  All right.  And so I'm asking you, do you have any personal

2    knowledge as to how this stuff got to this condition when it

3    got to you?

4    A.  No.

5    Q.  All right.  You don't know, other than what you were told

6    by Mr. McNamee or Mr. Emery; right?

7    A.  Correct.

8    Q.  So would you -- would you agree with me that the only thing

9    you know about how it got into this condition is what

10   Mr. McNamee and Mr. Emery told you?

11   A.  Absolutely.  Yes.

12   Q.  Okay.  Now, the bag on the left, what is that in this

13   picture?

14   A.  That was a bag that contained the bag on the right.

15   Q.  All right.  Was it in the condition of this picture when

16   you first arrived?

17   A.  The Miller Lite beer can within that Ziploc baggie was

18   within the bag on the left.

19   Q.  Was any of the other material in that baggie -- I'm sorry.

20   I'm not sure I understood.

21      So you are saying this bag on the left contained the beer

22   can?

23   A.  The bag on the left, the bigger bag that's scrunched up

24   there, had the bag on the right within it when I received it.

25   Q.  Okay.  So, let's do --

1   A.  I removed it from that bag to take a photo of it.

2   Q.  All right.

3   A.  I inventoried it in February 2008.

4   Q.  Okay.  Maybe the best way to do this is let you narrate.

5   When you walked into Mr. Emery's offices, okay, tell me what

6   you -- first of all, did you interview anybody before you

7   started checking the evidence?

8   A.  Yes.

9   Q.  Whom did you interview?

10  A.  Mr. McNamee and Mr. Emery.

11  Q.  Did each of them tell you their version about this evidence

12  and where it had been?

13  A.  Yeah, it was in conjunction with one another, they both at

14  the same time --

15  Q.  Now --

16  A.  -- or switching off were telling me about it.

17  Q.  -- recognizing you don't have any personal information

18  about this, but did you learn from them the condition it was in

19  when Mr. McNamee brought it to Mr. Emery?

20  A.  Yes.

21  Q.  What was your understanding as the condition of this

22  evidence when Mr. McNamee brought it to Mr. Emery, how was it

23  packaged?

24          MR. DURHAM:  Hearsay.

25          THE COURT:  Sustained.  Hearsay.

1              MR. HARDIN:  Okay.

2      BY MR. HARDIN:

3      Q.  When you arrived, did you find out whether Mr. Emery had

4      ever himself done anything with this evidence before the

5      photograph?

6      A.  Yes.

7      Q.  What had he done?

8      A.  He had observed the evidence, taken it out of a FedEx box

9      and taken a look at it, I believe, removed it from the bags.

10     Q.  I think -- was the bag over the FedEx box?  What do you

11     mean, removed what from the bag?

12     A.  I'm sorry?

13     Q.  What was removed from the bag?

14     A.  The items within it.

15     Q.  Okay.  Let me back up.  The box, I believe you volunteered

16     or were asked by Mr. Durham when he was questioning you, that

17     there was a FedEx box there.  We see a FedEx box in the

18     picture; is that correct?

19     A.  Correct.

20     Q.  Is that the same FedEx box that was shown to you by the

21     government earlier today?

22     A.  Yes, it is.

23     Q.  Okay.  So we can take this photograph as to be the box --

24     and what was that box supposed to be?  Was anything in it when

25     you arrived?

1    A.   I don't know if anything was in it when I arrived.   It was

2    described to me that that box was brought to the office by

3    Mr. McNamee with these bags of material within it.

4    Q.   Okay.   So that box was supposed to have contained

5    everything that you take back with you to California?

6    A.   Ultimately, yes, I took everything back with me inside that

7    box to California.

8    Q.   And how did you take it back to California?

9    A.   Via airplane.

10   Q.   No.   But how did you have it packaged?

11   A.   In a suitcase in the overhead compartment right above me.

12   Q.   So, did you keep the materials in the FedEx box?

13   A.   Yes.

14   Q.   Did that mean that after you got through there

15   photographing, you put them back in the FedEx box?

16   A.   No.   These photographs took place well after I came back to

17   the office.

18   Q.   Okay.   All of these did?

19   A.   Yes.

20   Q.   Okay.   All right.   Then, let me ask you then -- I probably

21   was -- those are the pictures taken by Agent Madrigal, weren't,

22   they?

23   A.   That's correct.

24   Q.   Okay.   So what I was showing you there in that -- Madrigal,

25   M-A-D-R-I-G-A-L.

1    A.   Very good.

2    Q.   All right.   Now, what I would like to do is show you --

3    what I was showing you there were pictures that you took or she

4    took during that time in February before you sent it to the

5    lab; is that right?

6    A.   That's right.

7    Q.   Okay.   So we have just been looking at pictures that were

8    pretty orderly.   They got in that condition from you; right?

9    A.   Correct.

10   Q.   Now, let me see if these pictures help you see the way it

11   was when you first walked in.

12             MR. HARDIN:   I'm going to show the government Exhibits

13   13, 14, 15, and 16.   And actually, if I could take them in

14   their condition up to the witness to have them identified, that

15   might be necessary?

16             THE WITNESS:   Thank you.

17   BY MR. HARDIN:

18   Q.   Sure.   Would you look at those, 13, 14, 15, 16, and see if

19   you have seen them before?

20   A.   Sixteen I have seen before.

21   Q.   Describe for me what 16 was?

22   A.   Sixteen is the picture that Agent Madrigal took after I

23   opened the beer can and we laid out the items within.

24   Q.   That's actually a picture similar to the one that was in

25   Defense 63 we had, isn't it?

1    A.   That's my recollection, yes.

2    Q.   All right.   Now, what I'm really asking you about the

3    others is, do those fairly and accurately show the condition of

4    the stuff that Mr. Emery and Mr. McNamee was giving you as of

5    the time you arrived in the office?

6    A.   No.

7    Q.   Why not?   What's different about them?

8    A.   These items are outside of the plastic bags.   And when I

9    went into the office, they were within the plastic bags.

10   Q.   Yes.   But did Mr. Emery give you some photographs?

11   A.   He may of, I don't recall.

12   Q.   Do you recall from your investigation you determined that

13   when Mr. McNamee brought this stuff to Mr. Emery, that

14   Mr. Emery took it out of the box and made photographs?

15   A.   I recall him telling me that.   I believe that's in the

16   Memorandum of Interview that I prepared, that he told me that

17   he did that.

18   Q.   All right.   And then, was it your understanding that after

19   he took photographs of it, he put it back in a plastic bag; is

20   that what you understood?

21   A.   Yes.

22   Q.   All right.   Did you ask why in the world did you take this

23   stuff out, why didn't you just leave it alone for me?

24   A.   No.

25   Q.   Okay.   Did you find out to what degree that he messed

1    around with this stuff when Mr. McNamee brought it to him?

2              MR. DURHAM:  Objection.  Argumentative.

3              THE COURT:  Sustained.

4    BY MR. HARDIN:

5    Q.  Well, did you determine what he did?  I mean, strike the

6    word "messed around."  Did you check to see or try to figure

7    out -- let me back up.

8         You wanted to know -- you knew down the line people would

9    be talking about the chain of custody and whether this evidence

10   had been interfered with; right?

11             MR. DURHAM:  Object to the commentary.  He can ask a

12   question.

13             THE COURT:  Did you know that, that that would be an

14   issue?

15             THE WITNESS:  Yes.  Chain of custody will always be an

16   issue in evidence like this.

17   BY MR. HARDIN:

18   Q.  Right, in any case.  Yeah, I'm not even talking about that

19   it would end up like this.  I'm not asking you that.

20        Any time you are collecting evidence or being given

21   evidence by other people, you immediately become concerned

22   about the chain of custody and preserving the integrity of the

23   evidence; is that correct?

24   A.  Well, concern, I don't know if I would use that word, but

25   it's something you ask about and track down, yes.

1    Q.  And you show -- you are concerned about the integrity of

2    evidence, are you not, that you collect?

3    A.  Yes.

4    Q.  I thought I wrote down, did I write down wrongly or

5    correctly that you explained that the reason you were doing

6    some of these things was to preserve the integrity of the

7    evidence?

8    A.  Correct.

9    Q.  Okay.  Did you find out that before you ever arrived on the

10   scene a private party that represented the person making the

11   allegations against Mr. Clemens had done something with this

12   evidence before you got it?

13          MR. DURHAM:  Objection, hearsay.

14          THE COURT:  Sustained.  It would call for hearsay.

15   BY MR. HARDIN:

16   Q.  All right.  Now, when you left there -- if you were king

17   for a day, would you have preferred that Richard Emery not mess

18   with that stuff at all but just hold it for you?

19          THE COURT:  That's going directly to what I just

20   sustained the objection to --

21          MR. HARDIN:  I don't --

22          THE COURT:  -- counsel.  Yes, it is.  It's commenting

23   on what somebody else did.  That's hearsay.  I have ruled on

24   that.

25          MR. HARDIN:  I'm sorry, Judge.  I thought I was asking

1    him was he concerned when he left there.

2              THE COURT:  You are seeking to elicit the same

3    information I have just ruled on.  I'll sustain the objection.

4    BY MR. HARDIN:

5    Q.  All right.

6        Now, let me ask you this, Mr. Novitzky:  What all -- when

7    you left there -- well, let me ask you this.  Let me back up.

8        When you talk about --

9              MR. HARDIN:  Can I have the picture, please, that has

10   this all laid out, Stacy?

11   BY MR. HARDIN:

12   Q.  In preserving the integrity of the evidence, would you have

13   wanted anybody to open up that Ziploc bag before you got it and

14   pour it out on the table, anyone not connected with law

15   enforcement?

16   A.  No.

17   Q.  Okay.  And if you -- would you have wanted anybody to put

18   it in different bags differently than it arrived at the

19   location?

20   A.  No.

21   Q.  Now, I believe this is a picture that you discussed some

22   with the government.  Do you recall?

23   A.  This is the picture that Agent Madrigal took in my

24   offices --

25   Q.  Yes, but it --

1    A.   -- in February.

2    Q.   -- but my question was, this is a picture that you

3    discussed with the government, isn't it?

4    A.   Yes, correct.

5    Q.   Okay.  Now, I want to look around, and are we to

6    understand -- and you laid this all out here, didn't you?

7    A.   I did lay this out, correct.

8    Q.   And then you had her take photographs of it before you sent

9    it off to a lab where, in California?

10   A.   Correct.

11   Q.   Now, in each of these items that you indicated, does this

12   one mean that everything that was in this photograph was inside

13   the beer can?

14   A.   That's correct.

15   Q.   Was the beer can crunched the way it appears in this

16   picture when you got there?

17   A.   Other than the bottom being removed from it, yes, it did

18   have a general crushed appearance.

19   Q.   So, you had these three cotton balls; right, inside the

20   beer can?

21   A.   Yes.

22   Q.   You had -- what did we say that was, it's not a vial, the

23   broken one?  It's a --

24   A.   Ampule.

25   Q.   -- ampule.  You had this broken ampule; right?

1    A.  Correct.

2    Q.  Did it have anything in it?

3    A.  No.

4    Q.  Did I -- what was your testimony as to whether it was

5    broken at the time you went to Mr. Emery's office?

6    A.  Well, I -- this ampule was in the beer can, so I --

7    Q.  So you don't know?

8    A.  -- didn't deserve it -- observe it.  I didn't know until I

9    opened it up on February 5th --

10   Q.  Okay.

11   A.  -- in my office.

12   Q.  All right.  I may have misunderstood you, then.

13       So, when you opened up this ampule, there was no liquid in

14   it; is that right?

15   A.  I didn't open up the ampule.

16   Q.  When you looked at that ampule, was there any liquid in it?

17   A.  No.

18   Q.  Was there any liquid in the beer can when you cut the

19   bottom of that out?

20   A.  No.

21   Q.  Were the cotton balls in there?

22   A.  Yes.

23   Q.  Did the ampule have a steroid?  What was in the ampule

24   originally, do you know?

25   A.  According to the -- it was labeled as an anabolic steroid.

1    Q.  All right.  So --

2    A.  Primobolan, P-R-I-M-O-B-O-L-A-N.

3    Q.  Does that have any other kind of nickname?

4    A.  They all have different kinds of nicknames.

5    Q.  Yeah.  Do you know what that one is?

6    A.  Premo, Bolan.  Yeah, those are the two --

7    Q.  Okay.

8    A.  -- off the top of my head.

9    Q.  That's okay.  So let me -- if I understand, the beer can

10   didn't have any liquid in it.  The ampule, that's labeled as

11   steroid had no liquid in it, and the steroid -- the balls

12   had -- the cotton balls had stains on them; right?

13   A.  That's correct.

14   Q.  So, it would be very possible, wouldn't it, that that

15   ampule --

16              MR. DURHAM:  Objection, Your Honor.

17              MR. HARDIN:  Let me just finish --

18              THE COURT:  The possible component of the question

19   raises questions with me.

20   BY MR. HARDIN:

21   Q.  Does it raise the possibility to you -- let me put it that

22   way -- that one or more of these cotton balls could have some

23   of the steroid liquid on them from being in that can, which was

24   dry when you got it open?

25              MR. DURHAM:  Calls for speculation.

1          THE COURT:  Calls for speculation.  I'll sustain.

2    BY MR. HARDIN:

3    Q.  Well, let me ask you this way:  If -- is it possible --

4    well, never mind.  I won't ask you to speculate.

5          I will ask you this, though, in addition to that ampule

6    that was empty in there, these other two bottles, these vials,

7    are those both steroids?

8    A.  No.

9    Q.  What are they?

10   A.  One -- the one with the blue top is Serostim, a form of

11   human growth hormone.  And the one with the silver top was, I

12   believe, Deca-Durabolin, which is a brand name of Nandrolone,

13   which is an anabolic steroid.

14   Q.  Okay.  By the way, did you check the lab reports to see if

15   any of these cotton balls had the steroid that's in that ampule

16   or that is labeled in that ampule?

17   A.  The lab reports, my understanding is that that was done,

18   but that was after I left IRS and wasn't participating --

19   Q.  No, no, that's fine.  I just --

20   A.  -- in the investigation.

21   Q.  I just wondered if you personally knew it.  I take it you

22   don't?

23   A.  No.

24   Q.  Fair enough.

25         Now, so you have got growth hormone in one of these or both

1    of them?

2    A.   One of them, the one with the blue cap.

3    Q.   All right.   In addition, you have got -- is there a needle

4    underneath this orange cap?

5    A.   Yes.

6    Q.   So you had two needles that were in the beer can?

7    A.   Correct.

8    Q.   And do you know -- the blue one here, right, do you know

9    what was found on that one?

10   A.   No.

11   Q.   Okay.   Do you know what was found yourself on any of these

12   items?

13   A.   I can't specify if it was on one of these items or not.

14   Q.   Okay.   That's fair enough.   That's fair enough.

15       So basically, what you have done here is you have tried to

16   preserve the integrity of this evidence by taking it out,

17   isolating it, making sure nothing happens to it once it's in

18   your custody, take a photograph of it, and then put it in this

19   plastic bag we are looking underneath at?

20   A.   Correct.

21   Q.   And then you sealed that plastic bag, and how was it that

22   you shipped it out to the lab?

23   A.   I delivered it personally.

24   Q.   You delivered it personally?

25   A.   Yes.

1    Q.  So, this evidence we are looking at, if this evidence, if

2    the lab people are later to talk about DNA samples here and

3    there and other steroids on this or that, your testimony is you

4    did everything you could, is it true, to preserve the integrity

5    of this evidence for those tests to be run?

6    A.  Yes.

7    Q.  All right.  Now, did you log everything that was here?  Did

8    you write down everything that was here?

9    A.  Yes, I did.

10   Q.  And what did you do with that log?

11   A.  I wrote a four-page report, and everything was in that

12   four-page report.  So it's part of a memorandum of activity

13   that I wrote while I was with the IRS.

14   Q.  All right.  Now, if I look at where -- do you have any

15   idea -- let me back up.

16              THE COURT:  Okay.  We better take a short break now

17   for the jury.  We are going to go until 5:30.  So we will break

18   for ten minutes.

19              (Recessed at 4:18 p.m.)

20              (Resumed at 4:33 p.m.)

21              THE COURT:  I wanted to go until 5:30, but one of the

22   jurors has some commitment at 6:00, and the marshals have to

23   take her to that location.  So they have asked that I give them

24   a little more time.  So I'm going to have to break at 5:15.  I

25   had hoped to go a little longer, but in order to give them

1    adequate leeway to get her there, we will have to break at

2    5:15.

3         As I have said before, I never want and try not to do

4    anything that in any way causes me to become a factor in the

5    jury's assessment.  And I fully appreciate that there is

6    significant stakes at issue here.  And therefore, I try and

7    give counsel significant leeway.

8         But I would just think that there are ways that can

9    get to the point that's trying to be made without the slow,

10   agonizing pace that we are going at.  And I'm not a scholar of

11   Shakespeare, but I do remember in a passage, it says, thou doth

12   protest too much.

13        Okay.  Let's get the jury.

14        MR. HARDIN:  I'm only going to protest for about ten

15   more minutes.

16        THE COURT:  That would be a good -- I don't know.  I

17   just get an impression that maybe the jury may be affected.

18   You never know who that hurts.

19        (Jury present.)

20        THE COURT:  You may be seated.

21        I had indicated we were going to go until 5:30, but

22   the marshals have asked me that I break a little earlier

23   because I guess somebody has a commitment at 6:00.  And they

24   said in order to make sure that they can get that person there

25   by that time, that we will have to break -- but as I was

1  saying, we will break at 5:15, so that the marshals can

2  accommodate the one juror who needs to be somewhere at 6:00.

3       And tomorrow -- it is Friday tomorrow, right -- we

4  will not be sitting.  I had tried to rearrange my schedule, but

5  somebody else had a prior commitment, and I think some of you

6  also.  So we will just start back on Monday at 9:00 o'clock.  I

7  don't have anything else on Monday, so we will have a full day

8  on Monday.  We will sit until 5:00.

9       Tuesday, I do have a matter at 9:00 and another at

10  9:15, so we will start at 9:30.

11       Wednesday, I have a 9:00 and 9:15 matter, so we will

12  start at 9:30 again, break at 5:00.

13       Thursday, I have a 9:00, but I think I'm going to have

14  to reschedule that matter, because there is a motion I have to

15  rule on in that case.  It's a civil case, and I just haven't

16  gotten to that.  So I'll have to move that.  So we will start

17  at 9:00, because that matter, the 9:00 matter has to be

18  changed.  So we will start at 9:00 on Thursday and go until

19  5:00.

20       I think -- I said something about trying to sit on

21  Friday, but I understand some of you have commitments that you

22  have already made based upon what I had indicated when we first

23  started about not sitting on Friday afternoon; is that right?

24       THE JUROR:  Correct.

25       THE COURT:  So we won't sit Friday afternoon.

 1              And then the following week, Monday, the 14th, we will

 2      have a 9:00 o'clock, so we will start at 9:30.

 3              Tuesday, I have a 9:00 matter, so we will start at

 4      9:15.

 5              Wednesday the 16th, I have a matter at 9:00, so we

 6      will start at 9:15 that day, go until 5:00.

 7              And then Thursday, we will start at 9:15.  I have to

 8      recess at 1:00, because I have to fly to West Virginia for some

 9      ceremony at the college I went to there.

10              And then I'm going to get an early flight back on

11      Friday, so we will start at 9:15 on Friday.  I think I had said

12      we would sit on May 18th, Friday and sit until 4:00 that day,

13      because I have a 4:00 pretrial hearing in a civil case I have

14      to hold.

15                      CROSS-EXAMINATION (CONTINUED)

16      BY MR. HARDIN:

17      Q.  Mr. Novitzky, I'm about through here.  I just want to make

18      sure that -- finally, this picture we have got here, I think we

19      have said this, I just want to be sure -- every single thing on

20      this picture was in the beer can; is that correct?

21      A.  Yes.

22              MR. HARDIN:  Okay.  You can take it down.  Thank you,

23      Stacy.

24      BY MR. HARDIN:

25      Q.  By the way, the box that we saw, that you were told -- you

1    were told that was the box Mr. McNamee brought it to

2    Mr. Emery's office in; is that correct?

3    A.   Correct.

4    Q.   That's the box that you showed the jury earlier through the

5    government?

6    A.   Yes.

7    Q.   Did that box have the word Clem, C-L-E-M, on it?

8    A.   I don't recall.

9    Q.   What was your understanding as to whether that was the box

10   this stuff had been stored in or whether that was a separate

11   box?

12   A.   I don't know if that was -- if that information was

13   obtained.   I just knew that that was the box that the items had

14   been brought to Mr. Emery's office in.

15   Q.   So you walked out with the stuff in the box that it was

16   represented to you it came to Mr. Emery's office in?

17   A.   Correct.

18   Q.   You don't know one way or the other and weren't told

19   whether or not that was the actual container that Mr. McNamee

20   had stored things in?

21   A.   I don't believe so, no.

22   Q.   Okay.  Fair enough.

23        And then, on the -- on the labels that the government went

24   over, remember there were six that you said Mr. Radomski

25   brought to you or called you about, how exactly did you get the

1    ones -- those six labels in July of '08?

2    A.  I picked them up from him personally in New York.

3    Q.  Did you come out from California to pick them up?

4    A.  I actually happened to be in New York already on a separate

5    case investigation.  And he called me when I happened to be

6    back there, so I went to his business and picked them up.

7    Q.  All right.  And is it true that of those six labels, all

8    but one had both the date and was untorn?

9    A.  That's correct.

10   Q.  I believe you told the jury you believed those dates,

11   without looking at them again, were like in 2003 and 2004?

12   A.  I believe so, yes.

13   Q.  And these were represented to you by Mr. Radomski as labels

14   he had just found?

15   A.  Correct.

16   Q.  And these were found under a TV set?

17   A.  Yes.

18   Q.  Do you remember that TV set in the house when y'all

19   executed the search warrant?

20   A.  Not personally, no.

21   Q.  Do you remember how big it was or where it was or anything?

22   A.  No.

23   Q.  Do you remember whether it was a floor model or a table

24   model or anything like that?

25   A.  I don't remember, no.

1    Q.   Okay.

2         And then, the only one of the six he gave you that was not

3    complete was the one that had the address of Mr. Clemens on it;

4    is that right?

5    A.   Torn, yeah.   Complete -- I don't know if that's the word

6    but --

7    Q.   All right.   You had a torn one, and would you agree that

8    that label reflected it was being sent to Mr. McNamee at

9    Mr. Clemens' address?

10   A.   Correct.

11   Q.   That label was not sent to Mr. Clemens, was it?

12   A.   The label --

13   Q.   Did not reflect -- you are right.   That label did not

14   reflect the contents were being sent to Mr. Clemens; it

15   reflected they were being sent to Mr. McNamee at Mr. Clemens'

16   house?

17   A.   The label had Mr. McNamee's name on it and Mr. Clemens'

18   address, correct.

19   Q.   Fine.   And it also is the only one of the six that did not

20   have a date on it; isn't that true?

21   A.   Correct.

22   Q.   And so, you and others have tried to figure out when that

23   was, and so you consulted, what, UPS people or -- trying to

24   figure out -- have you been a part of trying to pinpoint when

25   that label would have existed or been created or anything like

1   that?

2   A.  I have not been a part of that, no.

3   Q.  All right.  You know nothing about that?

4   A.  I do not.

5   Q.  I have got about three more minutes with you.  I want to

6   just firm up some dates here.  And tell me if you need anything

7   to refer to, all right?

8   A.  Thank you.

9   Q.  You were actively involved enough to know or do you want me

10  to tell you -- were you aware when Mr. McNamee and Mr. Clemens

11  were giving depositions before Congress?

12  A.  Generally, yes.

13          MR. DURHAM:  Objection, Your Honor.  It's outside the

14  scope of direct examination.

15          MR. HARDIN:  I just want to establish dates.

16          THE COURT:  Very well.  As long as it's establishing

17  dates.

18          MR. HARDIN:  That's all.

19  BY MR. HARDIN:

20  Q.  And so, can we say -- do you happen to know the actual date

21  of Mr. McNamee's deposition?

22  A.  No.

23  Q.  Can we both agree that it was February of '08, before the

24  hearing that you attended on February 13th?

25          MR. DURHAM:  Your Honor, is Mr. Hardin testifying?

1              THE COURT:  He is.  Well, do you know if that's the

2     case?  You do?

3              THE WITNESS:  Yes.

4              THE COURT:  Okay.

5              MR. HARDIN:  That's all I'm asking.  I'm just trying

6     to put them in preference.

7     BY MR. HARDIN:

8     Q.  You are aware that Mr. McNamee gave his deposition in

9     February of '08, the week before hearing you attended on the

10    13th; is that a fair statement?

11    A.  I'm not sure about the week before.  Fair statement to say

12    I'm aware that it occurred in February before the hearing.

13    Q.  All right.  And did -- and then, after this and then July

14    '08, Radomski gives J.N. labels, six labels; right?

15    A.  Yes.

16    Q.  And then, did you -- were you present outside or did you

17    attend court around the day that Mr. McNamee testified before

18    the Grand Jury in 2010?  If you weren't, then never mind.

19    A.  No.

20    Q.  You were not there?  That's all I'm asking --

21    A.  I had no -- correct.  I did not have any involvement or

22    really any knowledge of that.

23    Q.  Okay.  Did you ever testify before the Grand Jury?

24    A.  Which Grand Jury?

25    Q.  The Grand Jury investigating the case that resulted in

1    Mr. Clemens' indictment.

2    A.  No, I did not.

3    Q.  Okay.  And, finally, at the time that you escorted

4    Mr. Clemens to the Mitchell Commission for their first

5    interview was July, was it not?

6              MR. DURHAM:  Mr. McNamee.

7              MR. HARDIN:  Thank you.  Thank you, thank you.

8              I have forgotten what the question was going to be,

9    how about you, do you remember?  Was I halfway there?

10   BY MR. HARDIN:

11   Q.  All right.  I just had a couple.  Let me ask you, by the

12   way, on the television where that slip -- those, those labels

13   were supposedly, according to Mr. Radomski, do you recall

14   whether y'all took any pictures during the execution of the

15   search warrant?

16   A.  There were pictures taken, yes.

17   Q.  And do you know who might have custody of those?  And I am

18   not suggesting for a moment that we have ever asked for them or

19   anything.  I'm sort of asking now.  If we were to seek to look

20   for pictures of that, whom would we -- where would those

21   pictures be?

22   A.  I can get them for you.

23   Q.  Can you?  Okay.  You can get us the pictures that were

24   taken during the execution of the search warrant?

25   A.  Yes.

1    Q.  Super.

2         And then, at the -- oh, I know.  At the time that you

3    escorted Mr. McNamee to the Mitchell Commission, can you and I

4    agree that that was in -- the first time was in July of 2007?

5    A.  Yes.

6    Q.  And do you recall what that date was?  Could it have

7    possibly been July the 13th of 2007?

8    A.  Could have been, yes.

9    Q.  Okay.  And we have said you attended that whole meeting and

10   everything.  Is that right?

11   A.  Yes.

12   Q.  At the time that you took Mr. McNamee to the Mitchell

13   Commission, did you have any intention or plans to seek to file

14   charges against Mr. Clemens for anything?

15             MR. DURHAM:  Objection.

16             THE COURT:  He doesn't have the capacity to file

17   charges.  I'll sustain the objection.

18             MR. HARDIN:  Sir, I'm sorry?

19             THE COURT:  I'll sustain the objection.  He doesn't

20   have the capacity to file charges.

21             MR. HARDIN:  No, I said did he have the intent to try

22   to seek to have somebody file charges, is what my -- meant to

23   ask.

24   BY MR. HARDIN:

25   Q.  Did you have any intent at that time yourself to seek to

1　have anyone file charges against Mr. Clemens?

2　A.  Not at all, no.

3　　　　　MR. HARDIN:  Okay.  Now, Judge, I'll pass the witness

4　with the -- I want to move to introduce, if I may Defense

5　Exhibits 67, 68, 69, 70, 71.

6　BY MR. HARDIN:

7　Q.  And one final question to the witness is, as you look at

8　each of those and are you satisfied they truly and accurately

9　reflected the things you said that I was writing down?

10　A.  Yes.

11　　　　　MR. HARDIN:  Your Honor, that completes my question.

12　　　　　THE COURT:  Any position?  I assume these are being

13　offered as exhibits?

14　　　　　MR. HARDIN:  Yes, sir.

15　　　　　MR. DURHAM:  I'm sorry.  Yeah.  This is demonstrative.

16　　　　　THE COURT:  That's what I'm asking, whether there's an

17　objection.

18　　　　　MR. DURHAM:  Well, not as a demonstrative, but not

19　entered under the same circumstances the --

20　　　　　THE COURT:  Right, because we -- I think they can be

21　considered as demonstrative evidence, but I don't think they

22　come in as substantive evidence, just like the government's --

23　what the -- the chart that they put together can be used for

24　demonstrative purposes but not as evidence.

25　　　　　MR. HARDIN:  I agree, Your Honor.  And I think the

1    jury will be able to see that neither Mr. Durham or I will be

2    winning any penmanship contest.  But that's all my questions,

3    Your Honor.  If those could be admitted for demonstrative

4    purposes.

5            THE COURT:  Yes, for that reason, they can be.

6            MR. HARDIN:  Thank you.

7            (Defense Exhibit Nos. 67, 68, 69, 70, and 71 were

8            received in evidence.)

9            THE COURT:  Let me just ask before the government ask

10   questions, I think I understand your testimony, and I would

11   assume the jury does.  In reference to these items that were

12   recovered from the can --

13           THE WITNESS:  Yes.

14           THE COURT:  -- as I understand it, you don't know,

15   based upon your personal knowledge, how those items got into

16   the can; is that right?

17           THE WITNESS:  Correct.

18           THE COURT:  And what you call ampules, those are the

19   small bottles?

20           THE WITNESS:  Ampules, correct.

21           THE COURT:  And you don't know -- well, when you saw

22   those, were they empty at that time?

23           THE WITNESS:  Yes, Your Honor.

24           THE COURT:  You don't know if they were empty,

25   however, when they were placed in the can, though, do you?

1          THE WITNESS:  Correct, Your Honor.

2          THE COURT:  Okay.

3          Redirect.

4                    REDIRECT EXAMINATION

5    BY MR. DURHAM:

6    Q.  Good afternoon.

7    A.  Good afternoon.

8    Q.  Let me first start -- I don't really have much.  I want to

9    cover a couple of areas that Mr. Hardin covered.  Let me first

10   start -- let me look, if I could, at Government's Exhibit 47 --

11   sorry -- 48, 49 and 50c-1 and 50c-2, which have been admitted

12   into evidence.  We will put them on the screen.  Mr. Hardin

13   asked you some questions about shipping labels.

14          THE COURT:  She's not here.  I don't know how to do

15   it.

16          MR. DURHAM:  There we go.  It's up.

17          THE COURT:  Okay.  Can you see it?

18          THE JURY:  Yes.

19          THE COURT:  Okay.

20          MR. DURHAM:  Just so everybody can see it, that's all

21   that matters.

22          Exhibit 47, is this our 47?  I just want to make sure

23   we have got the right thing before the jury.  Forty-eight.

24   There is no government label on it.  That's my only concern.

25          THE COURT:  I assume the clerk is taking care of some

1    other business.

2              MR. DURHAM:  All right.  Thank you.

3              This is Government's Exhibit Number 48 -- let me just

4    look at the paper copies, if I could.

5              Court's indulgence for a moment, Your Honor.

6              Forty-eight, you can leave 48 on the screen.

7              May I approach the witness?

8              THE COURT:  Yes.

9              MR. DURHAM:  This is Government's Exhibit Number 48.

10   While I'm at it -- let me cleanup this area for you, sir -- can

11   I also get 49 and 50c-1 and 50c-2, the paper copies, if that's

12   possible, please.

13   BY MR. DURHAM:

14   Q.  Agent Novitzky, let me just ask you to take a look at

15   Government's Exhibit 48.  And 48, can you confirm that that's

16   what's displayed on the screen in front of us?

17   A.  Yes.

18   Q.  And is that the torn right quadrant of the mailing label

19   that you received from Mr. Radomski in July of 2008?

20   A.  Yes.

21   Q.  And that's the -- this is the -- to be clear, this is the

22   real McCoy; correct?

23   A.  Correct.

24   Q.  As they say.

25              Government's Exhibit 49, were these also -- do you

1    recognize them as additional labels Mr. Radomski turned over to

2    you in July of 2008?

3    A.  Yes.

4    Q.  To be clear, these are --

5            THE COURT:  One moment.  There's some kind of feedback

6    we are getting.  I don't know where that feedback is coming

7    from, apparently it's interrupting with the reporter's ability

8    to hear.  I guess we will need to get John up here to look at

9    it.

10           Is it interfering with your ability to hear?

11           THE COURT REPORTER:  It is, Your Honor.  But I think I

12   can --

13           THE COURT:  I mean, if it's a problem -- I want to get

14   a transcript, so if it's a problem, we just have to pick up on

15   Monday.

16           THE COURT REPORTER:  Okay.

17           THE COURT:  It's a problem for you?

18           THE COURT REPORTER:  It is.

19           THE COURT:  We are having a problem, technology

20   problem.  Technology is great when it's working, but I don't

21   know what's causing this feedback, but we will have to get the

22   IT people up here to -- does anybody have a BlackBerry on that

23   may be causing this to happen?

24           THE DEPUTY CLERK:  Or a cell phone.

25           THE COURT:  Or a cell phone.  If you do, could you

1   turn it off, so we can see if that fixes the problem.

2           She's saying it might be the computer that's causing

3   it.  I don't know if we can use the ELMO, and maybe that will

4   eliminate it.  I don't know.

5           (Pause.)

6           THE COURT:  Well, I had hoped we could go a little

7   further, but we have got to have a transcripts of the

8   proceedings accurately transcribed -- you can do it?

9           THE COURT REPORTER:  Yes.

10          THE COURT:  Okay.  We will try, then.  Go ahead.

11  BY MR. DURHAM:

12  Q.  Sorry.  You were talking about Government Exhibit 48 and --

13  yes, 48 and 49.  Go ahead and take a look at those.  Are those

14  all items that Mr. Radomski turned over to you in July of 2008?

15  A.  Yes.  These are the six mailing labels.

16  Q.  Let me ask you:  With respect to the mailing labels, the

17  information is grayed out which indicates the "To," who it's

18  being shipped to for legal reasons, do you recall any of the

19  addressees on the labels in 49, that is, the additional labels

20  that Mr. Radomski turned over to you?

21  A.  Generally I recall, they were not specific names, but

22  generally the types of people they were.

23  Q.  Let me ask you this, see if we can short-circuit this a

24  little bit.  Were those individuals, individuals that were

25  connected to your investigation?

 1    A.  Yes.

 2    Q.  And do you recall -- I can show you --

 3              (Technical interruption.)

 4              THE DEPUTY CLERK:  It seems like it's coming from the

 5    mic.

 6              THE COURT:  It's coming from the mic.  So we have to

 7    turn the mics off.  And we will try and get somebody up here

 8    before Monday to see if we can fix it.

 9              Can you hear now without the mic?  Is that a problem?

10    Now it is off.

11              THE COURT REPORTER:  If they speak up, I can hear it,

12    Your Honor.

13              THE COURT:  Okay.  Just keep your voice up, then.

14              Do you want the mics back on, then?

15              THE COURT REPORTER:  No.

16              THE COURT:  Because you are going to get the noise if

17    the mics are back on.

18              THE COURT REPORTER:  I hear you loud and clear.

19              THE COURT:  Okay.  Well, just speak up loudly.

20    BY MR. DURHAM:

21    Q.  We will go at it the old-fashioned way.  Agent Novitzky,

22    the grayed out area here, which I believe is now displayed to

23    the jury -- this is Government's Exhibit 49 that's been

24    admitted that evidence.  Do you have a general recollection of

25    the addressees in these items that Mr. Radomski turned over to

1    you, in addition to the one that he gave you with what appears

2    to be Mr. Clemens' home address?

3    A.  Yes.

4    Q.  And can you tell us -- we can get the originals, if you

5    would like -- are the addressees -- if you look back from 2008

6    back to 2005, are the addressees, or at least some of them,

7    connected or known to you in 2005 being connected with

8    Mr. Radomski?

9    A.  Yes.

10   Q.  Now, let me show you what's been admitted into evidence as

11   Government's Exhibit 50c-1.  I believe you testified that this

12   was obtained during a search warrant of Mr. Radomski's

13   residence.  Did I understand that correctly?

14   A.  Correct.

15   Q.  And describe that generally.  Why don't you hold it up for

16   the ladies and gentlemen of the jury -- is this the original

17   item or is it is a photocopy?

18   A.  No, it's a photocopy.

19   Q.  Why don't you hold up for the ladies and gentlemen of the

20   jury to see, and we will put it on the ELMO as well here or the

21   screen.

22       I want you to -- is that the condition that you and your

23   agents took this out of Mr. Radomski's home in December of

24   2005?

25   A.  Yes.

1    Q.  And will you hold up Government's Exhibit 48 next to

2    Government's Exhibit 50c-1.  And did those -- both of those

3    labels, that is, the one that was seized in December of 2005

4    and the one that was turned over to you in July of 2008, do

5    they appear to be right -- bottom right quadrants that are

6    ripped manually?

7    A.  Yes.

8    Q.  Thank you.

9        Mr. Hardin asked you some questions about methods of

10   payments in drug distribution cases.  Do you recall some of

11   those questions?  Do you recall that he referenced your

12   attention to some checks that were written by Mr. McNamee to

13   Mr. Radomski?

14   A.  Yes.

15   Q.  And in your experience as a federal agent, are drug

16   transactions always handled with instruments like checks?

17   A.  No.

18   Q.  And are in some cases drug transactions, illegal drug

19   transactions handled with the payment of cash?

20   A.  Illegal drug transactions?

21   Q.  Yes, sir.

22   A.  Correct.

23   Q.  Is that uncommon?

24   A.  No.  It's actually common, more common than not that they

25   would be handled in currency than negotiable instruments like

1    we were talking about earlier.

2    Q.  Why is that, do you know?

3    A.  Because the currency is not traceable.  A third party check

4    like that is very traceable, so currency isn't most of the

5    time.

6    Q.  Agent Novitzky, let me ask you the state of play as of

7    April of 2006 with Mr. McNamee.  What was the state of play, as

8    it were, with federal law enforcement, you, and Mr. McNamee?

9    A.  There was really none in April of 2006.  We knew there were

10   some checks going into Mr. Radomski's bank account, and

11   Mr. Radomski had provided information in an interview that he

12   passed along some drugs to Mr. McNamee, but wasn't certain with

13   what Mr. McNamee did with the drugs, whether or not he gave

14   them to anybody else.

15   Q.  And between Mr. Radomski and Mr. McNamee, do you have a

16   relative sense of which individual was dealing more with

17   steroids?

18   A.  You know, if you had to put them in a hierarchal level,

19   Mr. Radomski was above Mr. McNamee.  He dealt more amount of

20   drugs and handled more amount of drugs than Mr. McNamee did,

21   based upon the evidence collected in our investigation.

22   Q.  Mr. Hardin asked you some questions about people who were

23   charged or not charged.  In your investigation, sir, to your

24   knowledge, have any users of steroids been charged with using

25   steroids?

1   A.   No, none.

2   Q.   Have any users of steroids --

3            (Discussion off the record.)

4            THE COURT:   We will continue.   We will have to try and

5   fix it over the weekend.

6            MR. DURHAM:   Continue, Your Honor?

7            THE COURT:   Yes.   Because we are not getting a feed to

8   the other location, so there is nothing we can do.

9            MR. DURHAM:   Very well.

10  BY MR. DURHAM:

11  Q.   I think I was asking you whether any users of steroids had

12  been charged with using steroids?

13  A.   Not in any --

14  Q.   In your investigations?

15  A.   Not in any of my investigations relating to steroids and

16  performance-enhancing drugs, no.

17  Q.   Have any users of steroids been charged with possessing

18  steroids?

19  A.   No.

20  Q.   But have any users of steroids been charged with making

21  false statements to federal law enforcement officials or

22  committing perjury in Grand Juries?

23  A.   Yes.

24  Q.   Mr. Hardin asked you some questions about an individual, I

25  think the name Grimsley came up.   Do you recall that?

1    A.   Yes.

2    Q.   Just so we know, who is Mr. Grimsley?  You indicated there

3    was a search warrant at his residence?

4    A.   Correct.

5    Q.   Did I remember right that Mr. Hardin asked you some

6    questions about that?

7    A.   Yes.

8    Q.   Who was Mr. Grimsley?

9    A.   He was a former Major League Baseball pitcher.

10   Q.   And you said that Mr. McNamee's name appeared in a warrant.

11   Did you testify to that?

12   A.   Yes.

13   Q.   And why did Mr. McNamee's name appear in the warrant?

14           MR. DURHAM:  Actually we should approach, Your Honor,

15   I want to clear something here.

16           (Bench conference.)

17           MR. DURHAM:  Judge, Grimsley, of course, was a

18   baseball player and a teammate of Mr. Clemens with the Yankees.

19   Mr. Hardin asked and probed about Mr. McNamee and how he was in

20   this search warrant.

21           The question I'm going to ask may elicit information

22   that McNamee had provided information on more than just

23   Mr. Clemens and Mr. Pettitte.  And I think we are entitled to

24   do that because the jury has been left with a notion that

25   somehow Agent Novitzky was focused on getting Mr. Clemens.

1    Brian McNamee provided information on a number of players, and

2    that, I believe, is relevant and certainly within the scope of

3    issues that Mr. Hardin has raised.

4            THE COURT:  Did the -- I mean, I didn't understand the

5    predicate or the reason for asking about Grimsley, but what was

6    the purpose?  Was there another purpose other than what the

7    government said?

8            MR. HARDIN:  Yes, that they -- the only purpose I had,

9    in fact, was to point out that starting in April at least of

10   2006, he knew that Mr. McNamee was involved in illegal conduct

11   because he stated so in an affidavit.  I wasn't talking

12   about --

13           THE COURT:  Was that based upon something he had --

14   was it based upon something that was being placed in the

15   affidavit.

16           MR. HARDIN:  No, he actually --

17           MR. DURHAM:  He wrote the affidavit.

18           MR. HARDIN:  He was only writing that Mr. McNamee was

19   a crook starting in April of '06, and yet he doesn't do

20   anything or approach him until May of '07.

21           THE COURT:  If that was the only reason for which

22   you --

23           MR. HARDIN:  That was the only reason --

24           THE COURT:  I don't think that would open the door.  I

25   mean, if there is some type of instruction you want me to give

1    to make it clear that that was the focus on that inquiry, I

2    guess I don't have a problem doing that.

3            MR. HARDIN:  And I think what he is talking about,

4    providing the other information, it must be McNamee talking to

5    Radomski, because, of course at the time, he is seeking to

6    elicit information.  Mr. McNamee had not talk to this man at

7    all.  He doesn't talk to him, as you know, until May of '07.

8            So, I'm not sure what Mr. Durham means about the --

9    the limiting instruction is fine, because that's the only

10   purpose we asked the question.

11           MR. DURHAM:  The other issue, Your Honor, is that

12   Mr. Hardin asked questions about Mr. McNamee's meeting with

13   Senator Mitchell.  And, you know, at that meeting, Senator

14   Mitchell is interested in more players and more individuals

15   than just Mr. Clemens or Mr. Pettitte.

16           I think we should be able to fairly explore, at least

17   perhaps not with specific names, but that there were additional

18   players, additional people that Mr. McNamee had information on,

19   and this was not a game of got you with one single player.

20           MR. HARDIN:  We don't know what he said to

21   Mr. Mitchell, because we have no law enforcement notes as to

22   what was said there.

23           MR. DURHAM:  Well, but you have DLA Piper notes.

24           MR. HARDIN:  Some and very limited.  I mean, I don't

25   know that.  In fact, we were prevented from getting from DLA

1    Piper about other players.  We were only given -- in fact, most

2    of Radomski's stuff was cut out.  So we don't know what was

3    said.  And to deliberately not take notes and then to be

4    talking about what was said --

5            THE COURT:  We are going to have to come back in here,

6    because if you are going to take -- I have got to let the

7    jurors go, because the marshals want me to get them down there.

8    We will take this up -- we can address it after the jury is

9    gone, but I have got to let them go at this point.

10           (Open court.)

11           THE COURT:  Okay.  We are going to have to recess

12   because of the marshals' request that I make you available to

13   them.  And there are apparently some additional questions that

14   have to be asked of the witness, so we will just recess at this

15   time and pick up on Monday morning, I think I said at 9:15,

16   9:30.  Nine o'clock?

17           THE DEPUTY CLERK:  Yes, 9:00 on Monday.

18           THE COURT:  So we will pick up at 9:00.  Again, don't

19   talk about case and avoid all contact with everybody associated

20   with the case.  And if you do have any contacts with any

21   information about the case or contact with anybody who is

22   associated with the case, then please let me know about that,

23   but don't tell one of your fellow jurors what occurred.

24           It's supposed to be a nice weekend.  Enjoy.  We will

25   see you on Monday at 9:00.

```
 1                    (Jury excused.)

 2               THE COURT:  Thank you, sir.

 3               THE WITNESS:  Thank you, Your Honor.

 4               THE COURT:  I apologize to people who were in the

 5      other locations, but we are having a problem with our sound

 6      system, and that's why we had to turn off the mics, because we

 7      were getting feedback and that was impeding the ability of the

 8      court reporter to transcribe the proceeding.  So hopefully

 9      during the weekend, we will have that fixed, so that we will

10      have those two locations wired so people can hear from those

11      locations.

12               Regarding this issue that we were talking about, so we

13      can resolve that so we don't have to address that when we come

14      back on Monday.

15               I think the first issue has been dealt with, and you

16      just have to remind me on Monday to give a limiting instruction

17      regarding the purpose for which the questions about Grimsley

18      were asked.

19               And on the second point, what is that point again?

20               MR. DURHAM:  Well, there is a separate point, and the

21      more articulate way to explain it -- does the microphone work?

22               THE COURT:  No, it does not.

23               MR. DURHAM:  The point that I was trying to make,

24      perhaps inartfully, is that Mr. Hardin, through his

25      cross-examination, I think incinerated that at the outset Agent
```

1    Novitzky somehow focused and locked his attention on

2    Mr. Clemens, when, in fact, Agent Novitzky had a much broader

3    view, and Brian McNamee was able to provide information on

4    other people.  Some were baseball players, some weren't.

5         But I think it's a distortion for the fact finder to

6    be led with the belief, Mr. Hardin to be able to argue from the

7    evidentiary record, that you see, Novitzky was just out to get

8    Clemens, that's what he wanted to do from the outset.

9         So what I propose, Your Honor, is to ask a few

10   questions that allow Agent Novitzky to be able to say,

11   truthfully and fairly, that, no, there were other individuals.

12   I asked McNamee about a range of evidence, some were baseball

13   players, some were not.

14        THE COURT:  Without mentioning specific names?

15        MR. DURHAM:  Well, he has already mentioned

16   Mr. Pettitte's name.  I mean, that's on the record.

17        THE COURT:  Right.  Yes.

18        MR. DURHAM:  But I don't think there is a great need

19   for him to mention Knoblauch on other people.

20        THE COURT:  Is there any objection to the government

21   asking those questions without any revelation of the exact

22   names of the individuals?

23        MR. HARDIN:  I don't think so.

24        THE COURT:  Very well.  Then that will be fine.  We

25   will pick up with that on Monday.  And if you have some

1    language that you want me to give as a limited instruction

2    regarding the Grimsley information, just get that to me.

3          MR. DURHAM:  Very well.

4          THE COURT:  And on the issue -- I want to make sure, I

5    assume we don't have a lot of time left with him; right?

6          MR. DURHAM:  Oh, heavens no, Your Honor.

7          THE COURT:  So is our next witness going to be

8    McNamee?

9          MR. DURHAM:  No, Your Honor.  It will be the case

10   agent, John Longmire, and then we have three relatively short

11   witnesses.  I don't think we would reach Mr. McNamee until

12   Tuesday.

13         THE COURT:  Like I said we do need time to deal with

14   this motion to quash that's been filed by the lawyers for

15   Mr. McNamee's, I guess ex-wife now.  And we do need to resolve

16   that before we get to his testimony.

17         MR. DURHAM:  Very well.  I think for scheduling

18   purposes -- and again, Mr. Hardin's, I don't mind saying this,

19   cross-examination skills I wish I had, but he does like to

20   exercise his right to confront witnesses, it takes some time,

21   we respect that.  The estimate that I gave the Court

22   yesterday -- you know, we are trying to reach stipulations in

23   efficiency.  I don't want to mislead the Court, I know I said

24   two weeks, obviously we going to try our best to do that, but,

25   of course, both sides are trying to get as fair a trial as

1    possible.

2            THE COURT:  As I said, I will try and invest as much

3    time as I can with the other commitments that I have, because

4    the next two weeks, I think, are pretty good.  We should have

5    quite a bit of time.

6            I think our third week, as I recall, I do have this

7    FISA, Foreign Intelligence Surveillance Act meeting on Tuesday

8    and Wednesday morning.  I was going to have a real problem, but

9    fortunately, that has resolved itself, because I have a

10   three-judge court that I was appointed to in a redistricting

11   matter, and we are going to have to hold a trial in that case

12   in May, because the time limit, as far as individuals

13   announcing their candidacy for state Senate positions in that

14   particular state that's involved in that case was the 6th of

15   June.  But fortunately, the government precleared the

16   redistricting plans.  So fortunately, that went away.  So I was

17   really concerned about that impacting on our ability to try

18   this case.  But fortunately, it went away.

19           MR. HARDIN:  Was that going to be in Texas?

20           THE COURT:  That case is still pending.

21           MR. HARDIN:  We have a May 29th primary.

22           THE COURT:  This was New York, several counties in New

23   York.  But the one in Texas, I was just talking to -- that's

24   still pending, at least part of it is still pending, because

25   part of that was precleared, but there is another part that has

1    not been resolved yet.

2              Okay.  Have a good weekend.

3              (Court adjourned at 5:21 p.m.)

4                        - o -

1                          I-N-D-E-X

2                         **WITNESSES**

3   **On behalf of the Government**:

4                    **Direct   Cross   Redirect   Recross**

5   Jeff Novitzky
      (By Mr. Durham)                        116
6     (By Mr. Hardin)              3

7


8                         **EXHIBITS**

9   **On behalf of the Defense**:

10                                              **Page No.:**

11  **Exhibit Nos. 64, 65**                              **65**

12  **Exhibit Nos. 67, 68, 69, 70**                      **115**

13


14                        MISCELLANY

15  **Certificate of Court Reporter** .......................... **135**

16

17

18

19

20

21

22

23

24

25

1        CERTIFICATE OF COURT REPORTER

2

3        I, ANNIE R. SHAW, certify that the foregoing is a

4        correct transcript from the record of proceedings in

5        the above matter.

6

7   Date:   May 4, 2012

8        _____

9                              Signature of Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**'**

'01 [1]   40/6
'05 [2]   5/17 39/14
'06 [12]   32/25 40/2 40/7 63/20
 63/21 64/1 64/14 67/16 67/18
 67/19 68/16 126/19
'07 [25]   33/14 33/14 34/10
 37/5 37/24 38/20 39/22 43/3
 44/18 50/10 63/10 63/19 63/22
 63/24 64/1 64/15 68/20 79/23
 79/24 80/1 80/1 80/3 80/14
 126/20 127/7
'08 [7]   9/24 79/11 79/21 108/1
 110/23 111/9 111/14

**0**

07 [1]   78/22

**1**

1 milliliter [1]   12/13
1,000 [1]   12/18
10 [5]   1/9 12/15 85/16 87/4
 87/8
100 [1]   9/18
1001 [6]   57/12 57/18 57/20
 58/15 58/25 59/17
10th [11]   79/2 79/11 82/22
 83/25 85/2 86/4 86/6 86/17
 86/23 87/18 88/8
10th of [1]   85/20
11 [3]   9/21 11/12 21/3
115 [1]   134/12
116 [1]   134/5
12-13-07 [1]   78/22
12:50 p.m [2]   6/18 8/18
13 [2]   93/13 93/18
135 [1]   134/15
13th [2]   110/24 111/10
13th of [1]   113/7
14 [6]   5/15 19/9 21/23 29/16
 93/13 93/18
1401 [1]   1/19
14th [3]   8/10 39/14 106/1
15 [3]   5/6 93/13 93/18
16 [4]   24/16 93/13 93/18 93/21
16th [1]   106/5
17 [1]   6/3
18 [1]   24/22
18th [1]   106/12
1993 [2]   4/18 4/21
1:00 [1]   106/8
1:10-CR-00223-RBW [1]   1/4
1:50 [1]   1/7
1:50 p.m [1]   3/2
1st [3]   32/14 33/7 78/13
1st of [1]   31/24

**2**

2 milliliters [2]   12/7 12/9
2,000 [2]   9/1 9/3
20 [1]   12/17
2000 [2]   26/3 78/13
20001 [1]   2/8
2001 [3]   32/13 57/3 57/12
2003 [1]   108/11
2004 [1]   108/11
2005 [8]   5/15 8/10 29/3 29/16
 121/6 121/7 121/24 122/3
2006 [11]   29/23 31/12 31/24
 32/14 32/14 33/7 34/13 69/25
 123/7 123/9 126/10

42/16 66/17 66/19 113/4 113/7
2008 [19]   79/2 81/16 83/3 83/5
 83/19 85/16 85/21 86/4 86/6
 86/8 86/24 87/4 87/8 90/3
 117/19 118/2 119/14 121/5
 122/4
2010 [1]   111/18
2012 [2]   1/6 135/7
202 [1]   2/8
20530 [1]   1/17
21209-3600 [1]   2/4
2250 [1]   1/19
23 [1]   9/16
24 [1]   12/14

**3**

3,312 [1]   12/25
3242 [1]   2/8
333 [1]   2/7
354-3242 [1]   2/8
3600 [1]   2/4
3:02 p.m [1]   55/24
3:12 p.m [1]   55/25

**4**

438 [2]   13/2 13/3
4401 [1]   1/22
47 [3]   116/10 116/22 116/22
48 [9]   116/11 117/3 117/6
 117/9 117/15 117/15 119/12
 119/13 122/1
49 [7]   12/12 116/11 117/11
 117/25 119/13 119/19 120/23
4:00 [2]   106/12 106/13
4:18 p.m [1]   103/19
4:33 p.m [1]   103/20
4th [1]   1/16

**5**

50 [4]   12/8 12/9 12/10 12/11
50c-1 [4]   116/11 117/11 121/11
 122/2
50c-2 [2]   116/11 117/11
555 [1]   1/16
5:00 [4]   105/8 105/12 105/19
 106/6
5:15 [3]   103/24 104/2 105/1
5:21 p.m [1]   133/3
5:30 [3]   103/17 103/21 104/21
5th [1]   99/9

**6**

60 [1]   33/13
61 [1]   15/23
6225 [1]   2/3
63 [6]   81/4 82/8 82/17 84/13
 88/4 93/25
64 [4]   65/9 65/17 65/22 134/11
65 [8]   65/9 65/18 65/22 66/3
 66/4 66/5 134/11 134/11
652-9000 [1]   1/20
67 [3]   114/5 115/7 134/12
6722 [1]   2/7
68 [3]   114/5 115/7 134/12
69 [3]   114/5 115/7 134/12
6:00 [3]   103/22 104/23 105/2
6th [5]   42/5 42/6 44/17 61/10
 132/14

**7**

70 [4]   13/10 114/5 115/7

71 [2]   114/5 115/7
713 [1]   1/20
77010 [1]   1/20
7:20 [1]   6/17
7:20:00 a.m [1]   8/15
7th [1]   81/16

**8**

8th [3]   42/16 43/2 61/10

**9**

9000 [1]   1/20
92121 [1]   1/23
9:00 [11]   105/9 105/11 105/13
 105/17 105/17 105/18 106/3
 106/5 128/17 128/18 128/25
9:00 o'clock [2]   105/6 106/2
9:15 [7]   105/10 105/11 106/4
 106/6 106/7 106/11 128/15
9:30 [4]   105/10 105/12 106/2
 128/16
9th [3]   66/17 66/19 68/20

**A**

a matter [1]   58/14
a.m [2]   6/17 8/15
a/k/a [1]   1/7
abilities [1]   87/15
ability [4]   118/7 118/10 129/7
 132/17
able [9]   31/20 38/25 56/9
 64/12 115/1 127/16 130/3 130/6
 130/10
about [115]
above [3]   92/11 123/19 135/5
Absolutely [2]   32/12 89/11
accommodate [1]   105/2
accommodation [1]   47/17
accompanied [1]   53/1
according [2]   99/25 112/13
account [5]   21/5 24/14 65/13
 65/14 123/10
accounts [1]   25/3
accurate [9]   8/13 15/2 15/4
 15/5 16/16 60/15 62/7 64/14
 79/11
accurately [3]   94/3 114/8
 119/8
accused [1]   33/23
act [2]   47/11 132/7
actively [1]   110/9
activity [5]   6/6 6/7 68/10
 70/2 103/12
actual [3]   64/18 107/19 110/20
actually [24]   9/2 10/19 13/1
 14/21 17/2 20/10 23/15 23/19
 25/6 25/8 46/22 57/17 63/15
 64/4 67/7 75/15 80/7 80/16
 93/13 93/24 108/4 122/24
 125/14 126/16
addition [5]   42/21 77/23 101/5
 102/3 121/1
additional [5]   118/1 119/19
 127/17 127/18 128/13
address [8]   24/13 24/25 109/3
 109/9 109/18 121/2 128/8
 129/13
addressees [4]   119/19 120/25
 121/5 121/6
adequate [1]   104/1
adjourned [1]   133/3

**A**

admitted [6]   65/20 65/22 115/3
116/11 120/24 121/10
affected [1]   104/17
affidavit [18]   31/25 33/23
33/24 33/3 34/3 34/6 34/16
34/25 68/7 68/8 68/9 68/17
68/22 68/23 70/2 126/11 126/15
126/17
afoul [2]   55/10 67/10
after [38]
afternoon [7]   3/2 3/7 3/8
105/23 105/25 116/6 116/7
again [17]   5/14 8/9 10/5 16/22
21/11 32/17 35/22 42/13 49/18
56/22 70/2 74/17 105/12
108/11 128/18 129/19 131/18
against [13]   26/25 28/14 29/18
29/25 30/12 30/14 44/4 47/3
50/3 67/14 96/1 113/14 114/1
agent [34]
agents [7]   5/25 7/3 7/6 17/25
22/15 69/17 121/23
ago [2]   28/12 28/15
agonizing [1]   104/10
Agovirin [2]   12/7 12/9
agree [24]   13/15 37/1 47/16
49/14 54/17 54/20 64/20 68/19
69/24 71/18 77/24 78/21 83/17
83/19 84/15 84/22 84/25 86/1
88/14 89/8 109/7 110/23 113/4
114/25
agreed [1]   67/22
agreement [3]   36/25 43/24 73/4
ahead [10]   5/23 11/11 11/11
12/5 18/8 20/17 73/11 73/13
119/10 119/13
aid [1]   72/24
aided [1]   2/24
airplane [1]   92/9
all [175]
allegations [1]   96/11
allow [1]   130/10
allowed [2]   17/10 37/18
Allstate [1]   24/23
almost [2]   22/7 33/17
alone [2]   14/12 94/23
along [3]   81/15 81/18 123/12
already [4]   71/3 105/22 108/4
130/15
also [12]   26/17 45/22 55/13
55/13 69/2 71/13 78/6 79/3
105/6 109/19 117/11 117/25
always [15]   4/24 5/1 8/1 26/13
26/14 26/17 28/4 33/18 34/4
34/5 35/5 59/2 74/1 95/15
122/16
am [5]   39/3 55/10 56/20 86/22
112/17
AMERICA [1]   1/3
amount [7]   9/8 12/25 14/2 14/6
43/12 123/19 123/20
amounts [2]   26/11 45/10
ampule [22]   10/4 10/5 10/5
10/18 10/20 10/22 10/24 11/4
98/24 98/25 98/25 99/6 99/13
99/15 99/16 99/23 99/23 100/10
100/15 101/5 101/15 101/16
ampules [4]   12/25 13/2 115/18
115/20
anabolic [6]   11/14 20/5 21/9

Anavar [1]   9/18
and the [1]   58/12
and-a-half [9]   7/23 22/9 22/17
24/3 25/14 39/11 39/18 45/5
66/23
Andy [8]   26/18 28/2 29/9 33/18
34/4 34/7 34/12 46/23
Angeles [1]   78/13
ANNIE [2]   2/6 135/3
announcing [1]   132/13
another [10]   12/3 12/16 19/22
31/8 51/12 74/5 90/13 105/9
126/6 132/25
answer [9]   15/18 29/1 30/2
30/3 30/17 39/10 45/17 52/11
73/12
answered [4]   51/4 57/17 58/3
85/23
answering [1]   29/11
any [83]
anybody [17]   6/23 50/9 50/10
50/19 50/20 50/21 50/24 52/2
52/8 67/4 74/17 90/6 97/13
97/17 118/22 123/14 128/21
anymore [1]   53/12
anyone [4]   17/7 61/7 97/14
114/1
anything [36]
anyway [2]   40/5 80/21
apologize [2]   31/9 129/4
apologizing [1]   6/11
apparent [1]   7/21
apparently [2]   118/7 128/13
appear [2]   122/5 125/13
appearance [1]   98/18
APPEARANCES [2]   1/12 2/1
appeared [2]   31/23 125/10
appears [2]   98/15 121/1
Apple [1]   24/11
appliances [1]   24/1
appointed [2]   64/9 132/10
appreciate [3]   49/6 55/9 104/5
appreciate it [1]   55/9
approach [9]   7/15 27/4 27/4
32/18 70/5 77/2 117/7 125/14
126/20
approached [1]   64/25
appropriate [1]   69/9
approximate [2]   9/3 62/24
approximately [7]   6/17 9/1
42/11 43/12 43/13 61/18 75/8
April [14]   31/12 32/25 36/13
36/14 37/5 37/24 63/6 67/18
68/16 69/25 123/7 123/9 126/9
126/19
are [87]
area [8]   4/1 4/14 4/25 17/11
83/11 83/12 117/10 120/22
areas [2]   17/17 116/9
aren't [1]   19/25
argue [2]   27/17 130/6
arguing [1]   51/4
argument [1]   74/18
argumentative [3]   27/4 27/6
95/2
Arizona [2]   4/5 34/15
around [5]   56/13 95/1 95/6
98/5 111/17
arrange [1]   41/13
arranged [1]   76/23
arrangements [1]   41/3

arranged [5]   89/16 91/3
91/25 92/1 94/5 96/9 97/18
arrow [1]   63/25
article [7]   31/23 32/14 32/17
32/21 33/7 33/23 78/13
articulate [1]   129/21
as [124]
ask [54]
asked [35]
asking [45]
asks [2]   58/7 58/12
assessment [1]   104/5
Assistant [12]   1/16 41/20
44/23 46/6 50/2 60/4 61/12
62/1 71/14 71/20 73/16 77/24
associated [8]   6/7 20/16 22/16
26/9 33/15 68/11 128/19 128/22
Associates [1]   1/19
assume [6]   72/3 85/16 114/12
115/11 116/25 131/5
assumes [1]   47/24
athletic [1]   3/11
attached [1]   82/3
attaches [1]   51/18
ATTANASIO [1]   1/21
attend [4]   73/18 73/23 74/24
111/17
attended [4]   77/22 110/24
111/9 113/9
attends [1]   33/15
attention [2]   122/12 130/1
attorney [13]   1/14 2/2 9/25
41/20 42/9 44/24 46/7 60/4
62/16 64/4 64/9 64/13 64/21
Attorney's [4]   37/25 45/20
46/1 60/18
Attorney-at-Law [2]   1/14 2/2
attorneys [1]   1/16 50/2 53/6
61/12 62/2 66/19 71/14 71/20
73/17 77/25
audibly [3]   35/16 35/17 35/18
author [1]   78/15
authority [4]   20/22 55/7 55/7
69/9
authorize [2]   17/11 17/18
authorized [7]   17/9 17/20
17/24 18/5 20/8 20/10 20/13
authorizes [1]   17/13
available [4]   29/4 32/10 35/11
128/12
Avenue [2]   2/3 2/7
avoid [1]   128/19
awaiting [1]   37/25
aware [13]   23/14 29/19 32/13
40/3 40/5 40/13 52/2 76/16
76/20 80/16 110/10 111/8
111/12
away [2]   132/16 132/18

**B**

back [36]
background [1]   84/11
backward [1]   83/17
bad [4]   27/8 27/9 62/4 68/5
bag [16]   89/12 89/14 89/14
89/18 89/21 89/23 89/23 89/24
90/1 91/10 91/11 91/13 94/19
97/13 102/19 102/21
baggie [3]   88/5 89/17 89/19
bags [5]   91/9 92/3 94/8 94/9
97/18
balancing [1]   47/11

**B**

balls [6]   98/19 99/21 100/11 100/12 100/22 101/15
Baltimore [1]   2/4
bank [6]   21/23 21/24 24/11 25/3 45/8 123/10
baseball [7]   63/3 64/24 70/18 125/9 125/18 130/4 130/12
based [17]   13/23 35/6 49/11 51/20 52/1 58/23 77/11 85/24 87/14 87/15 87/19 87/24 105/22 115/15 123/21 126/13 126/14 14/22
basement [1]   14/22
basically [3]   61/24 66/24 102/15
basketball [3]   3/12 3/19 4/8
bathroom [2]   14/23 16/19
baths [1]   9/2
Baxter [2]   23/20 23/24
Bay [2]   4/14 83/11
be [118]
beating [1]   77/6
became [1]   4/20
because [52]
become [7]   7/21 25/25 29/24 32/13 80/16 95/21 104/4
becomes [3]   29/14 30/20 33/14
becoming [1]   53/24
bedroom [7]   9/1 21/2 21/3 21/8 21/14 22/1 23/23
beds [1]   23/11
been [70]
been covered [1]   73/10
beer [13]   88/5 88/6 89/17 89/21 93/23 98/13 98/15 98/20 99/6 99/18 100/9 102/6 106/20
before [54]
began [1]   53/11
beginning [3]   27/16 57/6 63/21
behalf [2]   134/3 134/9
being [23]   7/20 30/22 33/23 44/25 52/2 54/12 56/7 57/4 71/2 71/2 72/8 73/7 77/11 95/20 98/17 100/23 109/8 109/14 109/15 114/12 119/18 121/7 126/14
belief [2]   27/18 130/6
believability [2]   51/18 84/17
believe [41]
believed [11]   35/5 45/5 49/12 49/13 57/8 60/13 66/23 66/25 68/20 73/8 108/10
Bench [5]   7/16 27/5 32/19 77/3 125/16
best [8]   63/11 90/4 131/24
better [2]   56/22 103/16
between [2]   63/15 123/15
beyond [4]   34/22 35/10 55/14 77/7
bias [4]   27/15 35/4 35/7 35/8
big [2]   8/25 108/21
bigger [2]   105/25 89/23
bill [6]   24/13 24/23 25/2 25/2 25/2 25/2
bills [1]   24/20
Bingo [1]   26/13
bit [6]   10/25 26/14 39/2 60/1 119/24 132/5
black [1]   24/23
BlackBerry [1]   118/22
blue [3]   101/10 102/2 102/8

bol [1]   12/18
Bolan [1]   100/6
book [2]   21/10 24/13
both [9]   37/6 67/16 90/13 101/7 101/25 108/8 110/23 122/2 131/25
bottles [2]   101/6 115/19
bottom [7]   12/20 13/7 13/12 21/8 98/17 99/19 122/5
box [26]   17/2 19/19 21/3 21/4 91/8 91/10 91/15 91/17 91/17 91/20 91/23 91/24 92/2 92/4 92/7 92/12 92/15 94/14 106/25 107/1 107/4 107/7 107/9 107/11 107/13 107/15
boxes [5]   14/17 14/20 19/8 25/18 25/20
brand [1]   101/12
break [11]   9/11 11/4 55/23 103/16 103/17 103/24 104/1 104/22 104/25 105/1 105/12
breaking [1]   10/23
Brian [38]
bring [1]   34/20
British [1]   9/17
broad [1]   63/7
broader [1]   130/2
broken [3]   98/23 98/25 99/5
brought [10]   83/9 83/12 90/19 90/22 92/2 94/13 95/1 107/1 107/14 107/25
Bruno [1]   4/12
bunch [1]   19/23
business [5]   17/22 24/19 69/6 108/6 117/1
BUTLER [1]   1/14
buyer [1]   68/4
buying [10]   26/24 28/13 29/10 39/12 45/5 46/11 46/14 46/17 46/21 46/23

**C**

C-L-E-M [1]   107/7
cabinet [4]   18/13 19/6 23/17 24/10
cabinets [1]   23/9
cage [1]   83/14
California [14]   1/23 4/12 53/7 64/5 64/7 64/11 71/24 76/24 83/13 92/5 92/7 92/8 98/9 108/3
call [11]   6/6 35/11 39/5 39/7 40/15 43/20 62/4 62/6 77/12 96/14 115/18
called [8]   39/10 43/24 44/1 44/15 61/20 66/12 107/25 108/5
Calls [3]   84/19 100/25 101/1
came [7]   62/23 78/11 78/18 85/7 92/16 107/16 124/25
can [11]
can't [5]   6/12 20/16 66/5 88/14 102/13
candidacy [1]   132/13
cap [3]   10/25 102/2 102/4
capacity [2]   113/16 113/20
car [1]   21/24
card [2]   21/5 24/20
care [2]   56/10 116/25
career [3]   3/12 3/14 58/19
careful [1]   6/13
carefully [3]   14/25 29/20

carted [1]   25/19
case [32]   7/3 7/6 14/10 17/19 20/19 21/19 23/3 25/7 25/19 32/11 34/10 36/20 37/4 38/1 71/14 77/13 95/18 105/15 105/15 106/13 108/5 111/2 111/25 128/19 128/20 128/21 128/22 131/9 132/11 132/14 132/18 132/20
cases [3]   36/24 122/10 122/18
cash [2]   21/4 24/11 122/19
category [1]   48/11
cause [4]   68/24 69/14 69/18 70/1
caused [1]   56/5
causes [1]   104/4
causing [3]   118/21 118/23 119/2
cell [2]   118/24 118/25
ceremony [1]   106/9
certain [8]   16/20 16/20 17/10 17/12 20/24 39/24 39/25 123/12
certainly [2]   35/20 126/2
certainty [1]   63/13
Certificate [2]   134/15 135/1
certify [1]   135/3
cetera [1]   24/20
chain [3]   95/9 95/15 95/22
chair [1]   17/14
change [1]   50/7
changed [3]   49/14 67/25 105/18
changes [1]   33/5
charge [10]   21/17 21/21 37/1 37/2 37/8 52/21 57/24 60/4 60/10 69/10
charged [40]
charges [15]   40/22 50/3 58/19 58/23 58/24 69/3 69/5 69/8 69/22 70/11 113/14 113/17 113/20 113/22 114/1
charging [6]   36/17 48/17 49/18 55/7 58/21 69/9
chart [2]   63/12 114/23
Chase [2]   24/13 25/3
check [3]   95/6 101/14 123/3
checkbooks [1]   24/12
checking [1]   90/7
checks [6]   21/9 28/3 45/10 122/12 122/16 123/10
CID [1]   83/13
circles [1]   14/1
circuit [1]   119/23
circumstances [5]   8/2 44/8 44/11 87/16 114/19
City [3]   41/25 42/9 75/6
civil [2]   105/15 106/13
claimed [1]   50/11
claiming [1]   29/8
clarification [1]   75/19
CLARKE [1]   2/2
classifying [1]   13/24
cleanup [1]   117/10
clear [7]   64/17 71/17 117/21 118/4 120/18 125/15 127/1
clearly [2]   14/6 14/8
Clem [1]   107/7
CLEMENS [55]
Clemens' [6]   26/12 109/9 109/15 109/17 112/1 121/2
Clenbuterol [1]   20/5
clerk [1]   116/25

**C**

client's [1]  27/12
close [3]  26/9 62/22 63/4
closer [1]  35/19
closet [3]  21/3 22/2 24/22
closets [1]  23/7
Coast [1]  62/20
collect [1]  96/2
collected [3]  84/3 85/22
 123/21
collecting [1]  95/20
college [9]  3/13 3/19 3/20 4/4
 4/6 4/9 4/17 4/22 106/9
colloquial [1]  43/25
COLUMBIA [1]  1/2
combination [1]  83/15
come [6]  80/12 80/21 108/3
 114/22 128/5 129/13
comes [1]  34/10
comfortable [1]  64/19
coming [3]  118/6 120/4 120/6
commentary [1]  95/11
commenting [1]  96/22
Commission [9]  54/14 60/20
 61/1 61/1 61/9 77/1 112/4
 113/3 113/13
Commissioner [2]  63/2 63/2
commitment [3]  103/22 104/23
 105/5
commitments [2]  105/21 132/3
committed [1]  69/15
committing [2]  71/3 124/22
common [3]  3/10 122/24 122/24
communication [1]  38/18
compartment [1]  92/11
complete [2]  109/3 109/5
completed [1]  38/4
completely [1]  17/8
completes [1]  114/11
complex [1]  71/5
component [1]  100/18
component of [1]  100/18
computer [5]  2/4 9/5 9/5 25/5
 119/2
computer-aided [1]  2/24
computers [2]  9/4 25/6
concern [2]  95/24 116/24
concerned [5]  81/1 95/21 96/1
 97/1 132/17
concerning [2]  32/14 49/5
concluded [1]  8/18
conclusion [2]  42/12 84/19
condition [16]  53/13 53/24
 54/12 60/17 60/19 60/22 88/7
 89/2 89/9 89/15 90/18 90/21
 93/8 93/14 94/3 121/22
conduct [2]  68/21 126/10
conducted [1]  74/14
conducting [4]  17/25 18/2
 73/24 74/1
confer [1]  9/8
conference [5]  7/16 27/5 32/19
 77/3 125/16
confirm [1]  117/15
confront [1]  131/20
Congress [2]  52/18 110/11
conjunction [1]  90/13
connect [1]  26/4
connected [6]  6/3 8/9 97/14
 119/25 121/7 121/7
connection [7]  26/12 28/23

considered [12]  5/16 8/6 14/18
 28/4 28/13 44/25 46/20 47/5
 48/6 48/11 54/12 114/21
considering [2]  29/7 46/25
Constitution [1]  2/7
consulted [1]  109/23
Cont'd [1]  2/1
contact [8]  40/1 40/6 40/19
 45/24 63/16 66/8 128/19 128/21
contacted [3]  38/7 65/6 66/9
contacts [4]  17/22 17/22 38/21
 128/20
contained [4]  88/5 89/14 89/21
 92/4
container [2]  12/3 107/19
containers [1]  13/4
contended [1]  50/21
contends [1]  22/9
content [1]  29/22
contents [1]  109/14
contest [1]  115/2
context [1]  36/11
continue [10]  37/23 60/19
 60/23 60/25 71/1 71/10 73/5
 73/6 124/4 124/6
continued [4]  25/25 37/21 48/9
 106/15
continues [1]  37/15
contradicted [1]  77/11
contrary [1]  47/25
Control [1]  21/2
controlled [2]  37/11 37/19
conversation [1]  58/15
conversations [3]  29/21 30/6
 78/6
Cooley [1]  1/22
cooperate [10]  33/3 33/6 37/16
 47/10 67/22 70/16 70/21 70/24
 71/4 71/11
cooperated [1]  43/19
cooperating [2]  25/25 36/24
cooperation [9]  37/23 38/3
 53/2 53/4 53/9 53/14 54/12
 73/2 78/9
cooperator [4]  29/15 29/24
 30/20 54/13
copies [2]  117/4 117/11
copy [1]  82/11
correct [154]
corrected [1]  76/7
correcting [1]  49/6
correctly [7]  3/11 9/23 36/20
 44/1 85/16 96/5 121/13
corrects [1]  32/23
cotton [5]  98/19 99/21 100/12
 100/22 101/15
could [34]
couldn't [4]  17/14 33/21 63/8
 63/8
counsel [4]  35/21 81/5 96/22
 104/7
count [2]  5/20 14/22
counties [1]  132/22
counting [1]  6/1
Countrywide [2]  24/12 25/4
County [1]  25/2
couple [6]  36/10 44/8 65/4
 75/8 112/11 116/9
course [6]  55/12 58/18 74/2
 125/17 127/5 131/25
court [28]  1/1 2/6 2/6 8/4

considered [12]  (see above)
Court's [3]  55/10 67/10 117/5
COURTNEY [1]  1/14
courtroom [1]  71/18
cover [1]  116/9
covered [2]  73/10 116/9
CR [1]  1/4
crafted [1]  49/5
created [6]  83/20 84/23 85/4
 85/21 86/14 109/25
creation [2]  15/20 84/11
credibility [2]  56/3 77/14
credit [1]  21/5
crime [7]  36/12 57/18 58/9
 69/10 69/15 71/3 73/7
criminal [8]  4/24 5/5 33/20
 36/16 51/8 70/2 70/11 74/6
crook [1]  126/19
cross [5]  3/5 106/15 129/25
 131/19 134/4
cross-examination [4]  3/5
 106/15 129/25 131/19
crunched [1]  98/15
crushed [1]  98/18
curious [1]  31/11
currency [3]  122/25 123/3
 123/4
custody [6]  86/4 95/9 95/15
 95/22 112/12 112/17
cut [3]  3/15 99/13 128/2

**D**

D-bol [1]  12/18
D.C [4]  1/5 1/17 2/8 71/25
DANIEL [1]  1/14
date [24]  36/14 37/20 37/21
 37/22 38/2 38/9 38/20 39/1
 42/2 42/4 42/15 61/18 62/22
 64/16 64/16 65/5 66/9 66/16
 66/17 108/8 109/20 110/20
 113/6 135/7
dates [5]  36/10 108/10 110/6
 110/15 110/17
daughter [1]  6/20
DAVID [2]  1/15 2/2
day [26]  1/9 6/8 14/19 35/17
 36/14 36/17 36/18 37/1 37/3
 37/6 37/7 37/8 40/20 43/25
 44/3 60/17 66/10 66/14 74/9
 74/11 80/22 96/17 105/7 106/6
 106/12 111/17
days [4]  34/14 34/15 42/16
 43/8
deal [4]  47/21 47/21 54/21
 131/13
dealer [7]  13/17 13/18 13/25
 46/12 47/22 49/16 54/21
dealing [3]  13/16 49/11 123/16
dealt [2]  123/19 129/15
Deca [3]  11/21 12/13 101/12
Deca-Durabolin [1]  101/12
December [7]  5/15 8/10 26/3
 29/16 39/14 39/23 122/3
December 14 [1]  5/15
December 14th [2]  8/10 39/14
December of [1]  121/23
decide [1]  60/3

**D**

decided [1]  28/8
decides [4]  33/5 60/5 60/7
 60/9
decides what [1]  60/9
deciding [1]  48/12
decision [6]  45/17 45/18 46/1
 54/4 54/5 58/21
decisions [3]  48/18 49/19 55/7
deem [1]  20/16
defendant [3]  1/8 1/18 36/25
defendant's [6]  15/22 38/3
 65/22 81/4 82/8 84/13
Defendant's 63 [1]  84/13
Defense [6]  65/9 88/3 93/25
 114/4 115/7 134/9
deferred [1]  37/14
definitely [1]  46/25
degree [1]  94/25
deliberately [1]  128/3
delivered [2]  102/23 102/24
demonstrative [5]  114/15
 114/18 114/21 114/24 115/3
denied [2]  33/18 34/5
depending [2]  57/23 57/24
depends [1]  84/17
deposition [2]  110/21 111/8
depositions [1]  110/11
Deposteron [1]  12/1
Depostesteron [1]  12/6
Depot [5]  9/21 11/12 12/7 12/8
 12/9
Depotesteron, [1]  12/10
Depoteteron, 2 milliliters [1]
 12/10
describe [2]  93/21 121/15
described [1]  92/2
descriptions [1]  81/18
deserve [1]  99/8
details [1]  24/20
determination [2]  50/15 50/16
determine [2]  44/5 95/5
determined [1]  94/12
determines [1]  59/24
Diagnostics [1]  25/3
did [179]
didn't [51]
Diego [1]  1/23
difference [2]  10/17 10/22
different [13]  3/10 19/23
 25/11 42/20 42/24 42/25 43/7
 43/7 60/1 67/13 94/7 97/18
 100/4
differently [1]  97/18
dilutants [1]  19/9
direct [12]  24/23 31/15 32/6
 32/7 32/17 35/14 35/15 56/11
 77/8 77/15 110/14 134/4
directly [1]  96/19
disagreed [1]  75/12
disagreement [2]  75/16 75/18
discovered [1]  28/1
discuss [1]  83/8
discussed [2]  97/21 98/3
Discussion [1]  124/3
dishwasher [1]  24/19
displayed [2]  117/16 120/22
distortion [1]  130/5
distribute [2]  13/23 14/3
distributing [3]  45/6 45/7
 49/13

distribution [2]  14/1 14/18
 37/19 122/10
distributor [2]  14/7 14/12
DISTRICT [7]  1/1 1/2 1/11 53/7
 64/5 64/6 64/10
Division [1]  5/5
DLA [2]  2/3 127/23 127/25
DNA [3]  81/14 85/6 103/2
do [137]
Docket [1]  1/3
document [9]  22/1 22/3 22/3
 26/16 36/17 38/14 40/23 81/25
 82/14
documents [3]  19/14 19/16
 24/12
does [27]  7/12 8/14 8/17 13/3
 13/3 14/1 16/19 16/23 16/24
 17/4 19/7 22/1 22/2 23/1 34/1
 40/18 44/3 64/25 86/25 98/11
 100/3 100/21 115/11 118/22
 129/21 129/22 131/19
doesn't [11]  22/3 35/8 44/22
 48/17 55/6 58/8 86/25 113/16
 113/19 126/19 127/7
doing [11]  23/16 29/11 29/13
 33/22 53/16 54/1 55/12 68/15
 78/8 96/5 127/2
dollar [1]  45/10
don't [88]
done [11]  8/12 54/1 55/4 58/18
 83/21 86/8 91/4 91/7 96/11
 101/17 102/15
door [3]  21/8 53/12 126/24
doth [1]  104/11
doubt [1]  49/10
down [19]  9/8 9/8 9/11 9/12
 11/8 12/19 13/7 24/22 35/13
 43/10 53/10 95/8 55/25 96/4
 96/4 103/8 106/22 114/9 128/7
draft [1]  20/20
drafted [3]  16/12 21/15 33/24
Dragon [1]  9/17
draw [2]  11/2 63/25
drawer [1]  24/19
drawers [1]  23/4
dressed [1]  6/23
dresser [1]  21/8
drug [13]  13/17 13/18 13/25
 14/6 20/7 46/11 49/15 54/21
 122/10 122/15 122/18 122/18
 122/20
drugs [20]  8/23 9/9 13/23
 17/20 17/21 26/11 26/24 39/12
 45/6 45/7 46/14 47/18 49/11
 49/13 68/12 123/12 123/13
 123/20 123/20 124/16
dry [1]  100/24
duplicate [1]  21/9
Durabolin [2]  12/13 101/12
Durateston [6]  9/20 9/25 10/17
 12/2 12/11 12/17
DURHAM [7]  1/13 33/9 79/16
 91/16 115/1 127/8 134/5
Durham's [1]  35/16
during [21]  8/21 8/24 14/16
 19/16 25/21 29/12 31/15 33/10
 33/21 39/7 45/24 74/13 74/13
 75/15 77/15 77/16 93/4 112/14
 112/24 121/12 129/9

**E**

e-mail [7]  38/18 39/2 39/4

distribution [201]  65/13 66/13
e-mails [2]  29/21 65/13
each [6]  6/12 42/21 65/15
 90/11 98/11 114/8
ear [1]  35/18
Earl [3]  43/4 43/7 72/8
earlier [9]  15/15 38/12 52/25
 57/17 59/24 66/12 91/21 104/22
 107/4 123/1
early [1]  106/10
ease [1]  82/8
easiest [1]  11/18
Eastgate [1]  1/22
education [2]  4/1
efficiency [1]  131/23
eight [3]  34/15 116/23 117/6
either [4]  36/21 41/20 59/6
 74/23
electric [1]  25/2
elements [2]  57/24 58/4
elicit [4]  55/10 97/2 125/21
 127/6
elicited [1]  7/4
eliminate [1]  119/4
ELMO [2]  119/3 121/20
Elmu [1]  11/23
else [13]  13/6 51/14 53/19
 61/7 72/15 74/17 76/25 84/6
 87/20 96/23 105/5 105/7 123/14
Emery [16]  72/10 79/3 79/13
 84/7 85/5 89/6 89/10 90/10
 90/19 90/22 91/3 94/4 94/10
 94/13 94/14 96/17
Emery's [9]  79/5 79/12 83/6
 83/18 90/5 99/5 107/2 107/14
 107/16
empty [3]  101/6 115/22 115/24
end [11]  30/19 35/24 38/10
 48/3 60/2 60/17 63/20 63/21
 64/1 64/14 95/19
ended [1]  6/17
enforcement [18]  4/24 6/3 6/7
 8/9 14/1 54/21 55/11 58/1 64/2
 72/3 72/19 74/16 77/23 88/14
 97/15 123/8 124/21 127/21
engaged [2]  68/21 70/1
engaging [1]  68/10
enhancing [3]  20/7 68/12
 124/16
Enjoy [1]  128/24
enough [9]  60/12 63/7 70/1
 80/23 101/24 102/14 102/14
 107/22 110/9
ensure [1]  53/2
enter [1]  4/15
entered [2]  36/17 114/19
entire [1]  9/13
entitled [1]  125/23
entry [4]  7/11 7/11 7/12 8/16
envelope [1]  23/23
equate [1]  63/1
escorted [2]  112/3 113/3
Esquire [8]  1/13 1/14 1/15
 1/15 1/18 1/18 1/21 2/2
establish [1]  31/20 110/15
establishing [1]  110/16
estimate [2]  63/18 131/21
et [1]  24/20
eternity [1]  7/19
even [5]  7/25 27/25 32/23
 69/16 95/18
events [1]  16/18

**E**

ever [26]  17/8 26/16 30/13
 30/17 32/22 38/7 39/21 46/3
 49/1 49/8 50/2 51/7 54/1 55/4
 56/11 57/12 58/22 59/4 64/25
 74/4 74/17 76/6 91/4 96/9
 111/23 112/18
every [5]  26/16 26/16 29/4
 35/17 106/19
everybody [6]  5/14 6/23 76/25
 81/17 116/20 128/19
everybody's [2]  64/17 71/17
everything [11]  11/15 35/6
 57/9 92/5 92/6 98/12 103/4
 103/7 103/8 103/11 113/10
evidence [78]
evidence of [1]  29/6
evidentiary [1]  130/7
ex [1]  131/15
ex-wife [1]  131/15
exact [2]  52/24 130/21
exactly [6]  44/11 58/11 60/22
 61/3 82/4 107/25
examination [6]  3/5 106/15
 110/14 116/4 129/25 131/19
examine [1]  7/19
example [1]  87/5
except [1]  3/10
exchange [1]  75/11
excluding [1]  88/21
excoriates [1]  34/16
excuse [6]  6/9 7/2 32/13 49/23
 79/23 83/4
excused [1]  129/1
execute [3]  33/4 33/6 67/22
executed [2]  26/17 108/19
executing [2]  17/6 21/15
execution [5]  5/12 6/15 68/1
 112/14 112/24
exercise [1]  131/20
exhibit [23]  5/11 15/22 65/22
 65/25 66/2 66/5 81/4 82/8 88/4
 115/7 116/10 116/22 117/3
 117/9 117/15 117/25 119/12
 120/23 121/11 122/1 122/2
 134/11 134/12
exhibits [6]  65/4 65/15 93/12
 114/5 114/13 134/8
existed [1]  109/25
exited [1]  8/19
expandable [1]  22/2
experience [2]  55/11 122/15
explain [3]  36/19 45/4 129/21
explained [1]  96/5
explanation [1]  53/23
explore [1]  127/16
extent [3]  16/17 17/10 17/15
extract [1]  11/10
EZ [1]  25/3

**F**

fact [14]  13/24 26/24 28/13
 29/17 35/5 47/24 57/19 68/21
 86/24 126/9 127/25 128/1 130/2
 130/5
factor [2]  13/13 104/4
faculties [2]  87/19 87/20
fair [19]  4/25 14/4 19/13
 27/24 28/4 37/2 37/16 38/4
 38/21 63/23 70/25 80/23 101/24
 102/14 102/14 107/22 111/10

fairly [5]  39/25 41/9 94/3
 127/16 130/11
false [3]  34/17 34/24 124/21
falsehoods [1]  56/6
falsely [1]  33/22
far [6]  37/22 43/22 48/10
 77/13 80/25 132/12
fashioned [1]  120/21
fast [1]  33/17
fast-forwarded [1]  33/17
father [1]  35/16
FBI [4]  7/5 61/23 72/18 81/22
February [12]  5/17 81/16 83/3
 83/5 90/3 93/4 98/1 99/9
 110/23 110/24 111/9 111/12
February 13th [1]  110/24
February 5th [1]  99/9
February 7 [1]  83/3
February 7th [1]  81/16
federal [11]  53/16 57/18 57/19
 57/25 58/7 58/12 59/18 74/6
 122/15 123/8 124/21
FedEx [7]  91/8 91/10 91/17
 91/17 91/20 92/12 92/15
fee [1]  24/24
feed [1]  124/7
feedback [4]  118/5 118/6
 118/21 129/7
feel [1]  55/20
feet [2]  9/1 9/3
fellow [1]  128/23
felony [1]  57/25
felt [1]  69/25
few [2]  44/12 130/9
figure [3]  95/6 109/22 109/24
file [6]  21/4 113/13 113/16
 113/20 113/22 114/1
filed [4]  36/14 36/16 50/3
 131/14
filing [2]  69/2 69/5
final [1]  114/7
finally [2]  106/18 112/3
financial [2]  20/25 24/24
find [6]  22/14 25/14 27/12
 91/3 94/25 96/9
finder [1]  130/5
finding [1]  8/1
finds [2]  7/23 24/4
fine [7]  7/18 56/6 56/9 101/19
 109/19 127/9 130/24
fingerprint [1]  81/15
finish [3]  27/20 38/25 100/17
finished [1]  4/17
firm [4]  43/7 63/4 75/5 110/6
first [45]
firsthand [2]  16/17 22/4
FISA [1]  132/7
fits [1]  34/9
five [9]  8/11 8/12 12/16 19/4
 22/16 62/5 63/10 66/2 66/3
five-hour [1]  22/16
fix [2]  120/8 124/5
fixed [1]  129/9
fixes [1]  119/1
flew [1]  61/11
flight [1]  106/10
floor [2]  22/2 108/23
fly [1]  106/8
focus [1]  127/1
focused [1]  125/25 130/1
folder [1]  22/2

following [1]  106/1
force [1]  61/20
foregoing [1]  135/3
Foreign [1]  132/7
forever [2]  7/18 77/6
forgot [1]  43/10
forgotten [1]  112/8
Fork [1]  24/11
form [9]  13/7 24/5 29/24 48/14
 55/21 74/18 74/20 75/13 101/10
former [1]  125/9
forthcoming [1]  57/4
fortunately [4]  132/9 132/15
 132/16 132/18
Forty [2]  116/23 117/6
Forty-eight [2]  116/23 117/6
forward [2]  29/23 85/16
forwarded [2]  33/17 82/24
found [22]  7/25 9/9 9/16 9/18
 9/20 9/21 11/11 13/10 17/16
 21/14 22/10 22/18 22/23 23/22
 25/11 29/9 29/12 39/7 102/9
 102/11 108/14 108/16
four [10]  8/22 63/8 63/10
 63/21 63/24 64/1 64/15 72/23
 103/11 103/12
four-page [2]  103/11 103/12
Francisco [7]  4/14 61/11 64/5
 64/10 64/13 64/21 83/11
frequently [1]  69/9
Friday [7]  5/13 105/21 105/23
 105/25 106/11 106/11 106/12
front [4]  23/20 44/10 61/18
 117/16
FSA [3]  81/14 82/24 83/8
full [4]  5/6 33/6 68/1 105/7
fully [2]  17/8 104/5
furniture [3]  23/13 23/14 24/1
further [3]  35/8 59/25 119/7
future [3]  37/22 44/5 59/2

**G**

gallery [1]  35/17
game [1]  127/19
gang [2]  62/4 62/5
garage [6]  16/24 17/1 19/19
 19/22 19/22 21/14
gather [1]  47/6
gathered [2]  14/13 84/16
gave [10]  5/11 23/22 43/24
 81/14 85/10 109/2 111/8 121/1
 123/13 131/21
gear [1]  6/24
general [2]  98/18 120/24
generally [12]  58/5 59/12
 59/14 61/3 61/4 61/4 61/5
 71/21 110/12 119/21 119/22
 121/15
gentlemen [2]  121/16 121/19
George [4]  52/21 61/11 62/14
 66/20
get [39]
gets [3]  32/24 32/25 34/14
getting [7]  6/19 6/20 118/6
 124/7 125/25 127/25 129/7
GILBERTO [1]  1/15
give [16]  8/3 10/11 50/6 56/7
 61/4 62/22 64/18 65/4 77/5
 94/10 103/23 103/25 104/7
 126/25 129/16 131/1
given [5]  50/11 50/22 65/8

## G

given... [2]   95/20 128/1
gives [1]   111/14
giving [5]   26/11 47/14 51/19
  94/4 110/11
glad [1]   35/9
glass [2]   10/22 10/23
go [48]
God [2]   7/18 77/5
Godward [1]   1/22
goes [3]   54/22 72/12 72/15
going [57]
gone [5]   31/17 73/11 73/12
  79/16 128/9
good [12]   3/7 3/8 3/18 70/16
  70/20 70/23 93/1 104/16 116/6
  116/7 132/4 133/2
GOODHAND [1]   1/15
goods [1]   80/8
got [32]   10/24 16/10 28/7 34/6
  50/10 62/24 67/22 81/25 84/20
  85/1 86/25 87/17 88/11 89/2
  89/3 89/9 92/14 93/8 96/12
  97/13 98/16 100/24 101/25
  102/3 106/18 110/5 115/15
  116/23 119/7 127/19 128/6
  128/9
gotten [1]   105/16
government [32]   1/13 7/4 22/10
  22/11 30/21 30/24 31/6 33/10
  35/21 36/25 40/21 44/14 53/16
  65/8 73/4 77/8 77/14 79/8
  80/25 91/21 93/12 97/22 98/3
  107/5 107/23 115/9 116/24
  119/12 126/7 130/20 132/15
  134/3
government's [10]   114/22
  116/10 117/3 117/9 117/15
  117/25 120/23 121/11 122/1
  122/2
graduated [1]   4/8
Grand [5]   111/18 111/23 111/24
  111/25 124/22
grayed [2]   119/17 120/22
great [3]   65/21 118/20 130/18
Grimsley [18]   30/21 30/24 31/1
  31/3 31/7 31/12 31/15 33/3
  33/5 67/11 67/14 124/25 125/2
  125/8 125/17 126/5 129/17
  131/2
Grimsley's [2]   32/1 33/1
grounds [1]   73/21
group [12]   10/1 15/7 15/13
  25/7 25/18 59/10 61/22 62/8
  62/12 74/15 74/24 81/23
growth [6]   13/8 13/13 13/13
  67/3 101/11 101/25
guarantee [1]   60/23
GUERRERO [1]   1/15
guess [7]   3/12 27/17 88/25
  104/23 118/8 127/2 131/15
Guide [1]   21/9
guilty [7]   36/17 36/21 37/2
  37/8 37/9 37/18 37/25
guy [3]   29/4 41/10 47/17
guys [1]   23/2

## H

had [104]
hadn't [4]   3/15 24/2 45/22
  46/4
half [2]   118/22 118/23
  25/14 39/11 39/18 45/5 66/23
halfway [1]   112/9
handled [4]   122/16 122/19
  122/25 123/20
hang [1]   45/13
happen [5]   35/22 38/9 76/6
  110/20 118/23
happened [21]   16/18 23/3 25/7
  25/18 32/24 33/24 35/6 54/9
  54/17 56/25 63/9 83/24 86/4
  86/13 86/16 86/23 87/3 87/7
  87/9 108/4 108/5
happens [3]   34/10 37/14 102/17
hard [1]   82/11
HARDIN [17]   1/18 1/19 35/12
  35/15 110/25 116/9 116/12
  122/9 123/22 124/24 125/5
  125/19 126/3 127/12 129/24
  130/6 134/6
Hardin's [1]   131/18
Harvey [3]   41/23 41/24 43/8
Harvey's [1]   42/9
has [37]
hasn't [1]   52/5
have [202]
have been [1]   29/9
haven't [3]   40/23 58/19 105/15
having [7]   8/2 19/23 31/17
  32/6 34/16 118/19 129/5
he [221]
he is [1]   27/12
he'd [2]   47/9 56/22
he's [11]   27/16 33/3 33/5 34/4
  34/5 35/16 35/17 35/19 48/16
  52/6 87/25
head [1]   100/8
hear [8]   35/23 87/20 118/8
  118/10 120/9 120/11 120/18
  129/10
heard [2]   35/20 63/1
hearing [5]   33/14 106/13
  110/24 111/9 111/12
hearings [1]   33/10
hearsay [5]   82/14 90/24 90/25
  96/13 96/14 96/23
Heather [2]   7/5 61/23
heavens [1]   131/6
held [2]   75/4 75/5
help [15]   38/14 61/12 62/20
  62/23 63/11 64/3 64/13 64/14
  64/20 64/24 65/4 66/20 81/3
  82/12 93/10
helping [1]   80/13
helps [4]   9/7 39/3 55/1 66/7
her [6]   6/11 6/20 10/12 98/8
  103/23 104/1
here [36]
here as [1]   78/21
hesitate [1]   38/23
HGH [11]   6/16 28/14 32/1 34/8
  34/13 46/11 50/11 50/22 51/2
  51/9 52/13
hiatus [1]   80/21
hierarchal [1]   123/18
higher [1]   69/17
him [86]
himself [2]   59/22 91/4
hired [1]   63/3
his [56]
his position [1]   27/18
hold [9]   37/7 37/9 64/17 96/18
  122/1
  132/11
home [4]   7/22 7/24 121/2
  121/23
Honor [45]
HONORABLE [1]   1/11
hope [2]   7/20 41/9
hoped [1]   103/25 119/6
hopefully [1]   129/8
hormone [5]   13/8 13/14 67/3
  101/11 101/25
hotel [1]   83/9
hour [2]   8/12 22/16
hours [5]   8/11 42/11 42/12
  43/10 75/8
house [13]   8/10 8/24 8/25 9/9
  14/18 18/5 22/8 25/11 25/19
  32/1 33/1 108/18 109/16
Houston [1]   1/20
how [50]
however [3]   56/21 75/14 115/25
human [3]   13/8 13/13 101/11
humanly [1]   17/9
hurts [1]   104/18

## I

I'd [2]   68/7 72/23
I'll [25]   8/3 18/12 31/15 32/7
  35/9 35/10 38/19 39/1 40/11
  48/1 50/17 53/18 53/19 55/15
  56/9 56/12 71/7 77/19 84/20
  97/3 101/1 105/16 113/17
  113/19 114/3
I'm [106]
I've [2]   42/18 65/8
I-N-D-E-X [1]   134/1
idea [7]   62/9 70/16 70/20
  70/24 83/20 84/11 103/15
identified [1]   93/14
identify [4]   65/11 65/12 81/7
  81/10
IGF [1]   13/12
IGF-1 [1]   13/12
illegal [6]   68/10 68/13 68/21
  122/18 122/20 126/10
illegally [1]   39/12
image [1]   9/5
images [1]   25/5
immediately [1]   95/21
impacting [1]   132/17
impeached [1]   77/11
impeding [1]   129/7
impression [1]   104/17
inappropriate [1]   35/22
inartfully [3]   49/5 53/22
  129/24
incinerated [1]   129/25
inclined [1]   27/11
including [1]   87/22
incredibly [1]   54/20
indicate [10]   14/2 16/19 16/23
  16/24 17/4 22/1 44/21 57/7
  57/7 59/20
indicated [4]   98/11 104/21
  105/22 125/2
indicates [5]   17/1 17/5 19/6
  22/3 119/17
indicating [2]   17/22 39/8
indication [1]   13/22
indictment [1]   112/1
individual [3]   13/4 123/16
  124/24

**I**

individually [1]   82/5
individuals [6]   119/24 119/24
 127/14 130/11 130/22 132/12
indulgence [1]   117/5
information [33]   14/9 14/13
 16/20 34/20 34/25 34/25 36/14
 36/16 45/7 45/25 47/5 47/12
 47/13 47/15 50/10 51/20 52/1
 56/4 85/3 90/17 97/3 107/12
 119/17 123/11 125/21 125/22
 126/1 127/4 127/6 127/18
 128/21 130/3 131/2
informed [2]   43/16 73/16
initial [1]   6/22
initially [1]   35/13
inject [1]   11/1
injury [1]   3/16
inkling [1]   47/3
inquiry [1]   127/1
inside [3]   92/6 98/12 98/19
insist [1]   87/12
instance [4]   17/12 18/24 60/11
 88/3
instruction [4]   126/25 127/9
 129/16 131/1
instruments [2]   122/16 122/25
insulin [1]   13/13
integrity [6]   95/22 96/1 96/6
 97/12 102/16 103/4
Intelligence [1]   132/7
intended [1]   52/20
intent [3]   13/23 113/21 113/25
intention [1]   113/13
intentionally [1]   58/13
interested [1]   127/14
interfered [1]   95/10
interfering [1]   118/10
interjected [3]   75/13 75/15
 75/25
internet [1]   29/4
interrupting [1]   118/7
interruption [1]   120/3
interview [34]
interviewed [6]   25/21 25/24
 39/15 67/5 78/24 80/18
interviews [15]   42/20 42/21
 49/10 61/15 61/16 74/14 74/23
 76/23 77/9 77/16 77/16 78/11
 78/19 79/11 80/12
introduce [4]   40/21 65/17 82/8
 114/4
introduced [2]   40/23 44/14
inventoried [1]   90/3
inventory [4]   7/11 18/14 18/21
 19/2
invest [1]   132/2
investigate [1]   63/4
investigated [1]   56/5
investigating [1]   111/25
investigation [26]   5/5 26/1
 33/20 43/17 45/6 46/4 47/8
 48/7 49/2 49/7 54/1 55/1 58/14
 61/13 64/24 66/20 70/6 72/24
 74/3 74/7 94/12 101/20 108/5
 119/25 123/21 123/23
investigations [2]   124/14
 124/15
investigative [1]   48/19
investigator [2]   47/4 50/16
investment [1]   21/5

**I** (continued)

inventory [4]   18/12 19/8
invoices [1]   19/8
involved [5]   51/8 71/18 110/9
 126/10 132/14
involvement [1]   111/21
irrelevant [1]   55/13
IRS [4]   4/15 4/20 4/22 5/2
 5/3 5/5 7/8 65/13 72/16 81/24
 83/13 101/18 103/13
is [268]
is that [1]   45/11
isn't [22]   11/17 17/7 26/13
 28/8 34/23 44/15 47/20 51/5
 51/17 54/9 54/11 57/21 59/8
 60/6 60/11 69/3 74/13 74/15
 93/25 98/3 109/20 123/4
isolating [1]   102/17
issue [8]   77/14 95/14 95/16
 104/6 127/11 129/12 129/15
 131/4
issues [1]   126/3
it [405]
it's [55]
item [4]   19/3 24/16 87/12
 121/17
items [23]   18/15 18/18 18/19
 18/22 19/10 23/16 23/22 25/20
 44/9 81/15 85/7 88/6 91/14
 93/23 94/8 98/11 102/12 102/13
 107/13 115/11 115/15 119/14
 120/25
its [3]   16/12 35/21 35/21
itself [1]   132/9

**J**

J.N [2]   79/11 111/14
January [22]   5/17 5/17 9/24
 29/23 39/22 79/2 79/11 82/22
 83/18 83/25 85/2 85/16 85/20
 86/4 86/6 86/8 86/17 86/23
 87/4 87/8 87/18 88/8
January 10 [3]   85/16 87/4 87/8
January 10th [8]   79/2 83/25
 85/2 86/4 86/6 86/17 86/23
 87/18
January 10th of [1]   83/18
January 2008 [1]   86/8
January the [4]   79/11 82/22
 85/20 88/8
Jason [6]   30/21 30/24 31/1
 31/3 31/7 31/12
Jeff [2]   46/2 134/5
JENNIFER [1]   2/2
JEREMY [1]   1/18
JN [1]   38/21
John [2]   118/8 131/10
Jose [11]   3/20 4/1 4/7 4/9
 4/18 64/2 64/6 64/7 71/24
 76/24 83/13
JR [2]   1/18 2/2
judge [17]   1/1 1/11 17/11
 17/13 17/23 20/8 20/13 20/15
 20/17 20/22 36/2 55/16 56/9
 96/25 114/3 125/17 132/10
judging [1]   69/19
Judicial [1]   64/10
July [10]   33/14 108/1 111/13
 112/5 113/4 113/7 117/19 118/2
 119/14 122/4
June [12]   42/5 42/6 42/16
 42/24 43/2 44/17 61/10 61/10
 79/21 79/23 80/1 132/15

**J** (continued)

June [12]   42/16 42/5 42/6 44/17
 61/10
June 8th [3]   42/16 43/2 61/10
June 8th meeting [1]   42/24
junior [4]   3/12 3/20 4/6 4/9
Juries [1]   124/22
juror [1]   105/2
jurors [4]   35/19 103/22 128/7
 128/23
jury [42]
jury you [1]   108/10
jury's [1]   104/5
just [80]

**K**

keep [5]   14/22 35/11 70/11
 92/12 120/13
Kentucky [2]   80/9 80/10
Kevin [1]   64/8
Keyspan [1]   25/2
kind [7]   25/8 36/11 47/20
 51/13 63/25 100/3 118/5
kinds [2]   22/22 100/4
king [1]   96/16
Kirk [12]   21/20 26/5 26/9 28/3
 28/14 29/10 29/14 29/17 37/24
 39/8 45/9 68/11
kitchen [4]   23/1 24/9 24/22
 24/23
knew [12]   33/21 39/12 49/15
 68/20 71/3 80/19 80/20 95/8
 101/21 107/13 123/9 126/10
Knoblauch [1]   130/19
know [96]
knowing [1]   84/23
knowledge [29]   16/17 22/5 50/2
 83/19 83/23 83/23 84/24 85/6
 85/11 85/15 85/20 86/13 86/16
 86/19 86/20 86/23 87/14 87/15
 87/16 87/25 88/10 88/11 88/13
 88/15 88/20 89/2 111/22 115/15
 123/24
known [2]   66/23 121/7
knows [3]   38/19 51/25 57/14
KR [1]   37/9
Kronish [1]   1/22

**L**

L.A [1]   33/7
LA [10]   31/23 32/14 32/16
 33/12 34/6 34/13 34/15 34/16
 40/2 40/6
lab [10]   81/15 81/19 81/21
 81/22 93/5 98/9 101/14 101/17
 102/22 103/2
label [8]   109/8 109/11 109/12
 109/13 109/17 109/25 116/24
 117/18
labeled [5]   19/9 19/9 99/25
 100/10 101/16
labels [14]   107/23 108/1 108/7
 108/13 111/14 111/14 112/12
 116/13 118/1 119/15 119/16
 119/19 119/19 122/3
ladies [2]   121/16 121/19
laid [3]   93/23 97/10 98/6
language [1]   131/1
Lansing [1]   24/25
Lansing Marrision [1]   24/25
large [3]   23/23 24/2 26/11
last [6]   6/16 22/21 56/1 75/7
 76/10 80/14

**L**

late [1]  67/19
later [20]  7/23 9/24 22/9
22/17 24/3 25/15 32/22 33/14
33/17 34/14 34/15 39/18 42/16
44/13 70/5 80/11 82/25 83/2
86/25 103/2
laundering [2]  37/13 37/19
law [21]  1/14 2/2 6/3 8/9 14/1
42/9 54/21 55/11 57/25 63/3
64/2 72/2 72/19 74/16 75/5
77/23 88/14 97/14 123/8 124/21
127/21
lawyer [14]  41/17 41/19 41/22
41/23 42/22 42/25 43/5 47/9
57/23 69/10 72/4 79/12 84/8
84/10
lawyers [5]  50/1 72/6 72/15
72/22 131/14
lay [2]  34/18 98/7
leader [3]  7/9 21/18 21/21
League [4]  63/3 64/24 70/18
125/9
leaned [1]  14/9
learn [2]  80/11 90/18
least [7]  3/9 69/25 72/23
121/6 126/9 127/16 132/24
leave [4]  38/20 40/15 94/23
117/6
leaves [1]  80/16
led [2]  14/9 130/6
leeway [4]  8/3 77/5 104/1
104/7
left [15]  19/6 39/9 40/18
80/20 83/6 89/12 89/18 89/21
89/23 96/16 97/1 97/7 101/18
125/24 131/5
legal [3]  50/15 69/16 119/16
legally [1]  50/14
legitimately [3]  84/16 84/16
84/16
less [2]  83/1 83/2
let [50]
let's [18]  8/21 9/12 11/16
18/11 22/8 22/21 23/1 38/19
45/13 55/18 77/19 78/20 86/22
87/5 87/11 88/3 89/25 104/13
letter [4]  44/15 44/17 44/21
44/22
level [2]  26/9 123/18
Lexis [1]  24/24
Lexus [3]  19/7 24/13 24/23
lie [1]  57/21
lied [5]  44/5 55/20 56/20 57/3
58/13
lifting [3]  24/1 24/1 24/1
like [23]  7/1 9/10 18/17 28/16
39/14 43/15 45/23 56/24 63/25
93/2 95/16 95/19 108/11 108/24
109/25 114/22 120/4 121/5
122/16 122/25 123/4 131/13
131/19
likely [2]  47/8 69/1
limit [1]  132/12
limited [2]  127/24 131/1
limiting [1]  127/9 129/16
line [2]  35/13 95/8
liquid [7]  11/2 99/13 99/16
99/18 100/10 100/11 100/23
list [7]  7/3 9/13 10/11 10/12
10/15 10/19 11/19

34/13
listened [2]  76/22 78/6
listener [1]  74/25
listing [3]  18/14 18/22 68/16
Lite [2]  88/6 89/17
little [11]  10/25 34/19 39/2
60/1 83/1 83/2 103/24 103/25
104/22 119/6 119/24
LLP [2]  1/22 2/3
loan [2]  21/24 25/4
located [2]  41/24 64/7
location [4]  42/8 97/19 103/23
124/8
locations [4]  25/11 129/5
129/10 129/11
lock [1]  83/10
locked [2]  83/14 130/1
log [2]  103/7 103/10
long [9]  6/15 40/18 42/10
44/19 48/8 71/17 75/7 87/11
110/16
longer [2]  36/24 103/25
Longmire [1]  131/10
look [25]  18/13 19/18 21/2
23/1 23/11 23/13 39/2 42/17
53/3 63/24 65/4 68/7 88/3 91/9
93/18 98/5 103/14 112/19 114/7
116/10 117/4 117/14 118/8
119/13 121/5
looked [7]  23/14 23/17 34/7
74/17 81/19 81/21 99/16
looking [5]  7/3 93/7 102/19
103/1 108/11
loose [1]  19/23
Los [1]  78/13
lot [5]  37/15 77/5 79/2 85/15
131/5
loud [1]  120/18
loudly [1]  120/19
lower [1]  9/2
lunch [1]  15/18
lying [4]  52/6 57/18 57/25
58/25
Lynch [1]  24/14

**M**

M-A-D-R-I-G-A-L [1]  92/25
machine [1]  2/24
made [13]  8/16 35/25 36/1
45/18 45/19 46/1 49/19 50/16
60/17 60/18 94/14 104/9 105/22
Madrigal [4]  92/21 92/24 93/22
97/23
magic [1]  24/6
magically [2]  7/23 24/4
magistrate [5]  32/23 33/15
33/19 34/14 70/3
mail [13]  18/24 19/8 25/8 25/8
38/18 39/2 39/4 40/16 40/18
65/13 65/14 66/10 66/13
mailing [3]  117/18 119/15
119/16
mails [2]  29/21 65/13
major [7]  13/16 13/18 13/20
63/3 64/24 70/18 125/9
make [21]  14/12 35/21 38/23
41/3 42/18 45/17 47/21 48/17
53/10 54/21 55/7 76/13 78/5
84/20 104/24 106/17 116/22
127/1 128/12 129/23 131/4
making [6]  53/13 53/23 77/7

Mall [1]  1/22
man [7]  5/16 33/14 45/5 46/3
46/10 46/10 127/6
Manhattan [2]  41/25 75/5
manually [1]  122/6
many [11]  5/19 6/1 8/9 14/17
17/25 25/18 43/10 72/2 72/22
74/23 78/19
marked [1]  81/4
Marrision [1]  24/25
marshals [4]  103/22 104/22
105/1 128/7
marshals' [1]  128/12
Mart [1]  24/24
Maryland [1]  2/4
master [5]  21/2 21/3 21/8
21/14 22/1
material [6]  58/5 58/9 58/14
85/11 89/19 92/3
materials [1]  92/12
Matt [1]  41/20
matter [12]  31/8 49/7 58/14
105/9 105/11 105/14 105/17
105/17 106/3 106/5 132/11
135/5
matters [2]  50/3 116/21
may [44]
May 18th [1]  106/12
May 29th primary [1]  132/21
May 9th [3]  66/17 66/19 68/20
may been [1]  80/21
May of [1]  127/7
maybe [6]  8/14 38/18 63/16
90/4 104/17 119/3
McCoy [1]  118/22
McKinney [1]  1/19
McNamee [124]
McNamee's [10]  9/24 28/1 65/14
72/3 109/17 110/21 125/10
125/13 127/12 131/15
me [123]
mean [26]  6/9 7/12 7/17 9/10
13/22 28/16 28/19 32/13 33/12
34/22 34/23 53/8 60/1 62/4
77/4 77/10 85/23 91/11 92/14
95/5 98/12 118/13 126/4 126/25
127/24 130/16
means [2]  44/3 127/8
meant [2]  85/12 113/22
medical [1]  19/8
meet [5]  41/11 41/13 42/13
61/12 69/21
meeting [14]  41/15 42/12 42/24
43/2 46/6 46/7 53/1 55/20
62/14 62/16 113/9 127/12
127/13 132/7
meetings [7]  48/4 55/18 55/19
55/19 63/14 70/9 77/22
memorandum [2]  94/16 103/12
memory [4]  37/5 66/13 67/9
67/18
mention [1]  130/19
mentioned [2]  72/20 130/15
mentioning [1]  130/14
mentions [2]  33/13 34/12
Merrill [1]  24/13
mess [1]  96/17
message [2]  39/9 66/11
messed [2]  94/25 95/6
met [4]  42/2 57/24 61/19 64/8
metal [1]  83/14

**M**

methods [1]  122/9
Mexican [1]  9/15
mic [3]  120/5 120/6 120/9
MICHAEL [1]  1/21
microphone [1]  129/21
mics [4]  120/7 120/14 120/17
129/6
might [9]  3/15 14/12 29/21
36/20 38/12 46/17 93/15 112/17
119/2
Mike [3]  23/20 23/23 24/25
Miller [2]  88/6 89/17
milliliter [18]  9/15 9/17 9/20
9/21 10/20 11/12 11/21 12/1
12/2 12/6 12/8 12/11 12/12
12/13 12/14 12/15 12/16 12/17
milliliters [4]  11/23 12/7
12/9 12/10
mind [12]  26/23 33/5 41/1
45/13 49/11 53/19 67/25 70/13
76/1 101/4 111/18 131/18
minute [7]  7/15 45/12 55/23
77/2 85/8 86/10 87/11
minutes [4]  33/13 103/18
104/15 110/5
mis [2]  31/9 35/16
mis-remembered [2]  31/9 35/16
miscellaneous [1]  24/15
MISCELLANY [1]  134/14
mislabeled [1]  13/1
mislead [1]  131/23
misrepresented [1]  10/19
Miss [1]  61/23
mistake [2]  31/4 35/15
misunderstood [1]  99/12
Mitchell [46]
Mitchell's [3]  74/15 74/24
75/5
model [2]  108/23 108/24
moment [9]  10/7 28/4 28/12
28/15 45/23 82/10 112/18 117/5
118/5
Monday [12]  105/6 105/7 105/8
106/1 118/15 120/8 128/15
128/17 128/25 129/14 129/16
130/25
money [3]  21/25 37/13 37/19
monitor [3]  53/4 73/2 73/3
monitoring [3]  53/8 74/5 78/8
month [5]  38/8 62/22 82/24
83/1 83/2
months [6]  36/22 63/9 63/21
63/24 64/1 64/15
MONTHY [1]  1/18
more [19]  21/13 47/8 60/14
69/1 71/6 77/1 78/19 100/22
103/24 104/15 110/5 122/24
123/16 123/19 123/20 125/22
127/14 127/14 129/21
morning [3]  79/2 128/15 132/8
mortgage [2]  21/24 24/12
most [3]  62/7 123/4 128/1
motion [2]  105/14 131/14
Movant [1]  2/2
move [9]  5/7 8/21 22/8 36/9
65/17 77/19 82/7 105/16 114/4
Mr [21]  7/23 13/16 30/21 32/25
33/11 48/24 61/16 61/19 62/19
62/23 67/11 72/22 74/15 74/24
75/5 76/15 113/3 130/6 131/11

Mr. [260]
Mr. Clemens [39]
Mr. Clemens' [6]  26/12 109/9
109/15 109/17 112/1 121/2
Mr. Durham [5]  33/9 79/16
91/16 115/1 127/8
Mr. Durham's [1]  35/16
Mr. Emery [13]  79/3 84/7 85/5
89/6 89/10 90/10 90/19 90/22
91/3 94/4 94/10 94/13 94/14
Mr. Emery's [9]  79/5 79/12
83/6 83/18 90/5 99/5 107/2
107/14 107/16
Mr. Grimsley [5]  31/15 33/5
67/14 125/2 125/8
Mr. Grimsley's [1]  32/1
Mr. Hardin [13]  35/12 35/15
110/25 116/9 116/12 122/9
123/22 124/24 125/5 125/19
126/3 127/12 129/24
Mr. Hardin's [1]  131/18
Mr. Harvey [1]  43/8
Mr. Jeff [1]  46/2
Mr. McNamee [78]
Mr. McNamee's [8]  9/24 72/3
109/17 110/21 125/10 125/13
127/12 131/15
Mr. Mitchell [1]  127/21
Mr. Nedrow [2]  62/1 71/22
Mr. Novitzky [17]  17/6 20/20
27/24 33/19 34/2 46/22 48/12
51/16 53/23 59/7 70/25 73/19
83/16 86/21 88/13 97/6 106/17
Mr. Parrella [5]  57/2 57/8
59/9 62/1 71/22
Mr. Pettitte [7]  26/15 29/5
31/25 32/15 33/22 125/23
127/15
Mr. Pettitte's [1]  130/16
Mr. Radomski [37]
Mr. Radomski's [6]  8/10 8/24
40/22 121/2 121/23 123/10
Mr. Richard [1]  72/10
Mr. Rogers [2]  7/5 61/23
much [6]  6/11 35/19 104/12
116/8 130/2 132/2
multiple [1]  16/6
must [2]  12/3 127/4
my [41]
myself [2]  41/20 62/11

**N**

N.W [2]  1/16 2/7
name [10]  26/17 27/12 28/1
29/3 101/12 109/17 124/25
125/10 125/13 130/16
named [4]  33/25 68/3 68/8 68/9
names [6]  7/4 34/7 119/21
127/17 130/14 130/22
naming [1]  67/8
Nandrolone [1]  101/12
narrate [1]  90/4
necessarily [1]  13/20
necessary [2]  30/22 93/15
neck [1]  10/24
Nedrow [2]  62/1 71/22
need [10]  10/8 20/15 20/17
35/11 73/3 110/6 118/8 130/18
131/13 131/15
needed [1]  73/7
needle [4]  11/2 11/5 11/7

needles [1]  102/6
needs [2]  47/5 105/2
negotiable [1]  122/25
neither [5]  74/13 76/15 76/17
77/24 115/1
never [13]  15/22 41/1 44/4
45/13 49/14 49/16 49/23 52/12
64/17 101/4 104/3 104/18
111/18
new [13]  41/25 42/9 51/5 71/25
75/5 80/12 80/17 80/21 83/9
108/2 108/4 132/22 132/22
next [12]  11/20 12/12 24/22
27/14 36/18 37/7 38/8 76/22
78/24 122/1 131/7 132/4
nice [2]  41/10 128/24
nicely [1]  35/7
nickname [1]  100/3
nicknames [1]  100/4
nine [4]  5/24 6/1 22/15 128/16
no [118]
nobody [3]  32/22 50/1 51/7
noise [1]  120/16
non [6]  52/20 60/19 60/22
60/25 71/10 73/5
none [3]  77/23 123/9 124/1
normal [2]  47/20 55/12
North [1]  24/11
Northern [4]  53/7 64/5 64/6
64/10
Nos [4]  65/22 115/7 134/11
134/12
not [207]
note [1]  74/16
notepad [1]  24/20
notes [13]  24/15 53/3 73/19
74/1 74/4 76/13 77/24 77/25
78/2 78/5 127/21 127/23 128/3
nothing [5]  61/21 77/15 102/17
110/3 124/8
notion [1]  125/24
November [1]  4/20
November of [1]  4/20
Novitzky [29]  17/6 20/20 27/24
33/19 34/2 46/2 46/22 48/12
48/24 51/16 53/23 59/7 70/25
73/19 78/14 83/16 86/21 88/13
97/6 106/17 117/14 120/21
123/6 125/25 130/1 130/2 130/7
130/10 134/5
now [91]
number [14]  7/22 12/20 12/21
13/4 19/1 19/4 21/3 21/23
24/14 39/7 65/25 117/3 117/9
126/1

**O**

o'clock [3]  105/6 106/2 128/16
oath [2]  26/25 52/16
object [12]  3/22 22/4 24/5
31/13 55/21 69/4 73/20 74/18
78/14 82/13 88/17 95/11
objection [45]
observe [1]  99/8
observed [1]  91/8
obtain [2]  47/12 47/13
obtained [3]  26/10 107/13
121/12
obviously [4]  14/25 34/24
35/22 35/24 77/10 77/12 82/14
131/24

## O

occasion [4]   73/18 76/22 79/3
 79/7
occur [1]   35/24
occurred [2]   111/12 128/23
occurring [1]   76/11
October [7]   31/24 32/14 33/7
 34/12 40/2 40/6 78/13
October of [2]   40/2 40/6
October the [2]   31/24 78/13
off [13]   4/5 5/20 10/23 11/5
 64/16 90/16 98/9 100/8 119/1
 120/7 120/10 124/3 129/6
offense [1]   51/8
offered [2]   35/4 114/13
offhand [1]   38/10
office [29]   9/24 16/10 23/21
 38/1 42/9 42/24 43/8 45/20
 46/1 53/6 60/18 64/3 64/6
 66/19 71/18 79/5 79/12 83/7
 83/18 85/2 92/2 92/17 94/5
 94/9 99/5 99/11 107/2 107/14
 107/16
officer [5]   55/11 58/1 59/18
 74/16 88/14
officers [3]   5/25 7/1 72/19
offices [5]   42/22 76/24 83/13
 90/5 97/24
official [2]   2/6 26/16
officials [1]   124/21
officing [1]   71/24
oh [6]   13/9 15/9 15/25 43/10
 113/2 131/6
okay [118]
old [2]   6/20 120/21
old-fashioned [1]   120/21
once [3]   83/4 83/6 102/17
one [66]
ones [2]   44/12 108/1
ongoing [1]   33/20
only [26]   28/21 34/18 40/9
 48/20 54/16 63/13 64/19 68/3
 70/13 70/19 70/24 81/21 83/15
 85/23 85/23 89/8 104/14 109/2
 109/19 116/24 126/8 126/18
 126/21 126/24 127/9 128/1
open [10]   8/4 27/22 36/3 38/20
 77/20 97/13 99/15 100/24
 126/24 128/10
opened [3]   93/23 99/9 99/13
opine [1]   56/3
opinion [2]   56/7 70/10
opposed [1]   10/6
or 65 [1]   66/3
orange [1]   102/4
order [7]   19/8 35/2 47/6 53/2
 53/4 103/25 104/24
ordered [1]   21/25
orderly [1]   93/8
organization [2]   54/1 54/23
original [1]   121/16
originally [1]   99/24
originals [1]   121/4
other [40]
others [6]   14/3 46/24 72/8
 80/18 94/3 109/22
ought [2]   71/1 71/9
our [8]   32/11 116/22 123/21
 129/5 131/7 131/24 132/6
 132/17
out [57]

outside [5]   31/18 32/17 94/8
 110/13 111/16
over [20]   6/9 8/21 9/23 14/21
 19/18 25/17 73/11 73/12 79/16
 80/24 80/25 81/15 91/10 107/24
 118/1 119/14 119/20 120/25
 122/4 124/5
overhead [1]   92/11
Overruled [3]   49/21 73/22
 88/18
oversaw [1]   64/11
oversees [1]   64/10
own [6]   6/12 8/14 8/17 87/15
 87/20 87/24

## P

P-R-I-M-O-B-O-L-A-N [1]   100/2
P-R-O-C-E-E-D-N-I-G-S [1]   3/1
P.C [1]   1/9
p.m [9]   1/7 3/2 6/18 8/18
 55/24 55/25 103/19 103/20
 133/3
pace [1]   104/10
packaged [2]   90/23 92/10
padlock [1]   83/14
page [14]   8/22 18/13 18/14
 19/2 19/18 21/19 22/21 22/21
 23/20 59/5 88/3 103/11 103/12
 134/10
pages [1]   18/21
paid [1]   24/10
paper [4]   22/23 74/8 117/4
 117/11
papers [2]   19/14 19/16
Pardon [3]   15/3 20/1 42/18
Parrella [7]   41/21 57/2 57/8
 59/9 62/1 71/22 73/16
part [11]   10/23 11/19 23/25
 69/13 73/4 103/12 109/24 110/2
 132/24 132/25 132/25
participate [4]   15/20 16/11
 74/24 78/19
participated [6]   5/20 5/22
 5/24 21/19 83/24 84/1
participating [1]   101/18
particular [3]   38/3 60/11
 132/14
party [2]   96/10 123/3
pass [2]   25/3 114/3
passage [1]   104/11
passed [1]   123/12
past [2]   52/9 58/18
Pause [1]   119/5
paying [1]   45/9
payment [1]   122/19
payments [1]   122/10
pen [1]   74/11
pending [4]   36/20 132/20
 132/24 132/24
penmanship [1]   115/2
people [29]   5/20 5/24 6/3 7/4
 7/22 8/10 21/14 22/16 22/23
 34/21 35/21 36/19 48/12 51/19
 53/2 58/13 72/3 95/8 95/21
 103/2 109/23 118/22 119/22
 123/22 127/18 129/4 129/10
 130/4 130/19
per [6]   19/7 19/24 21/4 21/9
 21/23 21/23
perceived [1]   87/21
perception [1]   87/15

perfectly [1]   27/20
performance [3]   20/7 68/12
 124/16
performance-enhancing [3]   20/7
 68/12 124/16
perhaps [3]   53/22 127/17
 129/24
period [3]   46/16 47/2
 47/11 63/1 63/7
periodically [1]   38/2
perjury [2]   52/17 124/22
permit [2]   24/24 40/11
person [11]   25/25 56/7 57/20
 57/25 58/8 69/14 69/20 74/23
 75/2 96/10 104/24
personal [33]   14/3 24/20 25/5
 26/8 26/12 26/18 29/2 29/5
 34/3 46/15 46/18 46/21 83/19
 83/23 83/23 84/22 84/24 85/3
 85/10 85/20 86/13 86/16 87/14
 87/15 87/24 88/10 88/11 88/13
 88/15 88/20 89/1 90/17 115/15
personally [12]   15/8 38/7 46/2
 46/22 48/21 77/22 86/3 101/21
 102/23 102/24 108/2 108/20
personnel [1]   77/23
Pettitte [13]   26/15 26/18 28/2
 29/5 29/9 31/25 32/15 33/22
 34/4 34/12 46/23 125/23 127/15
Pettitte's [1]   130/16
PG [1]   37/9
phone [13]   17/21 24/23 29/21
 39/5 39/7 39/7 66/10 74/23
 76/21 76/23 78/6 118/24 118/25
photo [1]   90/1
photocopy [2]   121/17 121/18
photograph [4]   91/5 91/23
 98/12 102/18
photographer [1]   7/11
photographing [1]   92/15
photographs [9]   81/18 82/3
 82/3 82/4 92/16 94/10 94/14
 94/19 98/8
phrase [1]   43/25
phrased [1]   52/24
physical [2]   56/12 79/17
physically [1]   80/20
pick [5]   108/3 118/14 128/15
 128/18 130/25
picked [2]   108/2 108/6
picture [13]   88/5 89/13 89/15
 91/18 93/22 93/24 97/9 97/21
 97/23 98/2 98/16 106/18 106/20
pictures [9]   92/21 93/3 93/7
 93/10 112/14 112/16 112/20
 112/21 112/23
piece [2]   11/1 22/18
pieces [1]   22/22
pill [1]   9/18
pills [7]   9/18 12/18 12/20
 12/25 19/23 19/25 20/2
pinpoint [1]   109/24
Piper [3]   2/3 127/23 128/1
pitcher [1]   125/9
place [1]   92/16
placed [5]   39/7 77/14 83/14
 115/25 126/14
Plaintiff [1]   1/4
plans [2]   113/13 132/16
plastic [5]   94/8 94/9 94/19
 102/19 102/21

**P**

play [4]  3/19 80/14 123/6 123/7
played [1]  4/7
player [3]  3/12 125/18 127/19
players [6]  126/1 127/14 127/18 128/1 130/4 130/13
playroom [2]  17/4 17/5
plea [2]  36/17 40/22
plead [3]  36/21 37/2 37/18
pleads [1]  37/9
pleasant [1]  41/9
please [10]  5/23 7/15 17/6 42/17 81/13 82/18 83/16 97/9 117/12 128/22
pled [2]  37/8 37/24
plug [1]  65/5
plural [1]  48/16
plus [3]  14/13 62/1 77/7
point [19]  7/20 27/25 44/13 45/8 46/19 46/19 47/12 67/1 68/3 77/7 77/13 80/21 104/9 126/9 128/9 129/19 129/19 129/20 129/23
pointed [1]  35/14
pool [3]  24/12 24/24 24/25
portion [1]  47/15
position [3]  27/18 71/13 114/12
positions [2]  7/12 132/13
positive [1]  72/11
possessing [2]  14/3 124/17
possession [3]  13/22 14/2 83/6
possibility [1]  100/21
possible [8]  14/18 17/9 17/17 100/14 100/18 101/3 117/12 132/1
possibly [5]  17/16 38/13 75/18 76/10 113/7
postage [1]  24/14
potential [1]  59/17
potentially [4]  57/20 58/15 59/21 71/2
pour [1]  97/14
practice [1]  17/7
precleared [2]  132/15 132/25
predicate [3]  34/18 77/11 126/5
prefer [1]  59/3
preference [1]  111/6
preferred [1]  96/17
premises [2]  8/7 17/9
Premo [1]  100/6
preparation [1]  16/12
prepare [3]  15/14 15/18 16/22
prepared [8]  15/12 16/5 16/9 16/10 16/11 16/14 82/1 94/16
prescription [1]  13/17
present [10]  3/3 5/25 52/23 56/15 56/24 57/2 62/15 62/19 104/19 111/16
presented [1]  77/15
preservation [1]  84/11
preserve [3]  96/6 102/16 103/4
preserved [3]  84/17 84/24 85/21
preserving [2]  95/22 97/12
Presidentially [1]  64/9
Press [1]  33/15
pretrial [1]  106/13
pretty [4]  17/24 20/14 93/8

prevented [1]  127/25
previously [1]  72/20
primary [1]  132/21
Primobolan [2]  12/8 100/2
prior [2]  85/10 105/5
private [4]  53/25 54/1 54/22 96/10
probable [4]  68/24 69/14 69/18 70/1
probably [3]  73/11 74/12 92/20
probed [1]  125/19
problem [14]  32/21 35/3 55/6 66/6 118/13 118/14 118/17 118/19 118/20 119/1 120/9 127/2 129/5 132/8
proceeding [2]  44/5 129/8
proceedings [4]  1/10 2/24 119/8 135/4
process [3]  69/13 80/13 80/19
produced [2]  2/24 25/15
professionally [1]  4/16
proffer [4]  44/15 44/17 44/21 44/22
prohibited [1]  13/17
promise [1]  75/22
propose [1]  130/9
proposed [1]  41/15
prosecuted [1]  50/9
prosecution [2]  53/25 59/22
prosecutor [5]  45/18 50/16 52/25 58/22 58/25
protest [2]  104/12 104/14
provide [5]  10/12 10/14 130/3
provided [5]  52/2 81/18 123/11 125/22 126/1
providing [2]  47/17 127/4
proximity [1]  63/5
publicly [1]  29/3
publish [1]  82/20
pull [1]  11/5
purchase [1]  19/8
purchases [1]  21/4
purpose [6]  78/8 126/6 126/6 126/8 127/10 129/17
purposes [4]  48/20 114/24 115/4 131/18
put [30]  11/5 22/10 22/11 32/11 36/10 36/11 37/9 43/10 51/12 61/17 62/8 63/8 63/10 66/6 68/6 78/20 78/20 78/21 82/17 83/9 92/15 94/19 97/17 100/21 102/18 111/6 114/23 116/12 121/20 123/18
putting [3]  34/24 63/15 70/2

**Q**

quadrant [1]  117/18
quadrants [1]  122/5
qualification [1]  14/11
qualified [2]  14/6 56/3
quantified [1]  20/24
quantities [1]  9/18
quantity [1]  13/23
quarrel [1]  54/16
quash [1]  131/14
queen [2]  43/25 44/3
Quest [1]  25/3
question [40]
questioning [2]  8/1 91/16
questions [24]  31/6 31/14 41/7 52/9 53/11 58/2 61/6 75/9

quickly [7]  7/21 9/12 18/12 18/12 22/22 24/9 35/12
quite [2]  14/8 132/5

**R**

Radomski [53]
Radomski's [8]  8/10 8/24 39/8 40/22 121/12 121/23 123/10 128/2
raise [3]  69/21 77/8 100/21
raised [3]  35/14 35/14 126/3
raises [1]  100/19
ran [3]  40/2 40/6 86/25
range [1]  130/12
rate [1]  39/1
rather [2]  34/15 57/12
RBW [1]  1/4
reach [4]  36/25 39/4 131/11 131/22
reached [7]  39/19 41/2 42/1 66/22 79/20 80/1 80/3
reaching [1]  47/17
read [4]  9/8 9/8 16/14 64/12
reading [2]  3/11 10/15
ready [1]  6/20
real [7]  9/12 18/11 22/22 24/9 62/24 117/22 132/8
really [18]  4/16 5/17 6/11 22/14 27/25 34/21 34/22 34/23 35/4 35/7 46/17 61/7 64/19 94/2 111/22 116/8 123/9 132/17
rearrange [1]  105/4
reason [7]  67/21 85/23 96/5 115/5 126/5 126/21 126/23
reasons [1]  119/18
rebut [1]  44/10
recall [38]
receipt [1]  21/25
receipts [4]  21/4 24/10 24/11 24/14
received [9]  12/21 79/7 79/12 79/15 82/21 87/10 89/24 115/8 117/19
receiving [5]  51/1 51/9 52/12 66/25 68/11
recess [2]  106/8 128/11 128/14
Recessed [2]  55/24 103/19
recognize [1]  118/1
recognizing [1]  90/17
recollection [4]  43/12 68/12 94/1 120/24
recommended [3]  58/24 59/3 59/4
record [4]  124/3 130/7 130/16 135/4
recorded [1]  2/24
records [12]  8/14 8/17 17/21 17/22 20/11 20/15 20/16 20/18 20/23 20/24 20/25 45/8
recovered [4]  12/23 13/15 26/4 115/12
Recross [1]  134/4
Redirect [3]  116/3 116/4 134/4
redistricting [2]  132/10 132/16
refer [3]  61/22 62/10 110/7
reference [5]  21/9 29/4 56/1 81/4 115/11

**R**

referenced [2]   78/12 122/11
referred [6]   21/18 26/14 26/14
  32/22 34/4 79/2
referring [3]   19/1 20/2 79/25
reflect [6]   8/14 8/17 87/2
  87/3 109/13 109/14
reflected [4]   84/12 109/8
  109/15 114/9
refresh [2]   5/14 67/9
refrigerator [1]   19/7
regarding [4]   87/16 129/12
  129/17 131/2
REGGIE [1]   1/11
regularly [1]   69/13
related [1]   74/6
relating [2]   17/21 124/15
relative [1]   123/16
relatively [1]   131/10
relaying [1]   45/25
relevance [2]   7/14 73/20
relevant [3]   20/11 34/23 126/2
reliability [1]   51/18
remain [2]   32/10 52/20
remember [11]   3/11 38/9 67/11
  104/11 107/24 108/18 108/21
  108/23 108/25 112/9 125/5
remembered [2]   31/9 35/16
remembers [1]   33/8
remind [2]   59/17 129/16
removed [5]   90/1 91/9 91/11
  91/13 98/17
repair [1]   24/13
repeat [1]   71/6
rephrase [1]   51/11
report [19]   15/12 15/14 15/19
  15/20 16/9 16/18 16/19 16/22
  32/22 34/10 34/11 78/11 78/12
  78/15 78/18 78/22 81/14 103/11
  103/12
reporter [9]   2/6 2/6 10/7 34/5
  34/6 129/8 134/15 135/1 135/9
reporter's [1]   118/7
reports [2]   101/14 101/17
represent [1]   13/3
represented [3]   96/10 107/16
  108/13
representing [2]   42/25 43/2
request [2]   53/6 128/12
reschedule [1]   105/14
researched [1]   29/2
reset [2]   37/21 38/2
residence [8]   5/16 8/16 8/19
  22/17 39/8 83/12 121/13 125/3
resolve [2]   129/13 131/15
resolved [2]   132/9 133/1
respect [3]   45/14 119/16
  131/21
response [1]   58/2
result [1]   87/2
resulted [1]   111/25
results [5]   85/6 86/18 87/8
  87/14 87/22
Resumed [2]   55/25 103/20
return [1]   80/14
revealing [1]   34/25
revelation [1]   130/21
reverse [1]   47/20
review [2]   16/2 21/10
reviewed [4]   15/22 15/25 16/7
  38/14

right [198]
riot [1]   6/23
ripped [1]   122/6
ROGER [17]   1/7 26/5 26/18 28/2
  28/5 28/9 29/9 29/18 29/22
  29/25 33/18 34/3 34/7 34/11
  34/12 46/23 61/7
Rogers [5]   7/5 61/23 72/16
  76/15 81/24
room [3]   2/7 83/9 85/4
roughly [1]   61/17
RPR [1]   2/6
rubber [4]   11/1 11/1 11/2 11/8
rubric [1]   63/25
rule [1]   105/15
ruled [3]   48/20 96/23 97/3
ruling [2]   55/10 67/10
run [4]   55/9 67/10 86/10 103/5
runs [1]   32/21
RUSSELL [1]   1/18
Rusty [1]   1/19
Ryan [1]   64/8

**S**

said [51]
SALESKI [1]   1/14
same [21]   6/13 22/8 32/2 35/24
  36/13 37/1 37/3 37/6 37/8
  43/12 54/14 55/5 59/5 66/10
  66/14 76/3 82/4 90/14 91/20
  97/2 114/19
samples [1]   103/2
San [20]   1/23 3/20 4/1 4/7 4/9
  4/12 4/14 4/18 61/11 64/2 64/5
  64/6 64/7 64/9 64/13 64/21
  71/24 76/24 83/11 83/13
sat [2]   53/10 85/12
satisfied [2]   13/16 114/8
satisfies [1]   58/13
satisfy [1]   16/16
Savings [1]   24/11
saw [2]   106/25 115/21
say [30]   5/25 10/14 19/14
  20/16 26/3 26/18 28/15 28/16
  28/19 28/21 29/6 38/20 39/21
  44/22 45/12 45/15 52/25 53/12
  61/19 63/13 64/1 72/23 75/21
  75/25 88/20 98/22 110/20
  111/11 117/24 130/10
saying [18]   14/11 15/12 15/22
  15/24 28/19 29/8 30/9 31/24
  40/4 52/6 53/4 54/17 60/24
  76/8 89/21 105/1 119/2 131/18
says [7]   22/17 33/3 44/7 47/25
  77/10 77/18 104/11
scene [3]   25/22 25/24 96/10
schedule [1]   105/4
scheduling [1]   131/17
scheme [1]   34/9
scholar [1]   104/10
school [1]   6/21
scope [10]   31/18 31/20 32/5
  32/17 34/22 35/10 55/14 77/7
  110/14 126/2
screen [4]   116/12 117/6 117/16
  121/21
scrunched [1]   89/23
sealed [4]   32/23 32/25 34/6
  102/21
search [76]
searched [9]   7/22 8/10 14/25

searcher [1]   7/12
searchers [3]   21/11 23/19
  23/24
searching [2]   17/14 17/16
seated [3]   3/4 56/16 104/20
second [9]   19/18 37/9 56/21
  57/7 59/8 59/8 59/15 88/3
  129/19
secondary [1]   3/12
section [1]   34/11
secure [1]   83/12
secured [1]   83/13
security [1]   24/25
see [32]   5/9 7/3 11/4 11/16
  20/10 24/3 29/7 34/6 39/2
  47/18 54/11 60/16 61/17 65/5
  65/11 74/8 87/20 91/17 93/10
  93/10 93/18 95/6 101/14 115/1
  116/17 116/20 119/1 119/23
  120/8 121/20 128/25 130/7
seek [2]   20/25 69/8 69/10
  112/19 113/13 113/22 113/25
  127/5
seeking [4]   55/10 70/11 97/2
  127/5
seems [2]   77/6 120/4
seen [2]   93/19 93/20
seize [12]   9/4 17/12 17/13
  18/5 18/11 20/6 20/9 20/11
  20/18 20/22 20/24 21/2
seized [27]   8/24 9/5 13/10
  18/19 18/22 18/24 19/7 19/10
  19/11 19/13 19/15 19/16 19/20
  19/22 19/24 21/4 21/9 21/10
  21/11 21/14 21/23 21/23 22/23
  24/9 25/6 25/8 122/3
Selig [1]   63/2
Senate [1]   132/13
Senator [17]   53/1 53/10 53/11
  63/3 64/8 64/20 70/17 70/17
  70/21 70/24 71/4 71/11 72/2
  72/12 73/8 127/13 127/13
sense [1]   123/16
sent [11]   66/13 81/19 81/21
  81/22 83/7 93/4 98/8 109/8
  109/11 109/14 109/15
sentencing [4]   37/14 37/20
  37/25 38/2
separate [4]   21/20 107/10
  108/4 129/20
sequence [1]   33/13
Serostim [3]   13/7 19/9 101/10
session [1]   3/2
set [5]   37/20 37/21 37/22
  108/16 108/18
seven [1]   22/15
Seventeen [2]   6/2 24/19
several [3]   22/12 66/18 132/22
Shakespeare [1]   104/11
shall [1]   61/22
shape [1]   80/13
SHAW [2]   2/6 135/3
she [5]   6/11 10/12 76/17 76/20
  93/3
She's [2]   116/14 119/2
sheet [1]   18/14
shelf [2]   19/19 19/22
shipped [2]   102/22 119/18
shipping [1]   116/13
short [4]   3/15 103/16 119/23
  131/10

**S**

short-circuit [1]  119/23
shorten [1]  71/7
shorthand [1]  2/24
shortly [4]  4/22 37/3 39/10
 63/2
should [3]  125/14 127/16 132/4
shouldn't [3]  35/22 35/24
 35/25
show [11]  23/1 27/15 35/4 35/8
 65/8 93/2 93/12 94/3 96/1
 120/2 121/10
showed [5]  5/12 25/9 28/23
 86/18 107/4
showing [2]  92/24 93/3
shown [2]  88/8 91/20
shows [1]  88/4
sides [1]  131/25
sight [1]  23/6
Sigma [1]  13/12
Signature [1]  135/9
significant [3]  77/4 104/6
 104/7
silver [1]  101/11
similar [3]  13/13 50/1 93/24
simply [1]  11/7
since [1]  5/17
single [5]  26/14 74/16 74/16
 106/19 127/19
sink [1]  24/10
sir [14]  28/25 29/20 36/19
 46/2 52/9 75/20 85/8 88/22
 113/18 114/14 117/10 122/21
 123/23 129/2
sit [8]  26/23 78/3 85/25 105/8
 105/20 105/25 106/12 106/12
site [4]  18/15 18/19 18/20
 18/22
sits [2]  64/5 64/9
sitting [3]  86/1 105/4 105/23
situations [2]  37/15 50/1
six [8]  6/20 107/24 108/1
 108/7 109/2 109/19 111/14
 119/15
Sixteen [2]  93/20 93/22
skills [1]  131/19
skinny [1]  10/24
Skyline [2]  4/6 4/9
slip [2]  22/11 112/12
slips [5]  18/25 19/8 22/10
 25/8 25/8
slow [1]  104/9
small [3]  11/1 24/22 115/19
Smith [1]  2/3
sneak [1]  38/23
so [155]
social [1]  24/25
some [52]
somebody [23]  13/25 27/10 29/8
 34/5 47/7 50/17 52/20 53/19
 53/24 57/11 57/19 58/12 68/5
 69/10 86/25 87/20 88/15 88/21
 96/23 104/23 105/5 113/22
 120/7
somehow [3]  25/14 125/25 130/1
someone [3]  56/4 68/10 68/11
something [27]  7/24 11/17 17/1
 17/5 34/24 38/23 46/25 47/4
 47/25 51/14 57/20 59/4 64/18
 75/12 75/17 76/7 77/6 77/10
 77/12 87/3 87/9 95/25 96/11

sometimes [2]  13/25 86/24
somewhat [2]  20/14 71/5
somewhere [3]  7/17 63/15 105/2
sorry [18]  15/9 18/18 30/11
 31/2 31/13 35/15 44/2 66/4
 73/9 83/4 85/12 89/19 91/12
 96/25 113/18 114/15 116/11
 119/12
sort [2]  81/17 112/19
sought [12]  49/16 49/20 49/23
 49/23 50/3 58/19 58/19 58/22
 59/3 59/6 67/7 67/14
sound [1]  129/5
sounded [1]  28/16
Sounds [1]  78/23
sources [1]  85/3
speak [3]  72/12 120/11 120/19
speaking [2]  60/10 61/6
Special [3]  4/20 7/8 23/20
specific [5]  20/14 20/18
 119/21 127/17 130/14
specifically [2]  45/2 59/14
specify [1]  102/13
speculate [1]  101/4
speculation [2]  100/25 101/1
spellings [2]  10/8 10/13
spent [1]  4/6
spoke [1]  56/4
sponsored [1]  22/11
sport [1]  3/10
sporting [1]  80/7
square [2]  9/1 9/3
SQUILLARIO [1]  2/2
Stacey [1]  66/5
Stacy [2]  97/10 106/23
stage [1]  71/21
stages [1]  6/22
stains [1]  100/12
stakes [2]  77/4 104/6
stand [1]  43/25
standard [6]  69/1 69/2 69/16
 69/17 69/18 69/21
start [16]  3/19 14/22 59/15
 65/25 105/6 105/10 105/12
 105/16 105/18 106/2 106/3
 106/6 106/7 106/11 116/8
 116/10
started [9]  3/11 4/5 6/17 8/15
 15/17 35/12 59/9 90/7 105/23
starting [2]  126/9 126/19
state [6]  4/7 53/19 123/6
 123/7 132/13 132/14
stated [2]  35/13 126/11
statement [23]  4/25 8/12 14/4
 15/4 21/23 21/25 24/24 24/24
 25/1 25/1 25/4 25/4 27/24 28/4
 35/25 37/2 37/16 38/4 38/21
 51/7 70/25 111/10 111/11
statements [10]  21/5 21/5
 21/24 21/24 21/25 24/11 24/13
 24/14 26/10 124/21
STATES [9]  1/1 1/3 1/11 1/16
 41/20 45/19 46/1 64/4 73/16
status [7]  49/15 60/19 60/23
 71/2 71/11 73/5 73/6
sterile [1]  19/9
steroid [9]  9/18 11/14 11/15
 11/24 20/5 99/23 99/25 100/11
 100/11 100/23 101/13 101/15
steroids [36]
STEVEN [1]  1/13

still [9]  5/11 33/20 48/4 48/6
 48/10 49/16 132/20 132/24
 132/24
stipulations [1]  131/22
stop [2]  9/22 86/10
storage [1]  84/12
store [1]  80/8
stored [7]  83/12 84/16 84/23
 85/4 85/11 107/10 107/20
stories [1]  9/2
story [6]  9/1 9/2 33/12 34/17
 40/2 40/6
Street [1]  1/16
strike [2]  24/6 95/5
stuff [17]  79/12 79/15 80/24
 83/20 84/2 84/12 84/15 85/21
 89/2 94/4 94/13 94/23 95/1
 96/18 107/10 107/15 128/2
subject [5]  30/7 30/22 32/3
 32/6 53/24
subjecting [1]  59/21
subsequent [2]  86/17 87/9
substance [2]  37/11 37/19
substances [1]  13/17
substantial [2]  13/21 14/12
substantive [1]  114/22
succeed [1]  69/20
such [2]  16/23 17/21
Suffolk [1]  25/1
suggesting [2]  48/1 112/18
suitcase [2]  83/10 92/11
Suite [1]  1/19
summary [2]  9/10 81/14
Summer [1]  29/3
Super [1]  113/1
supervisor [2]  23/20 23/24
supposed [3]  91/24 92/4 128/24
supposedly [1]  112/13
suppositioned [1]  27/13
sure [34]
surfaced [1]  28/1
Surveillance [1]  132/7
suspicion [1]  47/4
sustain [15]  31/15 32/7 48/1
 50/17 53/18 53/20 55/15 56/2
 56/2 77/19 84/20 97/3 101/1
 113/17 113/19
sustained [14]  24/7 31/14 36/5
 54/7 55/2 56/19 69/5 74/20
 75/23 78/16 90/25 95/3 96/14
 96/20
Sustanon [1]  12/12
SWAT [1]  7/1
switching [1]  90/16
syringes [7]  17/2 17/2 19/19
 19/20 21/13 21/13 24/15
system [1]  129/6

**T**

table [5]  17/13 17/15 50/2
 97/14 108/23
take [32]  7/18 17/20 17/24
 21/7 36/21 42/10 45/23 50/7
 55/23 56/10 68/7 73/19 74/1
 74/4 87/5 90/1 91/23 92/5 92/8
 93/13 94/22 98/8 101/21 102/18
 103/16 103/23 106/22 117/14
 119/13 128/3 128/6 128/8
taken [8]  16/20 17/1 17/5 91/8
 91/9 92/21 112/16 112/24
takes [1]  131/20

taking [4]   32/20 77/23 102/16
116/25
talk [17]   6/9 18/11 33/11 41/7
47/10 53/25 60/25 71/11 71/20
77/1 86/22 87/11 97/8 103/2
127/6 127/7 128/19
talked [6]   39/21 46/3 49/12
52/21 67/11 80/18
talking [20]   5/15 15/15 51/16
58/9 71/21 79/8 82/8 86/3
86/17 86/20 95/9 95/18 119/12
123/1 126/11 127/3 127/4 128/4
129/12 132/23
talks [2]   25/5 33/10
target [25]   5/16 43/16 44/18
44/22 45/2 45/6 45/18 46/3
46/8 46/10 46/20 47/1 47/8
48/20 49/15 52/20 53/24 60/19
60/22 60/25 70/6 71/2 71/10
73/5 73/7
task [1]   61/19
tasked [1]   70/17
team [9]   7/8 21/7 21/11 21/18
21/21 22/23 23/2 23/2 23/25
teammate [2]   33/1 125/18
Technical [1]   120/3
technically [1]   21/21
technology [2]   118/19 118/20
telephone [1]   45/25
television [2]   23/23 112/12
televisions [1]   24/2
tell [49]
telling [10]   26/25 57/11 59/9
59/10 60/12 60/13 70/22 75/16
90/16 94/15
tells [2]   44/4 88/15
ten [9]   9/15 9/17 12/2 19/8
25/20 34/14 55/23 103/18
104/14
ten-minute [1]   55/23
tender [2]   81/5 82/11
Tennessee [1]   80/8
term [1]   13/20
terms [4]   45/7 60/5 62/8 84/3
test [6]   86/18 86/25 87/2
87/12 87/14 87/22
testified [3]   33/20 111/17
121/11
testify [3]   44/9 111/23 125/11
testifying [1]   110/25
testimony [7]   33/8 34/23 44/10
99/4 103/3 115/10 131/16
testing [1]   85/6
Testoviron [3]   9/21 11/11
11/12
tests [3]   86/10 87/9 103/5
Texas [3]   1/20 132/19 132/23
Textex [1]   11/23
than [23]   35/19 38/12 47/8
47/20 50/24 52/3 69/1 69/18
83/1 83/2 84/3 84/10 85/4
88/12 89/5 97/18 98/17 122/24
122/25 123/20 125/22 126/6
127/15
thank [22]   5/10 18/9 36/2
55/16 56/13 56/16 59/13 62/7
65/10 81/8 82/18 93/16 106/22
110/8 112/7 112/7 112/7 115/6
117/2 122/8 129/2 129/3
that [798]

that's [100]
the Presidentially-appointed [1]
64/9
their [10]   36/20 49/10 53/19
55/1 77/15 78/20 90/11 93/14
112/4 132/13
them [55]
themselves [2]   9/6 53/25
then [72]
there [124]
there's [6]   22/18 33/8 35/3
77/15 114/16 118/5
thereafter [4]   37/3 39/10 63/2
63/5
therefore [2]   35/6 104/6
these [39]
they [68]
they're [1]   64/7
they've [1]   60/3
thin [1]   10/24
thing [11]   3/9 6/13 11/18
27/14 47/3 47/20 63/13 75/25
89/8 106/19 116/23
things [18]   5/19 9/23 10/8
14/17 16/20 18/11 27/15 47/6
51/19 54/14 55/12 66/18 81/19
81/22 86/7 96/6 107/20 114/9
think [71]
thinking [1]   10/11
third [3]   18/14 123/3 132/6
this [175]
thorough [3]   8/7 17/24 22/15
thoroughly [3]   7/22 16/25
17/17
those [61]
thou [1]   104/11
though [4]   31/11 69/16 101/5
115/25
thought [20]   15/9 15/15 16/8
20/11 20/13 33/11 35/13 46/22
46/24 52/8 70/16 70/19 70/20
70/23 71/1 71/9 73/12 85/12
96/4 96/25
thousand [1]   45/10
three [15]   7/3 7/5 7/12 9/1
9/2 18/21 22/21 63/8 72/19
72/19 75/1 98/19 110/5 131/10
132/10
three-judge [1]   132/10
through [17]   11/2 11/8 11/15
22/7 23/3 23/6 23/9 35/20 39/4
39/5 40/21 63/10 79/17 92/14
106/17 107/4 129/24
throughout [1]   32/3
Thursday [4]   1/6 105/13 105/18
106/7
time [71]
timeframe [1]   78/21
timeline [1]   68/15
times [12]   31/24 32/14 32/16
33/7 33/12 34/6 34/13 34/16
40/2 40/6 78/13 78/19
today [3]   15/15 26/23 91/21
together [3]   41/4 61/24 114/23
told [46]
Tom [3]   41/23 41/24 42/9
tomorrow [2]   105/3 105/3
tone [2]   41/8 41/9
too [2]   5/10 104/12
took [23]   14/17 14/18 15/1
21/5 21/7 25/5 74/16 77/25

75/2 75/7 91/17 92/6 92/16
93/3 93/4 93/22 94/14 94/19
97/23 112/14 113/12 121/23
top [8]   6/12 10/23 10/25 11/8
11/19 100/8 101/10 101/11
torn [3]   109/5 109/7 117/18
total [5]   6/1 12/19 12/20
12/20 12/25
totally [1]   4/2
touch [2]   41/17 41/19
touched [1]   56/12
toward [2]   14/9 38/10
traceable [2]   123/3 123/4
track [1]   95/25
Tracy [1]   7/8
traffic [1]   68/5
trafficking [3]   66/24 67/1
68/5
trained [1]   29/9
trainer [8]   26/8 26/12 26/18
26/24 28/2 29/2 29/5 34/3
training [2]   80/19 80/22
transactions [4]   122/16 122/18
122/19 122/20
transcribe [1]   129/8
transcribed [1]   119/8
transcript [4]   1/10 2/24
118/14 135/4
transcription [1]   2/24
transcripts [1]   119/7
transferred [1]   4/7
transported [1]   83/11
Trenbolona [1]   12/15
trial [7]   1/10 32/3 36/21
60/10 69/20 131/25 132/11
tried [3]   102/15 105/4 109/22
tries [1]   33/15
trouble [2]   44/20 60/14
true [17]   26/13 28/8 31/23
48/3 48/19 51/5 51/7 51/17
54/12 59/8 60/6 60/11 74/13
74/15 103/4 108/7 109/20
truly [1]   114/8
truth [14]   43/20 44/19 48/9
48/12 58/1 59/11 59/21 59/21
59/25 60/5 60/7 60/9 60/13
73/8
truthful [2]   56/7 60/3
truthfully [1]   130/11
try [22]   5/9 6/12 17/8 18/12
29/17 29/25 30/12 41/4 47/11
56/12 77/5 78/21 95/6 104/3
104/6 113/21 119/10 120/7
124/4 131/24 132/2 132/17
trying [16]   22/14 35/7 40/5
47/13 51/10 52/11 53/22 60/3
104/9 105/20 109/23 109/24
111/5 129/23 131/22 131/25
Tuesday [4]   105/9 106/3 131/12
132/7
turn [4]   71/13 119/1 120/7
129/6
turned [7]   9/23 81/15 118/1
119/14 119/20 120/25 122/4
TV [3]   24/23 108/16 108/18
two [36]
type [4]   12/3 19/14 20/23
126/25
types [3]   19/23 20/15 119/22
typically [1]   10/20

**U**

ultimately [3]   31/23 36/11
 92/6
uncommon [1]   122/23
under [14]   17/14 20/8 20/10
 23/11 23/13 23/14 23/17 23/23
 26/25 52/16 64/6 64/22 108/16
 114/19
underneath [2]   102/4 102/19
understand [14]   11/4 30/10
 32/24 39/3 51/10 74/8 77/13
 98/6 100/9 105/21 115/10
 115/14 121/13 126/4
understanding [7]   44/18 52/17
 64/7 90/21 94/18 101/17 107/9
understands [2]   13/24 81/17
understood [3]   6/14 89/20
 94/20
UNITED [9]   1/1 1/3 1/11 1/16
 41/20 45/19 46/1 64/4 73/16
University [2]   4/5 4/7
unless [4]   22/4 44/5 54/4
 64/18
unlike [1]   37/15
unrelated [1]   51/14
unseal [1]   33/16
unsealed [1]   33/21
unseals [1]   34/15
until [15]   7/19 38/2 83/7
 83/17 99/8 103/17 103/21
 104/21 105/8 105/18 106/6
 106/12 126/20 127/7 131/11
untorn [1]   108/8
unusual [1]   54/21
up [50]
upon [14]   13/23 58/23 77/11
 84/17 85/24 87/14 87/15 87/19
 87/24 105/22 115/15 123/21
 126/13 126/14
upper [3]   18/13 19/6 24/10
UPS [1]   109/23
upset [1]   34/14
us [17]   2/3 6/12 10/5 14/9
 17/20 17/24 20/8 28/12 32/10
 32/20 45/11 47/10 60/14 88/4
 112/23 117/16 121/4
use [11]   13/20 14/3 14/8 41/8
 46/15 46/18 46/21 69/17 69/17
 95/24 119/3
used [6]   26/17 44/4 44/10
 44/12 69/2 114/23
user [4]   13/25 47/18 47/21
 68/4
users [7]   32/1 34/7 123/24
 124/2 124/11 124/17 124/20
using [6]   28/5 28/10 34/13
 48/16 123/24 124/12
USPS [3]   18/24 19/8 21/25
usual [1]   47/21
usually [2]   69/2 69/16

**V**

vague [2]   20/16 51/13
various [1]   10/8
Verizon [3]   21/25 25/1 25/2
version [1]   90/11
very [17]   7/21 7/21 10/24
 14/25 25/8 36/18 41/10 65/20
 93/1 100/14 110/16 123/4 124/9
 127/24 130/24 131/3 131/17
Veterinary [1]   9/15

vial [10]   9/15 9/20 9/25 10/6
 10/17 10/17 10/20 10/25 11/7
 98/22
vials [9]   9/17 12/21 12/25
 13/1 13/10 13/14 19/9 101/6
view [2]   18/4 130/3
violated [1]   60/6
violation [6]   57/3 57/12 57/12
 57/20 58/16 59/18
Virginia [1]   106/8
visit [1]   79/16
voice [5]   40/15 40/18 41/8
 41/9 120/13
voluntarily [1]   41/11
volunteer [1]   41/11
volunteered [3]   27/3 27/7
 91/15
vouched [1]   46/7

**W**

W-I-N-S-T-R-O-L [1]   12/14
wait [2]   45/12 85/8
waited [1]   39/18
walk [1]   53/12
walked [4]   85/2 90/5 93/11
 107/15
WALTON [1]   1/11
want [39]
wanted [17]   33/11 33/19 38/25
 41/6 41/10 52/25 60/25 70/10
 71/4 71/10 73/6 77/1 95/8
 97/13 97/17 103/21 130/8
wants [1]   34/19
Ward [3]   43/4 43/7 72/8
warned [1]   57/2
warrant [44]
warrants [2]   17/11 67/13
was [414]
was telling [1]   70/22
was thinking [1]   10/11
Washington [4]   1/5 1/17 2/8
 71/25
wasn't [26]   3/14 7/25 16/9
 21/18 30/11 44/24 45/2 46/19
 46/20 47/1 48/13 48/13 53/15
 60/12 62/24 66/25 70/12 70/23
 76/8 76/9 76/10 78/4 87/7
 101/18 123/12 126/11
water [1]   25/2
way [41]
ways [1]   104/8
we [181]
we'd [2]   59/4 65/17
we'll [2]   38/20 55/23
we're [4]   68/15 71/21 71/21
 77/5
we've [2]   33/17 72/20
Wednesday [3]   105/11 106/5
 132/8
week [4]   106/1 111/9 111/11
 132/6
weekend [4]   124/5 128/24 129/9
 133/2
weeks [2]   131/24 132/4
well [70]
went [22]   4/5 4/16 4/22 43/22
 48/10 52/21 59/25 60/20 64/4
 67/25 72/2 72/3 72/4 79/17
 80/25 94/9 99/5 106/9 107/23
 108/6 132/16 132/18
were [126]

went [36] 21/16 23/4 23/17 30/9
 46/16 92/21 107/18 111/18
 130/4
West [2]   62/20 106/8
what [189]
what's [10]   5/1 10/17 11/20
 15/5 62/7 66/16 94/7 117/16
 118/21 121/10
whatever [9]   6/6 11/8 39/15
 44/3 45/14 51/17 62/6 77/18
 87/21
when [87]
where [27]   4/4 4/7 4/11 4/16
 5/9 11/1 32/20 33/13 41/24
 44/11 46/19 75/4 75/11 76/23
 76/25 79/19 79/23 80/2 80/6
 83/13 90/12 98/9 103/14 108/21
 112/12 112/20 118/6
whether [33]   13/25 14/2 23/17
 23/25 29/11 46/20 54/16 55/11
 56/7 56/11 57/23 57/24 59/2
 60/3 60/5 67/1 69/19 69/20
 72/10 84/15 85/25 87/13 91/3
 95/9 99/4 107/9 107/10 107/19
 108/23 112/14 114/16 123/13
 124/11
which [28]   13/7 13/13 16/6
 20/5 20/7 23/25 33/10 36/16
 47/4 57/18 65/25 68/13 69/1
 72/6 73/18 73/19 79/7 83/10
 100/23 101/12 101/13 111/24
 116/11 119/17 120/22 123/16
 126/21 129/17
while [3]   37/15 103/13 117/10
who [30]   21/20 23/24 26/11
 29/2 31/1 34/1 41/15 41/22
 43/2 46/1 47/13 47/17 47/18
 54/18 56/4 59/24 62/8 64/8
 66/22 71/24 72/15 104/18 105/2
 112/17 119/17 123/22 125/2
 125/8 128/21 129/4
who's [1]   64/12
whoever [2]   60/4 69/9
whole [7]   10/15 30/16 33/21
 34/9 59/11 59/21 113/9
whom [4]   64/21 84/6 90/9
 112/20
whomever [1]   16/11
why [21]   20/6 35/25 45/4 47/1
 50/6 53/13 53/16 57/17 69/14
 70/19 70/22 70/23 73/3 94/7
 94/22 94/23 121/15 121/19
 123/2 125/13 129/6
wife [3]   6/19 25/1 131/15
will [56]
WILLIAM [1]   1/6
willing [1]   32/10
winning [1]   115/2
Winstrol [2]   12/14 12/16
wired [1]   129/10
Wireless [1]   25/1
wish [1]   131/19
within [11]   11/3 32/5 63/8
 89/17 89/18 89/24 91/14 92/3
 93/23 94/9 126/2
without [8]   13/17 41/2 67/4
 104/9 108/11 120/9 130/14
 130/21
witness [21]   7/19 22/4 32/10
 34/20 36/24 44/4 44/25 48/6
 48/11 48/21 56/3 58/13 60/2
 73/5 82/9 93/14 114/3 114/7

## W

witness... [3]   117/7 128/14
 131/7
witnesses [3]   131/11 131/20
 134/2
woman [1]   76/17
won't [4]   54/22 87/5 101/4
 105/25
wondered [1]   101/21
Wong [1]   7/8
word [9]   14/8 18/17 59/3 62/4
 68/5 95/6 95/24 107/7 109/5
words [2]   39/19 52/24
work [3]   17/11 23/21 129/21
working [6]   38/1 61/24 64/21
 71/14 80/17 118/20
world [3]   21/10 50/6 94/22
would [99]
wouldn't [10]   17/13 23/17 29/6
 43/20 43/22 44/20 48/4 48/8
 84/25 100/14
write [2]   96/4 103/8
writing [2]   114/9 126/18
written [5]   28/3 34/16 42/18
 79/10 122/12
wrong [4]   34/7 39/22 63/16
 79/23
wrongly [2]   51/4 96/4
wrote [4]   96/4 103/11 103/13
 126/17

## Y

y'all [12]   14/16 25/14 43/20
 48/13 52/20 57/4 57/7 58/9
 61/19 61/24 108/18 112/14
Yankees [3]   33/2 80/14 125/18
yeah [24]   5/23 5/23 31/18
 45/24 51/13 59/6 61/5 62/13
 63/8 63/23 67/10 69/19 73/16
 75/13 79/25 82/18 85/23 86/2
 90/13 95/18 100/5 100/6 109/5
 114/15
year [11]   4/6 4/17 6/20 33/17
 36/22 39/11 39/18 45/5 66/23
 70/5 80/14
years [9]   4/6 5/6 7/23 22/9
 22/17 24/3 25/15 88/14 88/22
yes [167]
yesterday [3]   25/9 30/21
 131/22
yet [3]   70/5 126/19 133/1
York [12]   41/25 42/9 71/25
 75/6 80/12 80/17 80/21 83/9
 108/2 108/4 132/22 132/23
you [920]
you ask [1]   94/22
you'll [2]   18/13 56/10
you're [20]   20/2 24/16 29/7
 29/7 29/8 30/9 40/5 45/12
 53/18 54/17 54/18 60/2 60/14
 60/24 64/18 69/19 69/19 74/1
 74/4 77/6
you've [2]   58/18 59/3
Young [4]   7/5 61/23 72/18
 76/18
your [121]
yours [2]   29/21 88/16
yourself [10]   16/16 42/21
 45/17 45/22 58/23 62/10 69/22
 84/24 102/11 113/25

## Z

Ziploc [3]   88/5 89/17 97/13